# HEARING TRANSCRIPT

```
 1                    JAMS ARBITRATION

 2

 3   - - - - - - - - - - - - - - - - - x
                                       :
 4   TIMOTHY SKRYNNIKOV,                :
                                       :
 5          Claimant,                   : Reference No.
                                       :
 6     v.                               : 1410006294
                                       :
 7   FEDERAL NATIONAL MORTGAGE          :
                                       :
 8   ASSOCIATION (FANNIE MAE)           :
                                       :
 9          Respondent.                 :
                                       :
10   - - - - - - - - - - - - - - - - - x
11                      Volume 1
12                      Tuesday, July 22, 2014
13                      JAMS
14                      555 Thirteenth Street, N.W.
15                      Suite 400
16                      Washington, D.C.  20004
17
18        The arbitration in the above-entitled matter
19   convened, pursuant to notice, at 9:46 a.m.
20
21   BEFORE:
22              HONORABLE DENNIS M. SWEENEY
```

## Page 2

1  APPEARANCES:
2  On behalf of the Claimant:
3     MARY KUNTZ, ESQ.
       S. MICAH SALB, ESQ.
       Lippman, Semsker & Salb, LLC
4     7979 Old Georgetown Road, Suite 1100
       Bethesda, Maryland  20814
5     (301) 656-6905
6     mkuntz@lsslawyers.com
       msalb@lsslawyers.com
7
       Also Present:  TIMOTHY SKRYNNIKOV, Claimant
8
9  On behalf of the Respondent:
10    DAMIEN G. STEWART, ESQ.
       Fannie Mae
11    3900 Wisconsin Avenue, N.W.
       Washington, D.C.  20016-2892
12    (202) 752-7000
       damien_g_stewart@fanniemae.com
13
       WILLIAM G. MIOSSI, ESQ.
14    MARY M. LENAHAN, ESQ.
       Winston & Strawn, LLP
15    1700 K Street, N.W.
       Washington, D.C.  20006-3817
16    (202) 282-5661
       wmiossi@winston.com
17    mlenahan@winston.com
18  Also Present:  KRISTIN DeMENT HARRISON,
                      Corporate Representative
19
20
21
22

## Page 3

1              C O N T E N T S
2  WITNESS        DIRECT  CROSS  REDIRECT  RECROSS
3  Kristin DeMent
4  Harrison      7    --    --    --
5  Timothy
6  Skrynnikov    51   178   250   --
7
8
9              E X H I B I T S
10  JOINT EXHIBIT       MARKED       RECEIVED
11  Nos. 1 through 86   (Previously)      5
12
13
14
15
16
17
18
19
20
21
22

## Page 4

1              P R O C E E D I N G S
2       JUDGE SWEENEY:  Counsel, first of all, do you
3  want to identify yourselves for the record.
4       MS. KUNTZ:  Mary Kuntz, representing Timothy
5  Skrynnikov.
6       MR. SALB:  Micha Salb, joining Ms. Kuntz.
7       JUDGE SWEENEY:  And the claimant, would you
8  identify yourself, sir, for the record here.
9       MR. SKRYNNIKOV:  Timothy Skrynnikov.
10       JUDGE SWEENEY:  And then over here on this
11  side?
12       MR. STEWART:  Damien Stewart with Fannie Mae.
13       MR. MIOSSI:  Bill Miossi for Fannie Mae.
14       MS. LENAHAN:  Mary Lenahan for Fannie Mae.
15       MS. HARRISON:  Kristin Harrison, Fannie Mae.
16       JUDGE SWEENEY:  And Ms. Harrison is the
17  corporate representative; is that correct?
18       MR. STEWART:  Yes.
19       JUDGE SWEENEY:  Let me just go over a few
20  things that I understand, Counsel, and tell me if I'm
21  correct.
22       First of all, I assume there's going to be a

## Page 5

1  rule on witnesses during this arbitration; is that
2  correct?
3       MR. STEWART:  Yes.
4       MR. MIOSSI:  Yes.
5       JUDGE SWEENEY:  All right.  And second is I
6  have received two volumes here of exhibits labeled
7  Joint Exhibits 1 through 86; is that right?
8       MS. KUNTZ:  Yes, that's right.
9       JUDGE SWEENEY:  It's my understanding that
10  these exhibits have been jointly prepared by the
11  parties and that it is the understanding and
12  stipulation of the parties in this case that Exhibits
13  1 through 86 will be in evidence for purposes of this
14  arbitration by joint agreement and stipulation; is
15  that correct?
16       MS. KUNTZ:  That's correct, Your Honor.
17       MR. MIOSSI:  Yes, it is.
18       JUDGE SWEENEY:  Okay.  So those Exhibits 1
19  through 86 will be in evidence for purposes of this
20  arbitration.
21            [Joint Exhibit Nos. 1 through 86
22            were received in evidence.]

Arbitration Day 1                                July 22, 2014

Washington, D.C.

## Page 6

1      JUDGE SWEENEY:  I think that is all the
2  things that I need to put on the record at this
3  juncture.  If there's anything else that -- oh, and I
4  think we also agreed that there would not be opening
5  statements, and both parties have submitted pretrial
6  submission statements, which were very useful, and
7  the arbitrator has read the prehearing statement and
8  found them to be very helpful and useful in getting
9  the background in this matter.
10     So with that, I think we can begin with the
11  claimant's presentation, the claimant's evidence.
12     MS. KUNTZ:  Thank you.  We call Kristin
13  DeMent Harrison.
14     JUDGE SWEENEY:  Ms. Harrison, if you want to
15  come to the stand over here.
16     Whereupon,
17           KRISTIN DeMENT HARRISON,
18         was called to testify and, having
19     first been duly sworn by the Notary Public, was
20         examined and testified as follows:
21
22     JUDGE SWEENEY:  Please be seated.  If you

## Page 7

1  would, would you state your name and business
2  address, please.
3      THE WITNESS:  Kristin Harrison, 4000
4  Wisconsin Avenue, Northwest, Washington, D.C.  20016.
5      JUDGE SWEENEY:  All right.  Ms. Harrison,
6  it's going to be important that everybody in this
7  room be able to hear you.  I am right on the verge of
8  not being able to hear you.  So if you could just
9  keep your voice up and talk as loud as you can.
10     THE WITNESS:  Okay.
11     JUDGE SWEENEY:  All right.  Go ahead.
12           DIRECT EXAMINATION
13  BY MS. KUNTZ:
14     Q.  Ms. Harrison, was there a time at Fannie
15  Mae when Tim Skrynnikov reported to you?
16     A.  Yes.
17     Q.  Can tell me when you became his
18  supervisor?
19     A.  I believe November 2008.
20     Q.  Can you tell me when you stopped being
21  his supervisor?
22     A.  When he left Fannie Mae, June of '09.

## Page 8

1      Q.  Is it your understanding that he left
2  Fannie Mae in June of 2009?
3      A.  That's when he didn't return back to
4  work.  So June or -- it was the end of June or the
5  beginning of July was the last time that he reported
6  to Fannie Mae.
7      Q.  So is it your position that he was no
8  longer an employee of Fannie Mae in July of 2009?
9      A.  No.  He just never returned.
10     Q.  I see.  My question is were you his
11  supervisor after July of 2009 when he went on FMLA
12  leave?
13     A.  Yes.
14     Q.  You were his supervisor?
15     A.  Until I moved on to a new position.
16     Q.  And when was that?
17     A.  I believe in September of 2009.
18     Q.  Okay.  Could I ask you to look at
19  Exhibit 64, please.
20     A.  Okay.
21     Q.  Does that refresh your memory?
22     A.  No.  I mean, it looks like a form, but I

## Page 9

1  don't think I filled it out or anything.
2      Q.  Do you know what this form is?
3      A.  It looks like a cost center and manager
4  change in the system.
5      Q.  Okay.  And do you see your name there?
6      A.  Yes.
7      Q.  And what is to the left of your name
8  there?
9      A.  Old manager name.
10     Q.  And on the line below, could you read
11  what is below your name?
12     A.  Lori Mallon.
13     Q.  And to the left of Lori Mallon?
14     A.  New manager name.
15     Q.  Do you have any understanding what this
16  form indicates?
17     A.  Probably, when I moved to my new
18  position, that Tim would transfer to Lori.
19     Q.  Okay.  So it indicates that for Employee
20  Tim Skrynnikov that you had ceased to be his manager
21  on the 27th of September of 2009; is that correct?
22     A.  Yes.

3  (Pages 6 to 9)

Page 10

1      Q.   Now, during the period you were
2   supervising Mr. Skrynnikov, how many direct reports
3   did you supervise?
4      JUDGE SWEENEY:  How many what?
5      MS. KUNTZ:  Direct reports.
6   BY MS. KUNTZ:
7      Q.   How many subordinates did you have?
8      A.   I believe it was Tim, Lourdes, and a
9   contractor.
10     Q.   Did you have other direct reports who
11  were senior financial analysts?
12     A.   I believe Lourdes Alcalde was.
13     Q.   Now, did there come a time when Mr.
14  Skrynnikov spoke to you about his view that the file
15  of executive incentive compensation should be
16  password protected?
17     A.   I don't recall.
18     Q.   You don't recall a conversation soon
19  after the conservatorship at Fannie Mae began when
20  Tim expressed his concern that the file of executive
21  incentive compensation needed to be less easily
22  available?

Page 11

1      A.   No.
2      Q.   You don't recall a conversation with Mr.
3   Skrynnikov about the AIG executive compensation and
4   the interest that the Congress had shown in it --
5      A.   No.
6      Q.   -- and it's implications for Fannie Mae
7   executive incentive compensation?
8      A.   No.
9      Q.   Do you recall a discussion with Mary
10  Martin or Sean Delaney about password protecting the
11  file of executives and their incentive compensation
12  targets?
13     A.   No.
14     Q.   Do you recall telling Tim that he was a
15  troublemaker for raising this issue?
16     A.   No.
17     Q.   Do you -- as a supervisor, do you have a
18  duty to make sure your employees have access to
19  Fannie Mae policies?
20     A.   Every employee has access to Fannie Mae
21  policies.
22     Q.   How do they have access to Fannie Mae

Page 12

1   policies?
2      A.   Through our COPPER system.
3      Q.   And what is the COPPER system?
4      A.   A records retention software system that
5   we use to house all of our policies and procedures.
6      Q.   And how do employees have access to the
7   COPPER system?
8      A.   Through their generic log-in to the
9   system.  When they log in to their computer, they
10  have a --
11     JUDGE SWEENEY:  Is the word "Copper".
12     THE WITNESS:  It's an acronym, C-O-P-P-E-R.
13     JUDGE SWEENEY:  Okay.  Go ahead.
14  BY MS. KUNTZ:
15     Q.   So is the Fannie Mae -- so are the
16  policies only available electronically?
17     A.   Unless you print them.
18     Q.   There's no printed employee handbook?
19     A.   Not that I'm aware of.
20     Q.   So have any of your direct reports ever
21  taken FMLA leave before Tim Skrynnikov?
22     A.   No.

Page 13

1      Q.   Now, Tim's job, when you were
2   supervising him, included updating the business
3   segment allocation report?
4      A.   Correct.
5      Q.   And one component of that required him
6   to update the executive incentive compensation report
7   each month?
8      A.   He didn't update the executive
9   compensation report.
10     Q.   Okay.  Did he have anything to do with
11  that report?
12     A.   I don't know what report you're talking
13  about.
14     Q.   Okay.  Could I ask you to look at
15  Exhibit 29, please.
16     A.   Okay.
17     Q.   Can you tell me what this is?
18     A.   This is a business segment allocation
19  report based on the full year forecast.  It's for, it
20  looks like, Q-1 of 2009.
21     Q.   And is this the report that Mr.
22  Skrynnikov was responsible for updating?

4 (Pages 10 to 13)

Page 14

1    A.   Yes.

2    Q.   Okay.  And in order to update this
3 report, what steps did Mr. Skrynnikov have to take?

4    A.   Can you be more specific?

5    Q.   I'm asking you what steps he had to
6 take.  Can you outline those steps?

7    A.   He would run through a process that
8 would import numbers into our PeopleSoft financial
9 system that would run through a calculation, and then
10 an output would come and he would manipulate that
11 data to go into an Excel-based report.

12    Q.   And would he do this manipulation for
13 each line in this business segment report?  Was there
14 a separate set of calculations done for, say, the
15 business and development technology under direct
16 specific allocation, for example?

17    A.   The system would compute it at that
18 level.

19    Q.   But he would access what the system had
20 computed to plug it into this?

21    A.   Yes, as output.

22    Q.   In January of 2009, was this fully

Page 15

1 automated?  Was this report --

2    A.   The report is not automated.  The
3 calculations that feed into the report was automated.

4    Q.   Okay.  And so what part did the human
5 updating this report have to play?

6    A.   There's balances and -- checks and
7 balances.  There's making sure that the information
8 that goes into the system to ensure the calculations
9 are running correctly are done so correctly.  Then
10 when the information comes out of the system, the
11 organization of the report requires a lot of manual
12 interaction.

13    Q.   Now, on this business segment report,
14 under the second category, and the third category is
15 the line item "Incentive Compensation".

16    A.   Yes.

17    Q.   Is that correct?

18    A.   Yes.

19    Q.   Now, what calculations had to be done to
20 update those lines in this report each month?

21    A.   Depending on -- so each line on here is
22 a division.  So depending on the division, incentive

Page 16

1 compensation would provide a percentage of how their
2 business was allocated to the three titles that you
3 see at the top of the page, CM for Capital Markets,
4 HCD for Housing and Community Development, or
5 multifamily, and then SF for Single Family.

6    Q.   Okay.  Could I ask you to look at
7 Exhibit 17, please.

8        Ms. Harrison, have you seen this document
9 before?

10    A.   Yes.

11    Q.   What is this document?

12    A.   It looks like old instructions on the
13 division incentive compensation and how they would
14 allocate their costs out to those divisions that I
15 just went over.

16    Q.   And are these instructions for how the
17 person updating the business segment report would
18 work on the executive incentive compensation part of
19 that report?

20    A.   I don't remember if this was still used
21 at the time, but it's instructions on the allocation
22 methodology.  So that's all I can attest to.

Page 17

1    Q.   Okay.  And it is a methodology that was
2 used for the business segment report; you're just not
3 able to testify when it was used?

4    A.   Correct.  This says 2007.  So I don't
5 know if it was updated.  I don't know if it was put
6 to bed and another allocation methodology was used.

7    Q.   Do you know what methodology was in use
8 when you were supervising the process?

9    A.   I don't remember.

10    Q.   Could I ask you to look at Exhibit 18,
11 please, with all apologies for how hard it is to
12 read.  Have you seen this before?

13    A.   Yes.

14    Q.   What is it?

15    A.   It's a file that looks -- it's a file
16 that was created by Janet Skoll, who was in the
17 position prior to my role in this group, and it has
18 the title "Executive Compensation Allocation" for
19 people in the company.

20    Q.   And what are we looking at in the file?
21 Can you tell me?  There seems to be names over on the
22 left.

Arbitration Day 1                                    July 22, 2014
                    Washington, D.C.

## Page 18

1      A.   There are names of Level 6s and 7s.
2      Q.   What is a Level 6 and 7?
3      A.   They used to be our director, would be a
4  Level 6, and the officer level would be Level 7.
5      Q.   So these are high-level executives?
6      A.   Middle management.
7      Q.   And what else can you tell me about
8  this?
9      A.   It looks like this is their allocation
10  of how they would -- how they would spread their
11  target bonuses to the business segment allocation
12  file that we just looked at.
13      Q.   How they would spread it.  Who is they?
14      A.   Incentive Compensation is a division in
15  the company.  So they would provide our team with a
16  methodology on if you sat in "X" cost center, did you
17  support HCD, multifamily, single family, what portion
18  of your compensation should be attributed to that,
19  because everyone's compensation was spread back to
20  the lines of business.  It wasn't sitting at the top
21  of the house.
22      Q.   And is that what an allocation is;

## Page 19

1  you're allocating to the different divisions?
2      A.   No.  To the business lines.
3      Q.   To the business lines?
4      A.   Yes.
5      Q.   Thank you.  Now, you said that Janet
6  Skoll prepared this report?
7      A.   It has her name as "created by", I think
8  it says at the top.
9      Q.   Was she responsible for the executive
10  incentive updating monthly as part of the business
11  segment allocation report?
12      A.   I don't remember what her role was.  I
13  think she was in the group prior to Tim being in the
14  group, but I don't know.
15      Q.   Isn't it true that Tim took over her job
16  in updating the executive incentive compensation
17  file?
18      A.   I don't remember.
19      Q.   But you did supervise Tim?
20      A.   I supervised Tim, yes.
21      Q.   Now, in order to prepare this report,
22  the person updating the executive incentive

## Page 20

1  compensation had to access confidential information
2  about executive compensation, didn't he?
3      A.   The only thing that's confidential may
4  have been around targets, but this is not
5  compensation.
6      Q.   So explain to me what was confidential
7  about the targets.
8      A.   I don't know if it was broadcast around
9  what targets were for -- other than the senior vice
10  presidents that were published in our 10-K, I don't
11  think compensation is widely spread as something that
12  you would know around the company.
13      Q.   And this isn't just straight salary
14  compensation; this is bonus or incentive
15  compensation.  Correct?
16      A.   Yes.  This has nothing to do with
17  salary.
18      Q.   And when you say that these are targets,
19  what do you mean?
20      A.   If you look on the column that has
21  bonus, they all have the same number except for when
22  you get to the officer level.

## Page 21

1      Q.   So are you saying -- how can you tell
2  we're at the officer level?  Can you tell me what
3  column it is?
4      A.   Sixes are directors and sevens are
5  officers.
6      Q.   And where is that indicated?
7      A.   Grade.
8      Q.   Okay.  Is that about six columns over
9  from the left?  Seven columns?
10      A.   Eight columns.
11      Q.   Okay.  Grade.  Then if we go over
12  another eight, nine columns, we get to the bonuses,
13  and your point is what, that it's the same for what
14  category?
15      A.   It looks like all of the sixes are the
16  same number and then there is differentiation between
17  the sevens, and I don't know if there was an eight or
18  not.
19      Q.   Right.  It's hard to read.
20      A.   Yeah.
21      Q.   Okay.  And what is your point with
22  respect to the targets, about the differentiation of

6 (Pages 18 to 21)

**Page 22**

1    or the sameness of these numbers?

2       A.  You asked why I thought they were

3    targets.  I said because they were the same number

4    across the board.

5       Q.  Okay.  And that indicates to you that

6    they're targets.  Targets for what?  Explain to me

7    what they're targets for.  What does it mean that you

8    are calling them targets?

9       A.  I don't know.  Maybe a max that they

10   could get paid out.  I don't know.  It's just their

11   methodology on what they were putting aside from a

12   budgeting purpose.

13      JUDGE SWEENEY:  So it's like an allocation;

14   is that what you're saying?

15      THE WITNESS:  Yeah.  So if you set your

16   budget at a million dollars and you had ten people

17   that you were allocating your million dollars to, you

18   could do it pro rata, a hundred million each or

19   whatever.  A hundred thousand.  Bad math.  Sorry.

20      JUDGE SWEENEY:  But everybody that's a six is

21   at the 125 level is what you're saying?

22      THE WITNESS:  Yeah.  On this sheet, yeah, but

**Page 23**

1    then there's different levels of officers.  Even

2    though they have the same number, it could be tenure

3    based.  It could be role based.

4       If you read their title, there's some

5    differentiation in what their responsibilities would

6    be and that would probably set them apart.

7    BY MS. KUNTZ:

8       Q.  Now, you don't sound like you know very

9    much about what these targets are doing.  Do you have

10   any knowledge from either your own experience or from

11   people who work for you, now or in the past, about

12   these bonus allocations?

13      A.  No.

14      Q.  Are you at a director level?

15      A.  I am, yes.

16      Q.  Do you receive a bonus allocation now?

17      A.  Yes.

18      Q.  And how does that work?  Is it set as a

19   target?

20      A.  Yes.  There's a range of what your max

21   target could be, but you could still get paid above

22   and beyond that number or percentage.

**Page 24**

1       Q.  You could get paid above that?

2      A.  Above or below, depending on your

3    performance.

4      Q.  So but you're saying that this is not

5    confidential information.  Would this be available on

6    the Fannie Mae internet?

7      A.  I said that one piece that looks

8    confidential is probably the target or the bonus line

9    item.  Other than that, the employee I.D. is part of

10   your personal identification within the company.

11   It's on your badge.  So, technically, you can see

12   that information.

13      Q.  But this is a report about incentive

14   compensation.  So it's about those bonus numbers.

15   Doesn't that mean that this report would in itself be

16   valuable as confidential information?

17      A.  Sure.  Yes.

18      Q.  Did you password protect this report?

19      A.  I don't remember.  I don't remember this

20   report myself.  So it's not my name on the file.

21   It's not Tim's name on the file either.

22      Q.  So let me be clear that I'm using this

**Page 25**

1    report as an example and I'm asking you questions

2    about this report generally.  While you were

3    supervising Tim, did you ever see a report like this?

4      A.  I believe so.

5      Q.  Okay.  And in what context did you see

6    that report?

7      A.  I don't understand the question.

8      Q.  Was it in the context of doing your

9    duties or did you find it lying about in the

10   lunchroom or exactly where did you see this report?

11      A.  In the duties.

12      Q.  And for what purpose did you see the

13   report?  Why did it come across your desk?

14      A.  Well, if this -- I can't attest to the

15   allocation methodology on this report, but if

16   incentive compensation was spread using this type of

17   methodology, this would have been a feeder or

18   background information into the business segment

19   allocation report, which you just showed me.

20      Q.  I see.  So this would be information

21   that would underlie the information that would go

22   into the business segment allocation report?  Is that

Arbitration Day 1                                                July 22, 2014
Washington, D.C.

Page 26

1  what you mean by feeder?
2       A.  Yes.
3       Q.  So in order to update the business
4  segment allocation report, it would be necessary to
5  update this report?
6       A.  If this was the allocation methodology,
7  yes.
8       Q.  And so if this were not the exact
9  allocation method, there would have been some
10  allocation method; is that true?
11       A.  Yes.
12       Q.  And there would have been a report that
13  would have specified that allocation method; is that
14  true?
15       A.  Yes.
16       Q.  And because that would have been
17  necessary as a feeder document to the business
18  segment allocation report?
19       A.  Well, it could have been at this level
20  of detail or it could have been a very high level of
21  detail.  Just like on the other report which is a
22  business segment allocation, each division had their

Page 27

1  own methodology of how their costs were attributed to
2  the line of business that we went over.
3       Q.  So at some point in doing the
4  calculations, though, the bonus allocations have to
5  be assigned to the individual and the individuals to
6  their divisions?
7       A.  That is their methodology.  To get down
8  at a certain granular level of detail, you could
9  assume 20 percent of the individual supported single
10  family and 60 percent supported capital markets and
11  the other 20 percent to multifamily.
12       This is their choice of methodology on what
13  level of detail they wanted to use, but it's not
14  typical of any other organization to go down to
15  name-by-name level allocation methodology.
16       Q.  But if it does go down to a name-by-name
17  allocation, then we know exactly the individual and
18  what's been allocated to the individual; is that
19  correct?
20       A.  Hypothetically, you know because of
21  their title.  So that's why I go back to it's a
22  target.  It's not necessarily what the bottom line

Page 28

1  number is when we're looking at P&L statements.
2       Q.  What's a --
3       A.  Profit and loss statements.
4       Q.  And so it doesn't represent actual
5  payments to these executives?
6       A.  Correct.
7       Q.  Now, you spoke earlier about the Fannie
8  Mae policies being available on the Fannie Mae --
9       A.  COPPER.
10       Q.  -- COPPER.  Okay.  What else is
11  available on the Fannie Mae COPPER?
12       A.  Depending on what module you're in, you
13  could look at invoices, like accounts payable
14  invoices.  I don't use it anymore as far as other
15  than policies and procedures.
16       Q.  Do you get an update about things
17  happening at Fannie Mae on the internet?  Do you get
18  those by E-mail?
19       A.  It depends on the subject matter.
20       Q.  Okay.  What about Fannie Mae in the
21  news; do you get a sort of news clipping service
22  E-mail?

Page 29

1       A.  If you subscribe.
2       Q.  But that is available to employees?
3       A.  Yes.
4       Q.  Now, in March of 2009, Tim Skrynnikov
5  came to you to discuss Senator Grassley's request for
6  information on executive incentive compensation?
7       A.  No.
8       Q.  No or you don't recall?
9       A.  No.
10       Q.  You're confident of that?
11       A.  Confident.
12       Q.  So he didn't bring you copies of the
13  letter that Senator Grassley sent to Fannie Mae and
14  copies of the response given by FHFA on Fannie Mae's
15  behalf?
16       A.  No.
17       Q.  You're confident of that?
18       A.  A hundred percent.
19       Q.  And he didn't say that he was concerned
20  because of AIG that Fannie Mae had to report to the
21  Senator and that, in fact, it had reported only the
22  retention bonuses of approximately 71 million rather

8 (Pages 26 to 29)

Arbitration Day 1                                          July 22, 2014
Washington, D.C.

Page 30

1   than what was shown in the executive employee
2   incentive compensation reconciliation at
3   approximately 350 million?
4        A.   No.
5        Q.   Could we look at Exhibit 23, please.
6        JUDGE SWEENEY:  I'm sorry.  What number?
7        MS. KUNTZ:  23.
8   BY MS. KUNTZ:
9        Q.   Have you seen this report before?
10       A.   Yes.
11       Q.   What is it?
12       A.   It's entitled the "Employee Incentive
13  Compensation Expense Reconciliation Year-to-Date
14  Expense" for a specific general ledger account,
15  6111-75.
16       Q.   And listed on the left, the programs,
17  what are these programs?
18       A.   They are a variety of different programs
19  that are managed by the Employee Incentive
20  Compensation Division.
21       Q.   Okay.
22       A.   From cash, stock.  We had gift cards.

Page 31

1   It's called Accrual Rewards, pension, retirement,
2   life insurance.  It's all on the left-hand side.
3        Q.   Okay.  So and this is showing the
4   amount, the actuals or the accruals for these
5   accounts?
6        A.   If this reconciles to the general
7   ledger, it would be a combination of accruals --
8   whatever's on the general ledger.
9        Q.   So what goes on the general ledger?
10       A.   What goes on the general ledger?
11       Q.   Yes.
12       A.   Journal entries or estimates, actual
13  payments, receivables, accounts receivable, accounts
14  payable.
15       Q.   Now, did Tim at any time ever speak to
16  you about his concern that the response to Senator
17  Grassley's request for information was grossly
18  incomplete?
19       A.   No.
20       Q.   Did he ever speak to you about his
21  concern that the interest of the Congress in Fannie
22  Mae's compensation program put a particular burden on

Page 32

1   your office to protect this information?
2        A.   No.
3        Q.   Do you have access to your employees'
4   Outlook calendars?
5        A.   It depends on if they give you access.
6        Q.   In March of 2009, did you ask Mr.
7   Skrynnikov for access to his Outlook calendar?
8        A.   I don't know.
9        JUDGE SWEENEY:  I didn't hear your answer.
10       THE WITNESS:  I don't know.
11  BY MS. KUNTZ:
12       Q.   Did you have access to the Lourdes
13  Alcalde's Outlook calendar?
14       A.   I don't remember.
15       Q.   You had a meeting with Mr. Skrynnikov on
16  April 28th to discuss development goals; is that
17  true?
18       A.   I had many meetings on development goals
19  with Mr. Skrynnikov.
20       Q.   Do you remember one on April 28th?
21       A.   No.
22       Q.   Now, did you ever discuss with Mr.

Page 33

1   Skrynnikov a meeting at which you shouted at him and
2   threw things on a table?
3        A.   No.
4        Q.   Did you discuss a meeting of this sort
5   with anyone else at Fannie Mae?
6        A.   No.
7        Q.   Did you discuss a particularly vitriolic
8   meeting with Mr. Skrynnikov with Carrie Lee?
9        A.   No.
10       Q.   Did anyone from Fannie Mae Legal ever
11  ask you about a contention that an altercation with
12  you was the root cause of Mr. Skrynnikov's medical
13  condition?
14       A.   No.
15       Q.   At a meeting on July 1 when you
16  presented Mr. Skrynnikov with a written warning, do
17  you recall him objecting that your treatment of him
18  became substantially worse since the April 28th
19  meeting?
20       A.   No.
21       Q.   Now let me ask you to clarify.  Your
22  response on the April 28th meeting, is that one of

9 (Pages 30 to 33)

Page 34

1 not remembering it or being confident that it didn't
2 happen?
3     A.   I don't remember an April 28th meeting.
4     Q.   And you don't remember any subsequent
5 discussion of a contention that there was an April
6 28th meeting between you and Mr. Skrynnikov?
7     A.   No.  I had weekly meetings with Tim.
8     Q.   Did you have any subsequent discussions
9 with Carrie Lee about any particularly contentious
10 meeting with Tim Skrynnikov?
11     A.   No.
12     Q.   Now, in early May of 2009, you
13 instructed Mr. Skrynnikov to stop updating the
14 executive incentive compensation file, didn't you?
15     A.   I don't remember.
16     JUDGE SWEENEY:  Counsel, what did you say
17 what the date was?
18     MS. KUNTZ:  May of 2009.
19     JUDGE SWEENEY:  All right.
20 BY MS. KUNTZ:
21     Q.   Did you assign him different tasks at
22 that time?

Page 35

1     A.   He was assigned different tasks in, I
2 believe, January of '09.
3     Q.   And what were the tasks assigned in
4 January of '09?
5     A.   He picked up a few.  I think one was
6 called contractor head count or contractor
7 statistics.  It's in the development plan that I had
8 for him.  There were a couple other activities.
9     Q.   And can you talk about your rationale in
10 assigning those tasks to him?
11     A.   Because the business segment allocation
12 report was automated up front from the manual
13 processes with the exception of reporting piece of
14 it, he had some more bandwidth during specific weeks
15 of the month that he could pick up more as we were
16 picking up more responsibility on the team ourselves.
17     Q.   But let me return to May.  Did you make
18 special assignments, new assignments to him in May of
19 2009?
20     A.   I don't remember.
21     JUDGE SWEENEY:  I'm sorry?
22     THE WITNESS:  I don't remember.

Page 36

1 BY MS. KUNTZ:
2     Q.   When you spoke to Tim, when you
3 communicated with him about his work, did you do so
4 by E-mail?  Did you go to his desk?
5     A.   Both.
6     Q.   Where was your desk with respect to his?
7     A.   I believe across, across the row and
8 across the cube.  So I couldn't see him from my cube.
9     Q.   And you were in a cube?
10     A.   I believe so, yes.
11     Q.   Do you have any doubt about where you
12 were?
13     A.   I don't think so.  I don't know if I
14 moved during the timeframe, but I remember sitting in
15 a corner cube.
16     Q.   Would you E-mail him with assignments or
17 with questions?
18     A.   For follow-ups and -- yeah.  That would
19 be part of -- if I did it verbally, I'd also follow
20 up with E-mails as well.
21     Q.   Now, Ms. Harrison, on July 9th, you
22 received an E-mail from Tim Skrynnikov telling you

Page 37

1 that he was sick and that he would not be into the
2 office; is that right?
3     A.   I don't remember.
4     Q.   Could I ask you to look at Exhibit 47.
5     A.   Sure.
6     [Witness peruses exhibit.]
7     THE WITNESS:  Okay.
8 BY MS. KUNTZ:
9     Q.   Does that refresh your memory?
10     A.   Yes.
11     Q.   Now, he followed up later in the day by
12 notifying you and Carrie Lee that he was taking
13 emergency medical leave.
14     A.   Okay.
15     Q.   And can you explain to me why he
16 notified Carrie Lee?  Who is Carrie Lee?
17     A.   She's our H.R. business partner at the
18 time.
19     Q.   Had you instructed him to notify Carrie
20 Lee?
21     A.   No.
22     Q.   Would it surprise you to know that

Arbitration Day 1                                                July 22, 2014

Washington, D.C.

---

Page 38

1    Carrie Lee had recommended that he take FMLA leave?
2        A.   No.  I don't know.  I mean, I don't know
3    what the protocol was and what she instructed him to
4    do.
5        Q.   You had no discussion with Carrie Lee
6    about his taking FMLA leave?
7        A.   No.
8        Q.   You forwarded this E-mail string to Lori
9    Mallon.
10       A.   Yes.
11       Q.   Who is Lori Mallon?
12       A.   She was the director over myself at that
13   time.
14       Q.   So that would make her Tim's
15   second-level supervisor?
16       A.   Yes.
17       Q.   Why did you forward it?
18       A.   To let her know of his absence.
19       Q.   Was that your usual procedure when an
20   employee was out for a day?
21       A.   It didn't say a day.  It said -- if you
22   read what he wrote, it said he would further

---

Page 39

1    evaluated on July 17th.  So it was more than a day.
2        Q.   So was that your usual procedure?
3        A.   It was the first time for me.
4        Q.   Do you recall Lori Mallon's response?
5        A.   No.
6        Q.   Did you respond to Mr. Skrynnikov's
7    E-mail?
8        A.   I don't believe so.
9        Q.   You didn't send him any E-mail questions
10   about the work he was engaged in so that someone
11   could take it over?
12       A.   I don't believe so.
13       Q.   You didn't send him an E-mail letting
14   him know that his request for absence was approved?
15       A.   I don't think I ever E-mailed his
16   personal E-mail account.
17       Q.   What about his Fannie Mae E-mail
18   account?
19       A.   I don't believe I E-mailed him once he
20   said he was out sick.
21       Q.   When was your next communication with
22   Mr. Skrynnikov?

---

Page 40

1        A.   I didn't -- I don't think I communicated
2    with him at all.  Once he left, I don't remember any
3    conversation through E-mail or a conversation with
4    him.
5        JUDGE SWEENEY:  After --
6        THE WITNESS:  July.
7        JUDGE SWEENEY:  -- July 9th?
8        THE WITNESS:  Yes.
9    BY MS. KUNTZ:
10       Q.   But you did receive a phone message from
11   Mr. Skrynnikov on or about October 20th when he was
12   preparing to return to work following medical leave,
13   didn't you?
14       A.   I don't believe I received any
15   communication from Tim.
16       Q.   Now, you didn't speak with Tim, but you
17   continued to play a role in his FMLA leave, didn't
18   you?
19       A.   The only role was confirming that he had
20   not contacted Fannie Mae.
21       Q.   Did you terminate or give instructions
22   to terminate his access to the Fannie Mae intranet on

---

Page 41

1    or about July 9th?
2        A.   No.
3        Q.   How about E-mail; did you terminate or
4    give instructions to terminate his access to E-mail?
5        A.   No.
6        Q.   Did you discuss with anyone removing
7    these accesses from Mr. Skrynnikov?
8        A.   No.
9        Q.   Do you know why he was barred from
10   accessing his employee E-mail?
11       A.   I mean, I have been on FMLA before.  I
12   believe that's the policy, that they remove you from
13   having access.
14       Q.   So how is it an employee on FMLA leave
15   is supposed to access company policies if he didn't
16   have access to COPPER?
17       A.   HRBP or the H.R. rep or the H.R. Service
18   Center, which is an 800 number that you can call.
19       Q.   Now, while Tim Skrynnikov was out on
20   FMLA leave, you remained in communication with H.R.,
21   didn't you, regarding his leave?
22       A.   I was only asked if he had called,

---

Alderson Reporting Company
1-800-FOR-DEPO

Page 42

1    contacted us.  That was the only interaction we had.
2          Q.   Now, were you -- let's look at Exhibit
3    82, page 23.
4          A.   What page?  I'm sorry.
5          Q.   I'm sorry.  Page 23.
6          A.   Okay.
7          MR. MIOSSI:  Mary, which exhibit?  I didn't
8    hear you.
9          MS. KUNTZ:  Exhibit 82, page 23.  It's a long
10   exhibit, 124 pages.
11         MR. MIOSSI:  Thank you.
12   BY MS. KUNTZ:
13         Q.   Now, this is just one example in this
14   long exhibit expressing concern about Tim's
15   contention that his medical condition arose from an
16   altercation with his supervisor on April 28th.
17         A.   Okay.
18         Q.   And I'm happy to point to all the other
19   sections of this exhibit if that's necessary.  We'll
20   be visiting them later today.
21         My question to you is, simply, whether you
22   were questioned by anyone from H.R. about his

Page 43

1    allegation that there was an altercation with his
2    supervisor?
3          A.   I don't recall.
4          Q.   But you were his supervisor at the time?
5          A.   Yes.
6          Q.   You don't recall a conversation about an
7    altercation?
8          A.   I don't recall anyone asking me
9    questions.
10         Q.   You don't recall Madonna McGwin asking
11   you?
12         A.   No.
13         Q.   You don't recall Lisa Kober asking you?
14         A.   No.
15         Q.   What about Carrie Lee?
16         A.   No.
17         Q.   Would you look at the next page, please.
18         Now, I submit to you that this is a record
19   that was provided by Fannie Mae, but it comes from
20   the Reed Group that was working for Fannie Mae at
21   that time, and I'm asking you why your E-mail address
22   appears in the Reed Group's record on page 24 under

Page 44

1    the date 8-3-2009.
2          A.   I don't know.
3          Q.   Were you contacted by the Reed Group?
4          A.   I don't know.  The only contact I had
5    was through a mailbox, and it was an E-mail
6    communication asking if Tim contacted myself or Lori.
7          Q.   I'm sorry.  It was a communication
8    through what mailbox?
9          A.   It was some type of mailbox from H.R.
10   that would come out and ask us if we had
11   communication with Tim.
12         Q.   So turn back to the previous page, and
13   the header for this E-mail from Lisa Kober includes a
14   CC to STT-FMLA-Liaison Mailbox.  Is that the one that
15   was --
16         A.   Yeah.  I think that's -- I believe
17   that's the one that we would get E-mails from
18   requesting confirmation if Tim had contacted us.
19         Q.   And who else would get that?  You're
20   using a plural there.
21         A.   I don't know.  I've seen an exhibit with
22   the names on it before, but I recognize the name Lisa

Page 45

1    Kober, myself.  I think Carrie Lee would be on it as
2    well, but I'm not sure of all the participants in the
3    E-mail.  They're somewhere in the exhibits.
4          Q.   So are you testifying that no one at
5    Fannie Mae talked to you about the purported
6    altercation with Tim Skrynnikov's supervisor that
7    underlay his medical condition?
8          A.   Not that I remember.
9          Q.   You're testifying that you don't recall
10   it?
11         A.   I don't remember any conversation about
12   an altercation with Tim.
13         Q.   Could I ask you to look at page 52 of
14   this exhibit.  In the top E-mail, you are an
15   addressee and someone from Fannie Mae named Yvonne
16   Miller, and we can see she's from Fannie Mae because
17   her E-mail address is at Fannie Mae, is asking about
18   an estimated return to work date.
19         Do you know why you're copied on this?  You're
20   not copied on this.  It's addressed to you.  Do you
21   know why it's addressed to you?
22         A.   I'm assuming because I was his manager.

12  (Pages 42 to 45)

Arbitration Day 1                                                    July 22, 2014
Washington, D.C.

Page 46

1    Q.   Okay.  Did you have ongoing
2  communications with those who were handling Tim
3  Skrynnikov's leave?
4    A.   Only these E-mail that would confirm if
5  he contacted us.
6    Q.   When did you stop being his manager?
7    A.   The exhibit you showed an effective date
8  of September 27, 2009.
9    Q.   Okay.  Is there any reason to think that
10  date is wrong?
11    A.   I don't remember if it's in the system
12  that that was the effective date of my new position
13  or if that's the effective date that the transfer
14  actually happened in the system.  That's the official
15  record.
16    So, regardless, he didn't return to work after
17  the June-July timeframe.
18    Q.   Can you tell me why on, say, page 95 of
19  this exhibit, at the end of October, October 28th
20  when you were no longer Tim Skrynnikov's supervisor,
21  you're still receiving E-mails about him?
22    A.   I don't know why they addressed them to

Page 47

1  me.  I'm assuming because nobody had spoken to him.
2  So he wouldn't have known that I took a new position.
3    Q.   So Carrie Lee would have known that you
4  were no longer his supervisor?
5    A.   Yes.
6    Q.   But Carrie Lee sends this to you?
7    A.   Yes.
8    Q.   Do you know why?
9    A.   No.
10    Q.   Isn't it true that Carrie Lee is copying
11  you on this because you remained involved in Tim
12  Skrynnikov's employment through October even though
13  you were no longer his supervisor?
14    A.   No.  I don't know why she copied me.  So
15  I can't answer why she copied me.
16    Q.   But you are included in discussions
17  about Tim Skrynnikov's return to work, aren't you?
18    A.   Only from the E-mails asking has he
19  returned to work.  That was the only conversation
20  about Tim that we were having, did he contact you.
21  The answer would be no.  That was it.  That's all we
22  would have in the conversation.

Page 48

1    MS. KUNTZ:  Okay.  Thank you no further
2  questions.
3    JUDGE SWEENEY:  Is that everything you have?
4    MS. KUNTZ:  Yes.
5    JUDGE SWEENEY:  Okay.  Fine.
6    Counsel, any cross?
7    MR. MIOSSI:  I think we're going to hold
8  Kristin for our side of the case.
9    JUDGE SWEENEY:  Nothing at this time then?
10    MR. MIOSSI:  No.
11    Thanks, Kristin.
12    JUDGE SWEENEY:  Ma'am, you may go back to
13  where you were.
14    [Witness excused.]
15    MR. SALB:  Your Honor, I just want to raise
16  an issue.  There is a rule on witnesses.  We called
17  Ms. DeMent Harrison first because Fannie Mae has
18  decided to make her their corporate designee.  We
19  could be cynical as to why they made that decision,
20  but it seems to us that her testimony should be heard
21  all at once in order to give meaning to the rule on
22  witnesses.

Page 49

1    JUDGE SWEENEY:  Well, the rule on witnesses
2  generally does not apply to parties and corporate
3  designees are generally parties.
4    So I don't know.  What's your position on
5  this?
6    MR. MIOSSI:  Well, I'm sorry that you're
7  cynical about it.
8    JUDGE SWEENEY:  Well, address it to me,
9  please.
10    MR. MIOSSI:  She was -- Ms. Harrison is here
11  in large part to listen to Mr. Skrynnikov's testimony
12  so that we respond as appropriate on our side of the
13  case.
14    So I anticipate we will cover a good deal
15  more than just the narrow scope that they covered on
16  their direct that they chose to do right now.
17    JUDGE SWEENEY:  Well, I don't believe that
18  the corporate designee is -- they're entitled to
19  designate their corporate designee as covered by the
20  rule on witnesses.  So I will not either treat this
21  witness as barred from being here because of the rule
22  on witnesses, nor require the respondent to have to

13  (Pages 46 to 49)

## Page 50

1   put on additional testimony from that witness.

2       MR. SALB:  Your Honor, let me just be clear.

3   We understand that the rule on witnesses does not

4   apply to a corporate designee, but the principle

5   underlying it applies universally.  In this case,

6   counsel had stated explicitly that their intention is

7   to tailor her testimony and for her testimony to

8   respond to the testimony of other witnesses.

9     That is universally problematic.  It doesn't

10  have to be dependant on the specific rule on

11  witnesses.  It is improper for testimony to be

12  affected by the other testimony during any hearing.

13  That's, as I say, axiomatic and it's a real problem

14  in this case as well.

15     JUDGE SWEENEY:  All right.  I understand your

16  objection, but, ma'am, if you would go back here, and

17  do you want to call your next witness?

18     MS. KUNTZ:  We call Tim Skrynnikov, please.

19     Whereupon,

20         TIMOTHY SKRYNNIKOV,

21     was called to testify and, having

22     first been duly sworn by the Notary Public, was

## Page 51

1     examined and testified as follows:

2

3     JUDGE SWEENEY:  Sir, would you state your

4  name and your address, please.

5     THE WITNESS:  My name is Tim Skrynnikov,

6  S-K-R-Y-N-N-I-K-O-V.  My current address is 30 Rhode

7  Island Avenue, Northeast, Apartment 405, Washington,

8  D.C.  20002.

9     JUDGE SWEENEY:  Thank you.

10    Go ahead, Counsel.

11     MS. KUNTZ:  Thank you.

12       DIRECT EXAMINATION

13  BY MS. KUNTZ:

14    Q.  Mr. Skrynnikov, can you tell what your

15  profession is.

16    A.  Financial analyst.

17    Q.  Are you now a financial analyst?

18    A.  Yes, I am.

19    Q.  Can you give me some of your background.

20    A.  I hold an MBA from the College of

21  William and Mary.  I got the MBA in 2003.  Starting

22  from 2003, all of my jobs were in the financial

## Page 52

1   analysis area.

2    Q.  Have you ever been an auditor?

3    A.  Yes, I have.

4    Q.  For what company?

5    A.  I was auditor, an internal auditor, for

6  KPMG in 2005.

7    Q.  Okay.  How do the role of a financial

8  analyst and that of an auditor differ?

9    A.  Well, as an auditor, you follow certain

10  of auditing rules and you audit the work done by

11  financial analysts.  So you're on the other side of

12  the financial analysis.

13    As a financial analyst, you need to make sure

14  that your work satisfies certain criteria, for

15  example, that you meet all the key controls and that

16  your work satisfies the tests, different tests, done

17  by the auditor.

18    Q.  Now, at Fannie Mae, what was your

19  position?

20    A.  It was senior financial analyst.

21    Q.  When did you begin working at Fannie

22  Mae?

## Page 53

1    A.  I started at Fannie Mae as a consultant,

2  I believe early in the summer of 2007, and that was

3  converted to an FTE, which is a Fannie Mae employee,

4  in September of 2007.

5    Q.  Okay.  Who was your supervisor in 2009?

6    A.  Kristin DeMent Harrison was my

7  supervisor in 2009.

8    Q.  And when did she become your supervisor?

9    A.  She became my supervisor approximately

10  in October of 2008.

11    Q.  Was there a time when you took medical

12  leave from Fannie Mae?

13    A.  Yes.

14    Q.  When did you take this leave?

15    A.  It started in early July of 2009.

16    Q.  Whom did you inform at work?

17    A.  I informed Kristin DeMent Harrison and

18  also Carrie Lee, the human resources contact in the

19  department.

20    Q.  Why don't we look at Exhibit 47.

21    As with most E-mail strings, I'm going to ask

22  you to read from the bottom.  So reading from the

14  (Pages 50 to 53)

Page 54

1    bottom, can you tell me what the first E-mail is,
2    what you're doing there?
3        A.   I'm informing Kristin that I will not be
4    in the office during that day.
5        Q.   To your knowledge, does that conform to
6    Fannie Mae policy when you're absent from the office,
7    contacting your manager?
8        A.   I don't know, but while this is my role,
9    you usually let your manager know if you're not going
10   to be in the office that day.
11       Q.   Now, you contacted Carrie Lee.  Why did
12   you contact Carrie Lee?
13       A.   Because she was aware that I having some
14   medical problems at that time.
15       Q.   Now, did your supervisor, Ms. Harrison,
16   respond to your E-mail?
17       A.   No.
18       Q.   When did you next hear from your
19   supervisor?
20       A.   Never.
21       JUDGE SWEENEY:  I'm sorry?
22       THE WITNESS:  Never.  Never.

Page 55

1        JUDGE SWEENEY:  Are you saying after July
2    9th, you never had any communication with her?
3        THE WITNESS:  No.
4        JUDGE SWEENEY:  Go ahead.
5    BY MS. KUNTZ:
6        Q.   Who is Lori Mallon?
7        A.   Lori Mallon is Kristin's -- she was
8    Kristin DeMent's supervisor.
9        Q.   Did Ms. Lee respond to you?
10       A.   Ms. Lee did respond to me.
11       Q.   Can I direct your attention to Exhibit
12   50.  What is this exhibit?
13       A.   This is a response from Carrie Lee sent
14   to my personal E-mail where she informs me to contact
15   the Reed Group, the administrator of FMLA for Fannie
16   Mae.
17       Q.   Did you have any other communications
18   from Carrie Lee in July?
19       A.   Yes.
20       Q.   Okay.  What else did you hear from her
21   on?
22       A.   Well, I met with your -- in your office.

Page 56

1        Q.   I mean after this.
2        A.   Oh, after this?  In July, no.
3        Q.   Did you contact the Reed Group by phone
4    as Ms. Lee had instructed in her E-mail of Exhibit
5    50?
6        A.   Absolutely, yes.
7        Q.   Do you recall if you spoke to a person
8    or did you get a recording?
9        A.   I spoke with a person, with an intake
10   manager.
11       Q.   Can I ask you to look at Exhibit 80,
12   please, page 11.
13       A.   Page?
14       Q.   Eleven.
15       A.   There's only one page.
16       Q.   82.  I'm sorry.  82.
17       Now, on page 11, I'm going to direct your
18   attention to the top entry for 7-10-2009.
19       A.   Yes.
20       Q.   This is a log of sorts.  So it's full of
21   abbreviations.  So I'm going to ask you to make out
22   what you think is written under 7-10.  Can you read

Page 57

1    it the best you can.  Could read it out loud, please.
2        A.   7-10-2009, phone call.  Spoke to intake.
3    Below the line, it says:  Spoke with employee to
4    begin case.  Employee is out of work as of July 10th.
5    Employee is currently out of work with for
6    depression.  Employee is out of work at least until
7    July 20th.  I explained STT -- I'm not sure what that
8    is -- policy due back in 30 days and FMLA rules.
9        JUDGE SWEENEY:  Counsel, are you on page 11?
10       MS. KUNTZ:  I am, Your Honor.
11       JUDGE SWEENEY:  I'm having trouble seeing
12   where he's reading from.
13       MS. KUNTZ:  Okay.  There are two entries for
14   7-10.  This is the top entry for 7-10.
15       JUDGE SWEENEY:  All right.  I see.
16       THE WITNESS:  Should I read it again?
17   BY MS. KUNTZ:
18       Q.   No.  I think that was fine.  Did you
19   read the last line of this entry?
20       A.   NDOT 7-17.  DOT is the next day.  Those
21   are the dates in the previous E-mail.
22       Q.   Okay.  Now, can you confirm whether to

Page 58

1    the best of your memory this accurately summaries
2    your initial conversation with Reed Group?
3         A.   Yes.
4         Q.   Did you tell Reed that you were out of
5    work as of 7-10?
6         A.   Yes.
7         Q.   Did you tell Reed that you were out of
8    work for depression?
9         A.   I said that that was the diagnosis of my
10   doctor at the time.
11        Q.   Did you tell Reed that you were out of
12   work at least until 7-20?
13        A.   Yes.
14        Q.   Had a doctor given you that date?
15        A.   Yes.
16        Q.   Had you already scheduled an appointment
17   with your doctor for 7-17?
18        A.   Yes.
19        Q.   Was it your intention to go back to work
20   on 7-20?
21        A.   It was dependant on what the doctor was
22   going to say.

Page 59

1         Q.   Now, looking further down the page to
2    the second entry for July 10th, could you read that
3    through to yourself.  It goes on to the next page and
4    I'm going to ask you to confirm also whether it
5    accurately summarizes your recollection of this phone
6    call.
7         MR. MIOSSI:  May I object, Your Honor.  We
8    understand that these are documents created by a
9    third party, and if counsel wants to test her
10   client's memory, that's fine, but I think she needs
11   to exhaust the memory before refreshing with a
12   document.
13        JUDGE SWEENEY:  All right.  Well, you know,
14   Counsel, I'm not sure -- what are you doing here with
15   this?  I mean, I can read the reports.
16        MS. KUNTZ:  Right.  I'm in part trying to
17   shorten things.  I can take us through this twice if
18   we need to, but I am asking both to get Mr.
19   Skrynnikov's testimony as to his initial
20   conversations and also that we've got documentary
21   confirmation for these initial conversations.
22        JUDGE SWEENEY:  Okay.  Well, I'll overrule

Page 60

1    the objection at least at this juncture.
2         All right.  Go ahead.
3         MR. MIOSSI:  Thank you.
4         JUDGE SWEENEY:  Do you want to reorient?
5    BY MS. KUNTZ:
6         Q.   So you're reading through the July 10th
7    entry?
8         A.   [Gestures.]
9         Q.   Okay.  Thank you.
10        JUDGE SWEENEY:  I'm sorry.  Do you have a
11   question?
12        MS. KUNTZ:  He's reading.  I was trying to
13   give him a pause.
14        JUDGE SWEENEY:  So you asked him to read
15   this?
16        MS. KUNTZ:  Yes.
17        JUDGE SWEENEY:  And what you're asking him to
18   read is --
19        MS. KUNTZ:  It's a fairly long entry.
20        JUDGE SWEENEY:  Right.  Page 11.  All right.
21        MS. KUNTZ:  Right.
22   BY MS. KUNTZ:

Page 61

1         Q.   Mr. Skrynnikov, can I ask you some
2    questions about this now?
3         A.   Sure.
4         Q.   Were you told in the phone conversation
5    about requirements for a return to work document from
6    your doctor?
7         A.   No, not in my recollection.
8         Q.   Okay.  Now, are you familiar with the
9    Fannie Mae return to work policy?
10        A.   At that time, I was not familiar with
11   this.
12        Q.   Okay.  Did you have access to Fannie
13   Mae's return to work policy while you were on FMLA
14   leave?
15        A.   No.  I didn't have any access to COPPER
16   or the intranet or I didn't have my Fannie Mae-issued
17   laptop.  So I di not have the access.
18        Q.   Now, when you had this initial
19   discussion with the Reed Group, did you describe an
20   altercation with your manager --
21        A.   Yes.
22        Q.   -- with your supervisor?

16 (Pages 58 to 61)

Page 62

1      A.  Yes, absolutely.
2      Q.  Can you remind -- can you tell me what
3   you said to the Reed Group?
4      A.  Well, I said that my troubles originated
5   from the April 28th meeting with my supervisor where
6   she verbally attacked me, threw things at my
7   direction, stated several times things like that she
8   could see hatred in my eyes, etc.
9      I also informed Reed Group that I was seeing a
10  Fannie Mae-appointed psychologist, who I saw probably
11  four or five times.  Her name was Madonna Madeline
12  Carpel, and I discussed what had happened with her,
13  and I was also addressing my health issues.
14      I was not able to sleep.  You know, my
15  concentration was becoming bad.  You know, I
16  stuttered.  I couldn't -- well, so there was several
17  issues.
18      The psychologist stated that I needed to see
19  an M.D. who can actually prescribe medication for my
20  condition because she felt -- the psychologist could
21  not prescribe medications.
22      Q.  Now, is this all that you told the Reed

Page 63

1   Group in this initial conversation?
2      A.  Yes.  Yes.
3      Q.  And did you specifically date the
4   altercation that you referenced to 4-28-09?
5      A.  I don't remember.  Probably, I did.
6      Q.  Now, who is the manager you referenced
7   in the -- "my manager, supervisor and altercation"?
8      A.  Kristin DeMent.
9      Q.  Now, we'll return to the specifics of
10  the altercation later, but for now, I want to ask
11  whether you discussed this altercation, as the Reed
12  calls it, with anyone at Fannie Mae?
13      A.  Yes.  I discussed it with several
14  people, most immediately after the altercation.
15  First of all, I discussed it with my supervisor,
16  Kristin DeMent Harrison, on at least three occasions,
17  immediately after the altercation, the following day,
18  and several days later.
19      I also discussed it with my coworkers.  I
20  discussed it with Carrie Lee and I discussed it with
21  Natasha Colton, who is with Fannie Mae Compliance and
22  Ethics Department.

Page 64

1      Q.  Okay.  Now, did you discuss it with
2   anyone from Fannie Mae's Legal Department?
3      A.  No.
4      Q.  No one from Legal interviewed about the
5   incident after you reported it to Reed?
6      A.  No.
7      Q.  What was the medical condition for which
8   you took leave?
9      A.  It was depression.
10      Q.  Could I ask you to look on page 3 of
11  this Exhibit 82.
12      A.  Yes.
13      Q.  Under the heading "Diagnoses", is this
14  consistent with what your doctor told you?
15      A.  Yes.
16      Q.  Was there any other reason for taking
17  medical leave?
18      A.  No.
19      Q.  Were you notified by Reed that you were
20  eligible for FMLA leave?
21      A.  Yes.
22      Q.  Could I ask you to look at Exhibit 54.

Page 65

1   Sorry.  I know the exhibits are cumbersome.
2      Is this the letter that you received stating
3   your eligibility for FMLA, DCFMLA leave?
4      A.  Yes.
5      Q.  Now, did Reed approve your leave?
6      A.  Yes.
7      Q.  Could you take a look at Exhibit 55.
8      Is this the letter you received approving your
9   leave?
10      A.  This is the letter approving the dates
11  for the leave, yes.
12      Q.  Okay.  Now, was your leave extended at
13  the beginning of August?
14      A.  Yes.
15      Q.  Can I ask you to look at Exhibit 57.
16      What did you understand this letter to tell
17  you?
18      A.  This is the exhibit dated July 21st?
19      Q.  No.  This should be a letter dated --
20  Exhibit 57.
21      A.  Oh, I'm sorry.
22      Q.  There you go.  Is it letter dated August

Page 66

1    5th?
2         A.   Yes.  This the extension of my FMLA
3    leave.
4         Q.   Okay.  And how long is it extended to?
5         A.   Through September 6th.
6         Q.   Now, can you explain to me how these
7    extensions for FMLA leave were handled month to
8    month?  What would you do?
9         A.   I was told by Reed Group during the
10   first intake interview that they handled everything
11   and that they will be in contact with the doctor.
12   They had special forms that the doctor will need to
13   fill in and fax them back, and based on the
14   information and the progress report that the doctor
15   was providing, you know, they would extend -- they
16   would consider what to do in terms of FMLA.
17        Q.   So you would just go to your doctor for
18   this update meeting?
19        A.   Well, I would see the doctor on a
20   regular basis.  It was -- Reed Group said that I need
21   to do it at least once a month, the doctor needs to
22   send them some paperwork, but I was seeing the

Page 67

1    doctor, I believe, at least weekly.
2         Q.   So did you see your doctor before the
3    expiration of your leave in September?
4         A.   I think so.
5         Q.   Did he tell you that you needed more
6    time to recover?
7         A.   Yes.
8         Q.   Did you understand that he would submit
9    the necessary paperwork to support the additional
10   medical leave?
11        A.   Yes.  He mentioned that.
12        Q.   Is that what he had done previously?
13        A.   At this point, I had a different doctor.
14   So I'm not sure if it was his first time to do this.
15        Q.   But he did say that he would submit the
16   paperwork?
17        A.   Yes.  Yes.
18        Q.   Did Reed contact you to let you know
19   about the return to work requirements?
20        A.   No.
21        Q.   Did you inform Reed that you understood
22   you were to remain out for a longer time?

Page 68

1         A.   Yes.
2         Q.   What did you do to ensure that the
3    medical documentation supporting your leave went to
4    Reed?
5         A.   Well, the nurse from Reed was calling me
6    pretty much every day, initially.  So she said that I
7    don't need to worry about the paperwork, that she is,
8    you know, in contact with the, you know, treating
9    physician and all I need to do is to get better and
10   take care of my health.
11             MR. MIOSSI:  May I impose an objection?
12   There clearly is a lot of hearsay testimony and I
13   have an objection letting him --
14             JUDGE SWEENEY:  On that specific item; you're
15   talking about what the nurse said?
16             MR. MIOSSI:  Yes.
17             JUDGE SWEENEY:  I'll sustain the objection on
18   that.
19             Go ahead, Counsel.
20             MS. KUNTZ:  Okay.  Thank you.
21             JUDGE SWEENEY:  Only as to that portion.
22             MR. MIOSSI:  Thank you.

Page 69

1    BY MS. KUNTZ:
2         Q.   When did you first learn that your
3    doctor had not submitted the paperwork for the
4    extension of your medical leave?
5         A.   It was around September 15th.
6         Q.   And how did you learn of that?
7         A.   There were two pieces of correspondence
8    that I received.  One was a letter from Fannie Mae
9    informing me that I had abandoned my job and another
10   letter was from Reed Group, and I think it talked
11   about not getting the paperwork or not extending
12   leave, something along those lines.
13        Q.   Which did you get first?
14        A.   It was -- well, the Fannie Mae letter
15   came first because it was delivered to me by a
16   courier on the same date it was issued.
17        Q.   So why don't we look at Exhibit 59.
18        A.   Yes.
19        Q.   Is this the letter you were speaking of?
20        A.   Yes.
21        Q.   Was this the first indication that you
22   had that your doctor had not supplied the necessary

Page 70

1   paperwork?
2        A.   Yes.
3        Q.   Why had you not followed up with your
4   doctor about the paperwork?
5        A.   Because my understanding was that he was
6   with Fannie Mae and that he would send the paperwork
7   to them.
8        Q.   Had you heard from Ms. Harrison asking
9   you about returning to work?
10       A.   No.
11       Q.   Had you heard from Carrie Lee asking you
12  about returning to work?
13       A.   No.
14       Q.   Now, you had not contacted your manager
15  after September 6th.  Why did you not contact your
16  manager?
17       A.   Well, at that point, I knew that I
18  needed more time, you know, for treatment, and as the
19  Reed Group informed me, all communication needs to be
20  between me and the Reed Group and the Reed Group will
21  take care of communicating with Fannie Mae.
22       Q.   Now, this letter references some Fannie

Page 71

1   Mae policies.  What steps had you taken to comply
2   with Fannie Mae policies?
3        A.   I wasn't aware of the policy at the
4   time.  My understanding was that I was on FMLA.  I
5   was not out of work, you know, on an unexcused
6   absence.  I was on a federally, you know, protected
7   leave.
8        Q.   Now, did you respond to this notice of
9   job abandonment?
10       A.   Yes, of course.
11       Q.   Can I direct you to Exhibit 61, please.
12       Prior to this problem with medical
13  certification in the middle of September, had you had
14  any prior problem with getting doctors' paperwork in
15  to the Reed Group?
16       A.   No.
17       Q.   Did you have to on any occasion actually
18  bring the medical certification to the Reed Group or
19  did this happen pretty automatically through your eyes?
20       A.   Well, that was happening behind the
21  scenes.  I never saw the paperwork.  So that was done
22  by the doctor.

Page 72

1        Q.   So looking at Exhibit 61, is this your
2   response?
3        A.   Page 2?
4        Q.   Page 2.
5        A.   Yes.  That was my response.
6        Q.   Page 2 is your response.
7        JUDGE SWEENEY:  Just for my information, who
8   is Carrie Lee?
9        THE WITNESS:  Carrie Lee is an H.R. contact.
10  She was kind of like -- she was the manager of all
11  H.R. issues for our department, Financial Planning
12  and Analysis.
13       JUDGE SWEENEY:  Thank you.
14  BY MS. KUNTZ:
15       Q.   Now, in your response to Carrie Lee
16  about your job termination in the middle of
17  September, you brought up your supervisor's treatment
18  of you?
19       A.   Yes.
20       Q.   Why is that?
21       A.   Because I felt that there was a
22  connection between this letter and the treatment that

Page 73

1   I was receiving from my supervisor.  I didn't see,
2   you know, any other reason why I would get such a
3   letter.
4        Q.   Can I ask you to look at Exhibit 62,
5   please.  Is this the approval you received for
6   additional leave through October 14th?
7        A.   Yes.
8        Q.   What did you understand this notice to
9   tell you?
10       A.   I'm sorry?
11       Q.   What did you understand this notice to
12  tell you specifically?
13       A.   That I'm -- you know, I'm good to be on
14  FMLA, that I'm approved through October 14th.
15       Q.   So what about the second to the bottom
16  line?
17       A.   Second to the bottom?  Okay.  So it
18  states that I'm approved for FMLA as in federal
19  medical leave until October 1, 2009.
20       Q.   Now, did you return to work on October
21  15th?
22       A.   No.

Page 74

1     Q.   Did you notify Reed of your
2   understanding that you would be remaining on leave
3   beyond 10-15?
4     A.   Yes.
5     Q.   Did you notify them by phone?
6     A.   Yes.
7     Q.   Let's look at Exhibit 82.
8        Page 77, the entry under 10-13-2009, does this
9   note, as you read it through, accurately represent
10   what took place in that conversation?
11     A.   Can you tell me where to look?  I'm
12   sorry.
13     Q.   I'm sorry.  Under 10-13-09.  The header
14   is "spoke to employee".
15     A.   Yes.
16     Q.   So you told Reed on 10-13 that you
17   anticipated a return to work on 10-26?
18     A.   Yes.
19     Q.   Do you know if your doctor submitted the
20   necessary paperwork to extend your leave beyond
21   10-15?
22     A.   Yes.  He did.

Page 75

1     Q.   Did you check?
2     A.   He did.  He told me.
3     Q.   He told you.  Were you approved for this
4   additional leave?
5     A.   Yes.
6     Q.   How do you know?
7     A.   I know that at some point, I received
8   another letter from the Reed Group.
9     Q.   Were you aware of any requirements
10   before you returned to work following medical leave?
11     A.   No.
12     Q.   Were you told that you had to have a
13   return to work note?
14     A.   I'm not sure.  I don't remember if I was
15   told about it, but I've got to assume that the
16   paperwork between the doctor and Reed Group would
17   stipulate my date of return to work, which would mean
18   that I was cleared by the doctor.
19        So that was my understanding.  I was never
20   specifically told I need a release to return to work.
21     Q.   Okay.  You don't recall whether you were
22   told or --

Page 76

1     A.   No.  I remember during my first
2   conversation -- well, during my conversation with the
3   Reed Group that they never stated until sometime in
4   late October that I needed a release to return to
5   work.
6     Q.   Do you know if your doctor provided a
7   return to work note?
8     A.   He completed the forms authorizing me to
9   return to work.
10     Q.   And what did you understand your doctor
11   was going to authorize?
12     A.   That I could work without constraints
13   starting on a certain date.
14     Q.   And what was the certain date?
15     A.   October 26th.
16     Q.   Okay.  So I would direct your attention
17   to Exhibit 67.  Did you ever see this note or was
18   this a communication directly between your doctor and
19   Reed?
20     A.   Right.  Well, I did not see it at the
21   time.
22     Q.   So could I ask you to turn to the third

Page 77

1   page of Exhibit 67.
2     A.   Yes.
3     Q.   Can you tell me if the information
4   recorded there in the middle of the page, is this
5   person able to return to work, is what the doctor has
6   written there consistent with what he told you?
7     MR. MIOSSI:  I apologize.  What exhibit?
8     JUDGE SWEENEY:  67.
9     MS. KUNTZ:  67.
10     MR. MIOSSI:  Okay.
11     THE WITNESS:  Where do I need to look?
12     MS. KUNTZ:  Below the box.
13     JUDGE SWEENEY:  You're talking about page 3?
14     THE WITNESS:  Page 3.  I'm sorry.
15        Yes.  It states that I can return to work in
16   any capacity as of October 26, 2009.
17   BY MS. KUNTZ:
18     Q.   Did you hear from Reed whether this
19   return to work note was sufficient?
20     A.   Yes.
21     Q.   Did Reed tell you whether you were
22   cleared to return to work on October 26th?

Page 78

1     A.   Yes.
2     Q.   How did they tell you that?
3     A.   It was some of the case managers called
4  me and informed me that I can return to work.
5     Q.   I'm sorry.  Did they inform you by
6  E-mail or by phone or how did they inform you?
7     A.   It was by phone.
8     Q.   Was a lot of your communication with
9  Reed by phone?
10    A.   Most of my communications with Reed
11 Group was by phone.  Sometimes they called me several
12 times a day to check on my well-being.
13    Q.   Did you, in fact, return to work on
14 October 26th?
15    A.   No, I did not.
16    Q.   Why not?
17    A.   I was not allowed to return to work.
18    Q.   Who did not allow you?
19    A.   Carrie Lee of Human Resources at Fannie
20 Mae did not allow me to return to work on October
21 26th.
22    Q.   Okay.  Let's look at Exhibit 68.

Page 79

1     A.   Yes.
2     Q.   Is this where Carrie Lee of Human
3  Resources informed you that you could not return to
4  work on October 26th?
5     A.   Yes.
6     Q.   Was she responding to your E-mail?
7  Let's turn back to page 2 of this same E-mail string.
8     A.   Yes.
9     Q.   Now, why had you contacted Carrie Lee?
10    A.   I was not able to reach my supervisor.
11 At that point, I knew that Kristin DeMent was no
12 longer my supervisor.  I called a colleague of mine
13 and asked her to look up who my supervisor was.  She
14 was not able to tell me who the supervisor was, but
15 she told me that Kristin DeMent was no longer in the
16 same department.
17    MR. MIOSSI:  I'm objecting on the grounds of
18 hearsay.
19    JUDGE SWEENEY:  At least as to that, I'll
20 overrule the objection.
21 BY MS. KUNTZ:
22    Q.   So let's go back to why you contacted

Page 80

1  Carrie Lee.  You testified that you had attempted to
2  reach your supervisor, by which you meant whom?
3     A.   Kristin DeMent Harrison.
4     Q.   And how did you try to contact her?
5     A.   Called her at the number that I had.
6     Q.   And did you leave a message?
7     A.   Yes.
8     Q.   Was this one attempt or more than one
9  attempt?
10    A.   No.  It was just once.
11    Q.   And do you remember when you attempted
12 to call her?
13    A.   It was after.
14    Q.   Was it prior to sending this E-mail?
15    A.   Oh, yeah.  Oh, yeah.
16    JUDGE SWEENEY:  I'm sorry.  Did you say prior
17 to?
18    MS. KUNTZ:  Prior to sending this E-mail,
19 which is dated October 21st.
20    THE WITNESS:  Yes.
21 BY MS. KUNTZ:
22    Q.   It was prior to October 21st?

Page 81

1     A.   Well, it could have been the same day,
2  but I think it was one day before.
3     Q.   Okay.  And what message did you leave
4  for Ms. Harrison?
5     A.   To let me know what I need to do to come
6  back to work.
7     Q.   And this would have been after you were
8  authorized by Reed to return to work?
9     A.   Well, that was -- I don't remember the
10 sequence exactly of events, but it was after the
11 doctor told me that I would be able to return to work
12 on the 26th.
13    Q.   So when you weren't able to reach
14 Ms. Harrison, what did you do?
15    A.   Well, I sent this E-mail to Carrie Lee
16 asking her about the procedure of returning to work.
17    Q.   Okay.  Now let's look at the second
18 paragraph of this E-mail on page 2 of Exhibit 68.
19    Tim, why did you need vacation when you had
20 been out for 16 weeks?
21    A.   I bruised my ribs several weeks prior
22 and I wanted to take additional time off as vacation.

Page 82

1       Q.   What had you done to your ribs?
2       A.   Well, I fell, and the emergency -- well,
3   I went to G.W., George Washington Emergency.  They
4   were not able to determine whether the ribs were
5   broken or bruised.
6       So, you know, they said that I should just get
7   through it, you know, because with this type of -- so
8   I was getting through it.  At this point, it was --
9       Q.   Well, hang on.  Let's look at Exhibit
10  65.
11      A.   Yes.
12      Q.   Now leaving aside page 1, which is the
13  fax cover sheet, are pages 2 and 3 of this exhibit
14  the discharge instructions you received when you
15  visited on your rib injury?
16      A.   Yes.
17      Q.   Now, did GWU Emergency Room prescribe
18  any pain medication for you?
19      A.   I don't think so.  They might have, but
20  I remember they mentioned that with the rib
21  fractures, pain medication really doesn't help.
22      MR. MIOSSI:  I'm really objecting on the

Page 83

1   hearsay grounds.
2       JUDGE SWEENEY:  All right.  I'll sustain to
3   that portion.
4       THE WITNESS:  Okay.
5       MS. KUNTZ:  It's not being offered for the --
6       JUDGE SWEENEY:  I understand.
7   BY MS. KUNTZ:
8       Q.   Did you take any over-the-counter
9   painkillers?
10      A.   Over the counter?
11      Q.   Like Tylenol?
12      A.   No.
13      Q.   No?
14      A.   No.
15      Q.   So mentioned here is a rib belt.  Did
16  GWU give you a rib belt for your ribs?
17      A.   No.
18      Q.   Turning to the second page, when were
19  you authorized to return to work after this rib
20  injury?
21      A.   The note says October 16, 2009.
22      Q.   So what did you find was different for

Page 84

1   you after your ribs were injured?  Were there things
2   you couldn't do?
3       A.   Well, initially, it was hard for me to
4   fall asleep because I was twisting and turning at
5   night.
6       Q.   Anything else?
7       A.   Well, I got allergies at the time.  So I
8   was sneezing.  You know, when I would sneeze, I would
9   feel pain.  So I started to take, actually, allergy
10  medication which prevented me from sneezing.  That's
11  it.
12      Q.   So you were able to walk?
13      A.   Oh, yes.
14      Q.   Despite your rib injury?
15      A.   Oh, yes.
16      Q.   And was there anything you couldn't do
17  because of your rib injury?
18      A.   I was able to do all of my normal
19  activities, you know.
20      Q.   Did you find yourself limited in any
21  way?
22      A.   Well, I couldn't exercise, of course.  I

Page 85

1   couldn't do the -- you know, like pull-ups.  So
2   that's the only kind of -- like upper torso activity,
3   I was limited.
4       Q.   So why did you need to take more time
5   for this injury?
6       A.   I just thought so because I kind of felt
7   discomfort.  So I thought that I would just ask and
8   see, you know, if I could use some of my accrued
9   vacation.
10      Q.   Did you think that this discomfort
11  somehow would affect your work at Fannie Mae?
12      A.   No.
13      Q.   Did this discomfort affect your ability
14  to -- I don't know -- work at a computer?
15      A.   Absolutely not.
16      Q.   Did it affect your ability to sit at a
17  desk?
18      A.   No.
19      Q.   So in your E-mail to Carrie Lee, did you
20  tell her that you were unable to work and, therefore,
21  needed to take leave?
22      A.   No.

22  (Pages 82 to 85)

Page 86

1     Q.   What's the exhibit number again?
2     MS. KUNTZ: Yeah. I'm looking for it. 68.
3     JUDGE SWEENEY: 68. Okay.
4     MS. KUNTZ: The second page.
5     JUDGE SWEENEY: All right.
6     BY MS. KUNTZ:
7     Q.   Did you tell her you were unable to
8   return to work?
9     A.   No. I actually stated in my E-mail to
10  her that I can start on the scheduled date of my
11  return, and my main inquiry in the E-mail was about
12  the procedures of me returning to work on October
13  26th as scheduled by the Reed Group.
14    Q.   Now, how did Ms. Lee respond?
15    A.   To my surprise, she stated that I had a
16  new medical condition and that she will not allow me
17  to return to work on October 26th.
18    Q.   Now, you responded to her and you say
19  there that you had spoken with the Reed Group. Can
20  you recall your conversation with the Reed Group?
21  What was the Reed Group telling you at this time?
22    A.   Well, I called the Reed Group and told

Page 87

1   them that Fannie Mae is requiring a new -- I guess
2   they called it a doctor's release. They said I had a
3   second condition for my rib injury. The Reed Group
4   representative said that it was not subject to FMLA
5   because it was an unrelated condition and that no
6   release was required, and Reed stated that I can
7   return to work on October 26th as scheduled, as
8   approved by Reed Group.
9     MR. MIOSSI: May we just -- since we're
10  having this testimony of someone who's not here,
11  certainly, it's hearsay -- but at least identify who
12  allegedly said this?
13    JUDGE SWEENEY: All right.
14    THE WITNESS: I think it was June. I'm
15  pretty sure it was June.
16  BY MS. KUNTZ:
17    Q.   Would that be the June Kosier we have in
18  the records of Exhibit 82?
19    A.   Yes.
20    JUDGE SWEENEY: Okay. Go ahead.
21  BY MS. KUNTZ:
22    Q.   And it was that conversation that you're

Page 88

1   trying to represent here in the second from the top
2   of page 1?
3     A.   Yes.
4     Q.   Okay. And so Carrie Lee responded?
5     A.   Yes.
6     Q.   And did you have a conversation with the
7   Reed Group after Carrie Lee responded?
8     A.   Yes.
9     Q.   And what did they tell you?
10    A.   They said that I need to provide a
11  release for the second -- for the rib injury.
12    Q.   So what did you do?
13    A.   I said I already provided you with a
14  release.
15    Q.   What were you referring to when you said
16  that?
17    A.   I was referring to the note from George
18  Washington Emergency that I faxed to them.
19    Q.   So you faxed them the George Washington
20  Emergency --
21    A.   Yes.
22    Q.   Okay.

Page 89

1     A.   And they said they would call and
2   reconfirm that.
3     Q.   They would call the hospital?
4     A.   Yes.
5     Q.   Did the Reed Group accept the note from
6   George Washington University Hospital?
7     A.   No.
8     Q.   What did they tell you?
9     A.   They said that I need to obtain a note
10  from the physician that was treating me when I was on
11  FMLA.
12    Q.   And what did you do then?
13    A.   I stated to them that my physician was a
14  psychiatrist by trade and that, you know, he can't
15  issue a note concerning a rib injury. The Reed Group
16  rep agreed with me and she said that in this
17  instance, I need to go to a general practitioner to
18  get this release.
19    Q.   Did you have a general practicer whom
20  you were seeing?
21    A.   At that time, I didn't have a general
22  practitioner.

Alderson Reporting Company
1-800-FOR-DEPO

Arbitration Day 1                                           July 22, 2014
Washington, D.C.

Page 90

1      Q.   Were you seeing anyone for the rib
2  injury?
3      A.   No, I did not, because it wasn't a
4  problem.
5      Q.   What did you do next?
6      A.   Well, I tried to find a general
7  practitioner and I went to the urgent care office
8  where, you know, I was before, you know, to obtain
9  this release.  The soonest I could do it was on
10  October 26th.
11      Q.   Let's look at Exhibit -- you went to the
12  urgent care.  Why was the soonest that you could get
13  there October 26th, several days later?
14      A.   Well --
15      Q.   Do you remember?
16      A.   It was the flu season.  No one was
17  available because it was not an emergency.
18      MR. MIOSSI:  I object.
19      JUDGE SWEENEY:  I'll overrule.  Go ahead.
20  You've answered.
21      Go ahead to your next question.
22  BY MS. KUNTZ:

Page 91

1      Q.   Can we look at Exhibit 69, please.
2      A.   Yes.
3      Q.   Was this the document you obtained when
4  you went to see the general practitioner on October
5  26th and you conveyed it to Reed?
6      A.   Yes.
7      Q.   And did Reed accept this?
8      A.   No.
9      Q.   What did they tell you?
10      A.   They said that the note should have
11  indicated the diagnosis.
12      Q.   And it didn't indicate the diagnosis?
13      A.   I don't see the diagnosis there.
14      Q.   But in any case, they rejected this
15  note?
16      A.   Yes.
17      Q.   Did they say that they would contact the
18  doctor?
19      A.   Yes, and they did.
20      Q.   Now can we look at Exhibit 70.
21      A.   Yes.
22      Q.   All right.  I'm not identifying my

Page 92

1  exhibit.  Excuse me.
2      Did you provide to Reed the necessary
3  diagnosis?
4      A.   I know I called the urgent care doctor
5  and asked them to provide the note with the
6  diagnosis, yes.
7      Q.   And did the general practitioner you
8  consulted give you a return to work note?
9      A.   Well, it was on the same document.
10      Q.   It was on the same document?
11      A.   Yes.
12      Q.   And what date did it specify?
13      A.   That I can return to work on November
14  2nd.
15      Q.   On November 2nd?
16      A.   Yes.
17      Q.   And do you remember your discussion?
18  Why November 2nd?
19      A.   I just asked -- you know, I wanted to be
20  prepared fully.  I asked for the date.  I was under
21  the impression that my FMLA was running out in the
22  second week of November because I calculated the full

Page 93

1  month of DCFMLA, not the -- the 16 weeks as four
2  months.  So I just added four months to July 15th,
3  which was my official date when I started FMLA.
4      So I thought that I was protected through
5  November 15th.  No one informed me at any point of my
6  FMLA leave about the dates, about the deadlines, when
7  the leave was expiring be it the federal leave or the
8  state leave.
9      Q.   Now --
10      JUDGE SWEENEY:  Well, let me just ask you did
11  the doctor suggest the day of November 2nd or did you
12  suggest the day of November 2nd?
13      THE WITNESS:  I suggested the date of
14  November 2nd.
15      JUDGE SWEENEY:  All right.  Go ahead,
16  Counsel.
17  BY MS. KUNTZ:
18      Q.   Now, Tim, you said that you weren't
19  notified about your state FMLA or your federal FMLA
20  expiring; is that true?
21      A.   No, I was not.
22      Q.   Can I ask you to look at Exhibit 63.

Page 94

1    It's a letter dated September 4th.
2        Do you recall receiving this letter, Tim?
3        [Witness peruses document.]
4        THE WITNESS:  Well, I probably received it,
5    but I don't.
6    BY MS. KUNTZ:
7        Q.   Did you understand what it meant?  Do
8    you recall?
9        A.   I don't recall.  I understand what it
10   means, but it was informing me that FMLA was --
11       Q.   Don't read it to me.  I'm just asking if
12   you recall receiving that.
13       A.   Vaguely.
14       Q.   Did you receive a similar notification
15   that your state FMLA was expiring?
16       A.   I don't think so.
17       Q.   Let's look at Exhibit 74.
18       A.   Oh --
19       MR. MIOSSI:  May I ask just can we get a
20   short break at an appropriate time?
21       JUDGE SWEENEY:  Sure.
22       MS. KUNTZ:  Could we go just a bit longer?

Page 95

1        MR. MIOSSI:  Yes.
2        JUDGE SWEENEY:  Whenever you feel like you're
3    at a break point, let us know.
4        MS. KUNTZ:  I'm about page and a half from
5    one.
6        JUDGE SWEENEY:  Okay.  Good.
7        MR. MIOSSI:  Single spaced or double spaced?
8        MS. KUNTZ:  One and a half spaced.
9    BY MS. KUNTZ:
10       Q.   Let's look at Exhibit 74.
11       A.   Yes.
12       Q.   Do you recall receiving this letter?
13       A.   Absolutely.
14       Q.   When did you receive it?
15       A.   Probably, after October 30th, after that
16   date, you know.
17       Q.   Oh, after -- you're just guessing; is
18   that right?
19       A.   Right.  Well, I received it after my
20   originally scheduled date to return to work.  I know
21   that.  The 26th.
22       Q.   Did you receive it -- let me call your

Page 96

1    attention to another October 30 letter, Exhibit 76.
2        A.   Yes.
3        Q.   Did you receive it before or after you
4    received Exhibit 76?
5        A.   I received it the following week.  Now I
6    remember.
7        Q.   The week following the receipt of --
8        A.   The Reed Group was --
9        Q.   -- Exhibit 76?
10       A.   Yes.  The Fannie Mae was hand-delivered
11   to me in the afternoon.
12       JUDGE SWEENEY:  Did you say hand-delivered?
13       THE WITNESS:  Hand-delivered, yes.
14   BY MS. KUNTZ:
15       Q.   A courier brought it to you?
16       A.   By courier on October 30th, in the
17   afternoon of October 30th of the same day, same date.
18       Q.   But the Exhibit 74 from the Reed Group
19   also dated October 30th --
20       A.   Right.
21       Q.   -- when did it come relative to the
22   termination letter?

Page 97

1        A.   The following week.
2        Q.   The following week?
3        A.   Yes.
4        Q.   Can we look for a minute at Exhibit 74.
5    This exhaustion letter notified you -- what did you
6    understand this letter to indicate?
7        A.   Well, the letter is dated October 30,
8    2009 and it informs me that my state leave is
9    expiring on the previous day, on October 29th.  So
10   this letter was mailed to me after the leave expired.
11       The previous exhibit that you showed about the
12   federal leave was mailed to me at least a week before
13   the expiration of the federal protection.
14       Q.   Were you notified of the approval of
15   your additional leave?
16       A.   Yes.
17       Q.   Let's look at Exhibit 75.  This is also
18   dated October 30th.  What is this document?
19       A.   This is an approval from Reed Group
20   extending my FMLA.
21       Q.   Okay.  Until when?
22       A.   Until October 29th.  I'm looking at the

Page 98

1  last line.  This letter on the following page, it
2  talks about return to work of November 2, 2009.
3        Q.   Do you recall when you received this
4  letter?
5        A.   Probably the same time I received the
6  previous letter.
7        Q.   Which would have been after you received
8  Exhibit 76; is that what you testified previously?
9        A.   Yes.  I received all letters from the
10  Reed Group dated October 30th after I received the
11  hand-delivered letter from Fannie Mae.
12        JUDGE SWEENEY:  This indicates that it's from
13  New York.  Did you deal -- the people you were
14  dealing with, they were all by phone?
15        THE WITNESS:  Yes.
16        JUDGE SWEENEY:  Did you understand them to be
17  in New York?  Or maybe you didn't have any
18  understanding one way or the other.
19        THE WITNESS:  Well, at one point, I
20  understood that they were in New York.
21        JUDGE SWEENEY:  All right.  That's fine.
22        Counsel, is this a good point?

Page 99

1        MS. KUNTZ:  I'm almost done, just a couple
2  more questions.
3        JUDGE SWEENEY:  All right.
4        MS. KUNTZ:  I'm sorry.  I don't mean to
5  exhaust people's patience on this.
6        JUDGE SWEENEY:  You may be exhausting their
7  bladders.
8  BY MS. KUNTZ:
9        Q.   Did you have any phone communication
10  with the Reed Group about the exhaustion of your FMLA
11  leave?
12        A.   No.  Well, after I got the letters,
13  after I got the termination letter.
14        Q.   I'm talking about before.  I'm talking
15  about before October 29th.  Did they talking to you
16  about it?
17        A.   Absolutely not.  On the same day, on
18  October 30th, Reed Group left me a message.  It was
19  June who left me a voicemail message that said,
20  Congratulations, go back to work Monday.
21        MR. MIOSSI:  I object to the hearsay.
22        JUDGE SWEENEY:  I'll overrule that part.

Page 100

1  BY MS. KUNTZ:
2        Q.   So neither -- not by E-mail, not by
3  letter, and not in any phone call, you're testifying,
4  you were informed of your FMLA -- the expiration of
5  your job protected leave?
6        A.   There was not any slight indication.
7  They talked to me during the week as November 2nd was
8  my return to work, and they stated this, left the
9  voicemail message for me.
10        Q.   What did you understand the reason for
11  your termination to be from Exhibit 76?
12        MR. MIOSSI:  I object to the characterization
13  of the letter.
14        THE WITNESS:  That my position was --
15        JUDGE SWEENEY:  Just one minute.
16        I'll overrule the objection.
17        All right.  Go ahead.  You can respond, sir.
18        THE WITNESS:  May I take just some time to
19  read it?
20  BY MS. KUNTZ:
21        Q.   No.  I think the document is available.
22  I was really asking for your understanding at the

Page 101

1  time.
2        A.   Well, that it was a termination letter.
3  That was my understanding, that I was not being
4  allowed to return to Fannie Mae.
5        Q.   Okay.  And once you took your FMLA
6  leave, did you ever return to work at FMLA?
7        A.   No, I did not.
8        MS. KUNTZ:  Okay.  Let's take a break.
9        JUDGE SWEENEY:  All right.  This is a good
10  point to take a break.  Let's take a break.
11        [Recess.]
12        JUDGE SWEENEY:  We'll continue with the
13  testimony here.
14        Counsel, go ahead.
15        MS. KUNTZ:  Thank you.
16  BY MS. KUNTZ:
17        Q.   Tim, can you remind us what your job
18  title at Fannie Mae was.
19        A.   Senior financial analyst.
20        Q.   And what department did you work in?
21        A.   Financial Planning and Analysis, a
22  consolidated group.

26  (Pages 98 to 101)

Page 102

1   Q.   I'm sorry?
2   A.   A group of corporate consolidations.
3   Q.   Then the other title that you gave was a
4   subgroup?
5   A.   Well, I was responsible for general and
6   administrative expense analysis.  That was the group.
7   Q.   Okay.  And what were your duties?
8   A.   My primary was the automation of the
9   business segment, allocation of the business segment
10  report.  In addition to that, I had financial, slash,
11  project analyst responsibilities, such as monthly
12  analysis of --
13  Q.   I'm going to interrupt you and ask you
14  to speak up.  Can you start again?
15  A.   From?
16  Q.   From the "in addition to that".
17  A.   In addition, I had typical financial
18  analyst responsibilities.  Well, senior financial
19  analyst, which would be variance analysis, comparison
20  of actual versus budget and forecasting, etc.
21  Q.   So I'm going to ask you to explain what
22  automating and updating the business segment

Page 103

1   allocation report entails, but I'm going to direct
2   our attention to Exhibits 29, 30, and 31, which I'm
3   hoping you'll use to help us understand what that job
4   entails.
5   JUDGE SWEENEY:  I'm sorry.  29, 30 and --
6   MS. KUNTZ:  And 31.
7   THE WITNESS:  Well, those -- I'll wait
8   MS. KUNTZ:  Go ahead.
9   JUDGE SWEENEY:  Go ahead.
10  THE WITNESS:  These are just samples of the
11  -- partial samples of the monthly reports that I
12  would produce.  This shows the forecast.  All three
13  exhibits, Exhibit 29, 30, and 31, show the forecast
14  either for a quarter -- oh, the first one is a full
15  year forecast for the first quarter of 2009, which is
16  Exhibit No. 29.
17  The following exhibit, 30, shows the variance
18  between first quarter and second quarter forecast,
19  and Exhibit 31 shows the second quarter full year
20  forecast.
21  In addition to this, I was producing monthly
22  actuals, year-to-date actuals, monthly budget,

Page 104

1   year-to-date budget, full year budget, and also the
2   variances between the actuals and the budget.  So
3   this is just partial representation of the business
4   segment report.
5   BY MS. KUNTZ:
6   Q.   So let's start.  You just testified that
7   it would have contained both forecasts and actuals,
8   the reports that you updated?
9   A.   And the budget, yes.
10  Q.   So can you explain what underlies this
11  report that you would update monthly.
12  A.   The underlying data would be residing in
13  the general ledger, and I believe that PeopleSoft was
14  the tool that Fannie Mae used to get the data from
15  the general ledger.  Before the report became fully
16  automated, what would happen, I would have all the
17  allocation percentages that would go to the --
18  allocation percentages recorded at the cost center
19  and project level.  This is the lowest level of
20  allocations residing in the Excel model.
21  So let's say there was approximately one
22  thousand cost centers at Fannie Mae and let's say

Page 105

1   there was approximately one thousand projects.  So I
2   would have at least two thousand different
3   allocations.  I would just dump the data from the
4   general ledger, you know, which would be just one
5   number for the cost center into the Excel model and
6   run those allocations.  That was the manual model
7   part.
8   The issue with the manual model was that it
9   was EUC -- it's called end user computing.  It was
10  subject to Sarbane-Oxley and it was subject to a
11  special program which would make a record of every
12  change in the cell.
13  So, for example, when I run those allocations
14  in Excel, it would take hours until the program
15  produces the result.  Sometimes the program just
16  would crash because there was just a lot of data
17  there.
18  So that's why the department which brought me
19  in as a consultant first wanted to automate this
20  part.  Well, to cut the long story short, the actuals
21  were automated.  So all the allocations, those
22  percentages that were residing in the Excel model

27 (Pages 102 to 105)

Page 106

1    were now residing PeopleSoft 3.

2         So the data that I would receive would already

3    have the allocations.  So what I needed to do was

4    just to put this data into the Excel file and create

5    the reports.

6         Q.   Now, you would get this data from the

7    general ledger?

8         A.   From the general ledger, right.

9         Q.   Not from separate departments?

10        A.   No.  No.  After the close, after the

11   monthly close -- the close changed to three business

12   days.  So we needed to be efficient and the business

13   segment was extremely manual.  So once it became

14   automated, it was saving time for, actually,

15   analysis.

16        Q.   Now, incentive compensation, as I look

17   at this, it looks like it was two parts of this

18   business segment allocation report.

19        A.   Well --

20        Q.   Let me be clear.  I see it in the second

21   tier and the second box and the --

22        A.   Sure.  As the incentive compensation

Page 107

1    percentages that were residing in the file, you know,

2    that were identified as -- you know, let's call it

3    Janet Skoll's file which I inherited.  Those

4    percentages were given -- I understand were given to

5    us for each of the cost centers of the project by the

6    heads of capital markets, multiple family, and single

7    family.

8         Those percentages were different for the cost

9    centers.  For incentive compensation, the regular --

10   well, let's call it other percentages for allocation,

11   you know, which were run through the model.  For

12   incentive compensation --

13        Q.   I'm sorry.  Are you saying that you had

14   to handle incentive compensation differently?

15        A.   Right.  Right.  So on a monthly basis,

16   this file was updated with the new names of --

17        Q.   Excuse me.  When you say "this file",

18   you're referring to?

19        A.   The Janet Skoll incentive compensation

20   file was updated by a payroll file that I would

21   receive from the payroll which showed all the head

22   count at Fannie Mae according to different grades.  I

Page 108

1    would update the file that I had with the names of

2    new executives or I would delete executives that

3    departed, and this very simple Excel spreadsheet

4    would run the allocation percentages.  These

5    allocation percentages would be put into the business

6    segment allocation model.

7         So that part, that file, was only used to

8    create the allocation percentages.

9         Q.   Tim, can we look at Exhibit 17, please.

10        A.   Yes.

11        Q.   Can you tell me what this exhibit is?

12        A.   This is a process description.

13        Q.   For what?

14        A.   For the monthly business segment update.

15   This document was provided to me by Janet Skoll when

16   she was training me on how to do the monthly updates.

17        Q.   And it's instructions on what

18   specifically?

19        A.   How to update the incentive compensation

20   file and how to calculate those percentages, and you

21   previously asked about the difference between the

22   direct and indirect.  So the indirect percentage is

Page 109

1    basically the corporate piece, which is distributed

2    according to the indirect allocation.  Direct is

3    something which is assigned, you know, 100 percent or

4    a certain percentage to a specific cost center.

5         Q.   What information would you get from the

6    Payroll Department?

7         A.   On a monthly basis, I would get the

8    payroll file which kept all the current employees for

9    Fannie Mae.  I would be able to see the grades of the

10   individuals associated with a specific I.D. numbers

11   and I would manipulate this file, put it into the

12   incentive compensation allocation table that we

13   discussed before, and I would basically just see if

14   anyone's position has changed.

15        You know, if someone moved to a different

16   office, if there were any departures of executives or

17   if there were new additions of executives, those

18   fluctuations on a monthly basis will provide me new

19   allocations.  This is the first part.

20        On an annual basis, I would receive those

21   targets that we spoke about, targets for -- bonus

22   targets for the executives.

Arbitration Day 1                                                    July 22, 2014

Washington, D.C.

Page 110

1      Q.   Would you receive that from payroll?
2      A.   I would receive this from payroll as
3   well.
4      Q.   Would you receive any other information
5   from payroll?
6      A.   Not that I recall.  I think it was just
7   on a the monthly basis, it would be the -- again, the
8   payroll file, and on an annual basis, it would be the
9   targets, the bonus targets.  So I received bonus
10  target updates twice.
11     Q.   Now could we look at Exhibit 18, please.
12     A.   Yes.
13     Q.   Let me return to something you were just
14  saying for a minute.  You said that you received data
15  from payroll.  What was in the payroll file other
16  than the names and the grades?
17     A.   There were no names.  There were
18  employee IDs.  The names were residing into the
19  incentive compensation file.
20     Q.   Okay.
21     A.   There were --
22     Q.   So there were identifiers for employees?

Page 111

1      A.   Well, there was an employee I.D. and the
2   grade, and I believe that was it.  I think the
3   position titles resided in my file; but, for example,
4   if someone was promoted, you know, from one grade to
5   another -- and this file is for senior professionals.
6   This is not just the middle management.  This is
7   director -- starting with the director level.
8      So this file only contains the names of Grades
9   6 and 7 starting with the director, then SVP and the
10  chief executive officer.
11     Q.   Now, you testified that the business
12  segment allocation report would have the forecast,
13  which we have samples of, and it would also have
14  actuals.  Would that be true for incentive
15  compensation?  Would that include both actuals and
16  forecasts?
17     A.   Yes.
18     Q.   And the budget?
19     A.   Of course.  Well, yes.  Right.
20     Q.   And would you receive actual numbers
21  from payroll for the incentive compensation?
22     A.   The actual numbers would be pulled from

Page 112

1   the general ledger, but I would also receive
2   incentive compensation reconciliation on a monthly
3   basis.  So the number in the incentive compensation
4   reconciliation, the bottom number, will be matched to
5   the number that I would get from the general ledger.
6      So this was my check, the two numbers, the
7   bottom numbers from the system and the number that I
8   received from another source that would tie that
9   there were no discrepancies.
10     Q.   I think we'll take a look at that.  I'm
11  watching our time.
12     Can we look at Exhibit 18.  I think we can
13  move through that.
14     A.   Yes.
15     Q.   Tim, tell me what Exhibit 18 is.
16     A.   Exhibit 18 is the file that we refer to
17  as the Janet Skoll file.  This is the executive
18  compensation allocation.  This is the file --
19     Q.   Excuse me.  Are you saying that you
20  referred to it as Janet Skoll's file even when you
21  were updating the file?
22     A.   No.  No.  We referred to it in the

Page 113

1   testimony.
2      Q.   I'm just asking you about this.
3      A.   Right.  So we referred to it during my
4   time when I worked at Fannie Mae as the Janet Skoll
5   file.
6      Q.   Okay.
7      A.   So it was referred to as the executive
8   compensation allocation file.  This is the file that
9   I inherited from a previous employee who transferred
10  to a different department.
11     Q.   And that employee was Janet Skoll?
12     A.   That employee was Janet Skoll.
13     Q.   You inherited it.  What did do with it?
14  Did it form a part of your work each month?
15     A.   Yes.  I updated file on a monthly
16  schedule, and the process descriptions that we looked
17  at before, this is the process description of how to
18  update this specific file.  I became what we called
19  the owner of this file shortly after I became an FTE
20  at Fannie Mae, I believe approximately in October of
21  2007, and I remained responsible for updating this
22  file through March of 2009.

29 (Pages 110 to 113)

## Page 114

1          Q.   So this file bears what relationship to
2    the business segment report?
3          A.   The only relationship that it bears that
4    the necessary for the business segment report is that
5    it provided the allocations between the three
6    businesses of Fannie Mae and the corporate piece.
7          Q.   Okay.  Now, this list in Exhibit 18 of
8    executives, does this list list scheduled payments or
9    does it record actual payments?
10         A.   Those are the targets.  This list does
11   not represent any actuals, but those are the annual
12   bonus targets.  Those targets are updated once a
13   year, and I changed -- I believe, actually, these
14   numbers that we see now was the numbers that were the
15   first numbers.  I updated those numbers at some point
16   of me being responsible for this file.
17         So I would get these numbers from the payroll.
18   When I started working on this file, I actually asked
19   Janet as a former KPMG auditor, I asked her why this
20   information was just -- I was surprised that the
21   names of executives were, first of all, disclosed in
22   this file, because in order to run the allocations,

## Page 115

1    you don't need the executives' numbers.  You just
2    need the IDs and the cost center and let's say the
3    target.
4         I also felt that the bonus targets were
5    confidential information and I did not believe this
6    file was treated as confidential.
7         Q.   Excuse me.  Can I interrupt?
8         A.   Yes.  I'm sorry.
9         Q.   When you inherited this file in the fall
10   of 2007, was it password protected?
11        A.   No, it was not.
12        Q.   Was it in any way -- how accessible was
13   it?  Could Fannie Mae employees access it?
14        A.   It was accessible --
15        MR. MIOSSI:  Objection.  I have an objection.
16   There's no foundation of how this witness would know
17   what other Fannie Mae employees could access.  There
18   hasn't been any testimony on that.
19        JUDGE SWEENEY:  This is the file he described
20   himself as being the, quote, owner of the file.
21        Is that correct, Counsel?
22        MS. KUNTZ:  That was the testimony.

## Page 116

1         JUDGE SWEENEY:  Under their customs and
2    usage, and I think that might give him a basis.  I'll
3    overrule the objection at least for the moment,
4    obviously, subject to cross-examination.
5         THE WITNESS:  This file was accessible by any
6    employee in my group.
7         JUDGE SWEENEY:  Any employee what?
8         THE WITNESS:  In my group, in the corporate
9    consolidations and the financial analysis people who
10   worked on the general and administrative expense
11   side.  I asked several employee to open the file for
12   me and they were able to open it.
13        JUDGE SWEENEY:  Would it have been accessible
14   by anybody else at Fannie Mae that you're aware of?
15        THE WITNESS:  I don't know that, but it was
16   accessible by my teammates.
17        JUDGE SWEENEY:  I have a hard time
18   envisioning how big the group is or how small a group
19   we're talking about.
20        THE WITNESS:  The group was probably at least
21   20 people.
22        JUDGE SWEENEY:  All right.  Go ahead,

## Page 117

1    Counsel.
2    BY MS. KUNTZ:
3         Q.   You were talking about having raised
4    your concerns about the confidentiality of the
5    information to -- was this to Janet Skoll that you
6    raised the concern?
7         A.   First, I was surprised -- yes.  First,
8    it was Janet Skoll.  I asked, first of all, why we
9    were handling this file, because to me, I thought
10   that it had a confidential nature to it and that it
11   should not have resided with us.  She said that
12   this --
13        Q.   Excuse me.  Where did you think it
14   should reside?
15        MR. MIOSSI:  Objection.
16        JUDGE SWEENEY:  I'll overrule the objection.
17   Go ahead.
18        THE WITNESS:  I believed it should have
19   resided with the Payroll Department and the people
20   who are responsible for calculating the bonuses,
21   etc., you know, whoever was responsible, because it
22   just had sensitive information; and that was the one

Arbitration Day 1                                                         July 22, 2014

Washington, D.C.

| Page 118 | Page 120 |
|---|---|

**Page 118**

1   who brought that issue to the first manager, who was
2   Mary Martin.  Then I brought this issue to my second
3   manager.
4   BY MS. KUNTZ:
5       Q.   Who was?
6       A.   Who was Kristin.  As a matter of fact,
7   when Kristin became my manager and we had a
8   one-on-one meeting as a new employee and new employee,
9   she asked me to tell her what was my biggest concern
10  in my work, and I said that this file was my biggest
11  concern because at this time, the news about AIG, it
12  happened after Fannie Mae went into the
13  conservatorship.  This news was already a hot topic.
14  I said we even don't have a password for it.
15      Q.   When did you have this conversation with
16  Ms. Harrison?
17      A.   It was when she became my manager.  So
18  it was probably late October, November of 2008.
19      Q.   And did you make specific suggestions as
20  to this file?
21      A.   Yes.  I said that at the very least, we
22  need to password protect it and I also suggested that

**Page 120**

1       Q.   Did she take any steps in response to
2   this, to your knowledge?
3       A.   She gave me instructions.
4       Q.   What were her instructions?
5       A.   To protect the file with a password.
6       Q.   Did you do so?
7       A.   I did and I sent an E-mail with a
8   password to her.
9       Q.   When did you password protect this file?
10      A.   Right after she became my manager when
11  she gave me that directive.
12      Q.   So sometime in the fall of 2008, as you
13  testified --
14      A.   Yes.
15      Q.   -- for the date of the meeting or soon
16  after?
17      JUDGE SWEENEY:  Counsel, I think I'll need to
18  take our recess.
19      Counsel, it's really more up to you than to
20  me, because I can come back at any time, but how long
21  would you like to have for a luncheon?  I can come
22  back at any time after one o'clock.

| Page 119 | Page 121 |
|---|---|

**Page 119**

1   this file should be outside our group.
2       Q.   Did you suggest where the file should
3   be?
4       A.   At the payroll.
5       Q.   Were there any action items to come out
6   of this meeting?
7       A.   Yes.  Kristin mentioned the file to Mary
8   Martin, and I believe there was also a conversation
9   between Kristin, Mary Martin, and Sean Delaney.
10      MR. MIOSSI:  I object.
11  BY MS. KUNTZ:
12      Q.   How do you know Kristin --
13      JUDGE SWEENEY:  I'll sustain without some
14  foundation being laid.
15      THE WITNESS:  Kristin told me --
16      JUDGE SWEENEY:  Wait.
17      Go ahead, Counsel.
18  BY MS. KUNTZ:
19      Q.   Mr. Skrynnikov, can you tell me if
20  Ms. Harrison ever discussed with you any steps that
21  she took with regard to this file?
22      A.   Steps that she took?

**Page 121**

1       MR. MIOSSI:  An hour?
2       MS. KUNTZ:  An hour.
3       JUDGE SWEENEY:  Okay.  We'll come back at
4   1:30 and continue with the testimony.
5       [Whereupon, at 12:24 p.m., a lunch recess was
6   taken, to reconvene at 1:30 p.m. this same day.]

Alderson Reporting Company
1-800-FOR-DEPO

Page 122

1    A F T E R N O O N   S E S S I O N
2            [1:32 p.m.]
3        JUDGE SWEENEY:  All right.  If we're ready,
4    we'll get back on the record now and continue with
5    the direct examination.
6            FURTHER DIRECT EXAMINATION
7    BY MS. KUNTZ:
8        Q.   Mr. Skrynnikov, we've looked at several
9    reports this morning.  Now what I would like to do is
10   to explore how they're put together.
11       Which of these reports do you create?
12       A.   The business segment allocation report.
13       JUDGE SWEENEY:  Sir, could you speak up a
14   little bit.
15       THE WITNESS:  The business segment allocation
16   report.
17   BY MS. KUNTZ:
18       Q.   So let me call attention to Exhibits 29
19   through 31, if you can refer to those as we go
20   through this.  From where do you get the data for the
21   business segment allocation report?
22       A.   Well, it comes from three sources.  The

Page 123

1    incentive computation reconciliation report is the
2    one of sources, minor sources.  Then the report that
3    we discussed before, the executive allocation report
4    with the names of the executives and allocation
5    percentages.
6        Q.   Could you look at Exhibit 18 and tell me
7    if that's the report you're referring to.
8        A.   Yes.  This report was used to derive the
9    allocation percentages on a monthly basis.
10       Q.   Okay.
11       A.   The general ledger was pulling the data
12   from -- I'm sorry.  The data was pulled from the
13   general ledger.  That was the primary source of the
14   information.
15       Q.   Okay.  So let's look at Exhibit 29.
16       A.   Yes.
17       Q.   What is this report telling us?
18       A.   Well, Exhibit 19 is labelled full year
19   forecast as of the First Quarter 2009.  It means that
20   this report shows three months worth of actual data
21   plus nine months of forecasted data.
22       Q.   And what is the data for?  Explain to me

Page 124

1    what the data is.
2        A.   The data is to show the allocation of
3    all the general and administrative expenses between
4    the three business segments at Fannie Mae.
5        Q.   And you were explaining how reliable
6    that data is.
7        A.   It's 100 percent reliable because it all
8    came from the general ledger.
9        Q.   Okay.  And -- but it's a forecast.  So
10   does that mean -- can you explain where --
11       A.   The actuals part was 100 percent
12   reliable.
13       Q.   Okay.
14       A.   Because those were the entries that were
15   already accrued or those were the actual expenses, in
16   this instance, for January, February, and March, the
17   three months of the first quarter.
18       Q.   So the Quarterly 1 DSA report is going
19   to have actuals for January, February, and March, but
20   the rest of year will be forecasts?
21       A.   Correct.
22       Q.   Could we look at Exhibit 31.

Page 125

1        A.   Yes.
2        Q.   Now, how is this report different than
3    Exhibit 29?
4        A.   The only difference is that for the
5    second quarter of 2009, there was six months worth of
6    actual data and six months of forecasts.
7        Q.   Also looking at Exhibit 31, can you tell
8    me what this report tells us about incentive
9    compensation?
10       A.   It shows how incentive compensation is
11   allocated between the three business segments and,
12   also, the method of allocating incentive, whether
13   it's direct allocation or indirect, which is a
14   corporate piece allocated according to the specific
15   allocation percentages that I calculated monthly.
16       Q.   Is incentive compensation specified on
17   the schedule, Exhibit 31?
18       A.   Yes, in two places.
19       Q.   Can you show where they are.
20       A.   The first one is under the direct
21   specific allocation and it's kind of in the middle,
22   the item --

Arbitration Day 1                                          July 22, 2014
Washington, D.C.

## Page 126

1     MR. MIOSSI:  Can I just -- I don't think you
2  want him writing in those documents, do you?  He has
3  pen ready to go.
4     JUDGE SWEENEY:  Particularly because other
5  witnesses may use this.
6     MR. MIOSSI:  Right.  Right.
7     JUDGE SWEENEY:  Okay.  I'm have trouble
8  following where -- where are you at, sir?
9     THE WITNESS:  It's in the middle of the page
10  under direct specific allocation.
11     JUDGE SWEENEY:  I see.  All right.
12     THE WITNESS:  Incentive compensation is line
13  5 from the bottom.
14     JUDGE SWEENEY:  Right.
15     THE WITNESS:  If you go to the total column,
16  which is the last column on your right, you will see
17  $198,367,000.
18  BY MS. KUNTZ:
19     Q.   And what does that number represent?
20     A.   It represents the portion of the six
21  months of actuals and six months of forecasted
22  incentive compensation for the year which was

## Page 127

1  directly allocated.  It's just a portion of incentive
2  compensation.
3     Q.   And what's the other portion of
4  incentive compensation?
5     A.   The other portion is under indirect
6  allocation, and if you go down, you'll see 300
7  million in handwriting and the question mark there.
8  So right next to it, you'll see 99,638,000.  That's
9  the portion of indirectly allocated incentive
10  compensation.
11     The sum of 198 million plus 99 million equals
12  approximately 300 million.
13     Q.   And what does that 300 million figure
14  represent?
15     A.   It represents the forecasted amount to
16  be spent for incentive compensation as of the second
17  quarter of 2009.  It means that it shows six months
18  of accrued expenses, actuals, plus six months of
19  forecasted expense.
20     Q.   So let's look back at Exhibit 29.
21     A.   Yes.
22     Q.   Now, on Exhibit 19, can you point to

## Page 128

1  where it discusses incentive compensation?
2     A.   Well, it will be approximately in the
3  same location.  So for the direct specific
4  allocation, you will see -- it's Line No. 5 from the
5  bottom and it shows incentive compensation in the
6  amount of 224,241,000, and for the indirect, you will
7  see incentive compensation in the middle of -- a
8  little lower than the middle, and it's 112
9  thousand -- 112,720,000.
10     The sum of the both is 336 million and it is
11  comprised of three months of actuals and nine months
12  of forecasts.
13     Q.   So what is the significance, what does
14  it tell you, that the total incentive compensation on
15  Exhibit 29 is greater than the total incentive
16  compensation on Exhibit 31?
17     A.   Well, to me, it means there were certain
18  entries made during the three months of the second
19  quarter.  You know, the actuals came in and they came
20  in at a lower dollar amount.
21     Q.   So Quarter 2 report in Exhibit 31 --
22     A.   Yes.

## Page 129

1     Q.   -- is reflecting?
2     A.   Six months of actuals.
3     Q.   Whereas report Exhibit 29 is reflecting?
4     A.   Three months of actuals.
5     Q.   And so your conclusion has to do with
6  the last three months of actuals?
7     A.   The three months in the second quarter.
8     Q.   And your conclusion about those three
9  months is what?
10     A.   That the amounts booked for the
11  incentive compensation were lower than originally
12  forecasted, than forecasted during the first quarter.
13     Q.   When you say booked, what do you mean?
14     A.   That there was an actual accrued
15  expense.
16     Q.   Now I would like to look briefly at a
17  couple of the other reports that you've talked about.
18  On 18, Exhibit 18, can you tell me what elements of
19  18 contribute or you rely on to produce the business
20  segment allocation report each month?
21     A.   If you go to the last page of the
22  report --

33 (Pages 126 to 129)

Arbitration Day 1                                      July 22, 2014

Washington, D.C.

---

Page 130

1      Q.   The last page of Exhibit 18?
2      A.   Yes.
3      Q.   Okay.
4      A.   You will see a shadowed box.  The first
5  line has the title "Corporate" and then "Capital
6  Markets".  Immediately -- and etc.  Immediately --
7      Q.   Excuse me.  Can you spell out what the
8  "etc." is?
9      A.   Corporate, capital markets, single
10  family, and HCD, which is the multifamily, and the
11  last column is the total percentage.  Immediately
12  below those titles, there are percentages.  For
13  corporate, it's 38.03 percent; for capital markets,
14  15.86; for single family, it seems like 20-something
15  percent; HCD is 17.24 percent.
16      All of these percentages comes to 100 percent.
17      For the business segment allocation report,
18  the only part of this report which is used are those
19  percentages.  Those percentages change on a monthly
20  basis when I did this report and they're blocked into
21  the business incentive allocation report, just the
22  percentages.

---

Page 131

1      Q.   Just the percentages, and all the
2  previous pages of this report, are they used by you
3  at all for the business segment allocation report?
4      A.   Not for the business segment report.
5      Q.   Are they used for any other report?
6      A.   Not to my knowledge.
7      Q.   You mentioned another report that you
8  use in preparation of business segment allocation
9  report?
10      A.   Yes.
11      Q.   Can you remind me what that is?
12      A.   It was the incentive compensation
13  reconciliation report.
14      Q.   Could I direct your attention to Exhibit
15  42.
16      A.   I'm sorry?
17      Q.   Exhibit 42, please.
18      A.   Yes.
19      Q.   What is this?
20      A.   This is the employee incentive
21  compensation expense reconciliation report.
22      Q.   Is this the report that you were talking

---

Page 132

1  about you relied on?
2      A.   Yes.
3      Q.   What do you use that for for the
4  business segment allocation report?
5      A.   Well, it was just to audit final number,
6  the total number of incentive compensation for the
7  reporting period.
8      Q.   So explain that.  What number would you
9  compare to what number?
10      A.   Well, for example, this one is as of May
11  31, 2009.  So for my business segment allocation
12  report for May 2009 actuals, I will make sure that
13  the balance which is shown in the bottom line, which
14  under program, it says total GL balance for Cost
15  Center 081, and if we go to the column titled May
16  2009, it shows 23.549 million dollars, which is an
17  accrued amount for incentive compensation.
18      So in my business segment allocation report,
19  the sum of the incentive compensation must equal that
20  amount.
21      Q.   Okay.
22      A.   So it was a check.

---

Page 133

1      Q.   Did you generate this report --
2      A.   No, I did not.
3      Q.   -- Exhibit 42?
4      A.   No.
5      Q.   Where would you get this report?
6      A.   Typically, I would get it from Lourdes
7  Alcalde, my coworker.
8      Q.   Was she in your department?
9      A.   Yes, she was.
10      Q.   So you would get this report from her
11  and you would simply use it to verify a number on
12  your business segment allocation actual report?
13      A.   Yes.  Well, yes.
14      Q.   What are all of these separate
15  categories?  You wouldn't have to calculate any of
16  these separate categories on this report?
17      A.   No.
18      Q.   Okay.  Did you get this report, Exhibit
19  42, monthly?
20      A.   Yes.
21      Q.   Now I want to bring your attention to
22  mid-March 2009.

---

34  (Pages 130 to 133)

Arbitration Day 1                                              July 22, 2014
Washington, D.C.

Page 134

1      A.   Yes.
2      Q.   Do you recall learning about a request
3   for bonus data from Senator Grassley?
4      A.   Yes.
5      Q.   How did you learn about that?
6      A.   I learned, I believe, through the news
7   clips E-mail that I got in the morning in my Outlook
8   box at Fannie Mae.
9      Q.   Okay.  Tell me what that E-mail was.
10     A.   Well, it just contains links to any --
11  well, I guess reliable news sources that mentioned
12  Fannie Mae during, you know, this day or immediately
13  preceding this day.
14        So, typically, you know, I would click on it,
15  you know, those links.  So, you know, I clicked on
16  one of the links and I saw that there was a mention
17  that the Senate was -- something about the inquiry
18  into Fannie Mae and, you know, I went to the linked
19  site and there was mention of Grassley and then I
20  went to his website and I read the letter.
21     Q.   Okay.
22     A.   Which talked about -- which addressed, I

Page 135

1   believe, Fannie Mae and Freddie Mac.  As far as
2   Fannie Mae, it talked about the bonuses.
3        MR. MIOSSI:  Object.  If you've got the
4   letter, I think we should look at it.
5        JUDGE SWEENEY:  I'll sustain the objection.
6        THE WITNESS:  Sure.
7   BY MS. KUNTZ:
8      Q.   Could I direct your attention to Exhibit
9   36.
10     A.   Yes.
11     Q.   Did you read about this request anywhere
12  else?
13     A.   Well, I read about it in the news.  I
14  think they also reported this on TV.
15     Q.   Okay.  Now could you look at Exhibit 36.
16  Is this one of the sources you looked at when you
17  were reading about Senator Grassley's request?
18     A.   Well, this source is directly from his
19  website.  So that's the first source, the original
20  source.
21     Q.   Now, what interested you about this
22  letter?

Page 136

1      A.   Well, everything was interesting in the
2   letter, but as far as my job was concerned, you know,
3   I saw several requests to Fannie Mae of which, you
4   know, were of concern to me.  I was -- I kind of
5   questioned whether we needed to produce -- that my
6   department needed to produce some information for the
7   request.
8      Q.   Can you point to some of the things that
9   directly concerned you in this letter?
10     A.   My first concern was -- can be found on
11  page 3 under paragraph 5 where it says please provide
12  a list of the names, titles, and position
13  descriptions for each employee to whom Fannie Mae
14  paid bonuses of 100,000 or more in 2008 or whom it
15  may pay bonuses of 100,000 or more in 2009 and 2010.
16     Q.   And why did that concern you?
17     A.   Because the file that we discussed
18  listing the names of executives, the titles with the
19  bonus targets, seemed to be responsive to me in this.
20  You know, it seemed to contain the information that
21  the senator was asking for.
22     Q.   Now let me be clear.  That file by which

Page 137

1   you mean Exhibit 18?
2      A.   Yes.
3      Q.   Does that file record forecasts or
4   actuals?
5      A.   It records the target.
6      Q.   The target?
7      A.   Yes.
8      Q.   And what is the target?
9      A.   The target is an estimate, an
10  expectation, and this request says -- asks to whom
11  Fannie Mae may pay bonuses of 100 or more in 2009 and
12  2010.
13        So to me, it was kind of responsive because it
14  was asking about -- in my mind, it was the estimate.
15     Q.   Were there any other concerns in this
16  letter?
17     A.   Yes.  If you go to the previous page,
18  page 2, at the very bottom of the page starting with
19  sentence:  "Because I'm concerned with maximizing
20  taxpayer investments in Fannie Mae, I'm requesting
21  first the official document outlining the retention
22  program and any other bonus compensation

35  (Pages 134 to 137)

Page 138

1   arrangements".
2        So those were two kind of issues from the
3   letter that I was concerned with.
4        Q.   Now, what did you do when you saw this
5   request from Senator Grassley?
6        A.   Well, I immediately, actually, addressed
7   the first part about the list of executive names and
8   bonuses that the employee may get in 2009 over
9   100,000.  You know, I spoke with Kristin about this,
10  and I said, So you see why I didn't want to have this
11  file in our possession, because this file lists all
12  the names, you know, of people who are eligible for
13  bonuses over a hundred thousand.
14       And she asked me if it was password protected.
15  I said yes.
16       Q.   Now, when did you have this conversation
17  with her?
18       A.   That was on the day when I saw this
19  article.
20       Q.   And where did you have this
21  conversation?
22       A.   In her cube.

Page 139

1        Q.   So you went to her cube?
2        A.   Yeah.
3        Q.   Did you discuss anything else at the
4   same meeting?
5        A.   Not at the same meeting, no.
6        Q.   Did you discuss this issue with
7   Ms. Harrison again?
8        A.   Yes.
9        Q.   When?
10       A.   When the response from on behalf of
11  Fannie Mae was published on Fannie Mae's intranet.
12       Q.   So you actually saw the response?
13       A.   Oh, yes.
14       Q.   And you read the response?
15       A.   Not only I read the response, but I
16  printed the response.
17       Q.   You did what?
18       A.   I printed the response.  I highlighted
19  some portions of the response which were troubling
20  me.
21       Q.   Let's talk about what was troubling you
22  about the response.

Page 140

1        A.   Well, I already -- the response was
2   talking about --
3        MR. MIOSSI:  Object.  We've got the response.
4   We should see the response.
5        MS. KUNTZ:  I don't think we do have the
6   response.  I think we failed to enter it in evidence.
7   I don't see it in the evidence.
8        JUDGE SWEENEY:  Okay.  Go ahead.  I'll
9   overrule the objection.
10       You can answer, sir.
11       THE WITNESS:  The response addressed those
12  two issues of concern to me.  The first issue dealt
13  with the names of employees that may be receiving
14  bonuses of over 100,000 in 2009 and 2010.  The
15  response was along the lines that this is
16  confidential information and, you know, it cannot be
17  released, briefly.
18       That kind of made sense to me.  So there was
19  a response, but my main concern was with the fact
20  that only one small part of the bonus compensation
21  was disclosed in the response, the retention bonus.
22       As I just read from the request by the

Page 141

1   Senator, he requested detail on the retention bonus
2   and any other bonus arrangements.  The data that I
3   had available to me showed not just the 72 million in
4   retention bonuses were disclosed in the response, but
5   it showed the total amount of bonus compensation in
6   the amount of $350 million, approximately.
7        So the variance was too large not to see it.
8        Q.   Now can you point to the document or the
9   report that you had access to at Fannie Mae that gave
10  you these numbers.
11       A.   That was the report that I was receiving
12  from Lourdes Alcalde titled "Employee Incentive
13  Compensation Reconciliation" which listed all bonus
14  programs in effect at Fannie Mae during the reporting
15  period.
16       Q.   Could we look at Exhibit 42.
17       A.   Yes.
18       Q.   Is that the report that you're referring
19  to?
20       A.   That's the report for -- as of May 2009,
21  yes.
22       Q.   But you saw that report each month?

Page 142

1    A.   Yes.

2    Q.   And can you point to something in the

3  report that you focused on with the response to

4  Senator Grassley?

5    A.   Well, I wondered why other programs

6  listed in the report -- the numbers are a little

7  different here from what I saw in the March or April

8  report, but you will see that the retention bonus is,

9  you know, 76.6 million, which is a little higher than

10  what was reported, but then there are a whole number

11  of other problems that don't budget.

12    For example, annual incentive performance, I

13  think program, the first line shows 73.5 million.

14  Discretionary bonus, the third line, shows 60 million

15  and the deferred cash awards, 43 million.  Those are

16  the largest three lines here and restricted stock of

17  68 million, and what I was surprised to see in March,

18  that -- well, those programs were active because

19  there were actual accruals, you know, for those

20  months, and if you look at this schedule, the

21  programs were still active January through May.  They

22  show the accruals.

Page 143

1    Q.   I'm sorry.  Can you explain to me how

2  this report shows that the program were still active?

3  Take us through it.

4    A.   Let take a look at the column in the

5  middle of this report.  It's titled "Year-to-Date

6  Total".

7    Q.   Okay.

8    A.   If you go to the last line, you'll see

9  140,626,000.  That shows that this amount has been

10  accrued, you know, for the bonus program.

11    Q.   Does year-to-date total means that this

12  is accrued?

13    A.   It is accrued.  This is something, like

14  I said -- well, I wanted to say like I said in my

15  deposition, but let me take this back.

16    You cannot accrue for something which does not

17  exist.  It's as simple as that.  So if there is an

18  accrual showing actuals, it means that the program

19  exist s.

20    Q.   And the difference between year-to-date

21  total and 130,626,000 and the 350,975 is what?

22    A.   That's the forecast.  This is how much

Page 144

1  the company is expected to pay out at the end of the

2  year.  So by the end of the year, it should be --

3  let's say as of December, it will be just actuals for

4  the year.

5    Q.   Okay.  Thank you.

6    So you had these concerns.  What did -- did

7  you do anything?

8    A.   Like I said, I printed the response.  I

9  also had this page for the period we were in.

10    Q.   Had what page?

11    A.   The employee incentive compensation

12  expense reconciliation, which provided the detail of

13  the bonus of the programs in existence as of March of

14  that -- it was -- I believe it was the March report

15  and I, you know, went to Ms. DeMent's cube and I

16  said, Did you see the response?  I don't recall her

17  answer, but I said, So we're saying in the response

18  that there is only a retention program of 72 million,

19  but data from PeopleSoft, you know, data from the

20  reconciliation shows that we have more than that.

21    I asked if this data was going to be changed

22  similar to the events that took place in the fall of

Page 145

1  2008 when the --

2    Q.   Now, first of all, why did ask if the

3  data would be changed?  Why would you think that it

4  was going to be changed?

5    A.   Because I thought that the response

6  provided, you know, to our U.S. Government official

7  was the most updated and truthful response and it

8  reminded me to the events that followed immediately

9  after Fannie Mae went into the conservatorship the

10  previous fall.

11    Q.   So tell me what those events were.

12    A.   Well, the Fannie Mae regulator, the

13  conservator, went over all the bonuses.  So all the

14  bonuses were pretty much zeroed out.

15    Q.   Did you see that in the report you

16  accessed?

17    A.   Yes.

18    Q.   How did it show up in the report?

19    A.   Well, it was a much smaller amount.  So

20  the budget was changed.  The actuals were changed.  I

21  don't remember now.

22    I mean, it wasn't a zero, let's say, but it

37 (Pages 142 to 145)

Page 146

1    was -- I mean it wasn't hundreds of millions of
2    dollars. It was something much smaller.
3        Q. So let me understand. In the fall of
4    2008, those incentive compensation lines we looked at
5    in the business segment allocation report would have
6    been substantially smaller --
7        A. Yes.
8        Q. -- than you were looking at?
9        A. Yes.
10       Q. No zero?
11       A. They changed month over month. There
12   was dramatic drastic drop, yes.
13       Q. They changed month over month meaning
14   from one month to the next?
15       A. Right. Well, when the conservator
16   ordered the bonuses to be cancelled, there was -- the
17   next month, I didn't see those accruals anymore. It
18   was a much lower amount.
19       Q. So how did that occur and why did you
20   think of that occurrence when you looked at this
21   disparity between the Grassley request and FHFA
22   report?

Page 147

1        A. Could you rephrase it? I'm sorry.
2        Q. Yes. You said that you went to
3    Ms. Harrison and you thought this might like what
4    happened in 2008.
5        A. Yes.
6        Q. And I'm just trying to figure out what
7    -- how were they similar?
8        A. Well, to me, I thought the more current
9    information was the information provided in the
10   response. So I asked, you know, when am I going to
11   see that change. I thought that at this point, it
12   will happen almost similar to what happened, you
13   know, six months prior to that.
14       Q. So when you say when we're going to see,
15   you meant when you're going to see it in a report?
16       A. In the general ledger and in the report,
17   the reconciliation report.
18       Q. The general ledger information data that
19   would show up in your business segment allocation
20   report?
21       A. Yes. Yes.
22       Q. What did Ms. Harrison say?

Page 148

1        A. She responded rather abruptly to me and
2    she said that all the changes will be next quarter
3    because we are already in the end of this quarter.
4        Q. This conversation took place in --
5        A. In her view. That was at the end of
6    March. So we were preparing for the close. We're
7    all busy.
8        Q. Were you satisfied with this response?
9        A. I was not 100 percent satisfied.
10       Q. Why not?
11       A. I just thought it was really strange
12   that there was a -- I had been told that -- I had
13   been taught and in my previous work I knew that you
14   need to be absolutely honest when you're answering an
15   officer of the U.S. Government. I know that it's --
16   and I did not feel that the answer was what was being
17   asked, that it was a full answer.
18       Q. And I'm asking you about what
19   Ms. Harrison said to you. What caused you concern
20   about that? You said you were only partially
21   satisfied with that.
22       A. Because last year, it happened like

Page 149

1    instantaneously. I mean the year before, in the fall
2    or 2008.
3        Q. The change?
4        A. The change happened, and at that point,
5    it was also a very hot topic. There was legislation
6    calling for taxation of 90 percent of retention
7    bonuses at FNMA, and if the full amount would have
8    been disclosed, probably the public, you know,
9    reaction would be -- would have been magnified.
10       Q. So your concern was tied to how quickly
11   things happened in 2008, and what caused you concern
12   about what Ms. Harrison had said?
13       MR. MIOSSI: I object to the leading form of
14   these question.
15       JUDGE SWEENEY: I think it's, actually, one
16   of the less leading ones recently. So I'll overrule
17   the objection.
18       THE WITNESS: Would you repeat?
19   BY MS. KUNTZ:
20       Q. I'm just asking you to draw a
21   connection. You applied a connection. Can you draw
22   a connection between what happened in 2008 and what

Page 150

1  Ms. Harrison said to you?
2       A.   I just --
3       MR. MIOSSI:  Same objection.
4       JUDGE SWEENEY:  All right.  I'll overrule it.
5       THE WITNESS:  There was no -- I didn't
6  understand what was the -- why we were having a
7  delay.  You know, my understanding was through 2009
8  that still there was only a discretionary bonus.  I
9  saw those accruals and, you know, I wondered why they
10  were there.
11  BY MS. KUNTZ:
12       Q.   Okay.  Did you raise this issue with
13  Ms. Harrison again?
14       A.   Yes.
15       Q.   When?
16       A.   I think the next time, it was during the
17  April 28th meeting.
18       Q.   Okay.  Now what was the purpose of the
19  April 28th meeting?
20       A.   It was scheduled to be a development
21  meeting between a supervisor and an employee;
22  however, it developed in a completely different

Page 151

1  direction.
2       Q.   Where did the meeting take place?
3       A.   The meeting took place in an office
4  which was adjacent to Ms. Harrison's cube.
5       Q.   And who was present for the meeting?
6       A.   It was just me and Ms. Harrison behind a
7  closed door.
8       Q.   Okay.  And how did you come to raise
9  this topic?
10       A.   During the meeting, Ms. Harrison accused
11  me of not contributing the value to the company for
12  the -- you know, for my level, for my grade level and
13  also for my salary.
14       She questioned my salary, and in response, I
15  actually said that, Well, you know, I don't think
16  that other people, especially executives, contribute
17  enough value for their salaries, and that kind of
18  triggered my question about the incentive
19  compensation and I asked when can I expect to see the
20  changes to the general ledger and the incentive
21  compensation cost center.
22       Q.   And what was the response?

Page 152

1       A.   That provoked just an extremely agitated
2  and angry response that -- I'm not sure if I should
3  be, you know, repeating what we -- because it was
4  just an extremely personal attack at me, which drove
5  me, like I said, to tears.
6       You know, she was throwing things in my
7  direction.  She was screaming on top of her lungs.
8  She stated that she could see hatred in my eyes.  She
9  said that she could tell by my body language that I
10  hate her.
11       At this point, I was completely silent and I
12  was writing what she was saying in notebook to
13  document what she was saying.  Then she said, Why are
14  you so quiet; you don't understand English no more?
15  Something like this, along those lines, and that line
16  actually made me cry.  That's when I said I cannot
17  stay here anymore and I need to go back to my desk.
18       Q.   Did you go back to your desk?
19       A.   I walked out of the meeting and went
20  back to my desk.
21       Q.   Were there any subsequent discussions
22  with Ms. Harrison about this meeting?

Page 153

1       A.   Yes.
2       Q.   When?
3       A.   Several times.  Five minutes after I
4  went to my desk, first, I actually stopped by the
5  cubicle which was like six feet away of my coworker
6  who saw me crying and she asked me what it was, and I
7  said --
8       MR. MIOSSI:  Object.  Hearsay.
9       JUDGE SWEENEY:  Well, I don't think -- he's
10  going to say what he said, I think.
11       MR. MIOSSI:  Oh, that's fine.  I was
12  anticipating a quote.
13       JUDGE SWEENEY:  Fair anticipation.
14       All right.  You can say what you said to the
15  coworker, if anything.
16       THE WITNESS:  So I said that Kristin yelled
17  at me and screamed at me and stated, you know, this
18  whole hatred in your eyes, you know, what's the word?
19  Tirade?
20       MS. KUNTZ:  Tirade.
21       THE WITNESS:  Then I went to my desk and
22  tried to compose myself and I started drafting an

39 (Pages 150 to 153)

Page 154

1  E-mail to Kristin where I was addressing the meeting.
2       When I was done with the E-mail and I was
3  reviewing it, I saw that Kristin was behind my back,
4  looking over the shoulder on my computer, and she
5  said, What are you doing?  I was still kind of teary,
6  and I said I'm writing an E-mail to you, and she
7  said, Let me see.  I said, Okay, you can read it
8  right now.
9  BY MS. KUNTZ:
10      Q.  Could I direct your attention to Exhibit
11  39.  What is this?
12      A.  That's the draft of the E-mail that I
13  was preparing.
14      Q.  Did you ever send this E-mail?
15      A.  No, I didn't because she said that --
16  she apologized several times, but, you know --
17      JUDGE SWEENEY:  Did you say 39?
18      THE WITNESS:  Yes.
19      MS. KUNTZ:  Yes.  It's 39.
20      JUDGE SWEENEY:  The one at the top?
21      MS. KUNTZ:  The one at the top.
22      THE WITNESS:  Yes.  This is the draft that I

Page 155

1  prepared.
2       JUDGE SWEENEY:  Go ahead, Counsel.
3  BY MS. KUNTZ:
4       Q.  And so you had a conversation
5  immediately following the meeting?
6       A.  Yes.
7       Q.  Okay.  And was there any outcome to that
8  conversation?
9       A.  She apologized profusely.  She said that
10  she didn't want to be a bad cop.  You know, the
11  reaction that I had was also because I thought she
12  was a fair manager.  I actually thought that we were
13  on a friendly relationship, but that meeting showed
14  me that I was just -- that it wasn't so.
15      So I was hurt for myself and I also was the
16  hurt for her, because I was looking up to her before
17  that.  I thought she was one of the best people in
18  the department.  It really hurt me a lot that she
19  subjected me to treatment like she did.
20      Q.  Were there any subsequent discussions at
21  this meeting with Ms. Harrison?
22      A.  Yes.

Page 156

1       JUDGE SWEENEY:  I'm confused.  Are you saying
2  were there any subsequent discussions following this
3  meeting?
4       MS. KUNTZ:  Yes.
5       JUDGE SWEENEY:  All right.
6       MS. KUNTZ:  Following the meeting where they
7  discussed this draft E-mail.
8       JUDGE SWEENEY:  Go ahead.
9       THE WITNESS:  The next day, I showed up late
10  at work because I was overwhelmed and I really didn't
11  want to come to work.  That was first sleepless night
12  because it just had a really bad effect on me, that
13  event.  I was at my desk around ten o'clock, and
14  immediately, she stopped by and she said that she
15  wanted to make sure that I was okay, that she would
16  not have -- she wouldn't have forgiven herself if
17  something bad were to happen.
18  BY MS. KUNTZ:
19      Q.  Did you discuss the substance of the
20  meeting?
21      A.  No.  I was not able to discuss anything
22  at that point yet.

Page 157

1       Q.  Okay.
2       A.  I discussed the substance of the meeting
3  during the officially scheduled one-on-one meeting,
4  which was a couple of days later at the beginning of
5  May where I was more composed at point and I did say
6  that -- you know, I touched upon, again, that I felt
7  her remarks were inappropriate.  She apologized again
8  and we discussed some of my deliverables and the
9  incentive compensation report was one of them.
10      Q.  So you did discuss the executive
11  incentive compensation report?
12      A.  Yes.
13      Q.  Did you discuss your concerns about the
14  disparity?
15      A.  Not at that point because I waiting to
16  see the official numbers.  I think it was either May
17  1st or 2nd.  We had a three-day close.  So the final
18  numbers were not there yet.  So I was waiting for the
19  final numbers.
20      Q.  Did you discuss this meeting with anyone
21  else at Fannie Mae?
22      A.  Yes.  I -- when you say "this meeting",

Arbitration Day 1                                                July 22, 2014

Washington, D.C.

|  | Page 158 |
|---|---|

1   you mean the April 28th meeting?

2          Q.   Okay.

3          A.   Right?

4          Q.   The April 28th meeting, did you discuss

5   that.

6          A.   I mentioned this to my coworkers the

7   following day, a group of my coworkers.  I also

8   mentioned -- well, I discussed it with Kristin, of

9   course.  I discussed it with Natasha Colton, I think.

10         Q.   Who is that?

11         A.   With the Office of Compliance and

12  Ethics.

13         Q.   When did you discuss that with Natasha?

14         A.   I sent her an E-mail about retaliation

15  that I experienced from Kristin and referring to that

16  to the April 28th event.

17         Q.   Could I direct your attention to Exhibit

18  43.

19         A.   So that was sometime in late June of

20  2009.

21         Q.   Could you tell me what Exhibit 43 is.

22         A.   That's the E-mail.  That's the letter

|  | Page 159 |
|---|---|

1   that I sent her.

2          JUDGE SWEENEY:  Well, is that the first time

3   that you brought this to Natasha Colton's attention,

4   was in this E-mail, this letter?

5          THE WITNESS:  Yes.  Yes.

6          JUDGE SWEENEY:  Okay.

7          THE WITNESS:  Yes.  I already had been to the

8   Ethics Department and Kristin was aware of that fact.

9   BY MS. KUNTZ:

10         Q.   Now, did you ever discuss this E-mail

11  with Natasha Colton?

12         A.   Yes.

13         Q.   When did you have that discussion?

14         A.   When Natasha Colton returned from her

15  vacation.

16         Q.   And when was that, approximately?

17         A.   July 1st or July 2nd.  That was on the

18  same day.

19         Q.   Okay.  So did you discuss the April 28th

20  meeting with anyone else at the Fannie Mae?

21         A.   With Carrie Lee.

22         Q.   And Carrie Lee is from what department?

|  | Page 160 |
|---|---|

1          A.   From Human Resources.

2          Q.   And why did you discuss it with Carrie

3   Lee?

4          A.   When?

5          Q.   Well, we can start with when.  When did

6   you discuss it with Carrie Lee?

7          A.   It was on the same day I met with

8   Natasha Colton.  I met with her, I believe, at ten

9   o'clock in the morning.  At 1 p.m., Kristin came by

10  my cube and she asked me to follow her.  I followed

11  her.  She brought me into the SVP Sean Delaney's

12  empty office, but Sean was not there.  Actually, he

13  left when we walked in, but Carrie Lee was there at

14  the round conference table.

15         They asked me to sit down, and I believe it

16  was Carrie Lee who started the conversation and she

17  said that they was serving me with a written

18  performance warning letter.  I'm not sure about the

19  exact title of it.

20         Q.   Could I ask you to look at Exhibit 44.

21  Is this the document you were given at that meeting?

22         A.   Yes.

|  | Page 161 |
|---|---|

1          Q.   Okay.  And how did the conversation

2   about the April 28th meeting come up at that meeting?

3          A.   Well, first of all, April 28th is

4   mentioned here as one of the days when I didn't meet

5   the deliverables.  Okay.

6          Oh, first, Carrie Lee asked me to take my time

7   and read the letter.  So I kind of, you know, read

8   it, more like scanned it and, you know, all of the

9   events that are referred to in this letter, they all

10  occurred, as I recall, after April 28th, and I was --

11         Q.   Did you raise that issue?

12         A.   Yes.  I actually went back -- when I saw

13  April 28th -- so on page second, there is a reference

14  to April 28th, that it was the third time that I --

15         JUDGE SWEENEY:  Sir, where are you now, what

16  exhibit?

17         THE WITNESS:  Exhibit 44, page 2.  In the

18  middle of the report, you will see April 28th would

19  have been --

20         JUDGE SWEENEY:  Yes.  I see it.  Go ahead.

21         THE WITNESS:  So it really just made me

22  anxious and I felt that I was being set up, that she

Alderson Reporting Company
1-800-FOR-DEPO

Page 162

1    took complete advantage of me for something that she
2    was the cause, that she caused it, and I said
3    immediately to Carrie Lee do you know what happened
4    on April 28th, and I recounted the events that
5    happened.
6    BY MS. KUNTZ:
7        Q.   Now, are you saying that Kristin
8    Harrison was in the room when you --
9        A.   She was in the room.  I stated --
10       JUDGE SWEENEY:  And this is what day now?  Is
11   this --
12       THE WITNESS:  That's July 1st or July 2nd,
13   that summer.
14       JUDGE SWEENEY:  Okay.
15       THE WITNESS:  At this point, I was asked to
16   sign the performance letter.  I refused to sign it
17   because I stated that it was fabricated.  It was
18   designed to make me fired.  I also stated -- quoted
19   from my notebook that I had with me what Kristin told
20   me in my face, especially her words about hatred,
21   etc.  She denied it right there in front of Carrie
22   Lee.

Page 163

1    BY MS. KUNTZ:
2        Q.   What was Carrie Lee's response?
3        A.   Carrie Lee, she was very silent.  She
4    did not expect that I would -- you know, because
5    usually, I'm a quiet person.  She didn't expect me to
6    be so vocal about my concern and that I felt that,
7    you know, I was being retaliated, and I stated that I
8    feel it was retaliation.  I said that there was an
9    ethics investigation going on and all the events
10   mentioned in the letter, you know, they also all
11   happened after the -- you know.
12       Q.   Now, was there any outcome to the July
13   1st meeting with you, Carrie Lee, and Ms. Harrison?
14       A.   Yes.
15       Q.   And what was the next step?
16       A.   I asked Carrie Lee to schedule a
17   one-on-one appointment with me.  She scheduled it for
18   the next day.
19       Q.   And did you meet with her the next day?
20       A.   Yes.  I met with her the next day.
21       Q.   And what was the discussion then?
22       A.   I repeated what happened.

Page 164

1        Q.   Excuse me.  Let me ask to be clear, was
2    it just the two of you at this meeting?
3        A.   Yes.  It was in her office.
4        Q.   Her office?
5        A.   In H.R.  She took very detailed notes of
6    our discussion.  I discussed everything from the --
7    you know, all kind of big and little things that I
8    felt that contributed to Kristin's being -- Kristin
9    retaliating against me.
10       I also mentioned the incentive compensation
11   file, that she didn't agree with me with my treatment
12   of the incentive compensation issue.
13       Q.   And what did Ms. Lee have to say about
14   that?
15       A.   Ms. Lee was just listening and taking
16   the notes.  I also mentioned to Ms. Lee that I was
17   seeing an employer-sponsored psychologist because I
18   was having these issues with my sleep, issues with my
19   concentration, that, you know, I couldn't communicate
20   clearly at that point in terms of I was stuttering
21   and just dizzy, throwing up.
22       Q.   Were there any takeaways from this

Page 165

1    meeting?
2        A.   The only takeaway was that Ms. Lee
3    suggested that I look into the FMLA leave.  She said
4    that all the professional issues of my concern would
5    be addressed after I take care of my health; that was
6    priority number one and that I need to speak with the
7    Reed Group and my physician and look into taking care
8    of myself first and that the professional issues
9    would be resolved after I feel better physically.
10       Q.   And so this meeting was on July 2nd?
11       A.   Yes.
12       Q.   What did you do next?
13       A.   I don't remember.  I went back to my
14   desk.
15       Q.   Did you pursue FMLA leave?
16       A.   Not on that day, but there was another
17   meeting with Kristin.
18       Q.   When did you have another meeting with
19   Kristin?
20       A.   That was on the day -- I think it was
21   shortly after the July 4th holiday.
22       Q.   And what did you meet with her about?

Arbitration Day 1                                                          July 22, 2014

Washington, D.C.

| Page 166 | Page 168 |

**Page 166**

1      A.   She stood by my cube and she delivered a
2   new -- there was a change in the compensation
3   structure of the company.  So she gave me my new job
4   title and my new salary range.  The salary was higher
5   than what it was.
6           When she served me, she just was a very royal
7   kind of gesture, you know, just threw it in front of
8   me.  I was like, Okay.
9      Q.   Was there any discussion?
10      A.   And she said, You know how I feel about
11   your salary.  I was like, Okay.  Then she said, I
12   cannot believe what you said to Carrie Lee; you got
13   me into a lot of trouble with H.R.; probably you
14   didn't understand me, because you tend to
15   misunderstand me; maybe it's because of your English
16   language skills that you didn't understand me; I
17   never used the word "hatred".
18           She started, you know, going back into this.
19   I stand 100 percent behind what I said.  She asked me
20   to revoke my statement to Carrie Lee.  I said I will
21   never do it, and then she said -- oh, before that, I
22   said that I'm sorry for the situation that we are

**Page 167**

1   both having, meaning that it had reached such level
2   of antagonism, and she said, Well, why did you say
3   you are sorry then?  I said I'm not going to say any
4   more words without an H.R. representatives being here
5   because I feel --
6           JUDGE SWEENEY:  Without what?
7           THE WITNESS:  H.R. representative being --
8   witnessing the conversation, because I feel that you
9   are targeting me for dismissal.
10           At that point, I was already talking to --
11   BY MS. KUNTZ:
12      Q.   Okay.  So did you have another
13   conversation with Ms. Harrison after this point?
14      A.   No.
15      Q.   Was your next communication the E-mail
16   on July 9th that we've already looked at?
17      A.   I did mentioned during that conversation
18   that there was a likelihood I was going to take FMLA
19   leave, because I already spoke with my doctor and
20   also the psychologist, the Fannie Mae psychologist.
21      Q.   And what was her response?
22      A.   You can do whatever you want.

**Page 168**

1      Q.   Now, Mr. Skrynnikov, did you ever take
2   any action to convey to the Senate Finance Committee
3   or to Senator Grassley your concerns about the
4   disparity in the report Fannie Mae provided to him?
5      A.   Yes.
6      Q.   Could we look at Exhibit 81.  What is
7   this?
8      A.   That's a letter that I sent to Senator
9   Grassley.
10      Q.   How did you send it?
11      A.   I faxed it to him.
12      Q.   Did you include anything with it?
13      A.   Yes.  It was the incentive compensation
14   reconciliation for May that year, I believe.
15      Q.   So it was Exhibit 42 that you sent along
16   with this?
17      A.   Yes.  Yes.
18      Q.   Did you receive any response?
19      A.   No.  I do have do a fax acknowledgment
20   that it went through.
21           JUDGE SWEENEY:  What date was this sent?
22           THE WITNESS:  That was sent after I was

**Page 169**

1   dismissed from Fannie Mae.
2           MS. KUNTZ:  There is a date right below
3   the --
4           THE WITNESS:  November 15th.
5           JUDGE SWEENEY:  Where is the date?
6           MS. KUNTZ:  It's right below the --
7           JUDGE SWEENEY:  Oh, I see.  November 15th.
8           THE WITNESS:  Yes.
9           MS. KUNTZ:  In your recollection, is that the
10   date, approximately, the date that it was sent?
11           THE WITNESS:  That's the date, because on
12   November 15th, I got a final letter from Fannie Mae
13   stating that I was terminated.
14           JUDGE SWEENEY:  I see.
15           THE WITNESS:  I was sitting on this letter
16   for several months.  I didn't have the courage to
17   send it.
18   BY MS. KUNTZ:
19      Q.   But you did send it.  Did you get a
20   response?
21      A.   I did not get a response, and at this
22   point, I already was seeking legal counsel.  So, you

43 (Pages 166 to 169)

Page 170

1   know, I didn't follow up on this.
2      Q.  Okay.
3      JUDGE SWEENEY:  I'm sorry.  What was the last
4   thing you said, sir?
5      THE WITNESS:  I said I was seeking legal
6   counsel.
7      JUDGE SWEENEY:  Did you say you didn't follow
8   up on this?
9      THE WITNESS:  Right.  I did not follow up on
10  the response.  I know that it was received by the
11  office.
12  BY MS. KUNTZ:
13     Q.  Now, Mr. Skrynnikov, when did start
14  looking for work after Fannie Mae?
15     A.  I started looking immediately when I got
16  the letter on -- was it October 29th or October 30th?
17  From Fannie Mae, but it was saying that my position
18  was no longer available.  I started looking for work
19  the same weekend.
20     Q.  Were you fit and able to work on October
21  30th?
22     A.  Yes.

Page 171

1     Q.  So when did you, in fact, begin to work
2  again?
3     A.  Not until March of the following year.
4     Q.  Now, you're trained as a financial
5  analyst?
6     A.  Yes.  I have an MBA in finance.
7     JUDGE SWEENEY:  So that would have been March
8  of 2010?
9     THE3 WITNESS:  2010, yes.  Sorry.
10     JUDGE SWEENEY:  That's all right.
11  BY MS. KUNTZ:
12     Q.  You have extensive training and
13  experience.  Why did it take you six months to find a
14  job, do you think?
15     A.  Well, as we all remember, it was what
16  was called the largest -- it wasn't quite the largest
17  depression, the second to the Great Depression.
18     So the climate was very not conducive to a job
19  search.  I applied to probably over a 150 jobs.  You
20  know, of course, I tried to target jobs for people,
21  you know, with my skills and my experience, and I got
22  a few interviews, but they did not materialize in job

Page 172

1   offers, and I started getting desperate at this
2   point.  You know, my savings were getting to zero
3   almost.  So I was looking for any job dealing with
4   financial analysis.
5     Q.  And what job did you get in March of
6   2010?
7     A.  I got a consultant, temporary consultant
8   job with America on Line.  I had prior experience at
9   MCI, you know, working as a financial analyst in the
10  equity group.  So I went back to the high-tech
11  corporate finance, which was a good opportunity, I
12  felt.
13     Q.  So the consultant position, was it full
14  time?
15     A.  It was full time, yes.
16     Q.  How many hours per week?
17     A.  Forty hours a week.
18     Q.  And what were your paid?
19     A.  I was paid $40 an hour.
20     Q.  All right.  Did you get any benefits?
21     A.  No benefits of any kind.
22     Q.  When did you leave that job?

Page 173

1     A.  I left that job in early December of
2   2010.
3     Q.  And where did you go?
4     A.  Well, when I was at -- well, I was still
5  looking for, you know, full-time jobs, and one of the
6  jobs I applied for was a position of financial
7  analyst with the District Government.  This is where
8  I got a full-time job, with the Government of the
9  District of Columbia.  This is where I remain
10  employed as of today.
11     Q.  And it's a full-time position?
12     A.  It's a full=time position.
13     Q.  All right.  What do you do?
14     A.  My title is financial analyst, but what
15  I do, I do analysis in support of rate cases for
16  electric, gas, and the telecommunications industry.
17  So it's a lot of policy analysis and less financial
18  analysis.  That was a completely new field for me.
19  It's public service rather than a you, know,
20  corporate environment.
21     Q.  Now, how is your new duties related to
22  your training and experience?

44  (Pages 170 to 173)

Page 174

1      A.   Somewhat related, but maybe just --
2    actually, my academic background was relating as far
3    as, you know, calculating return on equity and cash
4    flow analysis, but I did not use those skills
5    extensively at my career post-MBA.
6         So I'd say that 20 percent was relevant,
7    combined experience and education.  Everything else
8    was just brand new.  It's the D.C. Government.  They
9    have their own, you know, way of even like memo
10   writing.  It's very specialized.
11        So it's a very unique experience.
12        Q.   So what is your salary with the D.C.
13   Government?
14        A.   I started at 79,759, I believe.
15        Q.   And what was your salary at Fannie Mae
16   in October of 2009?
17        A.   Well, I received my new salary from
18   Ms. DeMent in July, because there was a salary jump.
19   So it was a little over -- I think it was 99,900, a
20   little under a hundred thousand dollars annually.
21        Q.   Have you ever received any salary
22   increases at the D.C. Federal Government since

Page 175

1    December of 2010?
2         A.   I received one cost of living adjustment
3    last year.  That was three percent of my salary.
4         Q.   And what do now make?
5         A.   It's approximately $82,000.
6         Q.   Okay.  Do you have benefits?
7         A.   Yes, I do have benefits.
8         Q.   Do you have medical benefits?
9         A.   Yes.
10        Q.   Do you have retirement?
11        A.   Yes.
12        Q.   Do you have a 401(k)?
13        A.   Not the contribution, but I have a
14   401(k) that I contribute.
15        Q.   But D.C. doesn't contribute?
16        A.   No.
17        Q.   Did you have a 401(k) at Fannie Mae?
18        A.   Oh, yes.
19        Q.   And did they contribute?
20        A.   They contributed, I believe, either or
21   ten percent.
22        Q.   Okay.  Now, did the termination in

Page 176

1    October of 2009 affect your health?
2         A.   Yes, to a great deal.
3         Q.   How so?
4         A.   Well, I had one -- I was having -- I
5    started having very bad headaches.  So I had to -- I
6    went to see a neurologist.  I suspected that I had a
7    brain tumor at the time, but the neurologist didn't
8    find anything.
9         At that point, Fannie Mae also tried to
10   eliminate my medical insurance.  Fannie Mae stated
11   that they dismissed me for a reason.
12        JUDGE SWEENEY:  I think the question, sir,
13   was the affects on your health.
14        THE WITNESS:  There was a very negative
15   affect on my health following my dismissal from
16   Fannie Mae, on my
17   BY MS. KUNTZ:
18        Q.   Okay.  And did it affect your standing
19   in the financial analyst community?
20        A.   Of course.
21        Q.   How so?
22        A.   Well, I cannot do the job that I wanted

Page 177

1    to.
2         MR. MIOSSI:  I object to this line of
3    questioning.
4         JUDGE SWEENEY:  This is pretty -- I don't
5    know where this is going.
6         MS. KUNTZ:  Well, we're almost done.
7         JUDGE SWEENEY:  That's the hook, we're almost
8    done.
9         All right.  I'll sustain the objection.  I
10   think that's pretty vague.  If you want to recast it
11   and try to get -- I mean, this goes to potential
12   damages.
13        MS. KUNTZ:  Yes.
14        JUDGE SWEENEY:  So I'm not sure what
15   compensatory damage there would be, that there could
16   be awarded based on standing, but go ahead.
17        Do you want to try to recast it?
18   BY MS. KUNTZ:
19        Q.   Have you tried to move in your career
20   into a promotion?
21        A.   I work for a small agency.  I'm at the
22   top of my grade.  There hasn't been an opportunity

45  (Pages 174 to 177)

Page 178

1    for promotion yet.
2          MS. KUNTZ: Okay. No further questions.
3          JUDGE SWEENEY: Is that all your questions?
4          MS. KUNTZ: Yes.
5          JUDGE SWEENEY: All right. Let's take a
6    brief recess before we continue with the cross.
7          MR. MIOSSI: Good.
8          JUDGE SWEENEY: We'll come back in five
9    minutes, approximately.
10         [Recess.]
11         JUDGE SWEENEY: We are ready to go back on
12   the record.
13         Counsel, are you ready?
14         MR. MIOSSI: I am. Thank you, Judge.
15         JUDGE SWEENEY: Okay. Go ahead.
16                CROSS-EXAMINATION
17   BY MR. MIOSSI:
18         Q.   Mr. Skrynnikov, you had no role of any
19   kind in responding to the request that Senator
20   Grassley's office posed to Fannie Mae, did you?
21         A.   No.
22         Q.   In fact, Fannie Mae didn't even respond

Page 179

1    to this request; isn't that right?
2          A.   I'm not sure what you mean.
3          JUDGE SWEENEY: You need to speak up.
4          THE WITNESS: I'm not sure what you mean.
5    BY MS. KUNTZ:
6          Q.   Well, the Federal Home Loan Agency
7    submitted the response to Senator Grassley's March
8    19, 2009 request for information on behalf of not
9    just Fannie Mae, but also Freddie Mac; isn't that
10   correct?
11         A.   That's correct.
12         Q.   You said you reviewed the response that
13   the Federal Home Finance Agency submitted, didn't
14   you?
15         A.   Yes.
16         Q.   But you don't have that here today, do
17   you?
18         A.   I don't have what?
19         Q.   You don't have the actual response that
20   the FHFA submitted, do you?
21         A.   No.
22         Q.   But you said you did review it --

Page 180

1          A.   Yes.
2          Q.   -- at some point. Correct?
3          A.   Yes.
4          Q.   Do you recall how lengthy it was?
5          A.   It was probably four or five pages.
6          Q.   And you have no information that Kristin
7    Harrison was involved in responding to Senator
8    Grassley's request, do you?
9          A.   No.
10         Q.   You didn't participate in any
11   discussions with Senator Grassley's staff concerning
12   the scope of information that they requested?
13         A.   No.
14         Q.   So you don't know whether the response
15   that the FHFA submitted on behalf of Fannie Mae was
16   actually complete in response to what Senator
17   Grassley's staff discussed with the Federal Home Loan
18   Agency; is that correct?
19         A.   I disagree.
20         Q.   Well, how do you know then? What source
21   of information? If you weren't involved in any
22   discussion, how would you know what they asked for?

Page 181

1          A.   By reading the letter.
2          Q.   All right. But my question was are you
3    aware if there were negotiations or discussions
4    between Senator Grassley's staff and the Federal Home
5    Loan Agency concerning the response?
6          A.   No.
7          Q.   So you don't know whether the original
8    request that the Senator's office made was limited in
9    some way or different from what was published on
10   March 19th; isn't that right?
11         A.   That kind of defeats the purpose.
12         JUDGE SWEENEY: Try to keep your voice up,
13   sir.
14   BY MR. MIOSSI:
15         Q.   My question really calls for a yes or a
16   no. If you weren't involved or you weren't aware of
17   discussions between Senator Grassley's staff and the
18   Federal Home Loan Agency concerning the scope of the
19   response, you don't know what you read was, in fact,
20   a complete response, do you?
21         A.   I don't know how to answer this
22   question. I cannot say yes or no. I don't know.

46 (Pages 178 to 181)

Page 182

1      Q.   You didn't have any communication with
2  Senator Grassley's office concerning the subject of
3  the Federal Home Loan Agency's response, Federal Home
4  Financing response -- excuse me -- until you sent a
5  letter to his attention November 15, 2009.  Correct?
6      A.   Yes.
7      Q.   That was the first communication, and
8  prior to that time, prior to the time you issued that
9  letter, you didn't disclose your intention to
10 communicate to Senator Grassley to anyone at Fannie
11 Mae, did you?
12     A.   I might have.  I might have made a
13 comment that someone needs to call the Senator or the
14 "Washington Post" to tell them what's going on.
15     Q.   And when and to whom did you make this
16 response that you may have made?
17     A.   I made it out loud right after the
18 second town hall meeting which was televised with
19 participation of Fannie Mae employees.  I made that
20 comment to Susan Weintraub and I'm sure other people
21 around me heard it.
22          So that's the only instance I can think of.

Page 183

1      Q.   Susan Weintraub was a coworker of yours.
2  Correct?
3      A.   Yes.
4      Q.   She wasn't your manager.  Right?
5      A.   She's a higher-level professional.
6      Q.   You didn't report to her, did you?
7      A.   No, I did not.
8      Q.   She didn't have any role in your
9  performance evaluation, did she?
10     A.   She contributed to my performance
11 evaluation.
12     Q.   How do you know that?
13     A.   She told me.  We had peer evaluation
14 introduced that year.  So coworkers were providing --
15     Q.   Let me ask you a question so we're
16 clear.  You did not disclose to anyone at Fannie Mae
17 that you sent your letter dated November 15, 2009 to
18 Senator Grassley, did you?
19     A.   I was no longer at Fannie Mae.
20     Q.   Right.  So the answer is no?
21     A.   No.
22     Q.   Because your employment was terminated

Page 184

1  effective November 13, two days before the letter was
2  sent; is that correct?
3      A.   I thought it was the same day.  Okay.
4  Sure.
5      Q.   Now I want to go through and understand
6  the testimony that you gave concerning the
7  discussion, the communication, on the subject of the
8  response to Senator Grassley's request.
9      A.   Sure.
10     Q.   That you had -- you allege that you had
11 with Kristin Harrison.  If my notes accurately track
12 your testimony, the first conversation, the first
13 communication, on this subject that you had with
14 Ms. Harrison was around March 20th or right around
15 the day that the request by Senator Grassley was
16 posted.
17     A.   Yes.
18     Q.   Is that correct?
19     A.   Yes.
20     Q.   And the communication between the two of
21 you consisted of your commenting that you thought it
22 was a good thing that the compensation files that you

Page 185

1  working with were password protected; is that right?
2      A.   That the executive allegation file was
3  password protected.
4      Q.   And Ms. Harrison's response was to agree
5  with you; is that right?
6      A.   Yes.  I was looking for a compliment
7  from her.  I thought I succeeded in proving that I
8  was a loyal employee.
9      Q.   That was the end of that discussion.
10 There was nothing further discussed concerning the
11 Grassley request; is that right?
12     A.   No.
13     Q.   Now, the second conversation occurred on
14 or shortly after you read a copy of the Federal
15 Housing Finance Agency's response to the Grassley
16 request.  Correct?
17     A.   On behalf of Fannie Mae, yes.
18     Q.   Correct.  It was submitted on behalf of
19 both Fannie Mae and Freddie Mac.  Right?
20     A.   Yes.
21     Q.   Senator Grassley made duplicate requests
22 to both Fannie Mae and Freddie Mac.  Right?

47 (Pages 182 to 185)

Page 186

1      A.   Yes.

2      Q.   And the agency, the Federal Housing

3  Finance Agency, was the conservator of Fannie Mae at

4  this point in time.  Correct?

5      A.   Yes.

6      Q.   So at the end of the March 2009 time

7  period, you asked Ms. Harrison when you thought or

8  when these accruals would be reversed; is that right?

9      A.   Yes.

10     Q.   And she told you that would occur at the

11 end of the second quarter.  Correct?

12     A.   During the second quarter.

13     Q.   Okay.  That was an acceptable answer to

14 you, was it not?

15     A.   Not 100 percent acceptable, but, mostly,

16 it was acceptable.

17     Q.   You didn't tell her it was unacceptable,

18 did you?

19     A.   No.  I trusted her as my manager.  I had

20 a very high opinion of her until that point, very

21 high.

22     Q.   Now, there was a -- whether it's the

Page 187

1  third or the fourth, perhaps I've lost track, but the

2  next occasion on which you discussed the Grassley

3  response was on April 28, 2009; is that right?

4      A.   Yes.

5      Q.   And that was at a meeting, a one-on-one

6  meeting you had with Ms. Harrison concerning your

7  development; that was the purpose for that meeting;

8  is that right?

9      A.   It was supposed to be a development

10 meeting.

11     Q.   Okay.  And you testified that

12 Ms. Harrison challenged your contributions.  She made

13 some comment, as you testified, challenging whether

14 you were worth the salary that Fannie Mae paid you;

15 is that correct?

16     A.   It was a personal attack at me, and

17 during the personal attack, which was inappropriate,

18 she made those statements among others, yes.

19     Q.   But the subject of the Grassley response

20 didn't come up in this meeting, did it?

21     A.   I brought it up.

22     Q.   Then you asked when will the numbers be

Page 188

1  -- when will the accruals being reversed.  Right?

2      A.   Not exactly those words, but that was

3  the line of communication when I responded back, and

4  I said I don't think that the executives brings the

5  value, some of the executives brings the value for

6  the salaries that they have.

7           And I said, By the way, that reminds me, are

8  we going to see the changes and how soon?

9      Q.   And she told you again what she told you

10 earlier, the end of the second quarter.  Correct?

11     A.   No.  She didn't respond to that.

12     Q.   So there was no answer?  There was just

13 no response to your statement; is that right?

14     A.   No.  This is when she started throwing

15 her notebook at me.

16          JUDGE SWEENEY:  I didn't catch that.  She

17 started what?

18          THE WITNESS:  She threw a notebook at my

19 direction, not at me.  I'm sorry.  I was sitting

20 probably -- the desk was probably the same distance,

21 and what she did was [gestures] and I had to

22 [gestures].

Page 189

1          JUDGE SWEENEY:  Okay.

2  BY MR. MIOSSI:

3      Q.   And following this meeting, you

4  testified that you were upset.  Correct?

5      A.   Well, when someone tells you that she

6  can see hatred in your eyes, questioning, you know,

7  your ability to speak English, questioning your

8  salary, you know, just questioning your

9  professionalism, yes; but I never screamed at her.

10 She's the manager.  She knows how to act as a

11 manager.  She received training in this, and as she

12 testified before, she majored in communication.

13          I'm sorry.  She knew exactly what she was

14 doing.  Her goal was to, you know, just bring me

15 down, destroy me verbally.  She knew exactly how I

16 would react.

17     Q.   You wrote a note to record, allegedly,

18 what occurred at this meeting after the meeting.

19 Correct?

20     A.   No.  During the meeting.

21     Q.   During the meeting, and that's an

22 exhibit in this case, Exhibit 40.  Correct?

48 (Pages 186 to 189)

Page 190

1     A.   I don't know what exhibit it is.
2     Q.   Please look at Exhibit 40.
3     JUDGE SWEENEY:  Mine is upside down.  Is that
4  intended or is that --
5     MR. MIOSSI:  Mine is too.  I can't take any
6  blame because I didn't produce it.
7     JUDGE SWEENEY:  All right.
8  BY MR. MIOSSI:
9     Q.   Do you have Exhibit 40 in front of you,
10  Mr. Skrynnikov?
11     A.   Yes.
12     Q.   These are notes that you took during or
13  following the April 20th meeting?  There's not a
14  great difference to me.  Is that right?
15     A.   Well, okay.
16     Q.   I'm asking you.  They're your notes.
17  Correct?
18     A.   It was during the meeting.
19     Q.   So as Ms. Harrison was speaking to you,
20  you were writing these notes we have in front of us.
21  They consist of two pages -- three pages.  What were
22  you writing?

Page 191

1     A.   Well, the notes don't go in the -- how
2  do you say it?  In the sequence of the conversation.
3     Q.   My question is these are your notes.
4  Right?
5     A.   Yes.  I'm sorry.
6     Q.   And there's nothing in these notes that
7  reflects anything concerning the response or the
8  accuracy of the response to the Grassley request; is
9  there?
10     A.   No.  No.
11     Q.   And on the next page, I don't see
12  anything that reflects anything about the subject of
13  the response to Senator Grassley's request.  Is there
14  anything there?
15     A.   As I testified before, we discussed the
16  business segment allocation.  So that's one of the
17  items mentioned there.
18     Q.   And in particular, the accruals, any
19  reversals, any changes would appear in the next
20  quarter.  Correct?  That's what she told you.  Right?
21     A.   That's -- the statement that was made
22  was back in March.  At this point, I didn't push it.

Page 192

1  You know, I was just listening to what was going on.
2     It was clear in my mind that she was on the --
3  to get rid of me, that she was going to terminate me.
4  As they say, you know -- I was thinking about keeping
5  my job.
6     Q.   Ms. Harrison didn't tell you your job
7  was in jeopardy; she didn't tell you that, did she?
8     A.   My impression during the April 28th
9  meeting was that she was going to fire me during that
10  meeting.
11     Q.   I understand and I cannot cross-examine
12  your impression.  I'm only asking you that
13  Ms. Harrison never told you anything about your job
14  being in jeopardy, did she?
15     A.   Yes, she did.
16     Q.   What did she say?
17     A.   She told me in June that my --
18     JUDGE SWEENEY:  I think he's talking about
19  the April 28th meeting.
20     MR. MIOSSI:  Yes, I am.
21     JUDGE SWEENEY:  The April 28th meeting.
22     THE WITNESS:  Well, she made the statement

Page 193

1  questioning my salary and my level of
2  professionalism.  That's, you know -- clearly, that's
3  a threat to your job.
4  BY MR. MIOSSI:
5     Q.   Well, by the time you had the meeting
6  April 28th, which I think you testified was a
7  development meeting, the purpose for the meeting was
8  to discuss your performance; is that correct?
9     A.   No.
10     Q.   You don't think that's correct?
11     A.   No.  It's incorrect.
12     Q.   And, in fact, though, this wasn't the
13  first meeting that you had with Ms. Harrison
14  concerning your performance; is that true?
15     A.   That was not a performance meeting.  A
16  development meeting is a positive meeting.  It's
17  about the goals for the future, not about checking in
18  to discuss your performance.  This is something else.
19     Q.   Prior to the development meeting, then,
20  where Ms. Harrison was working with you to assist you
21  in your employment, you had meetings with her where
22  she discussed the inadequacies or areas where you

49 (Pages 190 to 193)

Page 194

1  needed to improve your performance; is that true?
2        A.   I don't recall specifically, but it
3  could have been.
4        Q.   You were aware before the development
5  meeting on April 28, 2009 that Ms. Harrison had
6  concerns and had expressed concerns about aspects of
7  your job performance.  Correct?
8        A.   I don't recall.  You need to show me an
9  exhibit to refresh my memory.
10       Q.   After the April 28th letter -- excuse me
11  -- meeting, if I recall, you returned to your cube.
12  Correct?
13       A.   Yes.
14       Q.   And you began to compose an E-mail?
15       A.   Yes.
16       Q.   And that was Exhibit 39?
17       A.   Yes.
18       Q.   All right.  And you didn't send this.
19  Correct?
20       A.   No.
21       Q.   You read it or Kristin read it while you
22  were there and had it up on your monitor; do you

Page 195

1  understand that correctly?
2        A.   We read it together, yes.
3        Q.   And there's nothing in this E-mail at
4  the top of Exhibit 39 that references any concern or
5  any issue about the Grassley response, is there?
6        A.   Of course not.
7        Q.   Then the next meeting you had was, I
8  believe you testified, at some point in early May,
9  but you said there was no discussion at all about the
10  Grassley response in that meeting; is that accurate?
11       A.   Probably not.
12       Q.   Okay.  What's inaccurate about it?
13       A.   No.  I meant probably there was no
14  discussion.
15       Q.   I'm sorry.  The last discussion, the
16  last communication that you had with Ms. Harrison on
17  this whole subject -- well, actually, before I get to
18  that, look at Exhibit 43, please which was the
19  document you authored.
20       A.   Yes.
21       Q.   Okay.  Now, this was a letter.  It was
22  not an E-mail.  Right?

Page 196

1        A.   It was a letter, yes.
2        Q.   And it was addressed to Natasha Colton
3  and you dated it June 23, 2009, but it appears to be
4  your signature and you dated it on the bottom there
5  July 1st.
6        A.   This is why I gave you a handwritten
7  signed copy.  I E-mailed to her, I believe, June
8  23rd.  I got an out-of-office response.  She was on
9  vacation.
10       Q.   All right.  I misunderstood, because I
11  thought you said that this was a letter and not an
12  E-mail.
13       A.   There was E-mail communication.  I
14  believe I sent this first by E-mail and then I
15  printed this and I signed it for my meeting with her
16  that happened on July 1st.  That's my recollection.
17       Q.   And Natasha Colton at that time, she was
18  assigned in Fannie Mae Ethics and Compliance.
19  Correct?
20       A.   Yes.
21       Q.   And you understood that that was a
22  resource available to you as a Fannie Mae employee

Page 197

1  where you could raise concerns of almost any kind
2  concerning compliance with the law or the manner in
3  which you were being treated; is that correct?
4        A.   Yes.
5        Q.   And in this written full-page letter to
6  Ms. Colton, there's no reference in there to any
7  concern about the response to the Grassley request,
8  is there?
9        A.   This letter was in reference to the
10  official investigation process that was launched by
11  Compliance and Ethics.  I felt that I don't -- I just
12  need to talk about the retaliation as it occurred
13  after my complaint with the Ethics Department was
14  launched.  This letter shows the retaliatory actions
15  that I experienced.
16       That was not the venue and it wasn't my goal
17  to bring up, you know, the Grassley events here.
18       Q.   So the answer is there's nothing in this
19  about the Grassley response.  Right?
20       A.   No, and if you'll read the letter, it
21  says this letter is in reference to retaliation which
22  occurred after the Ethics Department launched the

Arbitration Day 1                                          July 22, 2014
Washington, D.C.

Page 198

1   complaint and the Ethics Department told me that, you
2   know, you are free from retaliation.  All the
3   negative events occurred after I contacted the Ethics
4   Department.
5       Q.   You perceived that you were being
6   treated differently -- you perceived, you believed,
7   that you were being treated harshly by Ms. Harrison
8   on the account of your national origin?
9       A.   Yes.
10      Q.   Is that correct?  And you believe that
11  she was critical of the type of food that you
12  enjoyed.  Correct?
13      A.   She made a comment like this.  At this
14  time, I was very sensitive her comments.
15      Q.   And you were concerned that she was
16  aware that you had made a complaint to ethics
17  concerning your previous boss, Lourdes Alcalde?
18      A.   Yes.
19      Q.   And none of that had anything to do with
20  the Grassley response, did it?
21      A.   No, it didn't, and this is what I
22  already answered.  This letter was in reference to

Page 199

1   retaliation that occurred after I submitted an ethics
2   complaint.
3       Q.   But you don't have a claim in this case
4   where you are claiming discrimination on account of
5   your national origin, do you?
6       A.   No, I don't.
7       Q.   The last meeting that you had, if I
8   recall your testimony, was right before July 4, 2009,
9   the last meeting with Ms. Harrison, and at that
10  meeting, she provided you a new job title and gave
11  you notice of a salary increase.  Correct?
12      A.   Yes.
13      Q.   And there was nothing there discussed
14  about the Grassley response.  Right?
15      A.   I believe I mentioned during this
16  meeting that I would not sign the SOX binder for the
17  incentive.
18      JUDGE SWEENEY:  You would not sign what?
19      THE WITNESS:  The Sarbanes-Oxley binder.
20      During that meeting, as I testified,
21  Ms. Harrison asked me to withdraw my statement I made
22  to H.R. about her during the April 28th outburst.

Page 200

1   BY MR. MIOSSI:
2       Q.   You didn't -- the last time you updated
3   the -- or the last couple months of your employment,
4   you weren't working on the business segment analysis;
5   isn't that right?
6       JUDGE SWEENEY:  Counsel, I'm a little bit
7   confused by your question.  Are you talking about the
8   time he was off on medical leave?
9       MR. MIOSSI:  No.  That's fair.  I'll clarify
10  that.
11  BY MR. MIOSSI:
12      Q.   The last couple of months before you
13  went out on leave in July 2009, you had not been
14  performing the update on the business segment
15  analysis.  Correct?
16      A.   I cannot say with 100 percent certainty,
17  but I believe I was still involved in this because
18  the exhibit that we looked at was dated the second
19  quarter of 2009.
20      Q.   Well, the last time you updated the
21  business allocation report was in April 2009.  Right?
22      A.   I don't know.  I'd be surprised if that

Page 201

1   was the case.
2       Q.   Okay.  Now, at no point during your
3   employment did you assert any type of a complaint to
4   the Ethics and Compliance Department that you were
5   being treated differently or unfairly or retaliated
6   against because you were concerned about the accuracy
7   of the response to the Grassley request, did you?
8       A.   There were several issues happening at
9   the same timeframe.  I wanted to follow up on them
10  one by one.
11  So no.  My answer is no.  Sorry.
12      Q.   Yet, you had prior to this -- you were
13  familiar and you were aware of the resource that the
14  Ethics and Compliance Group made available to you.
15  You could assert complaints concerning the way your
16  boss or your managers were treating you.  Correct?
17      A.   This is what I did.
18      Q.   You did, and you had a concern about how
19  your prior boss treated you.  Correct?
20      A.   No.
21      Q.   Lourdes Alcalde, you did not make a
22  complaint to Ethics concerning alleged treatment you

51  (Pages 198 to 201)

Arbitration Day 1                                                    July 22, 2014

Washington, D.C.

Page 202

1   experienced from her?

2        A.   It was a complaint against inappropriate

3   evaluation, not how she treated me.

4        Q.   Fine.  You complained that she didn't

5   evaluate you fairly.  Correct?

6        A.   Yes.

7        Q.   Did you ascribe any reason to it,

8   perhaps sex discrimination?

9        A.   Not at the time, no.

10       Q.   But at some point, you did allege that

11  she treated you differently because of your sex?

12       A.   I don't think so.  There was a

13  discussion about it, perhaps, but I don't think I

14  claimed that.

15       Q.   And you certainly made a complaint

16  concerning the way you felt Ms. Harrison treated you.

17  Correct?

18       A.   Yes.

19       Q.   But you've testified you didn't assert

20  that she was treating you differently because you

21  raised questions or concerns about a response to

22  Senator Grassley's request.  Right?

Page 203

1        A.   She began to treat me differently, in a

2   very aggressive way, after I brought up my concerns

3   with the bonus allocation.  I could not see any other

4   reason for her to treat me the way she was treating

5   me.  I thought she was my friend.

6        Q.   Now, you understood that it was your

7   responsibility to communicate with the Reed Group and

8   to supply and ensure that they had proper medical

9   documentation in connection with the administration

10  of your leave which you began in July 2009.  Right?

11       A.   No.

12       Q.   You did not know that?

13       A.   This is not the information which was

14  provided to me properly during my intake appointment.

15  I was told that I need to concentrate on getting

16  better and that the Reed Group will, you know, be in

17  communication with my treating physician and will

18  take care of all the paperwork.  That was my initial

19  understanding.

20       Q.   Okay.  Well, you were familiar with

21  Fannie Mae's family medical leave policy, correct,

22  before you went out on leave?

Page 204

1        A.   Not before I went on leave.

2        Q.   Are you sure?  You reviewed the family

3   medical leave policy before you went on family

4   medical leave, didn't you?

5        A.   I reviewed the part which indicated that

6   the Reed Group was Fannie Mae's administrator,

7   probably.

8        Q.   So look at Exhibit No. 10, please, page

9   5.

10       A.   Page 5.

11       Q.   Are you there?

12       A.   Yes.

13       Q.   At the top, it says determination of

14  FMLA, the title of that section.  Do you see that?

15       A.   Yes.

16       Q.   Do you see -- and read this before you

17  went out on leave, that the Reed Group was

18  responsible as Fannie Mae's third-party

19  administrator.  Correct?

20       A.   I believe there was another policy.  It

21  was a couple of pages long.  This is what I read.

22  Before I left when I had my last conversation with

Page 205

1   Kristin when she gave me the new job description, I

2   printed a bunch of policies and I took them with me,

3   but I didn't read them until a later date.

4        Q.   Well, you were familiar with -- just

5   take a look since we're here.  Exhibit No. 11 is the

6   Fannie Mae short-term disability.  You are familiar

7   with that.  Right?

8        A.   I think that's the exhibit I was

9   referring to, yes.  I was familiar with that one

10  page, two pages, yes.

11       Q.   Okay.  And on Exhibit 15, the attendance

12  policy?

13       A.   I was not familiar with this until I was

14  told that there was -- I was not familiar with this

15  until September.

16       Q.   All right.  So you were familiar with it

17  well before your employment ended.  Right?

18       A.   I don't know, sir, when I read it.

19       Q.   Okay.

20       A.   I don't know.

21       Q.   Before I move on, but you had a copy of

22  the family medical leave policy that we looked at,

52 (Pages 202 to 205)

Arbitration Day 1                                         July 22, 2014
Washington, D.C.

Page 206

1    Exhibit 10; in fact, you printed it before you went
2    on the leave.  Right?
3        A.  Yes.
4        Q.  Then Exhibit 12 is the return to work
5    policy.  You were familiar with that right?
6        A.  I'm not sure if I was familiar with it.
7        Q.  Well, you produced it to us, didn't you?
8        A.  Like I said, I printed a whole bunch of
9    policies on the last day I was at Fannie Mae.  That
10   doesn't mean that I read them.
11       Q.  Okay.  But you had it.  Right?
12       A.  I don't remember if that was, you know,
13   something which was in the file.  You know, I mean,
14   if we produced it, that means that we had it.
15       Q.  You were aware of it certainly no later
16   than October 22, 2009, weren't you?
17       A.  I don't know.  I don't know.
18       Q.  Huh?
19       A.  I do not know.
20       Q.  Okay.  Then let me see if this helps,
21   because in your deposition -- I'll read the question
22   that I posed and the answer that you gave, and I

Page 207

1    can --
2        JUDGE SWEENEY:  Do you have a page?
3        MR. MIOSSI:  Yes, I do.  I'm at page 162,
4    line 18.
5    BY MR. MIOSSI:
6        Q.  The question I posed, and I will
7    represent and I can show you, if necessary, I make
8    reference to Exhibit 20, which is Exhibit 12 in our
9    hearing today.
10       A.  Okay.
11       Q.  So let me read the question I asked and
12   the answer that you gave.
13       "Question:  After October 22nd, you were aware
14   of this policy, Exhibit 20?
15       "Answer:  I was aware of the policy, but I was
16   aware of the requirement which was communicated to me
17   via E-mail.  So --
18       "Question:  Okay.
19       "Answer:  -- you know, the conclusion is I
20   became aware of this."
21       A.  Right.
22       Q.  Okay.

Page 208

1        A.  So I'm saying that I became aware of the
2    policy through the E-mail.  This is what I'm saying.
3        Q.  All right.  Let me restate it because,
4    unfortunately, I skipped my some of the answers.
5        A.  Sure.
6        Q.  I'll restate line 18, page 162 of your
7    deposition which was April 22, 2014.
8        The question was:  "Okay.  Exhibit 20 is the
9    Fannie Mae return to work policy which is dated April
10   2, 2009.  Do you recognize that?
11       "No.  I was not aware about this until -- you
12   know, until October 22nd when I was told that I
13   needed to provide a release from work."
14       Do you recall that that's the answer I -- the
15   question I asked and the answer you gave; is that
16   right?
17       A.  Well, I'm clearly referring to the
18   subject matter of the memo, not to the memo itself.
19       Q.  Exhibit 13 is the sick leave policy.
20   You're familiar with that as well.  Correct?
21       A.  I don't know at what point in time I
22   became familiar with the policy.  I'm familiar with

Page 209

1    it now, but I don't remember when I first became
2    familiar.  If I answered this question in my
3    deposition, I will be happy, you know, if you refresh
4    my memory and I'll provide you with an answer.
5        Q.  Exhibit 54, please, would you turn to
6    Exhibit 54.
7        A.  Oh, I'm sorry.
8        Q.  This is a letter from the Reed Group on
9    July 16, 2009 which was addressed to you at home.
10   Correct?
11       A.  Yes.
12       Q.  All right.  And you received this,
13   didn't you?
14       A.  Yes.
15       Q.  Okay.  This advises you of your
16   obligation to provide appropriate documentation to
17   the Reed Group so that they can evaluate your request
18   for leave and how long that leave should be extended.
19   Correct?
20       A.  Not for me, but if my physician or other
21   care provider, I don't see where it says that I must
22   provide this information.  It says must certify in

53 (Pages 206 to 209)

Page 210

1    writing when you're medically capable to return to
2    work.
3         Q.   And the last paragraph advises you that
4    the information that you provide, including the
5    consent forms, will only be shared with Human
6    Resources in order to determine the appropriate
7    length of your disability.  Correct?
8         A.   I don't have any memory even of signing
9    this because I was not in good shape.  So I don't
10   remember it.
11        Q.   Okay.  Now turn to Exhibit 55, please.
12        A.   Yes, sir.
13        Q.   Actually, before you go there, you spoke
14   with representatives of the Reed Group frequently,
15   didn't you?
16        A.   Initially, it was several times a day,
17   yes.
18        Q.   And they advised you of the obligation
19   that you had to timely supply documentation
20   supporting your request.  Correct?
21        A.   [Pause.]
22        Q.   Is that correct?

Page 211

1         A.   I'm sorry.  I'm trying to remember.  I
2    think I had a conversation about timely submission of
3    paperwork after September 15th, after the first
4    notice I got from Fannie Mae.  This is when I spoke
5    with Reed Group about it.
6         Q.   Okay.  Exhibit No. 55, do you have that
7    in front of you?  That's a letter, July 20, 2009, to
8    you from Reed Group?
9         A.   Yes.
10        Q.   And you are being advised that your
11   disability is approved until July 31, 2009.  Do you
12   understand that?
13        A.   Yes.
14        Q.   And the sentence right in the middle of
15   the page, it reads:  "If you are unable to return to
16   work on August 1, 2009, you must provide Reed Group
17   additional medical documentation that supports the
18   continuation of your leave."
19        You saw that, didn't you?
20        A.   I'm not sure, and if I saw it, I would
21   have thought that it meant my doctor, because at no
22   point I, myself, provided any documentation to the

Page 212

1    Reed Group.  It came directly from the treating
2    physicians that I had.
3         Q.   All right.  But that doesn't say your
4    doctor; it says you.  Correct?
5         A.   I see that.
6         Q.   Now, you didn't return to work on August
7    1st.  Correct?
8         A.   No.
9         Q.   And you didn't notify anyone at Fannie
10   Mae that you weren't going to return on August 1st,
11   did you?
12        A.   I spoke with Reed Group about it.
13        Q.   But you didn't speak with Reed Group
14   before August 1st, did you?
15        A.   I don't remember, sir.
16        Q.   In fact, the Reed Group contacted your
17   doctor on August 4th to inquire about your status;
18   isn't that true?
19        A.   I wouldn't know.  I don't know.
20        Q.   And your leave was then later extended
21   until September 6, 2009.  Right?
22        A.   Yes.

Page 213

1         Q.   And that's Exhibit 57?
2         A.   Okay.
3         Q.   So August 5, 2009, you received notice
4    from the Reed Group you were extended -- you were
5    approved through September 6, 2009.  Again they asked
6    you if -- it's stated in their letter to you, just as
7    they did before, if you are unable to return to work
8    on September 7, 2009, you must provide Reed Group
9    additional medical documentation that supports the
10   continuation of your leave.  Do you see that?
11        A.   Yes.
12        Q.   And then the Reed Group called you to
13   inquire about your status on August 19th and they
14   left a message.  Do you recall that?  You didn't
15   return that message, did you?
16        A.   I don't recall the message being left.
17        Q.   Then the Reed Group contacted you on
18   August 25th and they spoke to you and you told them
19   you weren't feeling well.  Do you recall that?
20        A.   No, I don't.
21        Q.   Do you recall telling them that you
22   planned to see a doctor on September 1st?

                                    54  (Pages 210 to 213)

| Page 214 |
| --- |

1    A.   I don't.

2    Q.   And after that, do you recall telling

3  them that you would update the Reed Group following

4  that appointment?  Do you recall that?

5    A.   No, I don't.

6    Q.   Do you then recall that the Reed Group

7  called you on September 3rd and September 4th and

8  they left messages each time, but the calls were not

9  returned?

10    A.   Unfortunately, I don't remember.  I

11  regret, you know, that this happened, but the answer

12  is I don't remember, sir.

13    Q.   If the Reed Group phone records and

14  diary of their communications with you were to

15  reflect those facts, would you have any reason to

16  challenge the accuracy of those statements?

17    A.   Yes.  I've seen those records, but I

18  don't remember this happening.

19    Q.   On September 7th, you did not return to

20  work.  Right?

21    A.   No.

22    Q.   You didn't notify anyone at Fannie Mae

| Page 215 |
| --- |

1  that you weren't going to return that day, did you?

2    A.   No.

3    Q.   You didn't communicate prior to that

4  date with the Reed Group that you needed an extension

5  of your leave, did you?

6    A.   I'm not sure, sir.  I don't remember.

7    Q.   Please look at Exhibit 58.

8    A.   Yes.

9    Q.   Okay.  Do you remember getting this

10  letter dated September 15, 2009 from the Reed Group

11  notifying you that your leave had lapsed?

12    A.   I remember getting this letter sometime

13  after I got a letter from Fannie Mae, yes.

14    Q.   And the reason the Reed Group states

15  that your disability and your leave status has been

16  denied is because the Reed Group did not receive any

17  medicals to support your continued disability beyond

18  September 6, 2009.  Do you see that?

19    A.   Yes.

20    Q.   And then in the next paragraph, they

21  advise you that if you have information, medical

22  documentation, to substantiate an extension, you are

| Page 216 |
| --- |

1  invited to supply it, and they gave you an address

2  and they asked you to do so within 15 days.  Do you

3  see that?

4    A.   No.  I'm sorry.  Okay.  I see.

5    Q.   Do you see that?

6    A.   Yes.

7    Q.   Then the next exhibit is 59 and you

8  testified about that.  That's the job abandonment

9  letter that Fannie Mae sent to you.  In fact, they

10  messengered it to your home on the same day of

11  letter.  Right?

12    A.   Yes.

13    Q.   And they explained that -- again,

14  they're citing attendance policy, that you had been

15  absent without notice for six days and you did not

16  have authorization to be absent and that the

17  consequence was the abandonment of your job.  Did you

18  understand that?

19    A.   No, I did not.

20    Q.   Then in the last paragraph, you were

21  invited -- in fact, the last couple of sentences,

22  despite that, you were invited to submit information

| Page 217 |
| --- |

1  by the next day to excuse your absence and/or justify

2  an extension of leave.  You responded to that, didn't

3  you?

4    A.   Yes, I did.

5    Q.   And you did so very promptly, didn't

6  you?

7    A.   On the day I got this letter.

8    JUDGE SWEENEY:  Sir, I can't hear you.

9    THE WITNESS:  I'm sorry.  On the date that I

10  got this letter, I responded via E-mail to Carrie Lee

11  who wrote this letter.

12  BY MR. MIOSSI:

13    Q.   Right.  And that's Exhibit 16?

14    A.   Yes.

15    Q.   Right.  So if you look at -- sorry.  I

16  apologize.  Exhibit 61.

17    JUDGE SWEENEY:  61?

18    MR. MIOSSI:  61, right.

19  BY MR. MIOSSI:

20    Q.   And if you would please refer to the

21  second page of that exhibit, that's the sequence.

22    A.   Yes.

Page 218

1    Q.   So at 8:31 on September 16th, you
2  responded to the letter you received dated on
3  September 15th.  Correct?  You E-mailed Carrie Lee
4  and you stated you were not abandoning your job.
5  Right?
6    A.   Yes.
7    Q.   And you arranged somehow to have your
8  physician, Dr. O'Rourke -- was that your physician at
9  the time?
10    A.   Yes.
11    Q.   You had him submit some sort of
12  documentation to the Reed Group to excuse your
13  absence and extend your leave, didn't you?
14    A.   I don't think it was some documentation.
15    Q.   I'm sorry?
16    A.   I don't think it was just some
17  documentation that you are referring to.  I
18  understood Mr. O'Rourke was late submitting the
19  documentation that he was supposed to send to Fannie
20  Mae because he was out of town for a week.
21    Q.   The point is that he got it into the
22  Reed Group on September 16th and your leave was

Page 219

1  extended.  Correct?
2    A.   Yes.
3    Q.   The job abandonment letter was
4  withdrawn.  Correct?
5    A.   I assume so.
6    Q.   Now, I just have a question on your
7  letter here dated September 16th to Ms. Lee.  In the
8  third to the last paragraph, it's two sentences, but
9  you say: "I was told by Reed Group I have three
10  months of FMLA starting July 15th."
11    Do you see that?
12    A.   Um-hum.
13    Q.   What documents -- are you referring to
14  some documentation?
15    A.   I don't remember.  Just we talked about
16  Federal FMLA versus State FMLA.  So I don't recall.
17    Q.   Your leave actually started before July
18  15th, didn't it?
19    A.   I believe it started on July 15th even
20  though I contacted the Reed Group prior to that,
21  because in order for you to go on Federal Medical
22  Leave Act, you need to exhaust your sick leave.  So I

Page 220

1  think the difference between July 9th when I
2  contacted the Reed Group and 15th was me using that
3  accumulated sick leave.  I understand that's the
4  procedure.
5    Q.   That was your understanding.  Correct?
6    A.   That was my understanding and I think
7  this is what Reed group informed me.
8    Q.   Can you point to any of the documents
9  that the Reed Group sent you during this period of
10  time telling you that the commencement of your
11  federal and D.C. leave started July 15th as opposed
12  to the week before?
13    A.   No.  I see that.  Okay.  So what
14  happened to my sick leave?  I don't know.
15    Q.   Okay.  Then if you flip to the first
16  page of Exhibit 61 where Ms. Lee responded to you on
17  September 17th, she thanked you for contacting her.
18  She addressed the issue.  The job abandonment was
19  rescinded.  Is that what you understood?
20    A.   Yes.
21    Q.   Then in the paragraph which starts
22  "second" --

Page 221

1    A.   Yes.
2    Q.   -- she reminded you about your
3  obligation to communicate the medical information to
4  the Reed Group.  Were you aware of that?
5    A.   My understanding was it was in reference
6  to my doctor.  That was my understanding of this
7  phrase, "you" meaning your physician, your doctor.
8    Q.   Okay.  Then in the next paragraph down,
9  which says "as mentioned in the letter dated August
10  5, 2009", do you see that?
11    A.   Yes.
12    Q.   She was simply reminding you of the
13  importance to communicate and cooperate in a timely
14  fashion with the Reed Group.  Is that what you
15  understood her to be urging you to do?
16    A.   It says: "Going forward, you should
17  make every effort to provide or have your healthcare
18  provider provide reasonable notice of the changed
19  circumstances."
20    Q.   Right.
21    A.   So I understood that my healthcare
22  provider should be more diligent, and Dr. O'Rourke

Page 222

1    apologized to me for causing the delay.
2        Q.    Then, finally, Ms. Lee reminded you
3    about complying, being familiar with the attendance
4    policy that I asked you some questions about a little
5    while ago?
6        A.    That was, I believe, the first time when
7    I heard about the policy, from this E-mail.
8        Q.    That was the first time?
9        A.    I think generally as a business
10   practice, I know that employers requires medical
11   documentation after to three consecutive days of
12   being out of the office.  So I wasn't surprised by
13   seeing this, but I was on FMLA leave, which lasts,
14   you know, 16 weeks.
15       Q.    It can, but it doesn't automatically.
16   You understand that, don't you?
17       A.    I really have no judgment about this.
18   This is what, you know, I have been told.
19       Q.    I mean, the length of your leave is
20   something that's determined based upon your
21   physician's assessment of your health.  Correct?
22       A.    Right.

Page 223

1        Q.    So it might be sixteen weeks or it might
2    be four weeks.  Right?
3        A.    Right.
4        Q.    And as your course of treatment, because
5    you experienced your course of treatment during the
6    summer and fall of 2009, your doctor continued to
7    make different assessments of your health condition,
8    didn't he?
9        A.    Yes.
10       Q.    Exhibit 62 is another letter from the
11   Reed Group, if you would look at that, please.  This
12   one is dated September 21, 2009 and you're notified
13   there that your family medical leave is extended
14   until October 1, 2009.  Do you see where I'm reading?
15       A.    Yes.
16       Q.    And the line below that advises you that
17   your D.C. -- they call it state family medical leave,
18   but since you're in D.C., it's D.C. family medical
19   leave is approved through October 14, 2009.  You
20   understood that?
21       A.    Yes.
22       Q.    And did you understand that your federal

Page 224

1    medical leave -- excuse me -- your family federal
2    family medical leave expired, ran out; all 12 weeks
3    were expired October 1, 2009?
4        A.    Yes.
5            JUDGE SWEENEY:  Are you asking him does he
6    understand it now or are you asking him did he
7    understand it then?
8    BY MR. MIOSSI:
9        Q.    Did you understand by reading this
10   letter at the time you got it that your FMLA leave of
11   12 weeks expired, was exhausted as of October 1,
12   2009?
13       A.    My understanding was, and I think I
14   actually saw a Fannie Mae policy talking about this,
15   if you live in the District of Columbia, your FMLA is
16   determined by the laws of the District of Columbia
17   and it will be the full four months.  I mean 16
18   weeks.
19       Q.    That's really not my question.
20       A.    I didn't pay attention to this.
21       Q.    Okay.  Then in the next paragraph, the
22   usual reminder, the Reed Group gave you to ensure

Page 225

1    that you provided additional documentation if you
2    needed to extend your leave beyond the middle of
3    October 2009.  You saw that.  Right?
4        A.    Yes.
5        Q.    All right.  Now, you did not return --
6    take a look at Exhibit 63.
7        A.    Yes.
8        Q.    Now, this is a letter, separate letter,
9    the Reed Group sent to you specifically to inform you
10   that in the next week -- at the end of the next week,
11   your FMLA leave of 12 weeks would be exhausted on
12   October 1, 2009.  You received this letter, didn't
13   you?
14       A.    Yes.
15       Q.    And they provided you additional
16   information concerning rights that you might wish to
17   pursue under the Americans with Disabilities Act if
18   that was something that was appropriate for you?
19       A.    Yes.
20       Q.    You did not return to work on October
21   15.  Right?
22       A.    No.

57  (Pages 222 to 225)

Arbitration Day 1                                                                July 22, 2014
Washington, D.C.

Page 226

1      Q.   And you didn't notify anyone at Fannie
2  Mae before that that you would not be returning to
3  work on that date.  Right?
4      A.   Again, I was told to be communicating
5  just with the Reed Group by the Reed Group, not with
6  Fannie Mae.
7      Q.   I understand.  I'm just saying you
8  didn't notify anyone at Fannie Mae --
9      A.   No.
10      Q.   -- like Carrie Lee, I won't be in
11  because I'm not well or I've got something else?
12      A.   I was told that I'm not supposed,
13  actually, to be contact with Fannie Mae.  I'm only
14  supposed to be contact with the Reed Group.  I
15  believe that Carrie Lee told me that during our
16  discussion.
17      Q.   Okay.
18      A.   And I also want to say that this very
19  letter says that I may be eligible for protection
20  under the District of Columbia Medical Leave Act for
21  these absences.
22      Q.   The Reed Group called you to check your

Page 227

1  status and remind you that your leave was expiring
2  October 15th and called you and left messages on
3  October 5, 8, 9, and 13th.  Do you recall that?
4      A.   No, but if you say this happened, I
5  agree it probably happened.
6      Q.   And you didn't return any of their calls
7  until October 13th.  Right?
8      A.   I don't recall.  I don't remember, sir.
9  It was four years ago.
10      Q.   All right, Exhibit 68, please.
11      Please turn to the second page of the exhibit,
12  your E-mail to Carrie Lee --
13      A.   Yes.
14      Q.   -- October 21, 2009.  Now, you testified
15  that you were told only to communicate with Reed
16  Group, but you E-mailed this on October 21st to
17  Carrie Lee.  Right?
18      A.   Right, because I needed to know how to
19  come back to work.
20      Q.   So in this E-mail, you advised that
21  you're scheduled to return to work on August -- not
22  August -- October 26th, but then you also advise that

Page 228

1  you suffered a rib fracture, broke three ribs.
2  Right?
3      A.   The doctors never were able to tell
4  whether it was a broken rib or a bruised rib or a
5  fracture.  So I think these three words, I used
6  interchangeably in my communications and also Reed
7  Group records.
8      So yes.  I testified I -- I wrote an E-mail to
9  that fact.
10      Q.   Well, the emergency room diagnosis
11  stated that you had rib fracture.
12      A.   Yes.
13      Q.   And so you said you wanted to take
14  vacation?
15      A.   Yes.
16      Q.   Until November 2nd.  Right?
17      A.   Yes.
18      Q.   Then on the first page, Ms. -- turn back
19  to the first page of exhibit, please, Exhibit 68.
20      A.   Yes.
21      Q.   October 22nd, Ms. Lee responds to you.
22  She thanks you for advising of your condition and she

Page 229

1  tells you you have to work through the Reed Group to
2  get medical approvals for the return to work.
3      Okay.  Pertaining to, in particular, because
4  you just disclosed you had another -- I mean, the
5  broken ribs were not the reason you were originally
6  put on leave.  Correct?
7      A.   No.
8      Q.   That was something unrelated to the rib
9  injury.  Correct?
10      A.   Yes.
11      Q.   And Ms. Lee is advising you that given
12  this disclosure, you needed to work with the Reed
13  Group to provide whatever documentation they required
14  to assess your safety and your ability to resume --
15  to return to work.  That's what she says to you on
16  October 22nd.
17      Do you recall that?  Do you see that?
18      A.   Yes.
19      Q.   There is another E-mail exchange, but
20  the final exchange from Ms. -- the final
21  communication from Ms. Lee to you on October 22nd is
22  urging you cooperate with and meet the Reed Group's

Arbitration Day 1                                                July 22, 2014
Washington, D.C.

Page 230

1   requests and advising you that you can't return to
2   work on the 26th if you don't cooperate with them.
3   Do you recall that?
4       A.   I recall this E-mail.
5       Q.   And when you spoke to the Reed Group
6   about the same date, the Reed Group told you you have
7   to get a separate return to work permission related
8   to the rib injury?
9       A.   Incorrect.
10      Q.   So if their phone records don't disclose
11  that -- excuse me.  If their phone records disclose
12  they're communicating that to you, that's not right?
13      A.   I spoke with Reed Group two times during
14  that day.  The first time, I disclosed to them my rib
15  injury and I asked them if I could use an accrued
16  vacation time.  They said that this injury was not
17  related to my FMLA; there is no need to provide any
18  release from the doctor and that I should go back to
19  work as scheduled on October 26th.
20      They suggested that I contact Fannie Mae with
21  the vacation request.  This is what I did, and I sent
22  this E-mail to Carrie Lee.  A couple of hours later,

Page 231

1   after Carrie Lee responded that I needed to provide a
2   second release, I called the Reed Group and they told
3   me that I needed to provide a second release because
4   Fannie Mae had requested it.  I remember this
5   conversation very well.  I spoke with June about it.
6       Q.   And if the note that June wrote in her
7   phone call log recording her discussion with her you
8   were to reflect a different set of facts, would she
9   be inaccurate in recording what you said to her and
10  what she said to you?
11      A.   My memory, actually, is very -- I
12  remember this very well.  There were two
13  conversations.  There was the one thing, and then a
14  couple of hours later, I was 100, you know -- I don't
15  know -- 360 degrees the opposite thing.  I remember
16  this very well because I was stunned.
17      So I'm not sure about the log where you're
18  looking at it, but I can swear my memory doesn't fail
19  me on this one.
20      Q.   Okay.  That's fine.  I'm just going to
21  ask you then do you recall June Kosier telling you on
22  October 22, 2009 that most employers expect you to

Page 232

1   use sick time when you are sick and not vacation time
2   and they need to know you're able to work and that
3   she reflected a note -- this is her thinking -- she
4   thought you understood the information she provided
5   to you.
6       A.   I was not sick.
7       Q.   Do you recall that?
8       A.   I wasn't treated for the rib injury.  I
9   was released weeks prior from the hospital.  The
10  hospital indicated the date when I could return to
11  work, which was October 16th, 10 days before the date
12  scheduled by the Reed Group.
13      I just asked if I could use vacation and I
14  mentioned the unrelated rib incident.  That's all.
15      Q.   All right.  And you were told you can't
16  use vacation for sick; if you're injured or sick, you
17  can't or you were told that your manager has to
18  approve it.  Correct?  H.R. can't approve vacation;
19  do you remember that?
20      A.   Right, but at this point, I was told
21  immediately that I need the update a medical
22  certification, a medical release.  I also recall that

Page 233

1   I was reading in Fannie Mae policies that you could
2   add vacation time to your sick leave.  There was
3   something along those lines.  I'm not exactly sure
4   where.
5       Q.   But in any event, you understood that
6   only your manager could approve a vacation request,
7   didn't you?
8       A.   I didn't know who my manager was at this
9   point.
10      Q.   You didn't make any request to anyone at
11  Fannie Mae about -- to your manager anyway, about
12  getting vacation, did you?
13      A.   Well, at this point, I was told that I
14  needed to update a medical -- a second medical
15  certification.  So, clearly, I mean, vacation time
16  was out of the question for me because I was required
17  to provide something else.
18      Q.   Turn to Exhibit 70, please.
19      A.   Seven-zero?
20      Q.   Seven-zero.
21      A.   Yes.
22      Q.   Now, the first two pages, three pages,

59 (Pages 230 to 233)

Page 234

1   let me see if I can explain it.  The first -- I
2   apologize.  It's four pages.  The cover sheet is in
3   your handwriting.  It's a fax transmittal sheet.  The
4   second page and the third page are actually
5   duplicates.  The page with the Fannie Mae Bates stamp
6   was what was available in Fannie Mae's files, but
7   since there was some highlighting which obscured the
8   text, you produced a clean copy of the George
9   Washington Emergency Room discharge instructions.
10      A.   Okay.
11      Q.   So the second and third page of the
12  exhibit are the same thing.
13          Now, so I guess it's easier to read the one
14  that doesn't have any obscured text, but at the
15  bottom, you visited the emergency room on October 12,
16  2009.  Right?
17      A.   Yes.
18      Q.   So the injury to your ribs, is that the
19  date that it occurred?
20      A.   It occurred a couple of days before, I
21  think, maybe a day before.
22      Q.   All right.  And as we talked about it,

Page 235

1   the physician who completed this document diagnosed a
2   rib fracture?
3       A.   Yes.
4       Q.   Right or wrong, that was the doctor's
5   judgment.  Right?
6       A.   [Gestures.]
7       Q.   Then there's a third -- the last page of
8   the exhibit, the fourth page advises that you may
9   return to work without restriction on October 16,
10  2009.  Do you see that?
11      A.   Yes.
12      Q.   Now, this last page, though, you never
13  provided to the Reed Group, did you?
14      A.   Yes, I did.  As I testified before, I
15  provided two faxes around the time when I got an
16  E-mail from Carrie Lee.  So this is October 22nd.  So
17  probably it was the following day, and also on
18  October 29th, I sent this along with the release.
19          I mean, what would be the sense for me not to
20  send the release which is a release stating that I
21  can return to work 10 days before I originally
22  scheduled, 10 days before scheduled by the Reed

Page 236

1   Group?  I don't know the Reed Group did with that
2   page; but, sir, I mean, why wouldn't I send this to
3   them?  I testified about this before.  I have the
4   same answer to you.
5       Q.   I'm not sure what you're referring to,
6   but at the bottom of the first page that was in our
7   files, the bottom -- Exhibit 70, the second page of
8   exhibit, the bottom left-hand corner of the document
9   contains typing which states "received on 10-29-2009,
10  12:22:33 p.m." and that corresponds with the fax
11  transmittal sheet and the date stamp at the top of
12  the document.
13          Do you see that?
14      A.   Yes.
15      Q.   I'll represent to you that the Reed
16  Group included a notation just like that on every
17  document that they received.  So my question to you
18  is do you know why that same receipt notification
19  does not appear on the form George Washington
20  Hospital gave you saying you were released to return
21  without restriction on October 16, 2009?
22      A.   I don't know, but there were also

Page 237

1   conversations with June.  There should be a record of
2   her contact with the emergency hospital somewhere in
3   the files and discusses my situation.  She confirmed
4   in the conversation that she knew that I was okay to
5   come back.
6       Q.   This document was provided to you by the
7   emergency room physicians on October 12, 2009?
8       A.   Yes.
9       Q.   And you didn't send it to Reed Group
10  until October 29, 2009.  Right?
11      A.   No.  I sent it after the 22nd and also I
12  sent it on October 29th.
13      Q.   Are you sure that you sent it earlier
14  than the 29th or you don't have a memory?
15      A.   I sent it twice.  I sent it twice.  I
16  don't remember exactly, but I know I sent it twice.
17  This what I testified when you deposed me.
18      Q.   You thought you did, but you weren't
19  sure that you sent it before the 29th.  Right?
20      A.   [Pause.]
21      Q.   Is that right?
22      A.   Until you asked me this question, I was

Page 238

1    sure that it was sent twice.  I believe that this is
2    what I said during my deposition.
3         Q.    Exhibit 75, please.
4         A.    Yes.
5         Q.    Exhibit 75 notifies you on October 30,
6    2009 that you were approved for the DCFMLA until
7    October 29, 2009.  Right?
8         A.    Yes.
9         Q.    And at the top of the next page -- and
10   that's just the DCFMLA approval.  At the top of the
11   next page, you were notified to provide additional
12   medical documentation if you couldn't return by
13   November 2, 2009.  Right?
14        A.    Right.
15        Q.    So you received as of October 29th all
16   16 weeks of your DCFMLA leave entitlement, didn't
17   you?
18        A.    I was not aware of that until October
19   30th when I first received a letter from Fannie Mae
20   stating that my position was eliminated.  Also, this
21   letter, if you can see, it's dated October 30th.  So
22   Reed Group informed me retroactively about the date,

Page 239

1    because remember one of the exhibits you showed me
2    before about the expiration of the Federal Medical
3    Leave Act was mailed to me a week before the expiring
4    date.  This one is mailed to me after the expiration
5    date.
6         Q.    Right, but you didn't get them any
7    information about your rib injury until October 29th
8    and they responded on October 30th.
9         A.    No.  I did.
10        Q.    You don't have any documents to prove
11   that you did.  You have documents to show that you
12   got it on the 29th.  Right?  But do you have any
13   document that would reflect you provided the rib
14   injury medical documentation to the Reed Group or
15   anyone else prior to October 29, 2009?
16        A.    That documentation was attached to the
17   letter that I sent to Carrie Lee.  If you read this
18   E-mail, it says a file is attached to the E-mail you
19   are referring to.
20        Q.    Can you show me what you're referring
21   to?
22        A.    Sure.  The October 22nd E-mail exchange.

Page 240

1         Q.    So on October 21st -- I'm looking at
2    Exhibit 68.
3         A.    Exhibit 68, page 2.  It says:  "I'm
4    attaching a note from G.W. Hospital concerning the
5    diagnosis."
6         Fannie Mae received the communication from
7    G.W. on the 21st of October.
8         Q.    Okay.  But Fannie Mae doesn't make the
9    decisions concerning your medical leave status, do
10   they?  You were aware that Reed Group and only Reed
11   Group was assigned to administer that issue?
12        A.    I don't know.
13        Q.    Now, as of October 26th or I should say
14   10 days --
15        A.    Sir, I want to restate again I spoke to
16   Reed Group on the 22nd.  I'm sure I faxed them some
17   information around that date, and someone at Reed
18   Group said that they contacted G.W.
19        Fannie Mae had the note from G.W. on October
20   21st.  I mean, I don't know what kind of effort you
21   would expect someone in my position to do, but it
22   seems to me that I went beyond the call of what was

Page 241

1    requested for me.
2         May I please have a break?
3         JUDGE SWEENEY:  Sure.
4         Counsel, how much longer do you think you'll
5    be just for --
6         MR. MIOSSI:  Ten minutes.
7         JUDGE SWEENEY:  Okay.  Then maybe we should
8    try to finish this up today then.
9         MS. MIOSSI:  Yes.
10        JUDGE SWEENEY:  We'll take a five-minute
11   break.  Will that be fine, Mr. Skrynnikov?
12        THE WITNESS:  Absolutely.
13        JUDGE SWEENEY:  Let's take five minutes and
14   come back.
15        [Recess.]
16        JUDGE SWEENEY:  Counsel, are you ready?
17        MR. MIOSSI:  I am.  Thank you, Judge.
18        JUDGE SWEENEY:  Go ahead.
19   BY MR. MIOSSI:
20        Q.    Please look at Exhibit 76, please, Mr.
21   Skrynnikov.
22        A.    First of all exhibit should not have

61 (Pages 238 to 241)

Arbitration Day 1                                                July 22, 2014
Washington, D.C.

| Page 242 | Page 244 |
|---|---|

**Page 242**

1  been produced.  Those were my private notes to
2  myself.  It was never sent to anyone.
3        MR. SALB:  There is no question pending.
4        JUDGE SWEENEY:  Was it 76?
5        THE WITNESS:  76?
6        MR. MIOSSI:  What were you looking at?
7        JUDGE SWEENEY:  Yes.
8        Okay.  I think he was confused.
9  BY MR. MIOSSI:
10       Q.   Okay.  All right.  Mr. Skrynnikov, I
11  think on direct examination, you understood this
12  letter to be your termination notice; am I correct?
13       A.   Yes.
14       Q.   Did you notice in the letter, in the big
15  paragraph, the larger print in the middle -- I'll
16  just read it so we're all on the same page:
17  "Although you are not currently approved for
18  continued benefits under Fannie Mae's short-term
19  disability program, if you are retroactively approved
20  by Reed Group for such benefits based on information
21  you submit from your healthcare provider, you remain
22  on as a Fannie Mae employee, albeit without a

**Page 243**

1  position, so that you may continue to receive such
2  benefits -- etc.
3        Did you read that?
4        A.   Yes.
5        Q.   And you had -- you did, as we've
6  established, you did send additional medical
7  documentation to the Reed Group on the 29th of
8  October, and that was about your rib condition.
9  Correct?
10       A.   Yes.
11       Q.   And you were able to find a doctor who
12  approved you to return to work on November 2, 2009.
13  Right?
14       A.   I had to file -- what's it called?  A
15  general physician because the Reed Group that the
16  note from G.W. was not sufficient.  They told me that
17  I need to go to my personal physician and provide
18  that note.
19       A.   Sure.
20       A.   I did have a personal physician.  So it
21  took me a few days to find one.
22       Q.   Well, as we saw, G.W. Hospital only

**Page 244**

1  approved to October 16th.  Right?
2        A.   Yes.
3        Q.   So then you had to find another doctor
4  at Reed Group's direction to submit appropriate
5  medical support that you would be safe and capable of
6  returning to work November 2, 2009, and you did that.
7  Right?
8        A.   I asked the doctor to give me a note
9  excusing me from work until the following Monday.  My
10  understanding was that I needed to return on a
11  Monday.
12       Q.   So anyway, you submitted that and the
13  Reed Group approved you for short-term disability
14  benefits until November 2, 2009.  Right?
15       A.   I understood Reed Group approved me for
16  DCFMLA through -- I'm not sure, sir.
17       Q.   And just so that we're clear, look at
18  Exhibit 75, please.
19       A.   Okay.
20       Q.   And you're right.  Your D.C. family
21  medical leave was approved through October 29, but at
22  the top of the second page, you had a return to work

**Page 245**

1  date there of October 2nd.  Right?
2        A.   Yes.
3        JUDGE SWEENEY:  November 2nd.
4        MR. MIOSSI:  I'm sorry.  I mean November 2nd.
5  Sorry.
6        THE WITNESS:  So I was approved for two
7  weekend days.  This is what you're saying.
8  BY MR. MIOSSI:
9        Q.   I'm just trying to get the date straight
10  with you.  You were approved to return to work
11  consistent with the note that you supplied to the
12  Reed Group from your physician saying you can come
13  back to work November 2nd.  Right?
14       A.   Yes.
15       Q.   But you didn't come back to work
16  November 2nd, did you?
17       A.   Because I received a letter terminating
18  my employment on October 30th.
19       Q.   And you submitted an additional request
20  to Reed Group for short-term disability benefits, did
21  you not?
22       A.   I don't remember.  Probably.

Alderson Reporting Company
1-800-FOR-DEPO

Page 246

1      Q.    Look at Exhibit 79, please.  That was a
2  notice from the Reed Group that your request for
3  disability, short-term disability, from the period of
4  November 2nd to November 17th was denied, and they
5  explained the reason right there in the middle of the
6  page.  Do you recall that?
7      A.    No, I don't, but --
8      Q.    Look at Exhibit 78.
9      A.    Yes.
10     Q.    Exhibit 78 is a fax cover sheet that you
11 sent to somebody at the Reed Group, June.  Right?  Do
12 you see that?
13     A.    Yeah.
14     Q.    And that was November 6, 2009, and you
15 sent in information from the Neurology Center.
16 Right?
17     A.    Um-hum.
18     Q.    And this was information that the Reed
19 Group considered, but found insufficient to support
20 your claim for continuation of short-term disability;
21 is that correct?
22     A.    Yes.  It takes two weeks to schedule an

Page 247

1  MRI.  This is a very sophisticated procedure.  So
2  what I faxed to the Reed Group on November 6th was
3  the result of my first appointment with Dr. Polaski,
4  who is a leading neurologist in D.C. Metro.  He
5  scheduled me for the 17th to have an MRI.  There was
6  nothing I could do at this point.
7      Q.    Did you do anything to appeal the denial
8  of your short-term disability benefits?
9      A.    No.
10     Q.    Then on Exhibit 80, that's the notice
11 that your employment was terminated on November 13th.
12 Correct?
13     A.    I was surprised to see this letter
14 because I thought I was terminated on the 30th.  I
15 suppose this is the official date of my termination.
16     Q.    I just have a couple more questions for
17 you, Mr. Skrynnikov.  Please turn to Exhibit 18.
18     A.    One-eight?
19     Q.    One-eight.
20     A.    Yes.
21     Q.    Though it would help to have a
22 magnifying glass, you can see, if you are able to

Page 248

1  squint as hard as I can, the date on which this
2  document was printed, the date that's reflected on
3  the document is May 20, 2007.  Do you see that at the
4  top right?
5      JUDGE SWEENEY:  May 20th?
6      MR. MIOSSI:  May 20, 2007.
7      THE WITNESS:  Yes.
8  BY MR. MIOSSI:
9      Q.    And that reflects data that was current
10 or accurate as of that date --
11     A.    Yes.
12     Q.    -- in 2007.  Right?
13     A.    Um-hum.
14     Q.    Now, if I heard your testimony
15 correctly, the data set contained in -- represented
16 in Exhibit 18 is something that you used to prepare
17 the BSA report that you testified about at Exhibit
18 29.
19     A.    Yes.
20     Q.    Is that right?
21     A.    Yes, sir.
22     Q.    But Exhibit 29 addresses a time period

Page 249

1  in 2009, does it not?
2      A.    Yes.
3      Q.    So the data from 2007 can't possibly
4  reflect the data -- the analysis and the forecast for
5  2009, can it?
6      A.    You're absolutely correct.  This is just
7  a sample report.  I suppose we did not have in
8  possession the report for the appropriate period, and
9  if you look at the names of the executives, one of
10 the executives is David Mott, former CEO of Fannie
11 Mae, who was resigned -- who -- "was resigned" was
12 probably the right term.
13     So this is just for illustration.  I had those
14 reports prepared through 2008 and 2009 on a monthly
15 basis, but we didn't have those in my possession, in
16 our possession.
17     Q.    Fannie Mae was not under the supervision
18 of a conservator in 2007, were they?
19     A.    No.
20     MR. MIOSSI:  Thank you, Mr. Skrynnikov.
21     JUDGE SWEENEY:  Counsel, any additional
22 questions?

63 (Pages 246 to 249)

Page 250

1    MS. KUNTZ:  Yeah.  We've got a couple.
2         REDIRECT EXAMINATION
3    BY MS. KUNTZ:
4    Q.    Mr. Skrynnikov, I would like you to look
5    again at Exhibit 12.  I'm going to ask you to do an
6    impossible balancing act here.  I would like you to
7    look Exhibit 12 and also at Exhibit 82, page 11.
8    A.    It helps to have separate binders.
9    Q.    Yeah, I guess.
10        JUDGE SWEENEY:  Page?
11        MS. KUNTZ:  Page 11 of Exhibit 82.
12   BY MS. KUNTZ:
13   Q.    Now I guess we'll start with page 11 of
14   124, because we discussed that on direct, and under
15   the entry for 7-10-2009 --
16   A.    I'm sorry.  Could you restart of your
17   question?
18   Q.    I'm trying to direct your attention to
19   the place in Exhibit 82, page 11, the entry for
20   7-10-2009, the second entry, the long one at the
21   bottom of the page.
22   A.    Yes.

Page 251

1    Q.    Let's see.  Four photographs down
2    starting with "we need".
3    A.    Yes.
4    Q.    There is a statement about a return to
5    work note there.  I believe you testified earlier
6    that you had not received this information at the
7    time.
8         My question is was this procedure followed or
9    was the procedure in the Fannie Mae policy, Exhibit
10   12, followed when the return to work notes were
11   actually sought?
12   A.    [Pause.]
13   Q.    Did you submit -- were you asked to
14   submit the return to work note to the Reed Group or
15   to Fannie Mae?
16   A.    I always asked that my providers submit
17   the paperwork to the Reed Group.
18   Q.    Okay.  But, in fact, in the Reed records
19   on page 11 --
20   A.    That was new information to me.
21   Q.    Okay.  Now, there was some suggestion
22   that you took action in the middle of September after

Page 252

1    you had received notice of your job abandonment to
2    cause Dr. O'Rourke to supply paperwork to Reed Group
3    to support your continued leave.
4    A.    Yes.
5    Q.    Did you take action to cause
6    Dr. O'Rourke to supply that, those documents?
7    A.    Yes, of course.
8    Q.    What did you do?
9    A.    I think -- I believe I had at least
10   weekly appointments with him.  Maybe we started with
11   twice a week or maybe I mentioned it to him.  I mean,
12   I know that he followed up as soon as he could.
13   Q.    Could I direct your attention to Exhibit
14   60, the first page.  There is printed text below the
15   body of the fax cover sheet.  Can you read what's
16   there, starting with received on?
17   A.    Received on September 15, 2009, 4:42
18   p.m. Eastern Daylight Time.
19   Q.    Okay.  And one last thing I'd like to
20   look at, Exhibit 82.  Now, you were asked why you
21   submitted medicals, your emergency room note as an
22   attachment to Carrie Lee as we saw at Exhibit 68.

Page 253

1    A.    Right.
2    Q.    And the representation was made to you
3    that the Reed Group was the only place handling
4    medical leave?
5    A.    Yes.
6    Q.    Why did you apply to Carrie Lee and send
7    her the emergency room note?
8    A.    Well, at this point, I was not familiar
9    with what we just -- what you just pointed out to me
10   on page 11 with Exhibit 82.  I just tried to be nice.
11   Q.    Well, why were writing to Carrie Lee?
12   Exhibit 68, if you want to look at that.
13   A.    Well, first of all, I was writing -- my
14   main goal was to find out about the procedures, the
15   process of returning to work.  I was cleared to
16   return to work, but I wanted to ask about the
17   possibility of taking vacation time.
18   Q.    And why were you writing to Carrie Lee
19   about vacation time?
20   A.    Because she was my only contact at Human
21   Resources.  I did know who was my supervisor.
22   Q.    Did Carrie Lee tell you who your

64  (Pages 250 to 253)

| Page 254 | Page 256 |
|---|---|

**Page 254**

1  supervisor was?
2      A.   No, never.
3      Q.   Did she give you a contact to a manager
4  or supervisor who you could reach about vacation?
5      A.   No.
6      Q.   Could I direct your attention to Exhibit
7  82, page 107.
8      A.   Yes.
9      Q.   I have two questions to follow up with.
10  The first, there is a conversation marked by an
11  asterisk and the explanation of what the conversation
12  is.  It's actually on page 106, provided on 106.
13      It says this is a conversation between June
14  and you, and I'm asking whether you had a
15  conversation with June on 10-29 regarding the faxes
16  of the emergency room note?
17      JUDGE SWEENEY:  I'm sorry.  I didn't
18  understand your question.
19      MS. KUNTZ:  My question was whether he had a
20  conversation.  This is a summary of a conversation.
21  So I'm asking whether he had a conversation with June
22  about the faxing of the emergency room note.

**Page 256**

1      Q.   What did they say?
2      A.   They said I needed the note from a
3  personal care provider.
4      MS. KUNTZ:  Okay.  Thank you.
5      JUDGE SWEENEY:  Is that it?
6      MS. KUNTZ:  That's it.
7      JUDGE SWEENEY:  Nothing else?
8      MR. MIOSSI:  No.
9      JUDGE SWEENEY:  All right.  Thank you, sir.
10  It's been a long day.
11      [Witness excused.]
12      JUDGE SWEENEY:  Counsel, do I take it that
13  that's probably the end of the day for us today here?
14      MS. KUNTZ:  That would be great.
15      JUDGE SWEENEY:  All right.  So tomorrow we'll
16  still be in your case.
17      MS. KUNTZ:  Yes.
18      JUDGE SWEENEY:  We'll continue with the case
19  then tomorrow, the same time or I'm open to any
20  suggestions.
21      MR. MIOSSI:  I think 9:30 works because we
22  have -- she's got some family obligations.

**Page 255**

1      JUDGE SWEENEY:  On this date?
2      MS. KUNTZ:  On this date.
3      JUDGE SWEENEY:  The 28th?
4      MS. KUNTZ:  Yes.
5      [Witness peruses document.]
6  BY MS. KUNTZ:
7      Q.   If you don't recall, that's fine, but do
8  you recall?
9      A.   I'm sorry.
10      Q.   You're tired.
11      A.   Yes.
12      Q.   On the date, 10-29, did you have a
13  conversation with June at the Reed Group regarding
14  the reason that you had faxed the emergency medical
15  note to H.R. at Fannie Mae rather than the Reed
16  Group?
17      A.   No.
18      Q.   Now, did you have a conversation with
19  the Reed Group about the reason that the nurse case
20  managers viewed the medical note from the emergency
21  room as insufficient to extend your claim?
22      A.   Yes.

**Page 257**

1      JUDGE SWEENEY:  That's fine.  9:30 is fine
2  with me.
3      MS. KUNTZ:  Were you able to check of Lisa
4  Kober?
5      JUDGE SWEENEY:  Can we just go off the off
6  the record?
7      MS. KUNTZ:  Oh, I'm sorry.
8      JUDGE SWEENEY:  We're off the record.
9      [Whereupon, at 4:47 p.m., the matter was
10  recessed, to reconvene at 9:30 a.m. on Wednesday,
11  June 23, 2014.]
12
13
14
15
16
17
18
19
20
21
22

Page 258

1    CERTIFICATE OF COURT REPORTER AND NOTARY PUBLIC

2

3          I, CATHERINE B. CRUMP, a court reporter

4    and Notary Public, hereby certify that the foregoing

5    proceedings were recorded by me stenographically and

6    thereafter reduced to typewriting under my direction;

7    that the foregoing transcript is a true and accurate

8    record of the proceedings to the best of my

9    knowledge, ability, and belief; that I am neither

10   counsel for, related to, nor employed by any of the

11   parties to the action in the proceeding; and further,

12   that I am not a relative or employee of any attorney

13   or counsel employed by the parties hereto nor

14   financially or otherwise interested in the outcome of

15   the action.

16          _____

17          CATHERINE B. CRUMP

18          Notary Public in and for the

19          District of Columbia

20

21   My Commission Expires:  October 31, 2017

22

```
 1                    JAMS ARBITRATION

 2

 3   - - - - - - - - - - - - - - - - - x

                                      :

 4   TIMOTHY SKRYNNIKOV,              :

                                      :

 5         Claimant,                  : Reference No.

                                      :

 6      v.                            : 1410006294

                                      :

 7   FEDERAL NATIONAL MORTGAGE        :

                                      :

 8   ASSOCIATION (FANNIE MAE)         :

                                      :

 9         Respondent.                :

                                      :

10   - - - - - - - - - - - - - - - - - x

11                     Volume II

12                     Wednesday, July 23, 2014

13                     JAMS

14                     555 Thirteenth Street, N.W.

15                     Suite 400

16                     Washington, D.C.  20004

17

18      The arbitration in the above-entitled matter

19   convened, pursuant to notice, at 9:33 a.m.

20

21   BEFORE:

22              HONORABLE DENNIS M. SWEENEY
```

Arbitration Day 2                                                                July 23, 2014
Washington, D.C.

---

**Page 260**

```
1   APPEARANCES:
2   On behalf of the Claimant:
3     MARY KUNTZ, ESQ.
      S. MICAH SALB, ESQ.
4     Lippman, Semsker & Salb, LLC
      7979 Old Georgetown Road, Suite 1100
5     Bethesda, Maryland  20814
      (301) 656-6905
6     mkuntz@lsslawyers.com
      msalb@lsslawyers.com
7
      Also Present:  TIMOTHY SKRYNNIKOV, Claimant
8
9   On behalf of the Respondent:
10    DAMIEN G. STEWART, ESQ.
      Fannie Mae
11    3900 Wisconsin Avenue, N.W.
      Washington, D.C.  20016-2892
12    (202) 752-7000
      damien_g_stewart@fanniemae.com
13
      WILLIAM G. MIOSSI, ESQ.
14    MARY M. LENAHAN, ESQ.
      Winston & Strawn, LLP
15    1700 K Street, N.W.
      Washington, D.C.  20006-3817
16    (202) 282-5661
      wmiossi@winston.com
17    mlenahan@winston.com
18    Also Present:  KRISTIN DeMENT HARRISON,
              Corporate Representative
19
20
21
22
```

**Page 261**

```
               C O N T E N T S
1
2   WITNESS      DIRECT  CROSS  REDIRECT  RECROSS
3   Carrie Lee     263    344     412      420
4   Lisa Kober     362    --      --       --
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
```

**Page 262**

```
1            P R O C E E D I N G S
2     JUDGE SWEENEY:  We're still in the claimant's
3   case here, and do you want to call your next witness.
4     MS. KUNTZ:  Yes.  We would like to call
5   Carrie Lee.
6     JUDGE SWEENEY:  I'm sorry.  Could you say
7   that louder.
8     MS. KUNTZ:  We would like to call Carrie Lee.
9     JUDGE SWEENEY:  Ma'am, if you would stand and
10  be sworn by the stenographer here.
11    Whereupon,
12             CARRIE LEE,
13      was called to testify and, having
14      first been sworn by the Notary Public, was
15          examined and testified as follows:
16
17    JUDGE SWEENEY:  Would you state your name and
18  address, please.
19    THE WITNESS:  Sure.  It's Carrie Lee.
20    JUDGE SWEENEY:  Could you spell that.
21    THE WITNESS:  Yes.  It's C-A-R-R-I-E, last
22  name L-E-E, and I'm at 3900 Wisconsin Avenue, which
```

**Page 263**

```
1   is the Fannie Mae Headquarters Office, Washington,
2   D.C.  20016.
3     JUDGE SWEENEY:  All right.  Go ahead,
4   Counsel.
5     MS. KUNTZ:  Thank you.
6             DIRECT EXAMINATION
7   BY MS. KUNTZ:
8     Q.   Ms. Lee, you are in human resources at
9   Fannie Mae?
10    A.   Yes.
11    Q.   And is that where you worked in 2009?
12    A.   Yes.
13    Q.   What was your assignment in 2009?
14    A.   I was an H.R. business partner.
15    JUDGE SWEENEY:  Ma'am, I know it may be hard,
16  but can you try to keep your voice as loud as
17  possible.
18    THE WITNESS:  I apologize.  Sorry.
19    JUDGE SWEENEY:  We have the air conditioning
20  coming in here too and it can be kind of hard to
21  hear.
22    THE WITNESS:  You know, I'm going to get a
```

2 (Pages 260 to 263)

Page 264

1   cough drop, which I think might be helpful.
2       JUDGE SWEENEY:  Yes, if that would be
3   helpful.
4       THE WITNESS:  So my assignment was as an H.R.
5   business partner.
6   BY MS. KUNTZ:
7       Q.   And what were your specific duties?
8       A.   My duties were to partner with business
9   leadership, management, employees on a variety of
10  H.R. needs.
11      Q.   Were there specific departments that you
12  worked with?
13      A.   Yes.
14      Q.   What were they?
15      A.   Finance was one department.  I don't
16  recall all of the departments I had exactly at that
17  time.
18      Q.   So did that mean that you worked with
19  the group that Ms. Harrison managed?
20      A.   Yes.
21      Q.   In 2009, was Mr. Skrynnikov part of that
22  group?

Page 265

1       A.   Yes.
2       Q.   Now, as H.R. consultant, it was your job
3   to advise managers as to the use of written warnings?
4       A.   Yes.
5       Q.   Does Fannie Mae have a policy on the use
6   of written warnings?
7       A.   No.
8       Q.   So how do you know how to advise a
9   business manager?
10      JUDGE SWEENEY:  About giving a written
11  warning?
12      MS. KUNTZ:  About written warnings.
13      THE WITNESS:  It's dependant upon the
14  situation.
15  BY MS. KUNTZ:
16      Q.   Well, is it entirely your judgment or is
17  there a standard procedure for using written
18  warnings?
19      A.   Every situation could potentially be a
20  little bit different.
21      Q.   And how do you know what Fannie Mae's
22  use of written warnings is?  Did you have training in

Page 266

1   this?
2       A.   I came in to Fannie Mae as an
3   experienced H.R. business partner.
4       Q.   And is it your contention that written
5   warnings are used in the same way business to
6   business?
7       A.   Generally.
8       Q.   And does Fannie Mae have a policy on
9   progressive discipline?
10      A.   No.
11      Q.   Does it have a policy on discipline?
12      A.   Does Fannie Mae a have a discipline
13  policy?  No.
14      Q.   Is there any writing from Fannie Mae
15  that explains the use of written warnings?
16      A.   I don't recall what Fannie Mae may have
17  had at that time that says specifically how to use a
18  written warning.  I do not believe there was any such
19  policy at that time.
20      Q.   So how do you understand a written
21  warning should be used?
22      A.   The purpose of a written warning is to

Page 267

1   make sure that the employee understands the
2   performance concerns that a manager may be having
3   with them so that they have ample opportunity to
4   improve.
5       Q.   So a written warning is not given a
6   short time before termination?
7       A.   Not necessarily.
8       Q.   And is there a regular time given before
9   -- between giving a written warning and taking any
10  further steps?
11      A.   There is not a specific time.
12      Q.   Would you expect the time allowed for
13  improvement to be a week?  A month?  What would you
14  expect?
15      A.   I can't provide an expectation on that.
16      Q.   Would a week be too short?  Too long?
17      A.   I can't give you an expectation on that.
18      Q.   Have you ever had a case where you had a
19  week after a written warning and then a termination?
20      A.   Not that I recall.
21      Q.   Now, it was in your capacity as H.R.
22  advisor that you participated in the July 1 meeting

3 (Pages 264 to 267)

Page 268

1   where Kristin Harrison gave Mr. Skrynnikov a written
2   warning?
3        A.   Yes.
4        Q.   And Mr. Skrynnikov objected?
5        A.   I'm sorry.  Could you repeat that?
6        Q.   I was asking whether Mr. Skrynnikov
7   objected at the time to the written warning.
8        A.   I recall that he was unhappy about the
9   written warning.
10        Q.   Do you recall if he spoke about the
11   basis of his unhappiness?
12        A.   I'm sorry.  I am having trouble hearing
13   you.  Could you repeat that?
14        Q.   Oh, are you?  Okay.  Do you recall if
15   Mr. Skrynnikov expressed the basis for his
16   unhappiness?
17        A.   Yes, I do recall.
18        Q.   And what did he say?
19        A.   I believe he thought that his written
20   warning was unfair.
21        Q.   Did he specifically reference an April
22   28th meeting?

Page 269

1        A.   He did.
2        Q.   He did, and do you recall what he had to
3   say about the April 28th meeting?
4        A.   I took notes on the April 28th meeting
5   that would help to refresh my memory.
6        Q.   Did you take those notes at this meeting
7   of the three of you --
8        A.   I'm sorry.
9        Q.   -- of the written warning?
10        A.   Let me go back.  If I just said I took
11   notes at the April 28th meeting, I meant to say I
12   took notes at the July 1st meeting, which I remember
13   had notes about Tim's comments on the April 28th
14   meeting.
15        I misspoke.
16        Q.   Now, did you have the July 1 meeting
17   with just Ms. Harrison and Mr. Skrynnikov or was
18   there a follow-up meeting with Mr. Skrynnikov alone?
19        A.   Can you repeat that question?
20        Q.   On July 1st, you met with Mr. Skrynnikov
21   and Ms. Harrison to deliver the written warning?
22        A.   That's correct.

Page 270

1        Q.   Mr. Skrynnikov complained about the
2   written warning and made reference to the April 28th
3   meeting?
4        A.   That is correct.
5        Q.   Isn't it true that you suggested to Mr.
6   Skrynnikov that the two of you meet subsequent to
7   that and that you did, in fact, meet with him on July
8   1st or 2nd following the written warning meeting?
9        A.   I believe Tim asked to meet with me
10   rather than me suggesting to him that we meet.
11        Q.   And did you meet with him?
12        A.   We did meet the following day.
13        Q.   Why don't we look at Exhibit 45.
14        JUDGE SWEENEY:  Ma'am, you have books there
15   and they're numbered.
16        THE WITNESS:  To my left, okay.
17   BY MS. KUNTZ:
18        Q.   Now, are these the notes that you just
19   referenced?
20        A.   They are.
21        Q.   And are these in your handwriting?
22        A.   They are in my handwriting.

Page 271

1        Q.   Now, these notes, do you recall taking
2   them at the three-person written warning meeting or
3   at the subsequent meeting with Mr. Skrynnikov?
4        A.   The notes are dated Wednesday, July 1st.
5        Q.   Right.  I'm not asking you to read the
6   notes.  I'm asking you to tell me when you recall
7   taking these notes.
8        A.   So I recall taking these notes during
9   the meeting.
10        JUDGE SWEENEY:  Which meeting?
11   BY MS. KUNTZ:
12        Q.   Which of the two meetings?
13        A.   The meeting on Wednesday July 1st.
14        JUDGE SWEENEY:  Was that with Ms. Harrison?
15        THE WITNESS:  That was during the delivery of
16   the written warning, yes.
17   BY MS. KUNTZ:
18        Q.   Did you take any notes at the meeting
19   with Mr. Skrynnikov?
20        A.   Which meeting?
21        JUDGE SWEENEY:  With just her and Mr.
22   Skrynnikov?

4 (Pages 268 to 271)

Page 272

1  BY MS. KUNTZ:
2      Q.   The subsequent meeting with Mr.
3  Skrynnikov regarding the April 28th meeting.
4      A.   I don't recall taking any notes.
5      Q.   So let's take a look at these notes.  So
6  your testimony is that the written warning meeting
7  devolved into a discussion of the April 28th meeting?
8      A.   Can you repeat the question, please?
9      Q.   Your testimony, I'm asking, is that the
10  written warning meeting attended by you,
11  Ms. Harrison, Mr. Skrynnikov became a discussion of
12  the April 28th meeting.
13      A.   I believe that was part of what was
14  discussed.
15      Q.   And what was discussed out of the April
16  28th meeting?  Did you discuss comments that
17  Ms. Harrison is alleged to have made that Mr.
18  Skrynnikov objected to?
19      A.   So part of the meeting was where there
20  was this disagreement of the comment about hatred in
21  your eyes.  That was what the meeting on April 28th
22  that Tim referenced in that July 1st meeting -- you

Page 273

1  know, that's kind of what the 4-28 comments were
2  centered on.
3      Q.   And what do you recall being said at the
4  July 1st meeting?
5      A.   That Tim indicated that Kristin had told
6  him that she saw hatred in his eyes, which Kristin
7  disagrees with.
8      Q.   So at the July 1st meeting, you asked
9  Ms. Harrison about the April 28th meeting?
10      A.   I do not recall that I asked her about
11  the April 28th meeting.
12      Q.   But you have a note here about her
13  disagreeing.  So when did you get that information
14  that she disagreed?
15      A.   I may not have asked her.  It just may
16  have just come out as part of the discussion.
17      Q.   So she participated in the discussion of
18  the April 28th meeting on July 1st?
19      A.   I don't recall the specifics, but my
20  notes would indicate that there was a discussion
21  where Tim said Kristin said hatred in her eyes and
22  Kristin said she did not say that.

Page 274

1      Q.   Do you recall this discussion at all,
2  Ms. Lee?
3      A.   I do recall -- though it was five years
4  ago, with my notes, I do have recollection of it.
5  The notes are a refresher.
6      Q.   And what else was discussed, then, from
7  your memory, not the notes?
8      A.   I need the notes to assist me with my
9  memory.  It was a long time ago.
10      Q.   The notes are in front of you, but I'm
11  asking you what else.  Can you supplement the notes
12  with your memory?
13      A.   I cannot supplement the notes with my
14  memory.
15      Q.   So are the notes an accurate reflection
16  of what was discussed at the July 1st written warning
17  meeting?
18      A.   Beyond what is in the notes, in the
19  written warning meeting, we would have discussed the
20  contents of the written warning when it was delivered
21  to be sure Tim understood performance deficiencies
22  and where things weren't going well and received

Page 275

1  feedback.
2      Q.   Now, did you make notes of that here in
3  these written notes?
4      [Witness peruses document.]
5  BY MS. KUNTZ:
6      Q.   Ms. Lee, I'm not asking you to read
7  through the notes.  I'm asking you to recall that
8  meeting.  Do you normally, when you go to a written
9  warning meeting, take extensive notes?
10      A.   I do.
11      Q.   And do you take notes of the discussion
12  about the written warning itself?
13      A.   The contents of the written warning are
14  they're written up to provide to the employee.  We
15  typically in these meetings discuss point by point
16  what's going on with an employee's performance.
17      So I don't take notes of what's already
18  written in the written warning, necessarily, but I
19  take notes on discussion beyond what's covered in the
20  written warning that's provided in that meeting.
21      Q.   Okay.  Do you generally discuss an
22  employee's health problems at a written warning

Page 276

1  meeting?
2      A.  Absolutely not.
3      Q.  Could you look at the third page of
4  these notes.
5      Now, I have a little trouble with your
6  handwriting and maybe you can help us with this, but
7  it appears to me that there's some discussion of his
8  medical issues here, and my question is whether his
9  medical issues were discussed at the written warning
10 meeting.
11     [Witness peruses document.]
12     THE WITNESS:  So I can't stop an employee
13 from mentioning a medical concern if they bring it
14 up, but that is something that is not relevant to the
15 delivery of a written warning and I would not
16 encourage us to get into any written warning meeting
17 and I would try to stop any discussion of a medical
18 concern in the written warning delivery meetings.
19 BY MS. KUNTZ:
20     Q.  What proof is there that these notes are
21 from the written warning meeting and not from the
22 subsequent meeting with Mr. Skrynnikov?

Page 277

1      A.  I don't have proof that they are from
2  the written warning meeting versus the subsequent
3  meeting.
4      Q.  Now, at a one-on-one meeting with an
5  employee, would you have discussed medical issues?
6      A.  I would not discuss medical issues in
7  detail.  My practice is to refer those to our
8  third-party vendor, which at the time was the Reed
9  Group.
10     Q.  Did you recommend that Mr. Skrynnikov
11 take FMLA leave?
12     A.  I recommended that Mr. Skrynnikov
13 contact the Reed Group to let them determine what his
14 needs may or may not been.  I'm not in a position to
15 determine that as an HRBP.
16     Q.  So these references to his medical
17 problems, his sleepiness and so forth, did you have
18 that discussion with him at the subsequent meeting,
19 the one-on-one meeting with him?
20     A.  Let me read through these notes.
21     [Witness peruses document.]
22 BY MS. KUNTZ:

Page 278

1      Q.  How confident are you that these notes
2  are from the written warning meeting and they're in
3  reference to the written warning?
4      A.  I'm sorry.  You asked me a question
5  before that one, which I'm focused on right now, if I
6  could just take a minute to read through this.
7      [Witness peruses document.]
8      THE WITNESS:  Could you repeat your first
9  question?
10     JUDGE SWEENEY:  Why don't you go ahead.
11     MS. KUNTZ:  Thank you.
12     JUDGE SWEENEY:  She'll get back into it.
13     THE WITNESS:  Sure.  Absolutely.
14 BY MS. KUNTZ:
15     Q.  What is your evidence from these notes
16 that these notes are from the written warning
17 meeting?
18     A.  They may be a combination of written
19 warning notes and the meeting the day after.
20     Q.  And what is your evidence of that?
21     A.  I don't have evidence either way.  I
22 clearly did not do a good job of dating these notes.

Page 279

1  They're from one or the other or both.
2      Q.  Is there anything in the notes that
3  references the written warning itself?
4      A.  Yes.
5      Q.  And what's that?
6      A.  It's the page that says FM 0000108 at
7  the top, "but will not sign".
8      Q.  Okay.
9      A.  That references the written warning and
10 that he didn't want to sign it.  There's a few lines
11 down where he indicates that he doesn't feel that the
12 whole picture is painted in the written warning.
13     Q.  All right.  So how long was this
14 discussion of the April 28th incident at the July 1st
15 written warning meeting?
16     A.  I don't recall how long we focused on
17 the 28th.
18     Q.  But Ms. Harrison participated in that?
19     A.  I don't recall Kristin's level of
20 participation in that.
21     Q.  Well, there were three people in the
22 room?

Page 280

1       A.   There were three people in the room.
2       Q.   So was she participating in the
3   discussion?
4       A.   Certainly, she was delivering his
5   written warning and giving him feedback on his
6   performance.
7       Q.   But you have a response from
8   Ms. Harrison about the April 28th meeting?
9       A.   Certainly.  She doesn't agree with Tim's
10  statement.
11      Q.   So was July 1st the first time you had
12  heard of the April 28th meeting?
13      A.   I don't know.
14      Q.   Had --
15      A.   I think so, but I don't know.
16      Q.   Had Ms. Harrison discussed it with you?
17      JUDGE SWEENEY:  Prior to the July 1st
18  meetings?
19  BY MS. KUNTZ:
20      Q.   Prior to the July 1st meeting?
21      A.   I don't recall.
22      Q.   What does "I don't recall" mean?

Page 281

1       A.   It means I don't remember.
2       Q.   Do you not remember whether she spoke to
3   you or do you not remember the contents of the
4   meeting?
5       A.   Do I not remember that she spoke to me
6   about what?
7       Q.   About the April 28th meeting.
8       A.   So I do not recall whether or not
9   Kristin spoke to me about the April 28th meeting
10  before the meeting on July 1st.
11      Q.   Okay.  Great.
12      A.   If you are referring to something in
13  particular that would help refresh my memory --
14      Q.   No.  I'm just asking about this April
15  28th meeting.  Had Mr. Skrynnikov spoke to you about
16  the April 28th meeting before the July 1st?
17      A.   Again, I just don't recall the timeline
18  specifically.
19      Q.   Could you turn to Exhibit 44 briefly.
20      Now, isn't it true that you worked with
21  Ms. Harrison on drafting this written warning?
22      A.   That is true.

Page 282

1       Q.   And were you involved in the drafting
2   and the editing?  What part did you play in this?
3       A.   My part in written warnings when a
4   manager is drafting them is to provide feedback on
5   the clarity of the points the manager is trying to
6   make to do our best to provide the employee with
7   feedback that they can understand.
8       Q.   And was this written warning also
9   reviewed by Legal?
10      A.   I don't specifically recall that.
11      Q.   You don't -- it's not a regular process
12  to send this to the Legal Department to review
13  written warnings?
14      A.   Sometimes we ask for advice and sometime
15  we don't.  I don't remember in this case.
16      Q.   And why would you ask for advice from
17  Legal, under what circumstances?
18      A.   There could be a multitude of
19  circumstances for asking for advice.
20      Q.   Well, give me an example.
21      A.   If, for some reason, I wasn't sure
22  something was clear enough, I might want another

Page 283

1   opinion.
2       Q.   If something wasn't clear enough?
3   Something that the manager was saying in the written
4   warning?
5       A.   Right.  That could be just one example.
6       Q.   So just for editing, you would consult
7   the Legal Department?
8       A.   For substance, yes, for editing the
9   thoughts within to make sure that there was clarity,
10  that it made sense.
11      Q.   Okay.  Is there any other reason you
12  would consult Legal on a written warning?
13      A.   Every situation could be different.  So
14  I suppose there could be other reasons.
15      Q.   Do you recall whether Legal assisted in
16  drafting this written warning?
17      A.   I don't recall whether I asked for their
18  counsel on this one or not.
19      Q.   So at the July meeting or meetings,
20  recorded in your notes, Exhibit 45, your notes also
21  reflect that there was a discussion of not providing
22  the level of value required for the salary.  I

Page 284

1  believe that's the Line 5 down and that's the way we
2  interpreted it at the deposition.
3         Now, what was the discussion of that comment
4  at this meeting?  Did Ms. Harrison agree that she had
5  said that?
6         A.   As I recall, the discussion was brought
7  up by Tim and I thought something to the effect of
8  the work that you are producing is not providing what
9  we need in this role.
10        Q.   I'm sorry.  Did Tim interpret it that
11 way for you at the meeting or who provided that
12 interpretation at the meeting?
13        A.   I don't recall who provided that
14 interpretation.  I do recall that Tim brought that up
15 as a concern and that Kristin indicated, yes, I
16 shared that thought; you're not providing what we
17 need in this role; your performance isn't where we
18 needed it to be.
19        Q.   So that was another way in which she
20 responded regarding the April 28th meetings; is that
21 correct?
22        A.   That was another way that -- I'm sorry,

Page 285

1  Mary.  If you could repeat that question.
2         Q.   That was another way in which she
3  responded regarding the April 28th meeting?
4         A.   I can't validate that that was part of
5  the April 28th meeting.
6         Q.   Okay.  But you can validate that that
7  was part of the discussion at the April 28th meeting
8  at the July 1st meeting that you attended?
9         A.   I can validate that it was discussed in
10 the July 1st meeting.  I can't validate that it was
11 discussed in the July 1st meeting that that was part
12 of the April 28th meeting.
13        Q.   Thank you.  So now it was with
14 Ms. Harrison there that Mr. Skrynnikov made the
15 remark that she had been a great manager, but changed
16 in late March?  It's on page 4 of your notes.
17        A.   Are you referring to the second
18 paragraph there?
19        Q.   Yes.  Do you have any independent
20 recollection of that?
21        A.   I have a vague recollection of Tim
22 sharing with me that Kristin had, when he had done

Page 286

1  well, provided feedback that he had done well and
2  when he had not been delivering on expectations, she
3  provided that feedback as well.
4         Q.   Now, at this same meeting, you discussed
5  with Kristin, with Ms. Harrison, the ways of managing
6  Mr. Skrynnikov there at the meeting with the three of
7  you?
8         A.   Help me to understand what you're
9  referring to in terms of the ways of managing.
10        Q.   Well, there are just references to
11 managing on the first page with way KDH is managing
12 him, and they're actually scattered throughout where
13 there's discussion of how KDH, which I take to be
14 Kristin DeMent Harrison --
15        A.   Right.
16        Q.   -- is managing Mr. Skrynnikov, and I'm
17 trying to picture how those comments came up in this
18 three-way meeting that was taking place on July 1st.
19        A.   In general terms, I recall Tim, you
20 know, talking about which feeds into she gave me
21 feedback when things were going well and was
22 complimentary, you know, gave me feedback when things

Page 287

1  were not meeting expectations.  That was the
2  reference, I suppose, to the ways she managed him.
3         Q.   So did you have any follow-up
4  conversations with Ms. Harrison about this discussion
5  of the April 28th meeting?
6         A.   I don't remember.  Honestly, I don't
7  remember.
8         Q.   Did you have a follow-up discussion with
9  her about issues of managing Mr. Skrynnikov?
10        A.   I'm sure we had follow-up discussions
11 about managing Mr. Skrynnikov.  That's a standard
12 practice when you delivered a written warning, to
13 keep in touch with the manager on how things are
14 going, what's going on well, are you seeing
15 improvement, that type of thing.
16        Q.   How often do you have these follow-up
17 meetings with managers when a written warning has
18 been delivered?
19        A.   I don't think there is a standard,
20 necessarily.  I would say in some cases, it could be
21 every few days, depending on what's going on.  I
22 would say, probably, at least every other week

8 (Pages 284 to 287)

Page 288

1   checking back, if not more frequently.
2       Q.   Okay.  Do you keep any records for how
3   often you check back with managers?
4       A.   I do not keep formal records on how
5   often I check back with managers, no.
6       Q.   Would it be in an E-mail record?
7       A.   I don't keep formal records on how often
8   I check in.  So I wouldn't have it in an E-mail
9   record either.
10      Q.   So do you just keep a mental log of how
11  often you are checking back with managers?
12      A.   I mean, as a general practice, I want to
13  be kept informed and keep a dialogue going about how
14  things are going, and if there is something that has
15  popped up in any given case that's noteworthy, then
16  we'll meet about it and discuss it further.
17      Q.   Do you ever keep in touch with the
18  employees who have been given written warnings?
19      A.   Yes.
20      Q.   And how often do you do that?
21      A.   There's no set frequency.
22      Q.   Did you stay in touch with Mr.

Page 289

1   Skrynnikov after he was served with the written
2   warning?
3       A.   Yes.  We met the next day.
4       Q.   Was that to follow up on the written
5   warning?
6       A.   That was.
7       Q.   And what did you discuss with him that
8   had to do specifically with the written warning?
9       A.   I don't recall specifics from that
10  discussion about the written warning exactly.  I
11  believe these notes may speak to that.
12      Q.   So let's take a look at Exhibit 46.
13      Now, is this standard response, referring
14  people to various offices, to EAP and to the vendor
15  for medical leave, or --
16      A.   It is not a standard response.  It's
17  personalized to Tim for his case.
18      Q.   Did you speak with him about going to
19  EAP at the July 1st meeting?
20      A.   I need to look at my notes from the July
21  1st meeting.
22      JUDGE SWEENEY:  Does EAP stand for Employee

Page 290

1   Assistance Program?
2       THE WITNESS:  It does, yes.
3       JUDGE SWEENEY:  And what does the "R" stand
4   for in the sentence before that?
5       THE WITNESS:  I believe that was a typo on my
6   part and that that was meant to be H.R.
7       JUDGE SWEENEY:  Oh, I see.
8   I'm sorry.  Go ahead, Counsel.
9   BY MS. KUNTZ:
10      Q.   Would you typically discuss going to --
11  referring an employee to EAP when you're meeting in a
12  three-way with their manager as well?
13      A.   I refer employees to the EAP very
14  frequently.  It's a great resource and I want
15  employees to know that it is available to them.
16      Q.   That wasn't my question.  My question
17  was would you make that recommendation when they were
18  in the presence of their manager?
19      A.   Depending on the conversation, possibly.
20      Q.   And would you have in this situation of
21  a written warning being administered?
22      A.   Depending on the situation, I might.

Page 291

1       Q.   Well, we're talking about this
2   situation.  Did you in this situation?
3       A.   I don't recall in this situation
4   specifically.
5       Q.   Okay.  When you spoke to Mr. Skrynnikov
6   about taking FMLA leave at one of the two meetings in
7   early July, was he aware of the possibility of taking
8   FMLA leave at that time or was this new information
9   for him?
10      A.   I don't know if it was new information
11  or if he was aware.
12      Q.   Did he have any questions?  Did he know
13  what FMLA Lee was, what it meant?
14      A.   I don't recall whether or not he had
15  questions or whether or not he indicated that he knew
16  what FMLA meant.
17      Q.   Did he understand the difference between
18  FMLA leave and STD, short-term disability?
19      A.   I don't know if he understood or not.
20      Q.   You don't recall if you explained these
21  differences to him?
22      A.   I do not recall if I explained the

Page 292

1    differences to him.
2        Q.   Could I ask you to look briefly at
3    Exhibit 49. I'm just interested in the top E-mail.
4        What work-related questions were you referring
5    to there?
6        JUDGE SWEENEY: Where are you?
7        MS. KUNTZ: Exhibit 49, the top E-mail from
8    Ms. Lee to Mr. Skrynnikov dated July 9th at 5:15 p.m.
9        JUDGE SWEENEY: Okay.
10   BY MS. KUNTZ:
11       Q.   Ms. Lee, I'm just asking about the top
12   E-mail that you sent to Mr. Skrynnikov. I'm just
13   asking what you're referencing when you talk about
14   work-related questions from earlier this week. This
15   is July the 9th.
16       A.   I understand.
17       [Witness peruses document.]
18       MS. KUNTZ: If you don't know, we can move
19   on.
20       MR. MIOSSI: May I say something? I don't
21   think it's inappropriate, Your Honor, for a witness
22   to review an exhibit before answering a question for

Page 293

1    context, if nothing else.
2        JUDGE SWEENEY: That's fine. We'll let her
3    do that, but I think the witness has already said
4    this is five years ago and trying to recall this is
5    going to be difficult.
6        So I think the question is do you remember
7    anything about what you're referring to about work
8    related questions?
9        THE WITNESS: I was trying read this for
10   context to see if that would help me to answer that
11   question, and I can't say with certainty that I do.
12       JUDGE SWEENEY: Okay. That's fine.
13       Next question.
14   BY MS. KUNTZ:
15       Q.   Ms. Lee, in 2009, who at Fannie Mae was
16   responsible for managing FMLA leave?
17       A.   We outsourced that in 2009 to the Reed
18   Group.
19       If I could in just a minute ask for break.
20       JUDGE SWEENEY: Sure. Do you want that right
21   now?
22       MS. KUNTZ: This is a great place to stop.

Page 294

1        JUDGE SWEENEY: Okay. Why don't we do that.
2        [Recess.]
3        JUDGE SWEENEY: All right. We're back on the
4    record again.
5        Counsel, go ahead.
6        MS. KUNTZ: Thank you.
7    BY MS. KUNTZ:
8        Q.   I had asked you just before we broke, in
9    2009, who was responsible at FMLA for managing FMLA
10   leave.
11       A.   The Reed Group.
12       Q.   And within FMLA H.R., was there a
13   designated person for managing FMLA?
14       A.   We had a function that acted as a
15   liaison with the Reed Group, but it was really was
16   outsourced to the Reed Group.
17       Q.   And what was the liaison function? What
18   was their role?
19       A.   I think really to manage the service
20   level agreements with the Reed Group as a vendor, but
21   I was not part of that group. So I cannot say.
22       Q.   Can you explain what the role of Yvonne

Page 295

1    Miller was?
2        A.   I did not manage Yvonne Miller.
3        Q.   Did you know Yvonne Miller?
4        A.   I did know Yvonne Miller.
5        Q.   Did you know what her job was?
6        A.   I know that at least part of her
7    function was as part of that STD FMLA liaison group.
8        Q.   It your understanding that that group
9    was managing the contract with the Reed Group?
10       A.   It's my understanding, yes.
11       Q.   And what about Lisa Kober?
12       A.   I don't know what Lisa Kober's relation
13   was to that.
14       Q.   Do you know what Lisa Kober does?
15       A.   She's a benefits professional at Fannie
16   Mae.
17       Q.   And why would you go to Lisa Kober? Why
18   would you contact Lisa Kober?
19       A.   I suppose if I had a benefits-related
20   question about a vendor, I might go to Lisa Kober.
21       Q.   A benefits-related question about a
22   vendor?

10 (Pages 292 to 295)

Page 296

1      A.   A benefits vendor-related question.
2      Q.   Okay.  So she functions as a liaison
3  between vendors and benefits?
4      A.   I mean, as I said before, I can't really
5  say what Lisa Kober's role is because we're not on
6  the same team and I didn't manage her at the time,
7  nor do I now.
8      Q.   What is your role when an employee
9  within one of the groups you advise takes FMLA leave?
10      A.   My role is make sure that they
11  understand that they need to get in touch with the
12  Reed Group as the third-party vendor handling Fannie
13  Mae's short-term disability and FMLA.
14      Q.   Do you have any other role once they've
15  made contact with the Reed Group?
16      A.   In what specifically?
17      Q.   In any way, do you have any further
18  contact with the employee while they're out on FMLA
19  leave?
20      A.   Potentially, if an employee were to
21  E-mail me or call me, I would certainly respond to
22  them.

Page 297

1      Q.   But do you have any cause to reach out
2  to them while they're on FMLA leave?
3      A.   If there's something I need to
4  communicate on behalf of the company, yes.
5      Q.   Can you give an example of what that
6  might be?
7      A.   If the Reed Group had not heard from
8  someone, for example, and Fannie Mae did not know
9  what their status was and they were beyond their
10  deadline to get documentation to the Reed Group, we
11  would potentially reach out to them as H.R.
12  professionals.
13      Q.   And, typically, you would do that rather
14  than the employee's manager?
15      A.   Yes, probably.  You know, we're talking
16  about vague situations.
17      Q.   No.  I'm asking about in your
18  experience, is that the way this would be handled?
19      A.   Generally, in my experience.
20      Q.   What role does Fannie Mae's Legal
21  Department play in the administration of FMLA leave?
22      A.   In the administration of FMLA leave, no

Page 298

1  role.  The administration of FMLA leave is handled by
2  our third-party vendor.
3      Q.   Do they have any role with respect to
4  FMLA leave?
5      A.   They are our subject matter experts on
6  employment laws.
7      Q.   And when would you consult Fannie Mae
8  Legal with regard to the FMLA leave?
9      A.   It's a very broad question.  Can you --
10      Q.   It is.  Can you think of any time when
11  you have consulted Fannie Mae Legal with respect to
12  FMLA?
13      A.   Yes.  This case is a time when I
14  consulted Fannie Mae Legal.
15      Q.   Is there any other case where you have
16  consulted Fannie Mae Legal with respect to FMLA?
17      A.   Off the top of my head, I can't recall
18  anything.
19      Q.   Okay.
20      A.   But that certainly does mean that I have
21  not.  I just off the top of my head can't think one
22  of one right now.

Page 299

1      Q.   Could I ask you to turn to Exhibit 82,
2  please.
3          Did I say to look at page 29?  I'm sorry.  Can
4  I direct your attention to page 29.
5      A.   Page 29 of Exhibit 82?
6      Q.   Yes, please.  I want to call your
7  attention to an E-mail from you to Lisa Kober that
8  starts in the middle of page 29.  Could I ask you to
9  read that, please.
10      A.   I'm so sorry.  To read which one?
11      Q.   The E-mail from you to Lisa Kober that
12  starts in the middle of page 29 and, you know,
13  completes on that page.
14      A.   "Lisa, I just spoke to Madonna.  She
15  asked that you call Reed and ask them not for
16  specific details, but for an understanding of the
17  situation.  Indicate that because he has raised this
18  issue against us, we need to understand the nature of
19  the altercation that he had with his manager.
20          Also, Madonna would like you to satisfy
21  yourself that Reed is appropriately vetting this type
22  of physician certification.

11 (Pages 296 to 299)

Page 300

1        Thanks, Carrie."
2        Q.    Now, why are you going to Lisa with
3    this?
4        A.    Probably because we had questions from
5    Reed and she was the liaison to work with Reed.
6        Q.    Okay.  And who is Madonna in this
7    E-mail?
8        A.    Madonna McGwin.
9        Q.    And where does Madonna McGwin work?
10       A.    She's in our employment law group.
11       Q.    Is she an attorney?
12       A.    She is.
13       Q.    So you just spoke with Madonna.  Did you
14   reach out to Madonna?
15       A.    I don't recall if I reached out to
16   Madonna or she reached out to me.
17       Q.    Would Ms. McGwin have known about the
18   issue absent your reaching out to her?
19       A.    Absent my reaching out to her, probably
20   not.
21       Q.    So what is the situation referred to in
22   this E-mail?

Page 301

1        A.    [Pause.]
2        Q.    Do you recall what information you had
3    about this altercation with the manager that's
4    referenced in the second line of your E-mail?
5        A.    I do not.
6        Q.    Do you recall why you reached out to
7    Madonna about an altercation with this manager?
8        A.    I would have reached out to Madonna for
9    counsel about the situation given her role.
10       Q.    And what situation is that?
11       A.    As I just said, I don't recall what the
12   situation was.
13       Q.    I'm sorry?
14       A.    I said as I just said, I don't recall
15   what the situation was.
16       Q.    Was it your belief that Mr. Skrynnikov's
17   reference to an altercation with his manager was that
18   the manager was Ms. Harrison?
19       A.    I don't recall.
20       Q.    Who was Mr. Skrynnikov's manager at the
21   time he took FMLA leave?
22       A.    Kristin.

Page 302

1        Q.    Did you have any reason to believe that
2    his use of the term "manager" referenced anyone other
3    than Ms. Harrison?
4        A.    I did not, but again, I don't -- you
5    know, I don't remember the specifics around this
6    E-mail, but, typically, "manager" refers to your
7    direct manager.
8        Q.    Okay.  Now, the altercation with the
9    manager, what information had the Reed Group -- had
10   the Reed Group communicated with you directly about
11   the altercation with the manager?
12       A.    I don't recall the sequence of events on
13   this one.
14       Q.    You don't recall the Reed Group reaching
15   out to you about Mr. Skrynnikov claiming that an
16   altercation with his manager was the cause of his
17   needing to take FMLA leave?
18       A.    I don't recall that.
19       Q.    And you don't recall reaching out to
20   Ms. McGwin to discuss this issue?
21       A.    On this specific day, I don't recall.  I
22   do recall discussing the situation generally with

Page 303

1    Madonna McGwin.
2        Q.    And what situation was that?
3        A.    Tim's leave case.
4        Q.    Did you discuss with Ms. McGwin Mr.
5    Skrynnikov's claim that an altercation with his
6    manager was the cause of his need for FMLA leave?
7        A.    No.  Based on this E-mail, I did not
8    understand the nature of the altercation.
9        Q.    You did not connect this altercation
10   with the April 28th meeting that you had discussed
11   with Mr. Skrynnikov and Ms. Harrison on July 1st and
12   again with Mr. Skrynnikov on July 2nd?
13       A.    I do not recall specifically.  I don't
14   believe I connected it with the 28th.  I don't think
15   I knew what the issue was based on this E-mail.
16       Q.    And you did not discuss with Madonna
17   McGwin the information that you possessed about an
18   altercation that Mr. Skrynnikov had discussed with
19   you with his manager that took place on April 28th?
20       A.    Can you repeat that question?
21       Q.    Yeah.  You did not discuss with Madonna
22   McGwin the information that you possessed derived

12 (Pages 300 to 303)

Page 304

1  from your meeting with Mr. Skrynnikov and
2  Ms. Harrison on July 1st and with Mr. Skrynnikov
3  again on July 2nd?
4       A.   I don't recall what detail I would have
5  provided with Madonna McGwin at this point.
6       Q.   Did you provide her with your notes from
7  that meeting that recorded the discussion about the
8  altercation with his manager on April 28th?
9       A.   I don't know.
10      Q.   Now, why would Madonna McGwin not
11  contact Lisa Kober directly?
12      A.   I can't answer why she wouldn't have
13  done that.
14      Q.   Is it typical for you to work between
15  the Legal Department and Ms. Kober?
16      A.   It is not typical.  It is not atypical.
17      Q.   Are you aware of any instance where
18  Ms. Kober has worked directly with Ms. McGwin on a
19  case?
20      A.   I'm not aware of what situations they
21  work on together.
22      Q.   Now, can you tell me why you typed

Page 305

1  "attorney-client privileged" at the top of this?
2       A.   Because it was a privileged conversation
3  that I had with Madonna.
4       Q.   Were you instructed to type that?
5       A.   I can't answer that.  I don't know the
6  answer to that.  I don't remember if I was instructed
7  or if I did it -- I probably did it independently.
8       Q.   Do you always put "attorney-client
9  privileged" at the top of your E-mail?
10      A.   I do not always put it at the top of my
11  E-mails.
12      Q.   Do you always put it at the top of
13  E-mails that have to do with FMLA leave?
14      A.   I do not always put it at the top of
15  E-mails that have to do with FMLA leave.
16      Q.   Did you relay information back to
17  Ms. McGwin about the altercation, the information
18  that you sought from Lisa?  You asked Lisa Kober to
19  go to the Reed Group and get more information.  Did
20  she bring that information back and did you then
21  convey it to Ms. McGwin?
22      A.   I don't recall.  If we're referring to

Page 306

1  something specifically, that would help me with the
2  sequence of events or the timeline here.  That would
3  be helpful to me in recollecting.
4       Q.   Well, I'm just following up on this
5  request.  You gave a request to Ms. Kober and I'm
6  just asking if there was a follow-through on that, if
7  information came back through and, if so, what was
8  that information?
9       A.   I don't remember if information came
10  back through in response to this E-mail.
11      Q.   Are you aware of any investigation that
12  took place?  Did anyone speak to Ms. Harrison, Mr.
13  Skrynnikov's manager, about any possible altercation?
14      A.   I am aware of an investigation.  I had
15  referred Tim to Investigations, to Compliance and
16  Ethics.
17      Q.   Well, I'm talking about an investigation
18  of this assertion to the Reed Group that the basis of
19  his FMLA leave was an altercation with his manager.
20  Did you or did Legal, to your knowledge, follow up
21  with Ms. Harrison and ask her about an altercation
22  with her subordinate?

Page 307

1       A.   I don't recall.  I can't answer whether
2  or not Legal followed up.  I don't recall if I
3  followed up with Kristin directly or not.
4       Q.   So did you ask anyone to follow up with
5  Ms. Harrison?  Did you direct anyone to pursue this
6  with Ms. Harrison?
7       A.   So, again, if there's anything that
8  would help me to answer this question -- as I recall,
9  I spoke to Investigations about this at some point.
10      Q.   About the altercation that was mentioned
11  in the Reed Group document?
12      A.   I believe so.  I believe so.
13      Q.   Now, did you make a decision that a
14  worker's comp claim was not going to be filed?  Who
15  made that decision?
16      A.   I did not make that decision.
17      Q.   Okay.  Do you know who made that
18  decision?
19      A.   I do not know who made the decision.
20      Q.   The decision about worker's comp?
21           JUDGE SWEENEY:  The decision about not filing
22  a worker's comp claim?

Arbitration Day 2                                                July 23, 2014
Washington, D.C.

Page 308

1       MS. KUNTZ:  Yes.
2  BY MS. KUNTZ:
3       Q.   Do you know who made the decision about
4  not filing?
5       A.   I don't know who made the decision about
6  not filing a worker's comp claim.
7       Q.   Now if you would take a last look at
8  that E-mail, that last paragraph: "Madonna would
9  like you to satisfy yourself that Reed is
10 appropriately vetting this type of physician
11 certification".
12      What is this type of physician certification?
13 Had you seen the certification that was provided?
14      A.   I had not seen the certification that
15 was provided.
16      Q.   Had Ms. McGwin seen the certification
17 that was provided?
18      A.   I don't know.
19      Q.   So what does the reference "this type of
20 physician certification" mean?
21      A.   I believe it means a short-term
22 disability physician certification, but I don't

Page 309

1  recall specifically.
2       Q.   So did the Legal Department ask for
3  careful vetting of any short-term disability
4  physician certification?  Is that your testimony?
5       A.   Could you repeat that question again?
6       Q.   Yes.  Did the Legal Department ask for
7  special vetting of a physician certification for all
8  shout-term disability claims?  Did they intervene to
9  ask for that?
10      A.   I cannot answer that.
11      Q.   Are you aware of them having asked for
12 this previously?
13      A.   This request about Tim previously?
14      Q.   Are you aware of the Legal Department
15 having passed through you a request for special
16 vetting of medical certification for short-term
17 disability in any other case?
18      A.   Not that I recall off the top of my
19 head.
20      Q.   But you did not see the physician
21 certification?
22      A.   I did not see the physician

Page 310

1  certification.
2       Q.   Now, do you know if Ms. McGwin had any
3  reason to suspect that Mr. Skrynnikov lacked
4  sufficient medical certification or lacked a
5  sufficient medical basis to justify taking medical
6  leave?
7       A.   I can't answer that question.
8       Q.   Did you have any discussion with
9  Ms. McGwin about the certification for Mr.
10 Skrynnikov's medical leave?
11      A.   This E-mail would indicate that we had a
12 discussion.
13      Q.   Do you recall that discussion?
14      A.   I do not.
15      Q.   You don't recall why she wanted this?
16      A.   I do not.
17      Q.   Do you recall whether she suggested that
18 Fannie Mae needed to ask for a second opinion on Mr.
19 Skrynnikov's medical condition?
20      A.   I do not.
21      Q.   Do you know if Fannie Mae asked for a
22 second opinion on Mr. Skrynnikov's medical condition?

Page 311

1       A.   I don't know that.
2       Q.   Can I ask you to look at page 46 of the
3  same exhibit.  I'm asking about the E-mail in the
4  middle of page 46 from Lisa Kober to you.
5       Were you working with Ms. McGwin on Mr.
6  Skrynnikov's case in September?
7       A.   Yes.
8       Q.   And what were you working on?  What was
9  the issue?
10      A.   Generally, short-term disability and
11 FMLA questions with Madonna as the subject matter
12 expert.
13      Q.   And what were some of those questions?
14      A.   Well, the E-mail before seems to
15 indicate that we were talking about -- I don't
16 remember what page it was.
17      Q.   The E-mail that we talked about before?
18      A.   The E-mail that we just talked about on
19 page 29.  Clearly, that was July 23rd.  We had been
20 talking about this case.
21      Q.   And here we are on September 8th and I'm
22 asking whether you were still engaged with Ms. McGwin

14  (Pages 308 to 311)

Page 312

1  on Mr. Skrynnikov's case?
2      A.  I was.
3      Q.  And is it typical for you to remain so
4  engaged in an FMLA case when there's a third-party
5  vendor to handle the administration of the claim?
6      A.  It is typical if the employee is not
7  providing what the Reed Group is asking for in terms
8  of certification to where we don't know what the
9  status is.  You can see here that there's
10 noncompliance with required documentation.
11     Q.  Now, on page 59 of this exhibit, we are
12 told at the bottom of the page by someone from the
13 Reed Group, Dawn Gardener, that based on medical
14 information provided, we are able to extend him, that
15 is Mr. Skrynnikov, out of work through 10-15.
16 Ms. Kober responds and asked them to delay sending
17 approvals and she does so saying that she has asked
18 the HRBP and Madonna, Legal, for input.
19     My question, first of all, is are you an HRBP?
20 Is that H.R. Business Partner?
21     A.  That is.
22     Q.  Would that refer to you?

Page 313

1      A.  Yes.
2      Q.  Had Lisa asked have you for next steps
3  regarding Mr. Skrynnikov?
4      A.  She indicates that here.
5      Q.  Do you recall, yourself, whether she
6  did?
7      A.  I don't remember that specifically.
8      Q.  Do you recall what steps you were
9  discussing as possible steps given that his medical
10 leave had been certified and approved by the
11 third-party vendor?
12     A.  Can you repeat that question for me,
13 please?
14     Q.  What next steps would you or were you
15 considering for Mr. Skrynnikov given that his FMLA
16 leave was now certified and the certification
17 accepted and the leave granted by the third-party
18 vendor?
19     A.  Since he was sent a job abandonment
20 letter the day prior, we would have wanted to have
21 been sure that we were doing everything appropriately
22 and according to policy and law.

Page 314

1      Q.  Everything encompassing what?
2      A.  Everything encompassing any action
3  related to Tim.
4      Q.  Action related to Tim's termination?
5      A.  Action related to Tim's status as an
6  employee, Tim's leave, Tim's short-term disability
7  pay.  We just want to be sure that we're getting
8  things right.
9      Q.  So the delay in notifying Mr. Skrynnikov
10 of the approval of his FMLA was caution?
11     A.  I think that's accurate.
12     Q.  Could I ask you to look at Exhibit 59,
13 please.
14     Ms. Lee, have you seen this letter before?
15     A.  I have seen this letter.
16     Q.  What is this?
17     A.  This is the job abandonment letter that
18 I sent to Tim on September 15th.
19     Q.  Now, did you draft the letter?
20     A.  I did draft this letter.
21     Q.  Did anyone review the letter?
22     A.  I believe I had Madonna review this

Page 315

1  letter.
2      Q.  And turning to Exhibit 61, did you draft
3  the E-mail?
4      A.  Yes.
5      Q.  Did anyone review this E-mail before you
6  sent it?
7      A.  I would have asked Madonna to take a
8  look at this letter before sending it.
9      JUDGE SWEENEY:  You're talking about the
10 E-mail?
11     THE WITNESS:  Or this E-mail, yes.  My
12 apologies.
13     JUDGE SWEENEY:  That's all right.
14     Going back, can I ask you a question about --
15 I'm going back to 59 here for a second.
16     THE WITNESS:  Sure.
17     JUDGE SWEENEY:  I think there was testimony
18 previously about the letter being hand-delivered by
19 way of courier service.  Was that standard operating
20 procedure at that time, rather than mailing it?
21     THE WITNESS:  So in order to be timely when a
22 timeline is sensitive, we do do that.  I have sent a

15  (Pages 312 to 315)

Page 316

1    number of letters hand-delivery via courier.
2        JUDGE SWEENEY: Go ahead. I'm sorry.
3    BY MS. KUNTZ:
4        Q.   Ms. Lee, as you must be aware, the
5    documentation from Mr. Skrynnikov's doctor was
6    received on September 15th by the Reed Group. Are
7    you aware of that?
8        A.   I am thinking for a second.
9        I am now aware of that, yes, and I think I was
10   aware of that before receiving -- before sending
11   this, obviously, since we rescinded the job
12   abandonment.
13       Q.   Before you sent the job abandonment,
14   what steps did you take to ensure yourself that Mr.
15   Skrynnikov had made a good faith effort to get the
16   medical certification and that it wasn't just an
17   issue of a delay in getting the medical
18   certification?
19       A.   My practice would have been to have
20   worked with the STD FMLA liaison to ensure that we
21   had given the employee every opportunity to submit
22   the required paperwork to the Reed Group.

Page 317

1        Q.   What information did you get from the
2    Reed Group with respect to Mr. Skrynnikov's medical
3    certification before you sent the job abandonment
4    letter?
5        A.   I would have only received dates and/or
6    information indicating that required certification
7    had or had not been provided. I would not have
8    provided any level of detail about medical condition.
9        Q.   Would you have been provided with
10   information on whether it was typical for the Reed
11   Group to go to the doctor directly to get the
12   certification?
13       A.   I would not have been provided
14   information on Reed Group's typical practices.
15       Q.   So you would not have known that the
16   Reed Group advised employees that they would take
17   care of getting the medical certification?
18       A.   I would have known, yes. I would have
19   known that that was a standard practice of Reed Group
20   to -- that's part of their job, is to work with the
21   employee's doctor offices to get medical
22   certification.

Page 318

1        Q.   So what did you do to make sure that the
2    Reed Group had followed up with the doctor offices in
3    this instance?
4        A.   That would have worked through the STD
5    FMLA liaison to ensure that we had covered all the
6    dates, you know, made sure that we had received or
7    had not received certification before sending a
8    letter like that.
9        Q.   Now, when you testify "I would have",
10   are you testifying as to your typical practice or as
11   to your memory in this specific instance?
12       A.   It's both, but because it was five years
13   ago, it is difficult to specifically say something
14   like on this date, I contacted the FMLA liaison, for
15   example.
16       Q.   Now, were you made aware in -- strike
17   that.
18       Did you make sure -- was it part of your job
19   to ensure that the Reed Group sent out notices for
20   the exhaustion of FMLA and DCFMLA leave?
21       A.   It was not part of my job to make sure
22   that the Reed Group sent out the required

Page 319

1    notifications.
2        Q.   Did they copy you when they sent out
3    these notifications?
4        A.   I don't remember if the Reed Group
5    copied the H.R. business partners or not.
6        Q.   So did they copy you when they sent out
7    approvals for the different leaves?
8        A.   Again, I don't remember if at that time,
9    we had the Reed Group copying the H.R. business
10   partners on those types of notifications or not.
11       Q.   Were you notified when they extended his
12   leave, say, until August the 3rd?
13       A.   Again, I don't recall if the Reed Group
14   copied the H.R. business partner on extension
15   notifications or approvals or denials. We had the
16   FMLA liaison team to help us extract information if
17   we needed it.
18       Q.   So did you receive notification that Mr.
19   Skrynnikov was cleared to return to work on October
20   26th from the Reed Group?
21       A.   I don't know if I received that from the
22   Reed Group or not.

Page 320

1      Q.   Did you receive it from the short-term
2  disability FMLA liaison?
3      A.   I'm having difficulty remembering the
4  sequence of events.  Is there a specific E-mail or
5  something that we can refer to that you're
6  referencing?
7      Q.   I'm asking your memory.
8      JUDGE SWEENEY:  Ma'am, it's perfectly fine,
9  five years ago, to say I don't remember.
10     THE WITNESS:  And I don't remember.  I just
11  don't remember if I got an E-mail on the 26th.
12  BY MS. KUNTZ:
13     Q.   I'm not asking about on the 26th.  I'm
14  asking about well before the 26th, say, the week
15  before the 26th.  Did you receive from anyone the
16  information, even if it was a phone call or a hallway
17  comment, that Mr. Skrynnikov had been cleared by the
18  Reed Group to return to work?
19     A.   I don't remember.
20     Q.   Who was Mr. Skrynnikov's manager in
21  October of 2009?
22     A.   I don't remember that specifically

Page 321

1  either.
2      Q.   Was Ms. Harrison Mr. Skrynnikov's
3  manager?
4      A.   I don't remember who his direct manager
5  was at that time.
6      Q.   Could I ask you to look at Exhibit 64,
7  please.  Can you tell me what this document indicates
8  as to Mr. Skrynnikov's manager?
9      A.   That indicates that his manager changed
10  from Kristin DeMent Harrison to Lori Mallon on
11  September 27, 2009.
12     Q.   What steps were taken to notify Mr.
13  Skrynnikov that his manager had changed?
14     A.   It would not be our typical practice to
15  inform an employee on a leave of absence of a manager
16  change because that is work related and that's not a
17  typical practice.
18     Q.   Are there any notice requirements, an
19  employee needing to call their manager when they're
20  out on leave?
21     A.   There are not requirements to call your
22  manager when you're out on leave.

Page 322

1      Q.   Are there requirements that you call
2  your manager if you are absent from work?
3      A.   There are requirements to call your
4  manager and let them know if you are going to be
5  absent from work.
6      Q.   And how would an employee who doesn't
7  know who his manager is call his manager?
8      A.   They would call the person they thought
9  was their manager, who would refer them to their
10  current manager.
11     Q.   Would it be possible that they would
12  contact the H.R. business partner?
13     A.   They could certainly contact the H.R.
14  business partner and they would put the employee in
15  touch with the appropriate manager.
16     Q.   Did you put Mr. Skrynnikov in touch with
17  the appropriate manager when he contacted you by
18  E-mail on October 21st?
19     A.   I don't remember.
20     Q.   Could we look at Exhibit 68, please.
21  This is a two-page exhibit, Ms. Lee.  I would
22  ask that you to read through it and we'll start with

Page 323

1  the end of the exhibit on page 2.
2      [Witness peruses exhibit.]
3  BY MS. KUNTZ:
4      Q.   Ms. Lee, do you recall receiving the
5  E-mail that is on the second page of Exhibit 68?
6      A.   I do.
7      Q.   Now, had you been made aware before you
8  received this E-mail that Mr. Skrynnikov had been
9  cleared to return to work by the Reed Group?
10     A.   I don't remember.
11     Q.   So when you received this E-mail, what
12  did you do?
13     A.   I responded to Tim.
14     Q.   Isn't it true that at your deposition,
15  you testified that the Legal Department drafted the
16  response?
17     A.   I don't know what I said in our
18  deposition, but this E-mail would have been drafted
19  in combination with me and the legal team.
20     Q.   Why is that?  Do you generally refer to
21  E-mails that you receive from employees in groups you
22  advise to the legal team?

17 (Pages 320 to 323)

Page 324

1      A.   I had been working with Madonna McGwin
2   on this situation for some time, as we've been
3   discussing, and would have consulted with her on
4   this.
5      Q.   But I'm trying to figure out what the
6   situation was at this point.  Someone had taken leave
7   that they had been approved for.  They had gotten an
8   appropriate return to work notice.  They had been
9   told that they could return to work.
10      What was the situation at this point that
11   required you to refer it to the legal team?
12      A.   I was concerned about what Tim indicated
13   in this E-mail about a slip and fall accident and
14   broken three ribs and should be fully recovered in
15   about a week.
16      Q.   Now, did you speak to Mr. Skrynnikov by
17   phone or some E-mail that I don't have about how bad
18   his condition was or how he felt he was limited?
19      A.   I did not speak to him about that.  I
20   referred him to the Reed Group.
21      Q.   So what was your basis for knowing what
22   his condition was?

Page 325

1      A.   His E-mail was the basis and I referred
2   him to the Reed Group.
3      Q.   And you referred him to the Reed Group.
4   Did you receive along with this medical documents?
5      A.   I received one attachment with this.
6      Q.   Okay.  Could I ask you to turn to
7   Exhibit 70.
8      A.   After this question, could we take a
9   little break?
10      Q.   Sure.
11      A.   Thank you.
12      Q.   Can we finish talking about this?
13      A.   Yes, absolutely.  Absolutely.
14      Q.   Okay.  So Exhibit 70, is this an example
15   of what you received?
16      A.   So partially.  I didn't -- what I
17   received and viewed was generic.  It did not have,
18   that I saw, Tim's name on it, as indicated here.
19   That block in the upper right was not something that
20   I saw when I viewed this as an attachment from Tim.
21      Q.   And you remember that specifically from
22   October 21st?

Page 326

1      A.   I do remember that specifically because
2   I, you know, thought this was a generic sort of ER
3   tear sheet for rib fracture or tear.
4      Q.   And you checked it for anything specific
5   to Mr. Skrynnikov at that time?
6      A.   I viewed it and then referred Tim to the
7   Reed Group to really get into the specifics of the
8   medical condition.  That is not my role.
9      Q.   So it's your testimony that you have a
10   very clear memory of exactly what was on the sheet
11   that you reviewed?
12      A.   It is not my testimony that I have a
13   clear memory of exactly what was on this sheet.
14      Q.   So what is your testimony?
15      A.   My testimony is that I remember the
16   attachment being a generic emergency room rib care
17   sheet.
18      Q.   Did you follow up with Mr. Skrynnikov?
19      A.   I sent him the E-mail referring him to
20   the Reed Group that we just reviewed.
21      Q.   So in this E-mail, you referred to his
22   inability to return to work in response to an E-mail

Page 327

1   where he says I can start on the scheduled date of my
2   return?
3      A.   I'm sorry.  What exhibit was that?
4      Q.   It's 68.
5      A.   Thank you.  And could you repeat your
6   question for me, please?
7      Q.   Yes.  You speak of his inability to
8   return to work in your response, in response to an
9   E-mail that says if additional time is not possible,
10   I can start on the scheduled date of my return.  Why
11   did you do that?  Why you did you characterize --
12      A.   Because he indicates that he was in a
13   slip and fall accident, broke three ribs, and should
14   be fully recovered from it in about a week.  So that,
15   to me, is a clear indication that I needed to refer
16   this to the Reed Group.
17      Q.   That's not what I'm asking.  I'm asking
18   why you used this language, his inability to return
19   to work, in your E-mail?  What is the basis of your
20   statement that he was unable to return to work?
21      A.   The basis is that he indicates that he
22   broke three ribs and is going to need about a week to

18 (Pages 324 to 327)

Arbitration Day 2                                          July 23, 2014
Washington, D.C.

Page 328

1  recover.
2      Q.   Following that with "I can start on my
3  scheduled date".
4      A.   Well, if an employee indicates that they
5  have had a serious injury, which to me -- though I'm
6  not making the determination, I referred him to the
7  Reed Group -- this seems like an appropriate
8  interpretation that he cannot return to work since
9  he's saying he needs a week to recover.
10      Q.   But he says he can return to work.  What
11  is your basis for determining that this is a serious
12  injury that would preclude him from working?
13      A.   His indication that he should be fully
14  recovered in about a week.
15      Q.   What is your indication that he has to
16  be fully recovered in order to be able to work?
17      A.   So we take employee safety very
18  seriously.  If someone indicates that they've had an
19  injury, that they need about a week to recover, we
20  are going to refer it to the Reed Group to make sure
21  that it's appropriate for them to return to work, and
22  they can handle the medical requirements,

Page 329

1  certifications, etc., with the doctors.
2      Q.   Now, you say that you drafted this
3  together with the Legal Department?
4      A.   I would have had -- yeah.  I would have
5  worked with Madonna to draft this or have her review
6  this.
7      MS. KUNTZ:  Okay.  We can take a break.
8      JUDGE SWEENEY:  All right.  Let's take about
9  five minutes now.
10      THE WITNESS:  Thank you.
11      [Recess.]
12      JUDGE SWEENEY:  We're back on the record.
13      Go ahead, Counsel.
14  BY MS. KUNTZ:
15      Q.   Now, when you referred -- I'm still on
16  Exhibit 68.  When you referred Mr. Skrynnikov to the
17  Reed Group, you were quite specific and said that you
18  refused to allow him to return to work unless he was
19  cleared on both conditions.
20      A.   That's right.
21      Q.   And so whose decision was it to impose
22  those conditions on the Reed Group?

Page 330

1      A.   I can't say whose decision it was.  It's
2  more of a typical practice to not allow someone to
3  return to work when they've indicated they have a
4  serious injury that will take about a week to recover
5  from.
6      Q.   But this was the 21st when he wrote this
7  and he was not due to return to work until the 26th.
8  So what was the basis of your judgment that he
9  couldn't return to work when he was cleared to return
10  to work?
11      A.   We needed to know that he was okay and
12  safe to return to work.
13      Q.   Isn't it true that when you sent this,
14  you knew this would impose delays on his return to
15  work, forcing him to extend beyond his job-protected
16  leave?
17      A.   That is not true.  I did not know that
18  that would cause a delay.
19      Q.   Tim's response recounts what he had been
20  told by the Reed Group.  Did you speak with the Reed
21  Group to discuss --
22      A.   Are you referring to Tim's response at

Page 331

1  1:01 p.m. on October 22nd?
2      Q.   Yes.
3      A.   So please repeat your question for me,
4  again.
5      Q.   So Tim's response recounts information
6  that he says he was given by the Reed Group.  Had you
7  discussed this matter with the Reed Group at this
8  point?
9      A.   I don't remember whether or not I had
10  any discussion with the Reed Group at this point.
11      Q.   Do you know if Ms. McGwin had any
12  discussion?
13      A.   I do not know.
14      Q.   Did the two of you contact the Reed
15  Group?
16      A.   I don't remember.
17      Q.   Did you at any time contact the Reed
18  Group to discuss the return to work requirements?
19      A.   I don't remember.
20      Q.   You have no recollection of whether you
21  contacted the Reed Group to convey to them the
22  requirement that Mr. Skrynnikov get a second return

19 (Pages 328 to 331)

Arbitration Day 2                                           July 23, 2014
Washington, D.C.

Page 332

1   to work certification?
2       A.   I don't recall if I contacted the Reed
3   Group or if our STD FMLA liaison group contacted the
4   Reed Group.
5       Q.   Do you recall contacting the STD FMLA
6   liaison imposing a second return to work requirement
7   on Mr. Skrynnikov?
8       A.   I don't specifically recall that.
9   Clearly, I copied them here though.
10      Q.   Could you look at Exhibit 12.  Is it
11  your belief that this policy authorizes Fannie Mae to
12  require a return to work note any time an employee
13  has been out even for just a day if they tell you
14  that they're out because they have a cold?
15      A.   This indicates that if an employee has a
16  situation where they've been referred to the Reed
17  Group, the Reed Group needs to certify their ability
18  to return to work.
19      Q.   And so the triggering mechanism in
20  Fannie Mae's policy is referral to the Reed Group; is
21  that what you're saying?
22      A.   A referral does need to be made to the

Page 333

1   Reed Group in order for the Reed Group to certify
2   someone's return to work.
3       Q.   That wasn't what I was asking.  What I
4   was asking is is it your belief, is it your
5   understanding that this policy authorizes Fannie Mae
6   to require a return to work notice funneled through
7   the Reed Group, according to this policy, for any and
8   all time taken off from work that is medically
9   related?
10      A.   If a referral is made to the Reed Group.
11      Q.   So if a supervisor chose to refer
12  somebody who was out with the flu to the Reed Group,
13  it would be -- this return to work policy would come
14  into play?
15      A.   If an employee was referred to the Reed
16  Group and asked to provide medical documentation and
17  a release, then the Reed Group would have to say that
18  it was okay for the employee to return to work.
19      Q.   Now, where in this policy is the
20  prerequisite that the employee be referred to the
21  Reed Group before the return to work document policy
22  is in place?

Page 334

1       A.   There is not that prerequisite noted
2   here in the policy.
3       Q.   So your justification or Fannie Mae's
4   justification for requiring a second return to work
5   notice for Mr. Skrynnikov was because he had been
6   referred to the Reed Group?
7       A.   After he indicated that he had a medical
8   condition that would take about a week to recover, I
9   referred him to the Reed Group and, yes, this policy
10  justifies that we need a release to return him.
11      Q.   So you referred him to the Reed Group by
12  the E-mail that we just looked at on the 21st of
13  October?  Was that a referral to the Reed Group?
14      A.   That was me indicating, yes, that he
15  needed to contact the Reed Group.
16      Q.   So you had the power to impose this
17  return to work policy on any medication condition
18  simply by invoking the Reed Group?
19      A.   He indicated that he had broken ribs and
20  would need about a week to recover.  A week is the
21  threshold with our short-term disability policy.
22      Q.   He was not seeking short-term

Page 335

1   disability, was he?
2       A.   He indicated he needed a week to
3   recover, which was my trigger for sending him to the
4   Reed Group.
5       Q.   He indicated that he was prepared to
6   return to work.
7       A.   He also indicated that he had fractures,
8   had sought care in an emergency room, and would need
9   about a week to recover.
10      Q.   And your basis for this referral was to
11  require him to get medical care?
12      A.   Yes.  To require him to certify that he
13  was able to -- or provide a physician certification
14  that he was able to return to work given what he had
15  shared with me.
16      Q.   Ms. Lee, is there a Fannie Mae policy
17  that says if somebody is out for a week, they have to
18  get referred to the Reed Group?
19      A.   We have a policy that indicates that
20  after five consecutive days of absence, an employee's
21  absence moves to short-term disability and Reed Group
22  is the third-party vendor that was handing our

20  (Pages 332 to 335)

Page 336

1  short-term disability administration at that time.

2     Q.  But his leave as to the rib injury

3  certainly had not extended to five days, had it?

4     A.  He had indicated that it would take him

5  about a week to recover.

6     Q.  But that was on the 21st and he wasn't

7  due to return until the 26th, was he?

8     A.  I believe that is what the E-mail

9  indicated.

10     Q.  Could I ask you to look at Exhibit 76,

11  please.

12     Ms. Lee, did you draft this letter?

13     A.  I did.

14     Q.  Was it reviewed by anyone?

15     A.  It would have been reviewed by Madonna

16  McGwin.

17     Q.  Do you recall a discussion with Madonna

18  McGwin?

19     A.  Not specifically.

20     Q.  Did you discuss the decision not to hold

21  Mr. Skrynnikov's position open beyond the last date

22  of his job protected leave with anyone at Fannie Mae?

Page 337

1     A.  I would have discussed that with his

2  management.

3     Q.  You would have or you did?

4     A.  We did discuss it with his management.

5     Q.  And who was the management with whom you

6  discussed it?

7     A.  Lori Mallon.

8     Q.  Anyone else?

9     A.  Not that I recall.

10     Q.  Now, tell me who Ms. Mallon is.

11     A.  She had been in his management chain the

12  entire time.  She was his direct --

13     Q.  The entire time of what?

14     A.  The entire time, I think, that he --

15  well, the entire time that I was dealing with him on

16  this issue.  She had been Kristin's manager.

17     Q.  I'm sorry.  Could you clarify what this

18  issue is?

19     A.  Any interaction I had with him, Lori

20  Mallon was in his management chain, as I recall, but

21  she was now his direct manager as opposed to being

22  Kristin's manager.

Page 338

1     Q.  Thank you.  Now, can you explain why

2  this was delivered by courier?

3     A.  I tend to send things via courier when

4  they are time sensitive.

5     Q.  And why was this time sensitive?

6     A.  Because this is an important

7  notification to him.

8     Q.  But important isn't the same thing as

9  time sensitive, is it?  Why was this time sensitive?

10     A.  It's letting him know his status.  I

11  think it's time sensitive.

12     Q.  So what did Ms. Mallon have to say about

13  Mr. Skrynnikov's job and the decision not to continue

14  to hold his position open?

15     A.  I don't recall specifically, but

16  generally, that the position did not need to be held

17  open.

18     Q.  Are you saying that the position was

19  being eliminated?

20     A.  I am not saying that the position was

21  being eliminated, but that the position did not need

22  to be held open.

Page 339

1     JUDGE SWEENEY:  Open for him; is that what

2  you're saying?

3     THE WITNESS:  Open for him, yeah.

4  BY MS. KUNTZ:

5     Q.  And what was the reason given for that?

6     A.  I don't recall the reason given for

7  that.

8     Q.  It was simply Ms. Mallon's decision that

9  the position did not need to be held open?

10     A.  As management, that the position did not

11  need to be held open.

12     Q.  When you say "did not need to be held

13  open", what need are we talking about here?  Is that

14  a euphemism or are you talking about specific need?

15     A.  I don't know that it's a euphemism, but

16  it's not uncommon, certainly, if the job has been

17  vacant for some length of time that needs shift.  So

18  her determination as management was that it did not

19  need to be held open.

20     Q.  Was the job filled?  Was the job

21  advertised beginning in November of 2009?

22     A.  I don't recall.

Page 340

1      Q.   Was the job filled before the end of
2   2009?
3      A.   I don't recall that either.
4      Q.   Can you tell me why there was a shift in
5   management?  Lori Mallon had been supervising, as I
6   understand you to say.  Ms. Harrison, Ms. Harrison
7   moved somewhere else in the company, and Ms. Mallon
8   became his direct manager.  Who moved into
9   Ms. Harrison's position?
10      A.   I don't know that anyone moved into Ms.
11   Harrison's position.  I don't know the answer to that
12   question.
13      Q.   Well, you were the H.R. business partner
14   working with that group.  So you know --
15      A.   That is true.
16      Q.   -- if there was someone in that
17   position?
18      A.   That is true that I was the H.R.
19   business partner for the group, but I don't remember
20   the specific details.
21      Q.   Do you remember if anyone filled that
22   position?

Page 341

1      A.   I do not, as I said a minute ago.
2      Q.   So you were their H.R. advisor and
3   worked directly with the management of that group,
4   but you don't recall if anyone replaced Ms. Harrison
5   or not?
6      A.   That's true.
7      JUDGE SWEENEY:  Can I ask you a question
8   based on this letter here?
9      In the third paragraph, you say that if he's
10   approved for the STD program, you will remain on as a
11   Fannie Mae employee, albeit without a position.  What
12   does that mean?
13      THE WITNESS:  The intent there is that if his
14   short-term -- or if his FMLA had exhausted, so we
15   weren't holding his position open, but we were giving
16   him the benefit of the time to get documentation in
17   so that he could continue on the company's short-term
18   disability program and perhaps convert into long-term
19   disability, if needed.
20      JUDGE SWEENEY:  Okay.  If that path had not
21   been followed or ws not followed, would he continue
22   to be an employee?

Page 342

1      THE WITNESS:  You mean if his short-term
2   disability had not --
3      JUDGE SWEENEY:  It says if you're
4   retroactively approved by the Reed Group for such
5   benefits based on information you submit from your
6   healthcare provider, you will remain as a Fannie Mae
7   employee, albeit without a position.
8      If he had met that, would he have continued
9   to have a position at Fannie Mae?
10      THE WITNESS:  He would not have had a
11   position, but he would have continued in a paid
12   short-term disability status and received the
13   benefits.
14      JUDGE SWEENEY:  Then when the short-term
15   disability ended --
16      THE WITNESS:  His employment would have
17   ended.
18      JUDGE SWEENEY:  His employment would have
19   ended?
20      THE WITNESS:  Or he would have converted,
21   potentially, to long-term disability.
22      JUDGE SWEENEY:  If he doesn't meet the

Page 343

1   short-term disability or doesn't convert to the
2   long-term disability, does that mean he's no longer
3   an employee or what?
4      THE WITNESS:  That's right, because he does
5   not have a position to come back to and he would no
6   longer be in a short-term disability status.
7      JUDGE SWEENEY:  So once you say we will not
8   continue to hold your position open, that means that
9   you may still be able to get your long-term
10   disability, but you won't be an employee to come back
11   to work?
12      THE WITNESS:  That's right.
13      JUDGE SWEENEY:  Okay.
14   BY MS. KUNTZ:
15      Q.   Could I ask you to look at Exhibit 80.
16   Did you draft this?
17      A.   Yes.
18      Q.   Did Ms. McGwin review it?
19      A.   Yes.
20      MS. KUNTZ:  Thank you.  I'm through.
21   I'm done.  I'm sorry.  You didn't hear me.
22      JUDGE SWEENEY:  All right.

22  (Pages 340 to 343)

Page 344

1     MS. KUNTZ:  Sorry.  We keep having this
2  hearing thing.
3     JUDGE SWEENEY:  Go ahead.
4           CROSS-EXAMINATION
5  BY MS. LENAHAN:
6     Q.  Can you give us a little bit of your
7  background.
8     JUDGE SWEENEY:  Counsel, you're going to have
9  to keep your voice up.
10    MS. LENAHAN:  Sure.
11 BY MS. LENAHAN:
12    Q.  Sure.  Can you give us a little bit of
13 your background.
14    A.  I have an undergraduate degree in
15 psychology and a master's in human resource
16 management.
17    MS. LENAHAN:  And, Your Honor, for the record,
18 we will be calling this individual in our case in
19 chief.  Is it okay if --
20    JUDGE SWEENEY:  I'm sorry.  Did you say you
21 will not or will?
22    MS. LENAHAN:  We will be.  So do you mind if

Page 345

1  I just do my normal direct and they can then cross
2  her on it?
3     JUDGE SWEENEY:  That would be fine.
4     MR. LENAHAN:  Great.  Thank you.
5     JUDGE SWEENEY:  Wait.  I'm sorry.  Are you
6  saying you want to --
7     MR. MIOSSI:  Do it all at once.
8     MS. LENAHAN:  Do it all at once.
9     JUDGE SWEENEY:  All right.  That's fine.  I
10 was just temporarily confused.
11    MS. LENAHAN:  Sure.
12    MR. MIOSSI:  You're doing better than I am.
13    JUDGE SWEENEY:  Some people would say I'm
14 genetically confused.
15    Yes.  Go ahead.  That's fine.
16 BY MS. LENAHAN:
17    Q.  Can you restate your educational
18 background.
19    A.  Sure.  I have a bachelor's degree in
20 psychology and a master's in human resource
21 management.
22    Q.  And are you currently employed?

Page 346

1     A.  I am.
2     Q.  Where are you currently employed?
3     A.  Fannie Mae.
4     Q.  And what is your position?
5     A.  Director, H.R. Employee Services.
6     Q.  And when did you start that position?
7     A.  November 2013.
8     MS. KUNTZ:  Excuse me.  I can barely hear
9  you.
10    JUDGE SWEENEY:  Yes.  If both of you can --
11    MS. LENAHAN:  I will increase my voice.
12 BY MS. LENAHAN:
13    Q.  And what was your previous position?
14    A.  H.R. business partner.
15    Q.  What time period were you an H.R.
16 business partner?
17    A.  From the time of my hire in May 2007
18 through November 2013.
19    Q.  We previously discussed that the Reed
20 Group, during the 2009 time period, the Reed Group
21 was Fannie Mae's third-party administrator; is that
22 correct?

Page 347

1     A.  That is correct.
2     Q.  And what kind of leave do they
3  administer?
4     A.  Short-term disability family medical
5  leave.
6     Q.  On both the federal and state basis?
7     A.  That's correct.
8     Q.  Do they deal with Fannie Mae's unpaid
9  personal leave?
10    A.  They do not deal with Fannie Mae's
11 unpaid personal leave.
12    Q.  Or do they handle just typical sick
13 leave?
14    A.  They do not handle typical sick leave.
15    Q.  How would a Fannie Mae employee know how
16 to use the Reed Group?
17    A.  It is posted in the numerous places on
18 line as well as referrals from H.R. business partners
19 like I made in this case.
20    Q.  What would you describe as Reed Group's
21 function?
22    A.  To act as a third-party vendor, to

Page 348

1  independently make determinations on Fannie Mae's
2  behalf of disability and family medical leave-related
3  issues.
4      Q.   And would you ever receive the medical
5  authorizations?
6      A.   No.
7      Q.   And why wouldn't you?
8      A.   I don't want to see those. We want to
9  maintain that separation and let the Reed Group
10  handle that independently.
11      Q.   Can you turn to Exhibit No. 10.
12      Exhibit No. 10 is Fannie Mae's family medical
13  leave policy, corporate policy, dated April 1, 2009,
14  and who administered this policy?
15      A.   The Reed Group.
16      Q.   And how would employees know about
17  Fannie Mae's family and medical leave policy?
18      A.   It's posted in what family refers to as
19  COPPER, which is an online repository of all of
20  Fannie Mae's policies and procedures that any
21  employee can access.
22      Q.   If an employee asked you for the

Page 349

1  location, would you direct them there?
2      A.   Absolutely.
3      Q.   What are employees entitled to under
4  those policies? I'll direct your attention to page
5  4.
6      A.   So they're entitled at the federal level
7  with appropriate validation if they qualify for FMLA
8  up to 12 work weeks of unpaid family medical leave
9  for their self or others, and that's under, again,
10  federal and then D.C. would apply here as well.
11      Q.   And just to clarify, all of this leave
12  is not paid?
13      A.   That's right.
14      Q.   Can you turn to page 6 for me. Can you
15  just briefly summarize what are some of the general
16  notification and reporting requirements that Fannie
17  Mae requires of their employees who are on FMLA?
18      A.   Certainly. So as much advance notice as
19  possible working through the Reed Group to provide
20  the appropriate certification within the timeframes
21  required, keeping their manager and the Reed Group
22  informed to the extent possible of their situation,

Page 350

1  keeping in touch with the Reed Group on their status
2  and timeline, and providing a return to work
3  certification before returning to work.
4      Q.   And if an employee works in a state
5  which has further benefits, such as the District of
6  Columbia, do you follow the policy in that
7  jurisdiction?
8      A.   We do.
9      Q.   And do you know what their entitlements
10  under the DCFMLA leave are?
11      A.   Yes. D.C. is greater than 12 weeks.
12  It's up to 16 weeks.
13      Q.   Are the requirements similar for those
14  employees who fall under the DCFMLA for their
15  reporting requirements and general notification?
16      A.   Can you say that again?
17      Q.   If an employee falls under the DCFMLA,
18  if they qualify for it, are the general notifications
19  and reporting requirements --
20      A.   Yes.
21      Q.   -- that are established in federal
22  policy applicable?

Page 351

1      A.   They are applicable.
2      Q.   So, again, employees would be required
3  to report to Reed and follow these --
4      A.   That's right.
5      Q.   -- notifications?
6      Can you turn to Exhibit 12, please.
7      Exhibit 12 is Fannie Mae's return to work
8  policy, corporate practice dated April 2, 2009. Now,
9  what is the purpose of this document?
10      A.   The purpose is to let employees know
11  that if they are working with the Reed Group, that
12  they must provide a release to return to work and the
13  Reed Group lets Fannie Mae management know that the
14  employee is safe and sound and okay to return to
15  work.
16      Q.   So this wouldn't just be for any normal
17  sick leave, because as we discussed, Fannie Mae does
18  not refer all sick leave employees to the Reed Group?
19      A.   That's right.
20      Q.   Can you turn to Exhibit 11, please.
21      Exhibit 11 is the short-term disability
22  corporate practice dated April 28, 2009 for Fannie

24  (Pages 348 to 351)

Page 352

1   Mae.  Who administers Fannie Mae's short-term
2   disability policy in 2009?
3       A.   That's the Reed Group.
4       Q.   What are employees entitled to under
5   this policy?
6       A.   So employees are entitled to short-term
7   disability pay under this policy if they meet the
8   requirements as administered by Reed for qualifying
9   for short-term disability, and it's up to 26 weeks.
10      Q.   When does the applicability of this
11  policy set in?
12      A.   Applicability meaning when is the
13  employee eligible?
14      Q.   Correct.
15      A.   They are eligible immediately.
16      Q.   If you direct your attention to Section
17  3 --
18      A.   Yes, who work at least 20 hours per week
19  and have been absent for five consecutive days, under
20  the care of a physician and, again, needs to be
21  certified by the Reed Group.
22      Q.   Under Fannie Mae's short-term disability

Page 353

1   policy, what are employees paid?
2       A.   They are paid their full salary during
3   that time.
4       Q.   And is this job-protected leave?
5       A.   It is not job-protected leave.
6       Q.   What if an employee has a second medical
7   issue come up; what happens to the short-term
8   disability policy?
9       A.   It still applies for that second
10  condition.
11      Q.   Would it restart based on a new and
12  different medical condition?
13      A.   There would be different certification
14  for the new and different medical condition, but the
15  26-week max still applies.
16      Q.   And what are some of the requirements
17  for employees who fall under Fannie Mae's short-term
18  disability program?  Again, I'm drawing your
19  attention to Section 4.
20      A.   So it's you are referred to Reed and the
21  short-term disability policy applies in terms of
22  eligibility after the five consecutive work days.

Page 354

1   The Reed Group will work on that certification for
2   the employee.  There's a 180-day maximum there, which
3   is the 26 weeks I referred to, and the employee has
4   got to keep in touch with the Reed Group and
5   cooperate with their requirements in terms of
6   documentation.
7       Successive periods of disability are
8   considered one continuous period if they are
9   separated by fewer than four weeks of continuous
10  active employment with the company.  If it's
11  unrelated and different, it's not considered
12  continuous.
13      Q.   So then the short-term disability would
14  restart and they could be entitled to another 25
15  weeks?
16      A.   That's right.
17      Q.   What happens if an employee does not
18  timely comply and adequately comply with the
19  information, the information to provide continuous
20  pay?
21      A.   They would not receive the continuation
22  pay if they do not provide documentation to support

Page 355

1   the short-term disability claim.
2       Q.   Can I turn your attention to Exhibit 13,
3   which is Fannie Mae's sick leave corporate practice
4   dated April 1, 2009.
5       A.   Can we take a break in a minute?
6       JUDGE SWEENEY:  Do you want to do it right
7   now?
8       THE WITNESS:  We can answer this question,
9   but I just wanted to put in a request for a break.
10      JUDGE SWEENEY:  That's fine.
11  BY MS. LENAHAN:
12      Q.   I just wanted to discuss the return to
13  work policy based on the Fannie Mae sick leave
14  policy.  I'll draw your attention to page 4.
15      A.   So this indicates, this portion of the
16  policy indicates that if an employee is out on
17  short-term disability, they have to work through Reed
18  Group to provide documentation indicating that they
19  can return to work.  If it's five or fewer
20  consecutive days of absence, if an employee is
21  hospitalized, or the manager requests a return to
22  work release, they need to submit the medical

25  (Pages 352 to 355)

Arbitration Day 2                                    July 23, 2014
Washington, D.C.

Page 356

1   documentation to
2   sickleave_returntowork@FannieMae.com.
3       Q.   And why does Fannie Mae have this
4   uniform policy for returning to work?
5       A.   We just want to be sure that employees
6   are okay to return to work.
7       MS. LENAHAN:  We can take a break now.
8       JUDGE SWEENEY:  Okay.  That would be fine.
9       THE WITNESS:  It can be a quick break.
10      JUDGE SWEENEY:  All right.  Counsel, while
11  we're waiting for the witness, perhaps you could
12  clear up something for me.  I'm sure it's just my
13  confusion about the situation here.
14      When the claimant goes out in July here, he's
15  not compensated under -- FMLA does not require any
16  compensation, nor does the D.C. analog require
17  compensation, but the short-term disability under
18  Fannie Mae's policy is compensatory during that
19  period of time up to the 25 weeks?
20      MR. MIOSSI:  Correct.
21      JUDGE SWEENEY:  What was the -- was the
22  claimant getting paid under the short-term disability

Page 357

1   from the entire time of July 1st up through the --
2       MS. KUNTZ:  July 9th.
3       JUDGE SWEENEY:  Up to --
4       MS. KUNTZ:  July 9th.
5       JUDGE SWEENEY:  I'm sorry.  July 9th up
6   through --
7       MS. LENAHAN:  Through November 13th is when
8   the termination letter was sent.
9       JUDGE SWEENEY:  And the basis for his
10  compensation would have been the STD?
11      MS. LENAHAN:  Correct.
12      JUDGE SWEENEY:  Do I have that correct?
13      MS. LENAHAN:  Yes.  It's merely a paid
14  continuation policy.
15      JUDGE SWEENEY:  Right.  Okay.
16      When you said it was not job -- the STD is
17  not job protected --
18      MS. LENAHAN:  Correct.  It's not a legal
19  requirement.
20      MR. MIOSSI:  As distinct from the statute.
21      JUDGE SWEENEY:  The FMLA?
22      MR. MIOSSI:  Or DCFMLA.

Page 358

1       JUDGE SWEENEY:  Under at least your theory,
2   you can't abolish --
3       MS. LENAHAN:  Well, because employees could
4   qualify for only short-term disability and not under
5   FMLA or DCFMLA and, therefore, they would be not
6   entitled to any job-protected status even if they
7   went out -- you know, if their medical condition
8   didn't qualify under it, but they did qualify under
9   Fannie Mae's short-term disability, which is much
10  more vast than just the federal requirement.
11      JUDGE SWEENEY:  Okay.  I think I understand
12  it, the super structure over this.
13      Are we ready to go?
14      THE WITNESS:  Yes.  I appreciate it.
15      JUDGE SWEENEY:  That's fine.
16      MS. LENAHAN:  You know, we do have Lisa Kober
17  as a court call at 1 p.m.  Do we want to break for
18  lunch now?
19      MR. STEWART:  Remember we're locked into that
20  window.
21      JUDGE SWEENEY:  You are going to need --
22      MS. LENAHAN:  Yeah.  I'm going to need a

Page 359

1   little more time and then I'm sure they'll want to --
2       JUDGE SWEENEY:  As long as -- I don't want
3   this poor witness here to expire.
4       MR. MIOSSI:  We'll get more Kleenex.
5       JUDGE SWEENEY:  And I don't want her to give
6   it to us either.
7       THE WITNESS:  I use the hand sanitizer and
8   open the door with my elbow.
9       JUDGE SWEENEY:  That's probably a good idea.
10      Now, what happening at one o'clock?
11      MR. MIOSSI:  Lisa Kober is this liaison with
12  the Reed Group.  She's a Fannie Mae employee and
13  she's the witness that is qualified to --
14      JUDGE SWEENEY:  Right, and we're going to
15  take her up at one o'clock through some type of
16  means.
17      MR. STEWART:  By video.
18      MS. KUNTZ:  So are we proposing to then --
19      JUDGE SWEENEY:  We'll just continue with this
20  witness --
21      THE WITNESS:  That's okay with me.
22      JUDGE SWEENEY:  We'll have her be available.

26 (Pages 356 to 359)

Page 360

1      All right.  At one o'clock, we will come back
2  here and through the magic of video or whatever we're
3  doing.
4      All right.  Thank you.
5      [Whereupon, at 12:00 p.m., a lunch recess was
6  taken, to reconvene at 1:00 p.m. this same day.]

Page 361

1         A F T E R N O O N   S E S S I O N
2              [1:09 p.m.]
3      JUDGE SWEENEY:  Ma'am, would you please raise
4  your right hand.  We're going to swear you in for
5  purposes of this proceeding.
6      Whereupon,
7           LISA KOBER,
8      was called to testify and, having
9      first been duly sworn by the Notary Public,
10     was examined and testified as follows:
11
12     JUDGE SWEENEY:  You can put your hand down.
13  Please state your name and your address, if you
14  would.
15     THE WITNESS:  Lisa Kober, 803 North Cherry
16  Street, Mount Carmel, Illinois  62863.
17     JUDGE SWEENEY:  Fine.  And you're now going
18  to be examined by the claimant's attorney, Mary
19  Kuntz, and then you'll be cross-examined by one of
20  the other attorneys over here, and please keep your
21  voice up so we make sure we can hear you.  Okay?  Can
22  you hear us?

Page 362

1      THE WITNESS:  Yes, I can.
2      JUDGE SWEENEY:  All right.  Go ahead.
3            DIRECT EXAMINATION
4  BY MS. KUNTZ:
5      Q.   Ms. Kober, let me know if you can't hear
6  me.  What is your position at Fannie Mae?
7      A.   Benefits manager.
8      Q.   And what was your position in 2009?
9      A.   It was also benefits manager.
10     Q.   And what does benefits manager
11  encompass?  What areas do you manage?
12     A.   At the current time or in 2009?
13     Q.   2009.  Thank you.
14     A.   In addition to having the retirement and
15  pension plans at Fannie Mae, I also had the leave
16  administration function.
17     Q.   Now, isn't it true that the Reed Group
18  was contracted to administer the medical leave at
19  that time?
20     A.   They were our vender for FMLA and
21  disability, yes.
22     Q.   And so does that mean that you were not

Page 363

1  administering those portions or were you working with
2  the Reed Group?
3      A.   It means that our department was
4  responsible for overseeing any vendors that we hire
5  in the benefits space and Reed Group was one of those
6  vendors.
7      Q.   So what does that overseeing function
8  consist of, vetting billing or it is dealing with
9  individual cases?
10     A.   It's primarily just making sure that
11  communications are open and that the vendor is
12  performing satisfactorily.
13     Q.   Now, does your work involve you in the
14  needs or the leave requests of individual employees?
15     A.   It did not.  I was not involved in their
16  particular medical conditions, no.
17     Q.   Well, I wasn't asking as to medical
18  conditions.  I was asking about their applications
19  for leave or -- their applications for leave?
20     A.   It would depend on the case.
21     Q.   What would cause you to be involved in a
22  case?

Arbitration Day 2                                             July 23, 2014
                        Washington, D.C.

Page 364

1    A.   If our vendor, the Reed Group, had a
2  question that the employee either couldn't answer,
3  wasn't available to answer, they would reach out to
4  me.
5    Q.   A question as to what?  I don't
6  understand your response, in fact.  I'm sorry.
7    A.   If it was not clear as to what type of
8  claim it was, whether the employee was eligible for
9  certain benefits, those types of questions.
10   Q.   I see.  So contractual questions, you
11 would answer?
12   A.   Contractual, yes.  Policy, yes.
13   Q.   Now, it's true that you did respond to
14 the Reed Group in the case of Timothy Skrynnikov?
15   A.   Correct.
16   Q.   So I want to ask about some of that
17 interaction.  I believe you have Exhibit 82 before
18 you.
19   A.   Yes, I do.
20   Q.   Thank you.  In July of 2009, you became
21 aware of Mr. Skrynnikov's application for medical
22 leave?

Page 365

1    A.   That's correct.
2    Q.   Did notification come to you from the
3  Reed Group?
4    A.   Yes, it did.
5    Q.   And why did you hear it from the Reed
6  Group?
7    A.   Specifically, they were unsure as to
8  whether the claim was worker's comp or disability.
9    Q.   And what raised that issue for them?
10   A.   My understanding was the way in which
11 the employee had described what caused his
12 disability.
13   Q.   And what were you told about what the
14 employee described?
15   A.   That there was an altercation with his
16 manager.
17   Q.   Were you given any other information?
18   A.   No.
19   Q.   And they gave you information in order
20 to determine whether it was worker's comp or not?
21   A.   That's correct.
22   Q.   And did you determine it?

Page 366

1    A.   Yes, we did.
2    Q.   And what did you determine?
3    A.   We determined that it was not worker's
4  comp.  It was short-term disability.
5    Q.   Those two aren't alternatives; if it's
6  one, it's not the other; is that true?
7    A.   Can you clarify?
8    Q.   Yes.
9    A.   It is one or the other.
10   Q.   Okay.  So because it was short-term
11 disability, it could not be worker's comp?
12   A.   That's correct.
13   Q.   Okay.  So did you explore the underlying
14 facts of the claim regarding the altercation before
15 deciding it was not worker's comp?
16   A.   We rely on our worker's comp vendor to
17 make that determination.
18   Q.   And who followed up to get more facts in
19 order to make that determination?
20   A.   I'm not aware of that information.
21   Q.   Did you speak to, say, the manager in
22 question?

Page 367

1    A.   I'm sorry.  I didn't hear that.
2    Q.   If the issue was an altercation with a
3  manager, did you speak to the manager?
4    A.   No, I did not.
5    Q.   Did you speak to the business partners,
6  the H.R. business partner?
7    A.   No, I did not.
8    Q.   Do you know who --
9    A.   Not about that.
10   Q.   I'm sorry?
11   A.   Not about that issue.  That was not my
12 role.
13   Q.   Do you know who the H.R. business
14 partner was?
15   A.   Yes.
16   Q.   Who was that?
17   A.   Carrie Lee.
18   Q.   How often in FMLA cases are you involved
19 in the individuals' claims?
20   A.   Not regularly.
21   Q.   Has it happened in cases other than Mr.
22 Skrynnikov?

28  (Pages 364 to 367)

Arbitration Day 2                                                                July 23, 2014
Washington, D.C.

Page 368

1      A.   Yes.
2      Q.   Under what circumstances do you become
3   involved?
4      A.   Typically, if there are questions from
5   the vendor from Reed Group about the type of claim,
6   it could be a situation where the employee was not
7   following standard procedures or policies, either of
8   Fannie Mae or Reed Group.  They would ask for our
9   involvement.
10     Q.   Could I ask you to turn to page 23 of
11  Exhibit 82.
12     A.   Okay.
13     Q.   At the top of the page is an E-mail that
14  I would like you to read and then I'll ask you
15  questions about it.  It is the one from STD FMLA
16  Liaison Mailbox on Thursday, July 23rd at 9:40 p.m.
17  Do you see that?
18     A.   Okay.
19     Q.   Could you read through that, please.
20  Thank you?
21     [Witness peruses exhibit.]
22  BY MS. KUNTZ:

Page 369

1      Q.   Do you remember this E-mail?
2      A.   Yes.
3      Q.   Who had you talked to at Legal before
4   writing this E-mail?
5      A.   That, I don't recall.
6      Q.   Do you recall who asked you to send this
7   E-mail?
8      A.   No, I don't.
9      Q.   Do you recall any discussion leading up
10  to the sending of this E-mail?
11     A.   No, I don't.
12     Q.   Now, how often have you gone back to the
13  Reed Group or to a third-party vendor for medical
14  leave and asked for details about the employee's
15  condition?
16     A.   How often?  It would just depend on the
17  circumstances.  If there were outstanding questions
18  about the claim, the type of claim, that is when we
19  would ask for clarification.
20     Q.   Were you told of the reason that you
21  needed specific details regarding Mr. Skrynnikov's
22  claim?  I'm referencing page 23 of Exhibit 82.

Page 370

1      A.   No, not that I recall.  It's very clear,
2   though, that given that a claim cannot be both
3   disability and worker's comp, we needed to understand
4   enough so that we could make a determination about
5   which type of claim it was.
6      Q.   Is it the legal group that makes that
7   determination?
8      A.   Typically, no.  It would be the worker's
9   comp vendor.
10     Q.   So if the legal group is the one that
11  asks Reed to provide to you all details, would that
12  have been for worker's comp determination?
13     A.   It could have been we just needed to
14  better understand what occurred in that altercation
15  so that we knew which avenue of benefits that was
16  available to the employee.
17     Q.   Well, I understand that you needed to
18  make that determination, but you just said that the
19  Legal Department didn't make that determination, and
20  in this E-mail, you're saying that the Legal
21  Department was seeking this information.  So I'm
22  asking you if you know why that information was being

Page 371

1   sought.  Were you told?
2      A.   Other than to simply understand what the
3   underlying reason was for the disability, that's the
4   only reason I'm aware of.
5      Q.   So I'm looking at the last line of this
6   where you ask Reed about its confidence that the
7   documentation is sufficient and credible.
8      A.   Yes.
9      Q.   What would constitute sufficient and
10  credible documentation?
11     A.   Just simply that the medical provider is
12  a true physician, doctor, per our policy.
13     Q.   Was there any reason, to your knowledge,
14  to doubt Mr. Skrynnikov's medical certification?
15     A.   No.
16     Q.   Had you seen Mr. Skrynnikov's medical
17  certification?
18     A.   No.
19     Q.   Do you know if the Legal Department had
20  seen Mr. Skrynnikov's medical documentation?
21     A.   I don't know.
22     Q.   Do you know if a request was made for

29  (Pages 368 to 371)

Page 372

1    Mr. Skrynnikov to get a second opinion?
2        A.   I'm not aware of one, no.
3        Q.   Now, did you follow up with Mr.
4    Skrynnikov's manager regarding this altercation?
5        A.   No, I did not.
6        Q.   Do you know who his manager was?
7        A.   No.
8        Q.   Did you follow up with the Legal
9    Department regarding this altercation?
10       A.   No, I did not.
11       Q.   Do you know if the Reed Group gave you
12   additional information regarding the altercation?
13       A.   The only thing I recall is we were told
14   at some point that it was not physical, and that's
15   all I knew.
16       Q.   Did you speak to anyone else about this
17   altercation with the manager?
18       A.   I would have exchanged E-mails with the
19   H.R. business partner, also my assistant at the time
20   who managed the mailbox.
21       Q.   I'm sorry.  When you say "managed the
22   mailbox", do you mean the STD FMLA liaison mailbox?

Page 373

1        A.   Yes.  Correct.
2        Q.   Do you recall what conversation you had
3    with Ms. Lee about this issue?
4        A.   I don't recall anything specific other
5    than just notifying her of what we found out from the
6    Reed Group, which was there was a disability claim
7    made due to an altercation, and so just the basic
8    facts.
9        Q.   Did you suggest that Legal needed to be
10   contacted?
11       A.   Not that I recall, no.
12       Q.   Did Ms. Lee tell you at the time that
13   she knew of an altercation between this claimant and
14   his manager?
15       A.   Not that I recall.
16       Q.   Did she discuss a meeting in which she
17   had talked with both of them about this altercation?
18       A.   Not that I recall, no.
19       Q.   Can you tell me who Yvonne Miller is?
20       A.   She was my assistant at the time.
21       Q.   So she was the person who was managing
22   the STD FMLA liaison mailbox?

Page 374

1        A.   Correct.
2        Q.   Could I ask you to look at page 29 of
3    this same exhibit.
4        A.   Okay.
5        Q.   Yes.  Does this E-mail remind you that
6    you were asked to request the information from Reed
7    by Ms. Lee?
8        A.   Yes.
9        Q.   Do you now recall any conversation that
10   you had with Ms. Lee about this request for
11   information from the Legal Department?
12       A.   I recall after notifying her of the
13   application, yes.
14       Q.   Yes, a discussion?  Do you recall a
15   discussion with her or are you just recalling
16   notifying her?
17       A.   Just this E-mail.  We didn't have a
18   verbal discussion, to my knowledge.
19       Q.   Were there other occasions on which the
20   Legal Department intervened and asked you to seek
21   higher scrutiny of medical documents from a
22   third-party vendor?

Page 375

1        A.   Yes.
2        Q.   Is it common?
3        A.   Not common, but it would depend on the
4    case.
5        Q.   Do you know why you were asked to be
6    particularly vigilant regarding the medical
7    documentation in Mr. Skrynnikov's case?
8        A.   No.
9        Q.   Now could I ask you to look at page 96
10   of the same exhibit.
11       Now, there, you refer to the highest level of
12   scrutiny on the documentation.  What would the
13   highest level of scrutiny on the documentation?
14       A.   Just simply that the Reed Group and the
15   employee are adhering to our specified deadlines for
16   reporting absences or physician certification.
17       Q.   So your understanding of highest level
18   of scrutiny is that it pertains to deadlines?
19       A.   Yes.
20       Q.   And nothing else?
21       A.   Well, adhering to our stated protocols
22   for reporting absences and disability.

Arbitration Day 2                                                July 23, 2014

Washington, D.C.

Page 376

1      Q.   Are you aware of any circumstances in
2   this case that required the highest level of scrutiny
3   of documentation?
4      A.   The employee was not always compliant
5   with our requirements for reporting illnesses or
6   reporting absences and providing physician
7   certification.
8      Q.   And so you believed the higher level of
9   scrutiny had to do with making the deadlines here; is
10   that your position?
11      A.   Making the deadlines and complying with
12   our requirements, yes.
13      Q.   I would like to turn back to page 59,
14   please.  In the middle of that page is a
15   communication with your name on it.  It's dated
16   9-16-2009. It's smack in the middle of the page.
17   About the line is "correspondence" and below it, it
18   starts "Hi, Don".  Do you see that?
19      A.   Yes.
20      Q.   On 9-15, Mr. Skrynnikov had been sent a
21   job abandonment letter.  If you look at the --
22   reading from the bottom, the earlier communication,

Page 377

1   Ms. Gardener had communicated that the certification
2   from the doctor has arrived and has been approved and
3   he is -- they are ready to extend his medical leave
4   through 10-15.
5      My question to you is about your response
6   where you asked her to wait before sending
7   correspondence notifying him of approvals, etc.,
8   until we hear back from the H.R. Legal Team.  Had you
9   referred this to the H.R. business partner?
10      A.   That would not have been my role, to
11   refer this to them.
12      Q.   Okay.  Did you refer it to the legal
13   team?
14      A.   No.
15      Q.   So when you say up here in the first
16   line "I have asked them for input regarding the next
17   steps", had you gone to them asking about the next
18   steps for the employee?
19      A.   No.
20      Q.   Would it have been your job to determine
21   the next steps for the employee?
22      A.   That was not my job, no.

Page 378

1      Q.   So did you participate in any discussion
2   that had to do with next steps for this employee?
3      A.   No.
4      Q.   Do you know of any reason why
5   notification of his approval for FMLA extension was
6   to be held back for a time?
7      A.   Can you clarify "held back"?
8      Q.   Well, why they should wait to notify him
9   of the approval of his FMLA leave.
10      A.   My objective here was to make sure that
11   the Reed Group understood the circumstances of what
12   was in the letter so they could better understand and
13   better figure out the timeline.
14      Q.   By "what was in the letter", what are
15   you referring to?
16      A.   The letter that the employee received
17   about his job abandonment.
18      Q.   Okay.  And that was provided to the Reed
19   Group.  I'm not sure I can lay my hands on it, but
20   it's in this record.
21      So it was provided to them.  So your purpose
22   in delaying that was so that the Reed Group could be

Page 379

1   informed?  Because your E-mail appears to say that
2   you're waiting to hear back from Legal.  So I'm
3   trying to understand that.
4      A.   I was waiting to hear back as to the
5   content of the letter that the employee received.  I
6   was not privy to what the content of the letter was,
7   and Reed Group was in the dark, so to speak, about
8   speaking with the employee who was upset, and they
9   just needed to understand what the employee had been
10   told.
11      Q.   So if you look with me at page 64 of the
12   record, we have in the second half of the page and
13   spilling over to page 65 an excerpt from an E-mail,
14   and this appears to be conveyed by you.  Do you
15   recall sending this to them?
16      A.   Yes.
17      Q.   So here, you're conveying the E-mail and
18   you're asking them for their extension letter so that
19   you can vet it or would it have been passed to Legal
20   to be vetted?
21      A.   I don't recall specifically.  Our
22   primary concern was making sure that we provided all

Alderson Reporting Company
1-800-FOR-DEPO

Arbitration Day 2                                    July 23, 2014
Washington, D.C.

Page 380

1  of the job-protected leave that he was entitled to,
2  making sure the dates were correct.
3      Q.   Can I ask you to turn to page 88,
4  please.  Under the entry for 10-22-2009 on page 88,
5  you referred to this as a sensitive case.
6      A.   Yes.
7      Q.   Can you explain to me what you mean by
8  that?
9      A.   Typically, it means that the employee,
10  we expected the employee to at some point exhaust his
11  job-protected leave.  So we wanted to make sure that
12  all of the dates had been properly identified and
13  that he had received complete credit for all of his
14  absences.
15      Q.   Now, are you aware that by 10-22, the
16  Reed Group had approved him for return to work on
17  10-26?
18      A.   I recall seeing that in the materials,
19  yes.
20      Q.   But Fannie Mae expected him to exhaust
21  his leave nevertheless; is that what you're
22  testifying to?

Page 381

1      A.   What I'm saying is that we felt that
2  this was a case that was going to extend longer than
3  just a few weeks and that we would have expected him
4  to come close, not necessarily just it to end.
5      Q.   Now, on October 29th, you wrote to a
6  Reed Group representative and asked them to confirm
7  that Mr. Skrynnikov had been sent his FMLA and DCFMLA
8  exhaustion letters.
9      A.   Correct.
10      Q.   That's at page 107 if you need to see
11  that in this same exhibit.
12      Who had instructed you to send that inquiry?
13      A.   I don't recall specifically, but,
14  typically, those kinds of requests would come from
15  the H.R. business partner.
16      Q.   Did Reed confirm that they had sent both
17  exhaustion letters?
18      A.   My recollection is they confirmed they
19  had sent the federal, but since he had not exhausted
20  his state yet, they could not send the state
21  exhaustion letter.
22      Q.   Also on October 29th, you asked Reed to

Page 382

1  provide you correspondence covering both DCFMLA and
2  FMLA recent correspondence.  That's on page 110.
3      A.   Yes.
4      Q.   Did you confirm that the Reed Group sent
5  Mr. Skrynnikov a letter regarding his leave through
6  10-25?
7      A.   Can you repeat the question?  Did I
8  confirm it?
9      Q.   Well, you're asking at the top of page
10  110 -- why don't you look at that because you're
11  referencing a specific letter:  "Please provide the
12  most recent correspondence actually sent to Tim."
13      A.   Yes.
14      Q.   Did you locate that letter?
15      A.   I don't recall.
16      Q.   Now, in that same communication, you
17  refer to Mr. Skrynnikov's case as a special case.  Is
18  that the same as a sensitive case or is there another
19  reason that you're calling it a special case here?
20      A.   It's the same thing.
21      MS. KUNTZ:  That's all.
22      JUDGE SWEENEY:  That's it?

Page 383

1      MS. KUNTZ:  Yes.
2      JUDGE SWEENEY:  Any cross?
3      MR. MIOSSI:  No.  Thank you.  I have no
4  questions for Ms. Kober.
5      Thank you, Lisa.
6      JUDGE SWEENEY:  Ms. Kober, thank you for
7  taking the time to testify here.  We appreciate it
8  and you can go about your business.
9      THE WITNESS:  Thank you.
10      [Witness excused.]
11      [Discussion held off the record and recess.]
12      JUDGE SWEENEY:  We're back on the record.
13      Ma'am, would you please state your name again
14  for the record.
15      THE WITNESS:  Sure.  Carrie Lee.
16      JUDGE SWEENEY:  Okay.  We're going to
17  continue with your cross-examination.
18      FURTHER CROSS-EXAMINATION
19  BY MS. LENAHAN:
20      Q.   Ms. Lee, can you turn to Exhibit 15.
21      JUDGE SWEENEY:  Keep your voice loud, please.
22      THE WITNESS:  Yes.

32 (Pages 380 to 383)

Page 384

1      JUDGE SWEENEY:  Was it 15?

2      MS. LENAHAN:  Fifteen, which is Fannie Mae's

3   attendance corporate policy dated March 18, 2009.

4   BY MS. LENAHAN:

5      Q.   What was Fannie Mae's directive for

6   creating this policy?

7      A.   So as it states here in the second

8   section, the purpose here was to cover attendance and

9   relate that to or need-driven by ADA, FMLA, and

10  DCFMLA.

11     Q.   So this policy is specifically

12  applicable to individuals who are on these types of

13  leave, FMLA, DCFMLA, or certain kind of ADA issues?

14     A.   It could be and it's applicable to all

15  employees.

16     Q.   And what are some of the requirements as

17  stated in the policy in Section 5?

18     A.   So if an employee is not on approved

19  leave, sick leave, or family sick leave, they will be

20  considered absent if they don't report to work or

21  arrive late for work or take time off during the day

22  and then return later the same day or leave early

Page 385

1   from work without prior approval from their manager.

2      Q.   And under this policy for Fannie Mae,

3   how do you define excessive absenteeism?

4      A.   So as noted here, it's considered

5   excessive when, for example, it shows a pattern of

6   abuse such as extending weekend or other approved

7   leave without permission or adversely affects an

8   individual or their work unit's performance,

9   productivity or morale, or if it is unduly frequent

10  or repetitive, and then the policy goes on to specify

11  the guidelines for excessive absenteeism or,

12  generally, when an employee accumulates for than six

13  unplanned absences within a rolling 12-month period

14  will be deemed to have absenteeism that is unduly

15  frequent or repetitive and, therefore, excessive.

16  Consecutive days of unplanned absence will count as

17  one day when applying to this guideline.

18     Q.   Then how does this policy define

19  unauthorized absenteeism?

20     A.   Absent employees who don't have advanced

21  authorization for their absence must contact their

22  manager as soon as it is feasible to do so.  Their

Page 386

1   manager will determine if the absence is authorized.

2   The determination may be made and communicated to the

3   employee before or after the employee returns to work

4   and the manager may consult with health services to

5   make this determination.

6      Q.   And in your role as H.R. business

7   partner for Fannie Mae, did you follow this policy?

8      A.   Yes.

9      Q.   Did Mr. Skrynnikov ever fail to comply

10  with Fannie Mae's policy?

11     A.   Yes.

12     Q.   And what can you remember about his

13  failure to comply with certain policies?

14     A.   He was not at work during this process,

15  yet at the same time was not on an authorized leave

16  of absence from the Reed Group.

17     Q.   If I can draw your attention to Exhibit

18  82, page 29.  We had previously looked at this

19  exhibit.

20     The E-mail you sent is in the middle of the

21  page and it says --

22     MS. KUNTZ:  Excuse me, Mary.  What page?

Page 387

1      MS. LENAHAN:  29.

2   BY MS. LENAHAN:

3      Q.   "Also, Madonna would like you to satisfy

4   that Reed is appropriately vetting this type of

5   physical certification -- physician certification --

6   I apologize.

7      It doesn't say special certification.  It says

8   appropriately vetting.  Right?

9      A.   That's right.

10     Q.   If you could now turn to Exhibit 59.

11  This is a letter dated September 15, 2009 sent to

12  Timothy Skrynnikov regarding notice of job

13  abandonment from you.

14     A.   Yes.

15     Q.   What was the purpose of you sending this

16  letter?

17     A.   The purpose, as stated here, was to let

18  him know that per Fannie Mae's attendance policy, he

19  was considered to have abandoned his job because that

20  day was the sixth consecutive work day he had not

21  come to work, had not been on authorized leave, had

22  not contacted his manager.

33 (Pages 384 to 387)

Page 388

1      Q.   And this is an H.R. policy.  So this is
2   something that you would specifically be involved
3   with?
4      A.   That's correct.
5      Q.   And, to your knowledge, he had only been
6   approved for short-term disability, family medical
7   leave, and D.C. family medical leave through,
8   according to this letter, December 6, 2009?
9      A.   That's right.
10      Q.   Had you heard from him at all between
11   September 6, 2009 and the date you sent this letter
12   on September 15, 2009?
13      A.   No.
14      Q.   Would you have checked with anyone to
15   see if anyone else had heard from him?
16      A.   Yes.  I would have checked from probably
17   the FMLA mailbox.
18      Q.   When you sent this letter, to your
19   knowledge, had Mr. Skrynnikov contacted anyone at
20   either the FMLA mailbox or anyone at Fannie Mae or
21   anyone at Reed Group about extending his leave?
22      A.   No.  At the time I sent this letter, no,

Page 389

1   he had not.
2      Q.   So then you were following your policy
3   that we discussed before that states specifically six
4   unauthorized absences is excessive absenteeism?
5      A.   That's correct.
6      Q.   Now, in the letter, you specifically
7   reference:  "If you believe any of the above
8   information is incorrect or if you have been approved
9   for continued STD or FMLA, please contact me
10   immediately."
11      Why would you write that?
12      A.   Because I want to be sure in any type of
13   situation like this, this one included, that we have
14   all the facts, we understand, and we're giving the
15   employee an opportunity to handle the situation
16   appropriately according to our policies.
17      Q.   Can you now turn to Exhibit 61.  The
18   second page of Exhibit 61 is Mr. Skrynnikov's
19   response to your letter; is that correct?
20      A.   Yes.
21      Q.   And can you explain your response to me,
22   which is on the first page?  I know it's lengthy.  So

Page 390

1   if you want to just kind of paraphrase, you know, the
2   first paragraph and then followed by each additional
3   paragraph.
4      A.   Sure.  So the first full paragraph there
5   really focuses on allegations that were new to me
6   that Tim had raised, and I was referring him back to
7   F.M. Ethics, slash, the Investigations Group, which
8   is part of a Compliance and Ethics Group to follow
9   the Fannie Mae process and raise those allegations
10   through them, because I had not heard about those
11   previously and we want to make sure that those are
12   carefully looked at and vetted and handled.
13      Was there a second piece that you wanted me to
14   look at?
15      Q.   The second paragraph, if you want to
16   quickly paraphrase.
17      A.   Right.  So for his medical situation,
18   again, we directed him back to the Reed Group.  At
19   that time, it looks like here on the 17th, I had an
20   understanding that his doctor had been in touch with
21   the Reed Group and had provided the documentation
22   needed to support that absence that I mailed him

Page 391

1   about prior to this E-mail exchange.
2      Q.   Okay.  So you sent the letter on the
3   15th, and in the interim, Reed Group received the
4   medical documentation, and then at that time, you
5   waited and made this letter response as a result?
6      A.   That is correct and reminded him again
7   that he needs to get in touch with Reed on a timely
8   basis so we avoid this kind of situation.
9      Q.   And why after sending the job
10   abandonment letter did you want to talk it over with
11   both Legal and any -- you know, your boss prior to
12   making any adjustments to the letter that you had
13   sent?
14      A.   The job abandonment status?  Because we
15   want to look at this type of situation really
16   carefully.  You know, our subject matter expert in
17   terms of FMLA is in the Employment Law Group.  My
18   management for H.R. policies are people that I want
19   to make sure I consult with and make sure I've got
20   everything right before acting on it in an abundance
21   of caution.
22      Q.   Now, in the fourth paragraph, the last

Page 392

1   sentence states: "Going forward, you should make
2   every effort provide or have your healthcare provider
3   provide reasonable notice as to a change of
4   circumstances to Reed Group before your STD/FMLA
5   authorization expires as it did on September 6,
6   2009."
7        Why does Fannie Mae have this policy?
8        A.   Because we don't want to be in a
9   situation where we're having to retroactively go back
10  and adjust.  We need to make sure we have the facts
11  in advance so that we can handle things smoothly and
12  appropriately without any unnecessarily back and
13  forth miscommunication on this.
14       Q.   Did Mr. Skrynnikov have any follow-up
15  questions to this E-mail?
16       A.   I don't believe so.
17       Q.   Did Mr. Skrynnikov ever contact you
18  again after this September 15th, 17th E-mail
19  exchange?
20       A.   I don't specifically actually remember
21  if he contacted me again after this.
22       Q.   If I could draw your attention to

Page 393

1   Exhibit 68.
2        [Witness peruses exhibit.]
3        THE WITNESS:  Yes, he did.  Here we go.
4   BY MS. KUNTZ:
5        Q.   Can you quickly summarize the E-mail
6   that he sent you?  How did you -- I guess my first
7   question is it states that he attached something to
8   the E-mail.  Do you remember seeing any kind of
9   medical certification?
10       A.   So yes.  I remember seeing a generic
11  attachment from the hospital about rib fracture care.
12       Q.   If you turn just kind of shortly to
13  Exhibit 70, this is a four-page exhibit and this was
14  not provided to you, but just for reference, can you
15  go through each page and tell me if you saw that in
16  the attachment that Tim sent you on October 21st?
17       A.   So going through each page --
18       Q.   Correct.
19       A.   -- on Exhibit 70, I did not see this
20  handwritten note, that first page.
21       Q.   Okay.
22       A.   I saw a portion of this attachment here,

Page 394

1   the George Washington University Hospital discharge
2   instructions.  What I viewed on the attachment was
3   generic and did not have the specific information at
4   the top here related to Tim.  To me, what I viewed
5   and what I saw was an attachment that was generic.
6        Q.   So that's Bates No. FM_0000424?
7        A.   Yes.
8        Q.   The third page is Skrynnikov 00290.
9        A.   Is that the same thing?
10       JUDGE SWEENEY:  I think one has the
11  underlining and the other doesn't.
12       THE WITNESS:  So maybe this is -- I mean, I
13  saw a version of this.  It was the same kind of
14  generic, no name at the top.
15  BY MS. KUNTZ:
16       Q.   And what about the final page,
17  Skrynnikov 000291?
18       A.   I did not see that.
19       Q.   You've never seen this?
20       A.   I've never seen this.
21       Q.   Turning back to Exhibit 68, when you
22  received this E-mail asking for additional time off

Page 395

1   in the form of vacation, how did you respond?
2        A.   I indicated that I could not provide --
3   you know, it's management call on vacation, but he
4   indicates an injury here that's going to take some
5   recovery time and I referred him to the Reed Group.
6        Q.   Okay.  Because he's asking for a week
7   after the week he was supposed to return, so a return
8   date after November 2nd.
9        A.   That's right.
10       Q.   So why would a Fannie Mae employee not
11  be required to use vacation for an injury?
12       A.   Because we have sick leave and
13  short-term disability to handle different types of
14  injury or illnesses.
15       Q.   How much sick leave is a Fannie Mae
16  employee provided?
17       A.   There is not a finite number of six
18  leave days.  There are -- there's not a finite
19  number.  I mean, I don't want to use the term
20  "unlimited", but, essentially, it could potentially
21  be unlimited.
22       Q.   And is vacation limited?

Page 396

1     A.   That is not unlimited.  Yes.  Vacation
2   is limited, yes.  It is not unlimited.  It's accrued
3   benefit, paid benefit for employees.
4     Q.   To your knowledge, did he ever ask you
5   who his manager was that he could ask for vacation?
6     A.   He did not ask me who his manager was.
7     Q.   To your knowledge, did he ask anybody
8   for vacation?
9     A.   To my knowledge, he did not.
10     Q.   If you could turn to Joint Exhibit 76,
11   this is letter dated October 30, 2009 to Timothy
12   Skrynnikov signed by you, Carrie Lee.
13     A.   I'm sorry.  Can you repeat that?
14     Q.   Joint Exhibit 76 is a letter dated
15   October 30, 2009 to Timothy Skrynnikov signed by you,
16   Carrie Lee.
17     A.   Yes.
18     Q.   Can you explain to me the purpose of
19   sending this letter?
20     [Witness peruses exhibit.]
21     THE WITNESS:  So the purpose of this letter
22   was to let Tim know that his FMLA had exhausted, but

Page 397

1   he was still able to pursue benefits under Fannie
2   Mae's short-term disability and potentially long-term
3   disability, but we let him know here if that coverage
4   was not -- that STD benefit coverage was not
5   validated for the entire period from October 26th
6   through the 30th, that his employment would be
7   terminated effective that date.
8   BY MS. KUNTZ:
9     Q.   Okay.  So he was only out on approved
10   leave until October 25, 2009?
11     A.   That's right.  July 10th through October
12   25th.
13     Q.   When you sent this letter, did you
14   contact Reed Group to find out if he had provided any
15   additional medical documentation to receive
16   additional short-term disability benefits?
17     A.   Yes, and at the time of his letter was
18   not aware of that.
19     Q.   So when you sent this letter, you had
20   the understanding that he had provided no additional
21   medical documentation for the rib injury?
22     A.   That's right.

Page 398

1     Q.   And whose decision was it to determine
2   that the position was no longer a -- to determine his
3   position was no longer in a job-protected status?
4   Who did you speak to about that?
5     A.   That would have been his management.
6     Q.   And who was his management at the time?
7     A.   Lori Mallon.
8     JUDGE SWEENEY:  Just so I'm clear on this, is
9   this the letter terminating his employment, the
10   October 30th letter?
11     THE WITNESS:  It's not the letter terminating
12   his employment, because it's a letter telling him his
13   job is no longer held, but it's not terminating his
14   employment.  It's telling him that he still has the
15   opportunity as a Fannie Mae employee to look for
16   short-term disability benefits that potentially could
17   long-term disability benefits.
18     JUDGE SWEENEY:  But if he can't get down the
19   short-term disability or long-term disability road,
20   then he's terminated is his employment?
21     THE WITNESS:  I mean, yes.  I suppose there
22   is an opportunity that somebody could apply for a

Page 399

1   different job somewhere, you know, find a different
2   job in the company.
3     JUDGE SWEENEY:  But he wouldn't have any
4   priority?  I mean, sometimes companies have things
5   where --
6     THE WITNESS:  No.
7     JUDGE SWEENEY:  -- you're an employee; they
8   don't have a position, but as soon as we get a
9   position, you'll have the preference to get it.
10     THE WITNESS:  We don't have that.
11     JUDGE SWEENEY:  That's not what this would
12   do?
13     THE WITNESS:  That's right.
14     JUDGE SWEENEY:  Let me just ask you a
15   question here too.  I was uncertain about on that
16   September 15th letter --
17     THE WITNESS:  Okay.
18     JUDGE SWEENEY:  -- was that --
19     THE WITNESS:  Let me go back to the September
20   15th letter.
21     JUDGE SWEENEY:  I'm not sure what number that
22   was.

Page 400

1      MS. LENAHAN:  59, I think.

2      JUDGE SWEENEY:  59?

3      MS. LENAHAN:  Yes.

4      THE WITNESS:  Oh, yeah.  The job abandonment

5  letter, yes.

6      JUDGE SWEENEY:  Right.  Now, I don't want to

7  -- you know, these folks on both sides know this a

8  whole lot better than I do, but was this considered

9  no longer operative once he --

10     THE WITNESS:  That's right.  That is right.

11 So he got in documentation, and then the next one,

12 the next exhibit that we -- what was the next one

13 that we looked at?

14     MS. LENAHAN:  You responded in Exhibit 61 and

15 clarified that it's no longer applicable.

16     JUDGE SWEENEY:  Right.  So whatever this was,

17 whatever you were saying here, once he got his

18 documentation in --

19     THE WITNESS:  That's right.

20     JUDGE SWEENEY:  -- and the Reed Group

21 approved it --

22     THE WITNESS:  Because it extended his leave.

Page 401

1      JUDGE SWEENEY:  Okay.  So you're making the

2  decision on October 30th.  You are not relying on the

3  September 15th letter to make your decision on

4  October 30th?

5      THE WITNESS:  That's right.  The October 30th

6  letter is the FMLA exhaustion letter.

7      JUDGE SWEENEY:  Right.  It says the FMLA is

8  exhausted.

9      MS. LENAHAN:  DCFMLA.

10     JUDGE SWEENEY:  Yes.  The DCFMLA is

11 exhausted.  It almost seems like there is a missing

12 part to it.  It says you've exhaust your DCFMLA.

13     THE WITNESS:  Right.

14     JUDGE SWEENEY:  And the next thought is you

15 no longer have a job, a position.

16     THE WITNESS:  We are no longer holding that

17 position for you anymore.

18     JUDGE SWEENEY:  But there is no sort of --

19 why are we doing this?

20     THE WITNESS:  Well, because we want him to

21 have the opportunity to take advantage of the

22 short-term disability leave available to him if, in

Page 402

1  fact, he's gets in the appropriate documentation.

2      JUDGE SWEENEY:  I understand that.

3      THE WITNESS:  Okay.

4      JUDGE SWEENEY:  I mean, so when he exhausted

5  -- was a decision made that when he gets to the end

6  of his DCFMLA, he's gone?

7      THE WITNESS:  The decision was that we were

8  no longer going to hold his position, yes.

9      JUDGE SWEENEY:  All right.  I'll let folks --

10     THE WITNESS:  He didn't have a position to

11 come back to at that point with that group.

12     JUDGE SWEENEY:  When was that decision made?

13     THE WITNESS:  That decision was made on or

14 around October 30th when I sent this letter once the

15 DCFMLA had exhausted.

16     JUDGE SWEENEY:  Once again, I know there's a

17 lot of operative folks here, but who made that

18 decision.

19     THE WITNESS:  His management made that

20 decision.  So Lori Mallon.

21     JUDGE SWEENEY:  Lori Mallon would be the

22 person?

Page 403

1      THE WITNESS:  With Kristin having moved out

2  of the group or that role.

3      JUDGE SWEENEY:  So even though you're the

4  signatory on this letter, you're just informing

5  him --

6      THE WITNESS:  That's right, as the H.R.

7  business partner.  Yeah.  I had been primarily, as

8  you know from this, corresponding with him from a

9  policy perspective.

10     JUDGE SWEENEY:  And if Lori Mallon had --

11 maybe I'm getting ahead into the future here, but if

12 Lori Mallon had come to you on October 29th and said,

13 Look, this guy is really somebody we want to keep

14 around and he's doing -- maybe he hasn't done

15 everything, hasn't, you know, hit every button he

16 should have hit here, but we really want to keep him

17 around, would that have been her decision to make, to

18 say don't send this letter out?

19     THE WITNESS:  Yeah.  I would have been --

20 well, I would have sent the letter anyway because

21 FMLA would have exhausted.  So that's an important

22 point.

Page 404

1    JUDGE SWEENEY:  But would you say that the
2   position was gone?  Would you say in the letter your
3   position was gone at that point if she had said --
4    THE WITNESS:  Yeah.  I mean, it's
5   management's decision on whether or not the position
6   is held open or not.
7    JUDGE SWEENEY:  Okay.  Well, if she had said
8   I want to keep this fellow, I really want him; if she
9   had said on that day I want to keep him, you would
10   not have sent this letter?
11    THE WITNESS:  I would not have said these
12   words in this letter saying you no longer have a
13   position.
14    JUDGE SWEENEY:  You would have told him his
15   DCFMLA is over with and you've have your STD rights
16   and all that?
17    THE WITNESS:  Right.  I believe that's what I
18   would have done.
19    JUDGE SWEENEY:  Okay.
20    THE WITNESS:  I haven't had that situation
21   actually come up.
22    JUDGE SWEENEY:  Okay.  But that would have

Page 405

1   been the manager's --
2    THE WITNESS:  The manager makes the
3   determination of whether or not to hold the position
4   open, yes.
5    JUDGE SWEENEY.  All right.  I'm sorry.
6    MS. LENAHAN:  But to clarify, Fannie Mae's
7   short-term disability policy is not job protected
8   status.
9    THE WITNESS:  That's correct.  It is not job
10   protected status.  So if FMLA exhausts, there is no
11   longer a job-protected status.
12    MS. LENAHAN:  Under either federal law or --
13    THE WITNESS:  That's right, and that's where
14   we were at the point of this letter.
15    JUDGE SWEENEY:  If somebody is granted the
16   STD -- let's just assume FMLA doesn't apply, either
17   the federal or state.
18    THE WITNESS:  Okay.
19    JUDGE SWEENEY:  They have the STD and they're
20   status on that.  If they fully comply with Reed and
21   everything else, can you fire them?  Abolish their
22   position would be a better way to put it.  Can you

Page 406

1   abolish their position while they're in that status?
2    THE WITNESS:  I mean, I'm sort of dealing in
3   an unknown kind of hypothetical situation, but yeah.
4   I suppose let's say there was a reorganization or who
5   knows what reason -- I guess with STD, a position
6   could be eliminated.
7    JUDGE SWEENEY:  And they would stop getting
8   their STD benefits?
9    THE WITNESS:  No.  They would keep getting
10   their STD.
11    JUDGE SWEENEY:  But you could abolish their
12   position?
13    THE WITNESS:  Yes.
14    JUDGE SWEENEY:  I see.  Okay.  I think I
15   understand.
16    THE WITNESS:  All right.
17   BY MS. LENAHAN:
18    Q.   If you could turn to Exhibit 80, please.
19   Exhibit 80 is a letter dated November 13, 2009 sent
20   to Mr. Skrynnikov signed by you, Carrie Lee?
21    A.   Yes.
22    Q.   Why did you send this letter?

Page 407

1    A.   This letter was to note that because
2   Reed had denied the request for additional short-term
3   disability plus the fact that the job-protected
4   status had exhausted, his employment was being
5   terminated as of the effective date of this letter.
6    Q.   And did you know what other conditions
7   he applied for short-term disability between the date
8   of November 2nd and the date of November 13th?
9    A.   I did not.
10    Q.   So you had no -- you never discussed
11   with Reed the position certification for whatever
12   additional medical issues he had?
13    A.   I had no knowledge of that at all at
14   this time.
15    Q.   Can you turn to Joint Exhibit No. 9.
16   Exhibit No. 9 is Fannie Mae's Code of Conduct which
17   was revised in 2008.
18    A.   I'm catching up here.
19    Yes.  I'm here.
20    Q.   How are employees notified about Fannie
21   Mae's Code of Conduct?
22    A.   So the Code of Contact is a document

Page 408

1    that is posted to our intranet site.  There is also a
2    mandatory annual training for all employees of the
3    company that goes through -- highlights the Code of
4    Conduct and has every employee certify that they've
5    read, understand, and will comply with Code of
6    Conduct.
7          That's done, again, for every employee on an
8    annual basis.
9          Q.    And do employees ever raise compliance
10   and ethics issues with you?
11         A.    They do sometimes.
12         Q.    And what is your prescribed course of
13   action?
14         A.    I referred them to the Compliance and
15   Ethics Group.
16         Q.    Did Mr. Skrynnikov ever raise any ethics
17   concerns with you?
18         A.    He did.
19         Q.    What were those about?
20         A.    He felt that he been, I guess, treated
21   unfairly or harshly from a performance management
22   perspective by Kristin and I referred him to -- I

Page 409

1    think he used the word "retaliation" at that point.
2    I'm not sure what it was retaliation for, but I did
3    refer him to the FM Ethics Group for an investigation
4    and then he later -- and I'm forgetting which exhibit
5    and what date, but he later sent me an E-mail where
6    he alleged some discrimination or retaliation based
7    on protected categories that I then also referred to
8    FM Ethics.
9          Q.    Did Mr. Skrynnikov ever raise any
10   complaints that he was being treated unfairly because
11   he had allegedly raised concerns about disclosures to
12   Senator Grassley?
13         A.    Not to me.
14         Q.    What about did Mr. Skrynnikov raise any
15   concerns with you about how Fannie Mae reported on
16   its executive compensation?
17         A.    Not to me.
18         Q.    Did Mr. Skrynnikov ever raise concerns
19   to you about bonuses or how they were being handled
20   in response to the Grassley report?
21         A.    No.
22         Q.    Did you have any interaction with Mr.

Page 410

1    Skrynnikov prior to Ms. Harrison being his manager?
2          A.    Yes.
3          Q.    What were those interactions with Mr.
4    Skrynnikov?
5          A.    So I can't remember specifically, but I
6    had been the H.R. business partner for that group.
7    So I had knowledge of the employees in that FPNA
8    organization.
9          Q.    Do you remember what you specifically
10   would have spoken to Mr. Skrynnikov about or somebody
11   else in the group about Mr. Skrynnikov?
12         A.    I know that there were performance
13   concerns from prior management.
14         Q.    Do you recall who the prior management
15   was?
16         A.    Lourdes Alcalde, I believe was her last
17   name, and Mary Martin.
18         Q.    Can you put this in kind of a timeframe?
19   Was this --
20         A.    I mean, it be prior to Kristin being his
21   manager.  I don't recall the exact timeframe.  I
22   mean, if the written warning was delivered in July,

Page 411

1    I'm going to guess, probably, the tail end of the
2    prior year maybe.  I don't actually recall what the
3    timeframe was.
4          Q.    And do you recall what you did, meaning
5    did you -- do you recall what kind of interactions
6    you had with both Lourdes Alcalde or any of the prior
7    management about Mr. Skrynnikov's performance?
8          A.    What type of interactions?
9          Q.    Did you have meetings with them?  Was
10   this, you know, noted in a performance review in
11   2008?
12         A.    So I believe -- again, this is a long
13   time ago.  So I'm going back in memory.
14         I believe I had meetings with both Mary Martin
15   -- I know I had meetings with Lourdes and I know
16   there were some notations about performance concerns
17   that I believe that they had that they reflected in
18   his yearend review.
19         Q.    Can you turn to Exhibit 44, please.
20         Exhibit 44 is dated July 1, 2009.  It's to
21   Timothy Skrynnikov from Kristin Harrison, and the
22   subject is written warning for unsatisfactory job

Arbitration Day 2                                          July 23, 2014
Washington, D.C.

---

Page 412

1  performance. Is this what you and Ms. Harrison
2  handed to Mr. Skrynnikov in the July 1, 2009
3  performance meeting?
4      A.  Yes.
5      MS. LENAHAN:  No further questions.
6      JUDGE SWEENEY:  Anything further?
7      MS. KUNTZ:  A few.
8             REDIRECT EXAMINATION
9  BY MS. KUNTZ:
10     Q.  Ms. Lee, you referred to, I think -- I
11  should have these memorized by now -- Exhibit 76 as a
12  FMLA exhaustion letter.  Could we look at that.
13     [Witness peruses exhibit.]
14     THE WITNESS:  Okay.
15 BY MS. KUNTZ:
16     Q.  Now, by that, do you mean that it was
17  the letter that notified Mr. Skrynnikov that his FMLA
18  -- his entitlement to job-protected leave had
19  exhausted?
20     A.  I believe Reed Group would have sent
21  that letter, that official notification to him.
22     Q.  So what did you mean when you called

---

Page 413

1  this his FMLA exhaustion letter?
2      A.  I meant that I was saying here, as it
3  says, in the first paragraph: "As you know, you've
4  been out on an approved extended medical leave.
5  Although your leave has previously been designated as
6  under Fannie Mae's family and medical leave policy,
7  you are no longer in a job protected status."
8      Q.  Right.  I saw that in the document.
9  What I'm asking you is why you characterized this as
10  an FMLA leave exhaustion letter.  For example, did
11  you send an FMLA exhaustion letter before our perhaps
12  the day after October 1st when his federal FMLA
13  exhausted?
14     A.  So Reed Group sends the exhaustion
15  letters.  They're responsible for the timeline on
16  that.
17     Q.  So the purpose of this letter was not to
18  notify him that his FMLA leave had exhausted?
19     A.  The purpose of this letter was to let
20  him know that Fannie Mae would not continue to hold
21  his position open.  Maybe I shouldn't have said
22  exhaustion letter.

---

Page 414

1      Q.  Now, I believe you testified that when
2  you sent this letter, you had no knowledge of any
3  documents provided to Reed by the time that this
4  letter had been sent.  Could I ask you to turn to
5  Exhibit 82, page 99.
6      Did you have regular communications with Lisa
7  Kober of Fannie Mae about Mr. Skrynnikov's case?
8      A.  Let me catch up with you for a second.
9  We're going to page 99?
10     Q.  Yes, please.
11     A.  So I would not say I had regular
12  communications with Lisa Kober.
13     Q.  So if Lisa Kober received notification
14  that there were documents that Mr. Skrynnikov had
15  provided in this matter, you might not have known
16  that?
17     A.  I might not have known that.
18     Q.  Would you have checked on that before
19  sending the letter you sent on October 30th?
20     A.  I would have checked on it before
21  sending a letter, yes.  I would have checked to be
22  sure that I had up-to-date information, certainly.

---

Page 415

1  I was confused by your phrasing, I think.
2      Q.  Could I ask you to turn to Exhibit 68.
3      Now, I believe you were asked whether you knew
4  if Mr. Skrynnikov had asked anyone, presumably anyone
5  at Fannie Mae, for vacation time.  I wanted to direct
6  your attention to the second page of this exhibit and
7  the second paragraph of this E-mail.
8      I wanted to -- I also wanted to ask you -- the
9  E-mail says "if I could use one week of accrued
10  vacation time".  You understand that to be a request
11  to use vacation time?
12     A.  That was a request to use vacation time
13  to which I responded that he needed to talk to
14  management about that, that I'm not in a position to
15  approve vacation.
16     So, obviously, we've gone through this E-mail.
17  That question was out there, but I am not aware that
18  he asked anyone beyond my letting him know that he
19  had to talk to management about vacation.
20     Q.  Did you tell him who in management he
21  needed to talk to?
22     A.  I did not tell him who in management he

---

40 (Pages 412 to 415)

Page 416

1    needed to talk and he did not ask who in management
2    he needed to talk to.
3         Q.   I think I understood you to say when
4    discussing the September 15 job abandonment letter
5    that there had been no contact from Mr. Skrynnikov
6    since the expiration of his approved FMLA leave.
7    Could I direct you to page 40 of Exhibit 82.
8         I'm looking at the E-mail sent to you by Jim
9    Kosier under the date 9-8-2009 notifying you that
10   Reed Group had, in fact, spoken to Mr. Skrynnikov on
11   the 8th.
12        A.   Okay.
13        Q.   Did you respond to the Reed Group?
14        A.   I don't remember if I responded to this
15   E-mail or not.
16        Q.   Could I ask you to look at Exhibit 70.
17        JUDGE SWEENEY:  Which one?
18        MS. KUNTZ:  70.
19   BY MS. KUNTZ:
20        Q.   Now, as I understand it, you have said
21   that attached to the E-mail you received that is a
22   part of Exhibit 68, you received a generic version of

Page 417

1    these instructions.  I just wanted to make sure I
2    understood that the generic version, you say, did not
3    have this top right corner that was specific to Tim
4    Skrynnikov; is that correct?
5         A.   What I viewed was definitely generic.  I
6    remember distinctly thinking of this as a tear sheet
7    on rib fracture care and did not have specific
8    information about Tim either in the way I viewed it
9    or in the version that I viewed.  I did not see
10   anything that had employee-specific or
11   person-specific information on it.
12        Q.   So under final diagnosis, did it have
13   the information rib fractures with three in
14   parentheses?
15        A.   I don't remember specifically and I
16   referred this to Reed anyway.
17        Q.   Do you recall if at the bottom of the
18   page, it had a date, October 12th?
19        A.   I do not recall that.
20        Q.   Could I ask you to look at Exhibit 9 --
21   I'm sorry -- Exhibit 12.  I would like you at the
22   same time to look at Exhibit 82, page 11.

Page 418

1         Maybe we'll start with Exhibit 82, page 11.
2    If you look in the last section where it says Fannie
3    Mae Introduction in the bottom half of the page and
4    if you look at the first, second, third paragraph
5    beginning "we need to update", could I ask you to
6    read that and then I'll have a question.
7         A.   "We need the update with you at least
8    monthly or sooner, if appropriate.  We will task to
9    call you; however, if your doctor has released you to
10   return to work, please call us to update your case.
11   When medically cleared by your physician, Fannie Mae
12   requires a return to work note from your doctor to be
13   given to your workplace and we ask that you fax a
14   copy to Reed Group for your file.  If you have any
15   questions, concerns, complaints, or would like
16   additional information regarding case management
17   services, please contact your nurse case manager --
18   Reed's phone number -- "available 8 to 4:30 p.m. --
19   fax number provided.
20        Q.   So the instructions there that tell us
21   that Fannie Mae requires that a return to work note
22   be given to your workplace are different, aren't

Page 419

1    they, than the return to work policy that we see at
2    Exhibit 12?
3         A.   The policy indicates Reed Group must be
4    notified and a medical release form from the
5    physician or care giver must be submitted noting any
6    work restrictions or limitations.  Reed Group then
7    notifies the manager of the employee's ability to
8    return to work.
9         Q.   So the procedures are different between
10   these two?
11        A.   These notes differ from the policy.
12        Q.   Yes.  Can you explain that difference,
13   the notice given to the employee?
14        A.   Clearly, whoever put the notes in here
15   indicated that both the Reed Group and Fannie Mae
16   need a return to work notification.
17        Q.   That certainly characterizes this.  Can
18   you explain the difference?  Do you know of anything
19   that explains the difference between the two
20   policies?
21        A.   I don't know how to explain this
22   difference.  I didn't write those case notes.

Page 420

1      Q.   As applied, in your experience, was the
2   return to work note provided to the Fannie workplace?
3      A.   No.  We asked to have return to work
4   notes per policy provided to the Reed Group.
5      Q.   So despite the fact that it appears that
6   at least one employee was informed of a different
7   procedure?
8      A.   Per corporate policy, we asked employees
9   to provide their return to work notifications to the
10  Reed Group.
11     MS. KUNTZ:  Thank you.  That's all.
12     JUDGE SWEENEY:  Anything else?
13     MS. LENAHAN:  Just real quick.
14             RECROSS-EXAMINATION
15  BY MS. LENAHAN:
16     Q.   Did the fact that prior management
17  performance contributed -- did they contribute to
18  Tim's July 1, 2009 written warning?  Did prior
19  management have experience with that?
20     A.   I would say yes.  It's an accumulative
21  performance issue that spanned three managers, so
22  continued efforts to improve performance.

Page 421

1      Q.   And when you provided Mr. Skrynnikov the
2   July 1 PIP, did you throw it at him?
3      JUDGE SWEENEY:  I'm sorry?
4      MS. LENAHAN:  Did you throw it at him?
5      MS. KUNTZ:  I couldn't hear the whole
6   question.
7   BY MS. LENAHAN:
8      Q.   When you provided Mr. Skrynnikov with
9   the July 1 written warning or PIP, did you throw it
10  at him?
11     A.   Absolutely not.
12     MS. LENAHAN:  No more questions.
13     JUDGE SWEENEY:  That's everything then.
14     Counsel, I want your guidance on this.
15  Exhibit 45, the handwritten notes here, I have a lot
16  of trouble reading them.
17     MS. KUNTZ:  We can provide you with the
18  deposition.
19     THE WITNESS:  Do you want me to read it to
20  you now?
21     JUDGE SWEENEY:  We could do that.
22     MS. KUNTZ:  Well, we've got it in the

Page 422

1   deposition transcript.
2      JUDGE SWEENEY:  Well, we could do that here
3   and just have it in this record, but if you have --
4   whatever is easiest, but it would be helpful for me
5   to have -- to be able to read it.
6      If you have the time, ma'am.
7      MS. LENAHAN:  Do you want to take a break
8   before you read it into the record?
9      THE WITNESS:  You know, I could use a break.
10     JUDGE SWEENEY:  Okay.  What we're going to
11  ask you to do, just so it's clear, is just give an
12  exact rendition of this, not explain any of it.
13     THE WITNESS:  Okay.
14     JUDGE SWEENEY:  Do you know what I mean?
15     THE WITNESS:  I do, and you know you're
16  looking at multiple perspectives and observations.
17     JUDGE SWEENEY:  All we're doing is just to
18  get down --
19     THE WITNESS:  What the words are?
20     JUDGE SWEENEY:  What the words are, right.
21     THE WITNESS:  Because my handwriting is poor,
22  yes.

Page 423

1      JUDGE SWEENEY:  Well, it's better than mine.
2      MS. KUNTZ:  There are also fades in this that
3   make it difficult.
4      JUDGE SWEENEY:  Okay.  We'll come back in
5   just a couple of minutes and do that then.
6      Thank you.
7      [Recess.]
8      JUDGE SWEENEY:  All right.  So we're going to
9   have Ms. Lee read Exhibit 45.
10     Just read it as is, if you could do that.
11     THE WITNESS:  Certainly.  There may be a few
12  words that I, myself, cannot decipher.
13     JUDGE SWEENEY:  That would be fine.  Just
14  indicate it by saying, you know, can't --
15     THE WITNESS:  Illegible?
16     JUDGE SWEENEY:  Illegible, that's exactly
17  right.
18     THE WITNESS:  All right.
19     Wednesday, July 1, 2009.  Disagreement of
20  meeting on 4-28, quote:  Hatred in your eyes.  Tim
21  says she said it.  She says no, that she say doesn't,
22  but defensive, not looking at her, not responding,

Page 424

1  made a comment about, agreed that discussed not
2  providing the level of value required for salary.
3       Acknowledged that she said in the past that
4  she was proud of him, thought he did a good job.  Tim
5  brought this up, said yes, when things go well, she
6  does provide positive feedback.
7       April 28th:  Says he followed up with his POC
8  in Investigations.
9       It is really hard for him to work after the
10  28th of April.  He is very emotional about that.
11  Says that she apologized to Tim after that
12  conversation.  It wasn't a personal attack.  She says
13  that she apologized around the salary comment, meant
14  not providing high value.  Says after that day, he
15  knew he was no longer on his side after that point.
16       Also, Tim says that only in the past week has
17  she treated him like before and asked for his
18  opinion, slash, expertise.
19       Quote, extremely uncomfortable, end quote,
20  with the way Kristin DeMent Harrison is managing him
21  from 4-28 through a week ago.
22       Kristin DeMent Harrison says that she is

Page 425

1  having something -- I Carrie Lee am not -- I'm sorry.
2  I can read my words better.
3       Kristin DeMent Harrison said that she is
4  hearing something that I, Carrie Lee, am not.  She is
5  hearing Tim say that he can't work with her because
6  of stress.  Asks him to clarify.  Are you saying you
7  can't work with me.  Tim never really answers, says
8  he does need to meet requirements of job, understands
9  that I said she's still your manager, that's not
10  going change.
11       Kristin DeMent Harrison.  Okay to go to
12  doctor's appointments, not asking to cancel, but
13  still needs to meet deliverables.
14       Carrie Lee.  Told him to read today.  He said
15  he would ask for time with me today and I told him
16  maybe, but also tomorrow.
17       8:45, slash, nine to eleven o'clock with
18  Natasha Colton.
19       Kristin DeMent Harrison had given her a
20  heads-up about written warning about two weeks ago.
21       Also in meeting, Tim said multiple times that
22  he's not surprised, knew this was coming.

Page 426

1       Stresses, high personal stress level.  First
2  time I have heard or Kristin DeMent Harrison has
3  heard this since she's been managing him.
4       And that looks the end of those notes and a
5  new page starting here.
6       It starts with -- it does not have a date.
7  It starts with expected written warning since
8  4-29-09.
9       Has had a tough time coming to work since
10  then.
11       References the E-mail regarding Freddie
12  suicide.  I noted EAP still available when he --
13  illegible -- me that he -- when he assured.  It is
14  not illegible -- when he assured me that he did
15  didn't go to me -- that he didn't go to one of the
16  counseling sessions.  He said please let me continue,
17  quote.
18       On the 28th, felt Kristin was very agitated,
19  was bad communication experience.  It really rattled
20  him.  Susan Weintraub, he ran into her and told her
21  what happened, also said he needed to go on medical
22  leave because of this.

Page 427

1       Tim references E-mail draft from April 30th
2  that he never sent.  Kristin DeMent Harrison read it
3  that evening, apologized and told him not personal.
4       Fell asleep driving home 2 a.m. from work,
5  blames work since last June, too much stress.
6       Says that Lourdes said he was rude, says he
7  had two conversations with Mary Martin that, quote,
8  she didn't expect to see such a reaction from him.
9  Maybe it is regarding cultural difference, end quote.
10  Says she didn't say that it wasn't intended as a
11  personal attack and apologized, then did no.
12       Says has not been able to sleep because of
13  work for many weeks since 28th.
14       Refers to 18th as a verbal attack, has been
15  fearing that this could happen again.  Feels she's,
16  quote, building a wall, end quote, and is building a
17  case, note page 1 on the bottom right-hand corner.
18       The next pages is --
19       JUDGE SWEENEY:  Before you go on to the next
20  page, you said at three lines from the bottom, you
21  said 18th.  On reflection, would that be the 28th?
22       THE WITNESS:  Oh, that would be the 28th.

43 (Pages 424 to 427)

Arbitration Day 2          July 23, 2014

Washington, D.C.

Page 428

 1  You're right.  It would be 28th.  I can see that's a
 2  two now.  Thank you.
 3      JUDGE SWEENEY:  Go ahead.
 4      THE WITNESS:  Refers to an assignment
 5  forecast Q1 and Q2 comparison.  Initially asked him
 6  for it in two hours.  Refers -- I believe this says
 7  Lori's or Lourdes's expectations different than Mary
 8  Martin's.  That was stated later not at time of
 9  assignment.  Says he went back to her to say it is
10  taking longer because needed to validate.
11      Quote, she was on my side.  I thought she was
12  great, end quote.  Illegible something, earlier in
13  year and he accomplished something and she
14  congratulated him on it.  Then in late March, it
15  changed.
16      Feels like additional stress was created by
17  his manager after he broke down on 28th.  Told her
18  that she needs a different approach with him.  Says
19  because of stress, he felt that.
20      At 5:50 p.m., before he had a doctor's
21  appointment, they were asking a forecast problem and
22  she said she had a choice, one, come back; two,

Page 429

 1  cancel.
 2      In his opinion, the work could have waited
 3  until the next.  Doesn't recall if he asked her about
 4  coming back in the a.m.
 5      Quote, as a manager, she was full aware of
 6  long-term impact, end quote.  Referred to the 28th.
 7  She couldn't control her herself at all.
 8      Illegible, but then says, quote, who do you
 9  think you are, question mark, end quote.
10      I asked at this point what would you like to
11  see happen.  He says that she was intentionally
12  driving him to point of another emotional breakdown.
13  Everything in memo since 28th.  He something read
14  the memo -- going on to the next page -- but will not
15  sign.
16      At the point, says that she needs to address
17  her actions, asked about accountability.  Says he
18  takes accountability for work, but, underlined, under
19  circumstance, end underlining, but not painting whole
20  picture in written warning.
21      Events are since 28th.  Feels that she caused
22  this and should have reached out to him.  Believes

Page 430

 1  what she said was acceptable -- was unacceptable --
 2  my apologies -- was unacceptable in violation of
 3  code, quote, harassment, end quote.  Cannot just
 4  dismiss statements of this nature.
 5      Says she intentionally inflicted upon him
 6  personal attacks, can't just say, quote, hey, are we
 7  cool, end quote.  She should "D."
 8      Thinks she just changed from best manager to
 9  the worst, doesn't know why.  He needs to be able to
10  work without fear of punishment, feels is being held
11  to a different standard than others.  How?
12      If he produces work, dot, dot, do, there is
13  no standard.  It is not universal.
14      Close is BD3, BD4.  He needs something that I
15  cannot read.  I think it's E-mail.  Came 2:30 p.m.
16  that day.
17      Applies extra scrutiny to him, higher level
18  of expectation, and I can't read the rest of that.
19  It's illegible.
20      Last page:  June close wasn't until 3 p.m.
21  She said it was late.  He says it was late, not he
22  that was late.

Page 431

 1      JUDGE SWEENEY:  Okay.  Thank you very much.
 2      THE WITNESS:  Sure.
 3      JUDGE SWEENEY:  All right.  I think we can
 4  release you at this point.
 5      THE WITNESS:  Okay.  Thank you.
 6      [Witness excused.]
 7      JUDGE SWEENEY:  All right.  What is next
 8  here?
 9      MR. MIOSSI:  Well, we have a gap filler, I
10  suppose.  I think we talked about it.  We have the de
11  bene esse testimony of a gentleman named Chuck Roden,
12  who's the manager of Compensation and Benefits.  He
13  was unavailable during the original week we were
14  scheduled for trial.
15      So we can play that now.  He's on our
16  witness.  He's our witness, and that will allow to
17  use the day --
18      JUDGE SWEENEY:  Sure.
19      MR. MIOSSI:  -- as effectively as we can.  We
20  just need to get something to play it on.
21      MS. KUNTZ:  I just want to be clear that what
22  we've agreed between us is that we will complete our

44 (Pages 428 to 431)

Page 432

1  case tomorrow with the testimony of Madonna McGwin.
2      MR. MIOSSI:  She'll be the first one.
3      MS. KUNTZ:  And they are also seeking her
4  testimony.
5      JUDGE SWEENEY:  All right.  Good.
6      MR. MIOSSI:  Then Kristin and then we have --
7  I'm sure we'll be done early, but we'll have a slot
8  -- we'll have to got at three for Lori Mallon.  She's
9  in Dallas.  We'll do a court call with her and that's
10 all we have.
11     JUDGE SWEENEY:  Okay.  Good.
12     All right.  So we're going to set up
13 something to play --
14     MR. MIOSSI:  Yes.
15     JUDGE SWEENEY:  Okay.  Just so we're clear
16 for the court reporter, do you want the court
17 reporter to record it?
18     MR. MIOSSI:  I don't think so.  We have a
19 transcript, and we've all seen it.  We were there
20 live.
21     JUDGE SWEENEY:  Okay.
22     MR. MIOSSI:  Well, Mr. Skrynnikov wasn't.

Page 433

1      JUDGE SWEENEY:  Okay.  Good.
2      So if we're not going to have anything else,
3  we could release the court reporter for today.
4      MR. MIOSSI:  Agreed.
5      JUDGE SWEENEY:  All right.  Good.  We'll just
6  take a recess.
7      [Whereupon, at 3:01 p.m. a brief recess was
8  taken, following which a videotaped deposition was
9  presented after which the matter was recessed, to
10 reconvene at 9:30 a.m. on Thursday, July 23, 2014.]
11
12
13
14
15
16
17
18
19
20
21
22

Page 434

1      CERTIFICATE OF COURT REPORTER AND NOTARY PUBLIC
2
3      I, CATHERINE B. CRUMP, a court reporter
4  and Notary Public, hereby certify that the foregoing
5  proceedings were recorded by me stenographically and
6  thereafter reduced to typewriting under my direction;
7  that the foregoing transcript is a true and accurate
8  record of the proceedings to the best of my
9  knowledge, ability, and belief; that I am neither
10 counsel for, related to, nor employed by any of the
11 parties to the action in the proceeding; and further,
12 that I am not a relative or employee of any attorney
13 or counsel employed by the parties hereto nor
14 financially or otherwise interested in the outcome of
15 the action.
16     _____
17        CATHERINE B. CRUMP
18        Notary Public in and for the
19        District of Columbia
20
21
22 My Commission Expires:  October 31, 2017

45  (Pages 432 to 434)

```
 1                    JAMS ARBITRATION

 2

 3     _____

                                    :

 4     TIMOTHY SKRYNNIKOV,          :

                                    :

 5          Claimant,              : Reference No.

                                    :

 6        v.                       :  1410006294

                                    :

 7     FEDERAL NATIONAL MORTGAGE :

       ASSOCIATION (FANNIE MAE)   :

 8                                  :

            Respondent.           :

 9     _____:

10                         Volume III

11

12          Thursday, July 24, 2014

13          JAMS

14          555 Thirteenth Street, N.W.

15          Suite 400

16          Washington, D.C.  20004

17

18     The arbitration in the above-entitled

19     matter convened, pursuant to notice, at 9:31

20     a.m.

21     BEFORE:

22              HONORABLE DENNIS M. SWEENEY
```

Page 436

1   APPEARANCES:
2   On behalf of the Claimant:
3       MARY KUNTZ, ESQ.
        S. MICAH SALB, ESQ.
        Lippman, Semsker & Salb, LLC
4       7979 Old Georgetown Road, Suite 1100
5       Bethesda, Maryland 20814
        301.656.6905
6       mkuntz@lsslawyers.com
        msalb@lsslawyers.com
7
        Also Present: TIMOTHY SKRYNNIKOV, Claimant
8
9   On behalf of the Respondent:
10      DAMIEN G. STEWART, ESQ.
        Fannie Mae
11      3900 Wisconsin Avenue, N.W.
        Washington, D.C. 20016-2892
12      202.752.7000
        damien_g_stewart@fanniemae.com
13
        WIILIAM G. MIOSSI, ESQ.
14      MARY M. LENAHAN, ESQ.
        Winston & Strawn, LLP
15      1700 K Street, N.W.
        Washington, D.C. 20006-3817
16      202.282.5661
        wmiossi@winston.com
17      mlenahan@winston.com
18   Also Present: KRISTIN DeMENT HARRISON
                Corporate Representative
19
20
21
22

Page 437

1       CONTENTS
2   WITNESS    DIRECT CROSS REDIRECT RECROSS
3   Madonna McGwin  440  522   --    --
4   Kristin DeMent
    Harrison        538  595   --    --
5
    Lori Mallon     608  621   --    --
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 438

1           P R O C E E D I N G S
2       JUDGE SWEENEY:  We're on the record
3   now.
4       I reviewed the video and the
5   transcript last night of Charles Wayne Roden,
6   and you'll want this back; is that right?
7       MS. LENAHAN:  Sure.
8       MR. MIOSSI:  Unless you want to hold
9   on to it?
10      JUDGE SWEENEY:  No.  But at some
11  point, we may want to have a copy of it.
12      MS. LENAHAN:  Yes.
13      MS. KUNTZ:  That will become a part of
14  the record?  Because we're going to need a copy
15  of it since it's --
16      JUDGE SWEENEY:  Let me make a
17  suggestion that you all make a copy of the video
18  part, at least, and that we just have that be
19  part of the record for the case and a copy for
20  them.
21      MR. MIOSSI:  Okay.
22      JUDGE SWEENEY:  Because I think that

Page 439

1   would probably take care of that.
2       MS. LENAHAN:  Sure.
3       JUDGE SWEENEY:  And it just might be
4   useful, too, when you do that, if you could
5   supply a hardcopy of the transcript.
6       MS. LENAHAN:  Absolutely.
7       JUDGE SWEENEY:  Actually, it ended up
8   I couldn't do the video last night.  At first I
9   couldn't figure out which one to click.  So I
10  got the transcript and I said, well, I'll at
11  least read the transcript.  So then, as soon as
12  I finished the transcript, I figured out how to
13  do the video, so I watched, too.
14      Okay?
15      MS. LENAHAN:  Oh, okay.
16      JUDGE SWEENEY:  I actually watched it
17  twice, and I know more about accruals in 2008 at
18  Fannie Mae than most people.
19      All right.  So that -- and now we're
20  still in the plaintiff's presentation; is that
21  correct?
22      MS. KUNTZ:  That's right.

2 (Pages 436 to 439)

Page 440

1          JUDGE SWEENEY:  Okay.  And our witness
2    here -- who's calling this witness?
3          MR. SALB:  Good morning everybody.
4    We'd like to call Madonna McGwin.
5          JUDGE SWEENEY:  All right, ma'am.  If
6    you would stand, the court reporter will swear
7    you, as a witness here.
8               *  *  *  *
9    Whereupon --
10          MADONNA MCGWIN,
11    called to testify, having been first duly sworn
12    or affirmed, was examined and testified as
13    follows:
14          JUDGE SWEENEY:  Would you just state
15    your name and business address, if you would,
16    please?
17          THE WITNESS:  My name is Madonna
18    McGwin, M-c-G-w-i-n.  And my business address
19    is at Fannie Mae, 3900 Wisconsin Avenue, D.C.
20          JUDGE SWEENEY:  All right.  Go ahead,
21    Counsel.
22          MR. SALB:  Thank you, Judge.

Page 441

1          DIRECT EXAMINATION
2    BY MR. SALB:
3          Q.  Good morning, ma'am.  How are you?
4          A.  Fine.  Thank you.
5          Q.  I understand you are a deputy general
6    counsel at Fannie Mae?
7          A.  VP and deputy general counsel, right.
8          JUDGE SWEENEY:  Ma'am, just, when we
9    have air conditioning coming on in here, can you
10    keep your voice pretty loud?
11          THE WITNESS:  Oh, I can do that.
12          JUDGE SWEENEY:  Okay.  Good.
13          THE WITNESS:  I've been told to keep
14    quiet sometimes.
15          JUDGE SWEENEY:  No.  No.  No.
16          MR. MIOSSI:  You've asked for it.
17          JUDGE SWEENEY:  I've never had
18    anybody, in a courtroom or anywhere else, that
19    talk too loud, except some inmates at a mental
20    hospital that came into my courtroom.
21          MR. MIOSSI:  They were just
22    misunderstood.

Page 442

1          JUDGE SWEENEY:  All right.  So go
2    ahead, Counsel.
3          MR. SALB:  Thank you.
4    BY MR. SALB:
5          Q.  So what are your responsibilities as
6    deputy general counsel?
7          A.  I am the head of the Employment Law
8    Group at Fannie Mae, and my responsibilities
9    include handling the defense of cases against
10    Fannie Mae and providing advice and counsel to
11    HR and their various business units.
12          Q.  Now, you mentioned that you play a
13    role in the defense of cases.  By that, do you
14    mean that you engage in litigation defense of
15    Fannie Mae?
16          A.  Occasionally.
17          Q.  And do you serve as trial counsel?
18          A.  Not so much anymore.  I had.  I'm the
19    leader of the group now.
20          Q.  So you're supervising poor folks like
21    Mr. Stewart there?
22          A.  That would be correct.

Page 443

1          Q.  Okay.  When I'm talking to you
2    about your responsibilities, I'm particularly
3    interested in your responsibilities in 2009.  I
4    will try to bring your attention to 2009, but,
5    if I don't, and the answer might be different
6    from 2009, feel free to share that information.
7          Were your responsibilities in 2009
8    the same as they are now?
9          A.  No.  So I don't remember when I became
10    head of the group, but I didn't become a VP
11    until 2012.  So I was an associate general
12    counsel prior to 2012.  And I guess the duties
13    were about the same.  I think I was the manager
14    of the group at that time, too, so they would
15    have been about the same.
16          Q.  Okay.  Very good.  Thank you.
17          Did you have any role as it relates to
18    individual employee employment issues, other
19    than those that were in litigation?
20          A.  Yes.  Advising.  We provided -- that
21    group provides the advice and counsel to HR and
22    business groups about employment matters.

Page 444

1    Q.  And that was related to individual
2  employees, as well as setting policy and
3  describing the law, or guidance on the law,
4  to the other business units; is that right?
5    A.  I'm not sure I understand the
6  distinction.
7    Q.  Well, did you --
8    A.  Our group didn't set policy.
9    Q.  I beg your pardon?
10    A.  Our group did not set policy.
11  But we provide advice and counsel to HR
12  and the business units about employment matters,
13  and they relate, generally, to individual
14  employees.
15    Q.  Okay.  Now, Fannie Mae had, what,
16  about 7,000 employees in --
17    A.  I don't remember.
18    Q.  -- 2009?
19    A.  In 2009?
20      We've gone from 5,000 to 7,000, so it
21  was in that range.
22    Q.  Now, are you aware that the Department

Page 445

1  of Labor Statistics tells us that some 15
2  percent of employees take FMLA leave, or have
3  taken FMLA leave, within the last 18 months of
4  any point in time?
5    A.  I don't know what the Department of
6  Labor Statistics are.
7    Q.  Do you know how many Fannie Mae
8  employees have taken FMLA leave, say, within
9  the last year?
10    A.  I don't.
11    Q.  Would it be fair to say that it would
12  be in the hundreds?
13    A.  I don't know the number.  I know that
14  we have a number of people who take FMLA on a
15  regular basis.  I don't know the -- I don't get
16  provided with those kind of numbers.
17    Q.  Now, you're not involved in FMLA
18  leave requests and the process of supervising
19  FMLA leave for all of those employees who are on
20  FMLA protected leave, are you?
21    A.  No.
22    Q.  So how is it that you become involved

Page 446

1  in an individual employee's case?
2    A.  If someone asks me for advice.
3    Q.  Someone meaning who?
4    A.  Someone in management.  Somebody in
5  HR.
6    Q.  Now, what is the class of people who
7  would contact you for advice?  Who's reaching
8  out to you, particularly in 2009?
9    A.  Okay.  Our group was available -- so
10  it's clear, our group was available to provide
11  advice to HR and the business units.  So anyone
12  who was in a management role could have reached
13  out to anyone in my group, including myself.
14  Anyone -- mostly HR business partners might have
15  reached out to us about FMLA-related issues, and
16  possibly other supporting roles in HR.
17  It could have been somebody in the HR service
18  center, it could have been somebody who handles
19  benefits, but it would have been an HR and/or a
20  management person.
21    Q.  Would it be fair to say that your
22  client, so to speak, was almost always HR?

Page 447

1    A.  I would say it was primarily HR.
2    Q.  Okay.  And how many attorneys in 2009
3  were handling employment law-related matters?
4    A.  Four to five.  I'm not sure who was
5  there exactly at that time.
6    Q.  When inquiries were -- when employment
7  law inquiries had to be made by somebody at HR,
8  for example, how did the person making the
9  inquiry know to whom to address the inquiry?
10    A.  So our group was generally divided, as
11  HR was, by business units, except in certain
12  areas.  So certain areas -- everyone in the
13  group could handle any inquiry.  We were backups
14  for each other.  But, generally, if it was
15  somebody from finance, they would go to somebody
16  -- you know, a particular person in the group
17  first.  If it was technology, they would go to
18  another person in the group first.  If
19  it was for HR, they would go to, perhaps,
20  another person in the group.  But then we had
21  areas that all of those inquiries, on an initial
22  basis, would go to one person.

Page 448

1    Q.  Okay.  And was it your role to address
2  any particular area, subject matter or business
3  segment area?
4    A.  Well, one of them was leave.
5      JUDGE SWEENEY:  Was what?
6      THE WITNESS:  Like I said, my primary
7  responsibility was leave.  So exactly, you know,
8  obviously, what we're here for, any kind of
9  leave, FMLA.
10     JUDGE SWEENEY:  Leave?  Okay.
11     THE WITNESS:  Yeah.  Leave.  I'm
12 sorry.
13     Leave issues would come to me first,
14 as a general matter.
15 BY MR. SALB:
16   Q.  Now, there came a time that Fannie Mae
17 formed a contract with a company known as The
18 Reed Group, right?
19   A.  I'm aware of that, yes.
20   Q.  And The Reed Group is a company that
21 provides absence management and leave consulting
22 services to other companies, right?

Page 449

1    A.  My understanding is they provided them
2  to Fannie Mae, yes, at that time.
3    Q.  Did you have any role in the decision
4  to hire an outside company to provide those
5  services to Fannie Mae?
6    A.  Did I have a role?  I knew about it.
7  I wasn't on the selection group.  I knew about
8  it.
9    Q.  Whose decision was it to bring in an
10 outside company to handle that --
11   A.  HR.
12   Q.  -- task?
13     And, in fact, The Reed Group
14 was hired by Fannie Mae to provide absence
15 management services, right, associated with
16 FMLA and short-term disability leave?
17   A.  Yes.
18   Q.  And one of the benefits of hiring The
19 Reed Group is that it permitted Fannie Mae to
20 collect data about employee health conditions
21 without the risk that there would be
22 inappropriate leakage of that information, which

Page 450

1  was confidential, to parts of the business that
2  didn't need that information, right?
3    A.  Could you say that again?
4    Q.  Sure.
5      One of the benefits to hiring
6  an outside company to handle these leave
7  requests is that it allowed the collecting
8  of confidential health information about your
9  employees without facing the risk that there
10 would be leakage of that data to the business
11 side of Fannie Mae, right?
12   A.  I think that was a consequence.
13 I'm not sure that it was -- I mean, when you
14 say it's a benefit -- it was a consequence.  It
15 certainly was one of the results.
16   Q.  It was a laudatory result, wasn't it?
17   A.  It allowed the information to be
18 maintained by The Reed Group, yes.
19   Q.  And it's important, in handling FMLA
20 matters, that employee health information be
21 kept secure, right?
22   A.  Confidential.  Yes.

Page 451

1    Q.  Yes.
2      And it's important that that
3  information not be shared with the employee's
4  chain of supervision; isn't that right?
5    A.  It's important that it be kept
6  confidential.  I mean, obviously, that
7  information, sometimes the employees choose to
8  share it, but, yes, that is generally the way
9  Fannie Mae handles it; and the way the law
10 requires it, that it be kept confidential; and
11 that the managers don't need to be involved in
12 getting the details; and that no one in the
13 company needs to be involved in getting the
14 details of a particular absence.
15   Q.  Yes.  Exactly what I'm asking you.
16 This is not a question of mere Fannie Mae
17 policy.  This is the law.
18   A.  That's right.
19   Q.  Right.  Okay.
20     Another benefit of using The Reed
21 Group is that it allowed Fannie Mae to have the
22 resources of lots of doctors and nurses involved

5  (Pages 448 to 451)

Page 452

1  in evaluating leave requests without Fannie Mae
2  having to hire them directly, right?
3      A.  It allowed Fannie Mae to have people
4  who were specialized in this area handle them,
5  yes.  Whether they used doctors, or whoever they
6  used, they were the specialists.  We didn't have
7  that specialty.
8      Q.  Okay.  Fair enough.
9          And so the use of The Reed Group let
10 Fannie Mae manage employee leave in a manner
11 that really would be consistent with best
12 practices, right?
13     A.  That was the expectation, yes.
14     Q.  Now, The Reed Group's job included the
15 task of communicating regularly with employees
16 who were on FMLA leave, right?
17     A.  Their job was to provide the
18 notifications and have the communications about
19 the leave, yes.
20     Q.  Okay.  And their job also included
21 obtaining leave certifications from employee's
22 physicians, correct?

Page 453

1      A.  Their job was to get the information
2  that they were required to get.  And whether
3  they get it from a physician or a healthcare
4  provider was up to them.  We didn't dictate that
5  it had to be from a physician.
6      Q.  From an appropriate healthcare
7  provider?
8      A.  From an appropriate healthcare
9  provider.
10     Q.  Okay.  And then their job was to
11 analyze the information that they collected
12 from the healthcare provider to ensure that the
13 employee's request for FMLA protected leave was
14 a valid request that should or should not be
15 granted, correct?
16     A.  Among other things, right, but they
17 also administered our STD.
18     Q.  And they served the same function
19 as it relates to return-to-work certifications,
20 didn't they?
21     A.  With respect to FMLA, yes, and STD.
22     Q.  Would return-to-work certifications be

Page 454

1  used in other contexts?
2      A.  It might in a sick leave situation,
3  yes.
4      Q.  And I think you had touched on this,
5  but I want to make sure that we're clear that
6  Fannie Mae took the view that The Reed Group had
7  a very substantial internal knowledge about laws
8  related to leave, and, in particular, related to
9  the FMLA; is that right?
10     A.  What I know is that they were hired
11 to be the specialist in administering our leave.
12 That's what I know.  So I don't know those kind
13 of details, because HR did the hiring of them.
14         And another group would have been
15 involved in legal in doing the contract and
16 so forth.  That wasn't something that we were
17 involved in.  So I think that's a little too
18 detailed for me to have knowledge of.  I know
19 they expected them to be the specialists who
20 dealt with the third-party administrator for our
21 programs.
22     Q.  You worked with The Reed Group from

Page 455

1  time to time, didn't you?
2      A.  Very occasionally.
3          I wouldn't say worked with them.  I
4  would think more like asking them questions.
5      Q.  Okay.  Did the Reed Group ever ask
6  you to -- the only word that comes to mind is
7  second-guess, but I don't mean it in the
8  pejorative sense, did The Reed Group ever ask
9  you to second-guess their determination as to a
10 leave request?
11     A.  I don't recall The Reed Group ever
12 reaching out to me.  They were not one of my
13 client groups.
14     Q.  Okay.  Are you aware of The Reed Group
15 ever asking anyone in HR to second-guess their
16 determination, The Reed Group's determination,
17 as to an application for FMLA leave?
18     A.  I'm not aware of it.
19     Q.  Are you aware of The Reed Group ever
20 asking anybody at Fannie Mae to second-guess
21 their decision as to whether to approve or
22 disapprove an FMLA leave request?

6 (Pages 452 to 455)

Page 456

1      A.   Not that I'm aware of.

2      Q.   Are you aware of anybody at The

3   Reed Group ever asking anyone at Fannie Mae to

4   second-guess their determination as to a

5   return-to-work certification?

6      A.   Not that I'm aware of.

7      Q.   And, in fact, the role of The Reed

8   Group is to provide that function to Fannie Mae,

9   right?

10     A.   Second-guessing themselves?

11     Q.   No.  The function of making those

12  determinations.

13     A.   That was what their job was.  They

14  were the administrator of those claims.

15     Q.   All right.  Now, it was The Reed Group

16  that approved Mr. Skrynnikov's request for FMLA

17  protected leave, right?

18     A.   At what time?

19     Q.   When he went out on FMLA leave.

20     A.   I believe so.

21     Q.   Did you have any reason to believe

22  that The Reed Group had made an incorrect

Page 457

1   determination regarding Mr. Skrynnikov's request

2   for FMLA leave?

3      A.   You're going to have to be more

4   specific.

5           He had -- my recollection is that he

6   was approved -- he requested it, sometimes he

7   was retroactively requesting it.  So at the end

8   of the day, I believe he was approved for what

9   he had asked for, that I was aware of.

10     Q.   And -- and -- and as it relates to The

11  Reed Group's decision to approve his request for

12  FMLA leave, do you have any knowledge -- any

13  -- strike that, any reason to believe that The

14  Reed Group's determination approving his leave

15  request was improper?

16     A.   No.

17     Q.   And, likewise, you have no knowledge

18  that would indicate that The Reed Group's

19  decisions to approve extensions of his FMLA

20  leave were improper, correct?

21     A.   I don't have any knowledge of that.

22     Q.   Now, it was The Reed Group's job to

Page 458

1   track Mr. Skrynnikov's absence and to determine

2   whether his physician had approved his absence

3   or periods of absence, right?

4      A.   Their job was responsive to a request

5   from him.  So he would have had to contact them

6   to let them know he was out.  So when you said

7   it's their job to track an absence, no, it's

8   really the company's job to track absences.

9   But someone would have had to reach out to them,

10  and then he would ask for the FMLA leave or

11  whatever he was looking for, and then they would

12  make a determination.

13     Q.   Well, that's not really what was

14  happening with The Reed Group, was it?

15     A.   I don't know what you're asking.

16     Q.   In fact, The Reed Group kept in

17  constant contact with Mr. Skrynnikov, didn't

18  they?

19     A.   I don't know.

20     Q.   Okay.  And they would let

21  Mr. Skrynnikov know if they needed additional

22  certifications from his physician, wouldn't

Page 459

1   they?

2      A.   I don't know, other than I am aware

3   that they did ask him for some of those.  So I

4   don't know.  I am not fully aware of everything

5   that happened between them.

6      Q.   Okay.  Are you aware that The

7   Reed Group was communicating directly with

8   Mr. Skrynnikov's treating physician, about the

9   reason related to his leave, the reason he was

10  out on leave, that they were communicating

11  directly with the physician without going

12  through Mr. Skrynnikov?

13     A.   I don't know that.

14     Q.   And you don't have any reason

15  to believe that The Reed Group ever made

16  an incorrect determination as to whether

17  Mr. Skrynnikov's physician had properly

18  certified Mr. Skrynnikov's need for leave,

19  right?

20     A.   I don't have any information about

21  that.

22     Q.   Okay.  You know Carrie Lee; is that

Page 460

1    right?
2         A.  Yes, I do.
3         Q.  Did Ms. Lee ever indicate to you
4    anything that raised a concern in your mind of
5    the quality of the work as it relates to Mr.
6    Skrynnikov's case?
7         A.  I don't know if any of her concerns
8    were -- I don't know if she ever used quality of
9    the work, so I'm not really sure.
10         Could you ask it a different way?
11         Q.  Did Carrie Lee ever say anything to
12    you that raised a concern in your mind as to
13    whether The Reed Group was making determinations
14    as to Mr. Skrynnikov's leave which were
15    improper, incorrect, ill-conceived or in any
16    other way reflected poor quality work?
17         A.  What I can say is that when she came
18    to me, my recollection was there was confusion
19    about what his status was.
20         I don't know if that answers your
21    question.  So if there's confusion, you know,
22    there's confusion.

Page 461

1         Q.  Confusion by whom?  Who was confused?
2         A.  Carrie Lee and the managers, I
3    believe.
4         Q.  When did Ms. Lee come to you to
5    advise you that they were confused about
6    Mr. Skrynnikov's status?
7         A.  Well, that's not what she came -- she
8    didn't come to advise me of that.  She came to
9    ask me for advice on how to handle the situation
10    where Mr. Skrynnikov had not been contacting his
11    manager and was absent, and we didn't know why
12    he was absent.
13         Q.  When was that?
14         A.  I want to say September of 2009, I
15    think.
16         Q.  What did Ms. Lee report to you that
17    she had learned from The Reed Group in that
18    regard?
19         A.  She came to me because Mr. Skrynnikov
20    had not returned to work and he had been out.
21    And our policies -- Fannie Mae's policies had
22    consequences for him not contacting the manager.

Page 462

1    That's what she came to me for.  So that started
2    the ball rolling as to, well, find out, you
3    know, what his status is.
4         Is that what you're asking?
5         Q.  And you say Fannie Mae policy has
6    consequences, but, of course, Fannie Mae policy
7    is subject to state and federal law, right?
8         A.  Right.
9         Q.  State and federal law, when
10    applicable, supersedes Fannie Mae policy,
11    correct?
12         A.  If there's a conflict, sure.
13         Q.  How long had Mr. Skrynnikov failed
14    -- how long had it been that he had failed to
15    contact his manager when Carrie Lee came to talk
16    with you about that?
17         A.  Without looking at something that's
18    going to trigger me on the exact date, I don't
19    remember.  But I do remember the concern was
20    that he had not contacted the manager.
21         He was supposed to return to work,
22    he had not contacted the manager, and it

Page 463

1    had been several days.  I want to say, two,
2    three days, whatever it was.  And three days
3    is what kicks in a job abandonment under our
4    policies, so it would have been around that
5    time.
6         Q.  Okay.
7         A.  I don't know if they came to me
8    right away before it happened or right after it
9    happened.  I'm just not remembering the exact
10    date.
11         Q.  Okay.  What steps, if any, did you
12    take to ensure that, before considering this
13    to be a job abandonment under Fannie Mae policy,
14    the requirements of the Family Medical Leave Act
15    had been satisfied?
16         A.  Well, that -- like I was saying
17    before, part of what the process was in figuring
18    this out was to have her go and ask someone to
19    find out what the status was with The Reed
20    Group; you know, what was his FMLA balance?  Did
21    he have -- was he on FMLA?  Did we somehow not
22    get notice of it?  Did he have an application

8  (Pages 460 to 463)

Page 464

1  pending?  What was the status?
2      Q.  And what was the outcome of that
3  inquiry?
4      A.  My understanding was that he had not
5  been approved for FMLA at that time.
6      Q.  Well, did you have any understanding
7  as to the circumstances that caused him to be
8  not approved for FMLA leave at that time?
9      A.  No.
10     Q.  Were you aware that The Reed Group had
11  been in constant or repeated communication with
12  Mr. Skrynnikov's physician, that they had
13  directly been speaking with the physician to get
14  extensions?
15     A.  As I had mentioned before, I do not
16  know what steps they took with respect to his
17  case.
18     Q.  Did you make any inquiry of Ms. Lee as
19  to what The Reed Group was doing to determine
20  whether Mr. Skrynnikov's FMLA leave was --
21     A.  Yes.
22     Q.  -- being properly tracked by The Reed

Page 465

1  Group?
2      A.  Yes.
3      Q.  Okay.  And did she advise you that The
4  Reed Group had been communicating directly with
5  Mr. Skrynnikov's physician?
6      A.  My understanding was that he was not
7  covered by FMLA, that they did not have the
8  medical documentation that they needed at the
9  time, and that he had not been in contact with
10  his manager.
11     Q.  I don't think that was responsive to
12  the question that I was asking.
13     A.  So ask the question again.  I'm sorry.
14  I'm trying to respond.
15     MR. MIOSSI:  I must object, because I
16  think it was precisely responsive.
17     JUDGE SWEENEY:  All right.  Why don't
18  you try to clarify the question.  Okay?
19     MR. SALB:  Sure.
20  BY MR. SALB:
21     Q.  Did you learn from Ms. Lee that The
22  Reed Group was communicating directly, and had

Page 466

1  consistently been communicating directly, with
2  Mr. Skrynnikov's physician to get leave
3  certifications?
4      A.  No.  As I mentioned, I am unaware of
5  what exactly they were doing.  So I didn't learn
6  it from her, and I didn't learn it elsewhere.
7      Q.  Did Ms. Lee suggest to you, directly
8  or indirectly, that Mr. Skrynnikov had ignored
9  requests -- had failed to take any action in
10  response to requests for physician
11  certifications?
12     A.  I don't think that was part of the
13  discussion.
14     Q.  So you discussed firing Mr. Skrynnikov
15  without determining whether Mr. Skrynnikov had
16  actually attempted to comply with his notice
17  requirements under the FMLA.  Is that your
18  testimony?
19     A.  No.  No.  That's not.
20     Q.  So what, if any, inquiry did you make
21  into whether Mr. Skrynnikov had attempted to
22  comply with his notice obligations under the

Page 467

1  FMLA?
2      MR. MIOSSI:  I'm going to object,
3  because this is very repetitive.  We've had a
4  number of questions and answers, and they're not
5  changing.
6      JUDGE SWEENEY:  All right.  I'll
7  overrule the objection on this one.
8      THE WITNESS:  I asked her to determine
9  whether he was covered, did he have FMLA, was
10  there something -- what was his status on FMLA.
11  BY MR. SALB:
12     Q.  Forgive me.  That's not my question.
13  I'm asking about your inquiry into -- whether
14  you made any inquiry into whether Mr. Skrynnikov
15  had attempted to comply with his notice
16  requirements under the FMLA?
17     A.  That was the inquiry of what is his
18  status under the FMLA.
19     Q.  Well, no.  His status might be,
20  he's supplied paperwork or he hasn't supplied
21  paperwork.
22     A.  Okay.

9  (Pages 464 to 467)

Page 468

1      Q.  My question was, what inquiry did you
2  make into his attempts to comply?
3      A.  The discussion about what his status
4  was with The Reed Group included, was he being
5  cooperative -- the normal inquiries are, was he
6  being cooperative, did he have something
7  pending, were they waiting for something, was he
8  -- did they know ahead of time that he was going
9  to extend it and then somehow didn't tell us.
10         The inquiry wasn't limited to, is he
11  covered, is he not.  It's always, where are they
12  with him.
13         So maybe I'm not being clear, but the
14  inquiry is, where is he?  When I say status,
15  where is he with his FMLA.
16      Q.  Okay.  Thank you.
17         And what was the answer to that
18  inquiry?
19      A.  My recollection, without seeing
20  anything, on the first time, was that he didn't
21  have FMLA coverage and they had not gotten -- I
22  believe that either he had not been responsive

Page 469

1  or they weren't getting what they needed from
2  him.  And we, of course, have not heard from
3  him.  But the return-to-work date, when we were
4  asking, was still the date that had already
5  passed.
6      Q.  Ultimately, was Mr. Skrynnikov
7  cleared; that is to say, was his leave during
8  the period which we're talking about now, was
9  that period certified as appropriate FMLA leave?
10      A.  I think retroactively, it was.
11      Q.  And what was the reason for
12  Mr. Skrynnikov's failure to provide
13  certification during that time when Fannie Mae
14  fired him?
15         MR. MIOSSI:  Objection to
16  characterization.  He was not fired.  That's
17  established.
18         JUDGE SWEENEY:  You mean when the
19  letter went out?  Are you talking about the
20  September 15th letter?
21  BY MR. SALB:
22      Q.  The letter went out that said, your

Page 470

1  employment is terminated because you haven't
2  reported to work, right?
3      A.  No.  I don't recall that being what
4  the letter said.
5      Q.  Well, what did it say?
6         MR. MIOSSI:  It's an exhibit.  Why
7  don't we look at the exhibit?
8         MR. SALB:  I'm sorry.  This is my
9  examination.
10         JUDGE SWEENEY:  Yeah.  Let him ask the
11  questions the way he wishes, but we do have a
12  letter in the file.
13         MR. SALB:  I understand that.
14         JUDGE SWEENEY:  Go ahead.
15         THE WITNESS:  This letter was really
16  focused on Fannie Mae's policies and his
17  obligation to notify his manager what his
18  status is.  He had not.  We did not find any
19  information that helped us determine whether
20  he was being cooperative, or we didn't have
21  enough information to know what his status was.
22  But he wasn't covered.  He had this gap.  He had

Page 471

1  not gotten FMLA.  He had been out for some time,
2  I don't remember how long, but I believe at that
3  time he still had both FMLA and D.C. FMLA.
4         And the way this letter -- my
5  recollection of this letter, as written, is
6  that, you've been out for a certain amount of
7  time, you haven't notified us what your status
8  is, we don't believe you're covered by FMLA, we
9  have this job abandonment policy.  And then, at
10  the end, it's some paragraph that says, if we're
11  mistaken in some way, let us know by a certain
12  date that you're doing something or you think
13  that you're going to be covered.  Otherwise,
14  you're going to be terminated.
15         So it wasn't a termination letter.  It
16  was really a heads-up, let's get your attention,
17  let's get focussed on what needs to be happening
18  here.
19         JUDGE SWEENEY:  Go ahead.
20  BY MR. SALB:
21      Q.  And prior to that time -- you just
22  made reference to Mr. Skrynnikov's duty to

Page 472

1      notify his manager.  Prior to that time, had
2      Mr. Skrynnikov been in communication with his
3      manager at all during his FMLA leave?
4          A.  About this period of absence?
5          Q.  From the time he went out on
6      leave through this period of time that we're
7      discussing now, had Mr. Skrynnikov been in
8      communication with his manager?
9          A.  I don't know.
10         Q.  So you made a determination as to
11     whether Mr. Skrynnikov was fulfilling his
12     duty to communicate with his manager without
13     knowledge of the pattern and practice of
14     communication between them; is that right?
15         A.  I was very focused on the pattern and
16     practice of communication about that particular
17     point in time.  Obviously, he was an employee.
18     Obviously, in the past, he had had
19     communications with his manager.
20         Fannie Mae was focused on a period
21     when he was -- when we understood he was
22     supposed to return to work, and he hadn't been

Page 473

1      in touch with us about his status.  That's what
2      the focus was.  So the inquiry was all about
3      any phone messages, you know, has he contacted
4      anyone to let them know what he has been doing
5      and whether he's going to return to work.  And
6      then the adjunct inquiries about, where is he
7      with The Reed Group.
8          Q.  The truth is that The Reed Group had
9      been doing all of the communicating with Fannie
10     Mae regarding Mr. Skrynnikov's leave; is that
11     right?
12         A.  I don't know.
13         Q.  You don't know, because you didn't
14     inquire into that when you made the decision to
15     send this letter.
16         A.  I don't recall him having another
17     return-to-work date before that.  Maybe he had
18     another return-to-work date, and maybe he had
19     another gap.  But that's not my recollection.  I
20     believe this was the first time he was returning
21     to work and it had gone past that return-to-work
22     date.  So you may have information that I don't,

Page 474

1      but I know the focus was this particular period
2      when he was supposed to be back at work and he
3      wasn't there.
4          Q.  Ultimately, what was the reason for
5      Mr. Skrynnikov's failure to submit paperwork
6      necessary to certify his continued FMLA leave?
7          JUDGE SWEENEY:  Are we talking about
8      the September period?
9          MR. SALB:  Yes, sir.
10         THE WITNESS:  I don't recall as I sit
11     here.  I don't know if I know.
12     BY MR. SALB:
13         Q.  Would you be surprised to learn that
14     it was because his physician had been out of
15     town, out of the state?
16         A.  You know something, someone did tell
17     me his doctor was out the week that he did not
18     return to work.  I don't know where I learned
19     that, but someone did that say that.  But that
20     seemed odd.  We didn't go back to The Reed Group
21     to find out, but it seemed odd.
22         Since he had a return-to-work date,

Page 475

1      one would presume he had seen the doctor before
2      that when he didn't expect to return to work.
3      Whether the doctor was out, I don't know if that
4      was the case.  I just know someone said that was
5      the reason.  But I believe that he was out the
6      week that Mr. Skrynnikov was supposed to be back
7      and didn't return.
8          Q.  I'm a little confused because you're
9      indicating to me, if I'm understanding you
10     correctly, that nobody at Fannie Mae had heard
11     from Mr. Skrynnikov about his intention as to
12     whether to return to work or not; is that right?
13         A.  My understanding was the managers had
14     not.
15         Q.  What do you mean by the managers?
16         A.  His direct manager.
17         Q.  Who was his direct manager?
18         A.  I think Kristin.
19         Q.  So Mr. Skrynnikov had not been in
20     touch with Ms. Harrison?
21         A.  What I know is what the HR person told
22     me is that he had not fulfilled his obligation

Page 476

1    to notify his management that he was not coming
2    back.  That's what I know.
3          Q.   That's what Carrie Lee told you?
4          A.   I don't remember her exact words.
5    What I know is that he had not been -- he had
6    not notified his management that he was not
7    coming back, and that my -- my -- the issue for
8    me to solve is, where did we go from here.
9          Q.   So is it your testimony that Ms. Lee
10   did not advise you that she had spoken directly
11   with Mr. Skrynnikov the week before and that he
12   had told her that he would not be yet able to
13   return to work?
14         A.   I don't remember.  I don't remember.
15         If you have something that I could
16   look at, that would be helpful.
17         Q.   I'm asking you about what Ms. Lee told
18   you.
19         A.   Okay.  So you're asking specifics
20   about 2009.  I don't remember.  If you have
21   something that would help refresh me, that would
22   be helpful.

Page 477

1          I know what I was focused on.
2          Q.   Are you aware of the reason for
3    Mr. Skrynnikov's need for FMLA leave?
4          A.   No.
5          Q.   You don't know about what his ailment
6    was?
7          A.   No.
8          Q.   So you're not aware that
9    Mr. Skrynnikov was out of work because of
10   depression?
11         A.   I don't believe so, but I certainly
12   didn't know then.  The only thing I knew at the
13   time, at any time, because you haven't put a
14   time on it, was about his ribs, because he said
15   that.  But I don't know what the other -- I
16   never knew, at any time, when he was -- when
17   these inquiries were going on, what the
18   underlying issue was.
19         Q.   So I take from that, then, that you
20   were unaware that Mr. Skrynnikov alleged that
21   his depression was triggered by hostile
22   communications that he had received from

Page 478

1    Ms. Harrison?
2          A.   I don't know that.
3          Q.   Nobody advised you of that?
4          A.   No.
5          Q.   So let's shift gears a little bit.
6          You have been doing employment law for
7    a few decades?
8          A.   I would say so, yes.
9          Q.   You've done seminars on employment
10   law?
11         A.   Mm-hmm.
12         Q.   You've written book chapters on
13   employment law?
14         A.   Mm-hmm.  Yes.
15         Q.   You know, I was chair of the D.C.
16   Bar's Labor and Employment section.  And if I
17   had known you then, we would have put you to
18   work.
19         A.   Uh-huh.  D.C. Bar has put me to work
20   in the past.
21         JUDGE SWEENEY:  All right, Counsel.
22   Don't threaten the witness.

Page 479

1          All right.  Go ahead.  Next question.
2    BY MR. SALB:
3          Q.   So it would be fair to say that you
4    have a large store of knowledge about employment
5    law, right?
6          A.   I would say so.  I've accumulated
7    knowledge, yes.
8          Q.   Okay.  So you're probably familiar
9    with the rules related to the FMLA, that the
10   employer is allowed to ask the employee to
11   provide a return-to-work certification before
12   the employee would be allowed to return to work,
13   right?
14         A.   For the condition that they went out
15   on, yes.
16         Q.   Okay.  Now, there came a time
17   that Fannie Mae required a return-to-work
18   certification related to Mr. Skrynnikov's rib
19   injury; is that right?
20         A.   Yes.
21         Q.   Was the rib injury the reason for his
22   going out on FMLA leave?

12  (Pages 476 to 479)

Page 480

1     A.  I believe -- I believe it was
2  subsequently -- that was one of the times he was
3  retroactively covered by FMLA.  I believe that.
4     Q.  Certainly, you recognize that that
5  was not the reason he went out on FMLA leave,
6  because the rib injury happened while he was out
7  on leave, right?
8     A.  That was -- he -- clearly, he went
9  out for some other reason.  And he had at that
10  point -- by the time he had the rib injury, I
11  think he had been out and had exhausted his
12  federal leave and he had some remaining D.C.
13  leave.
14     That's my recollection of the timing.
15  I could be wrong.
16     Q.  Okay.  But the point is that he went
17  out on FMLA leave.  He sought leave for a health
18  condition that was not his rib injury, right?
19     A.  In addition to his rib injury, yes,
20  I understood that he was asking for leave for
21  another reason.  He had been -- he had been
22  released, and he was supposed to be returning,

Page 481

1  but, yes, he had been out for some other reason.
2     Q.  Let's be clear.  When Mr. Skrynnikov
3  stopped working at Fannie Mae, when he went out
4  on leave, --
5     A.  Right.
6     Q.  -- he made a request for FMLA
7  protected leave, right?
8     A.  That's my understanding, yes.
9     Q.  And the request for FMLA protected
10  leave was not for his rib injury, correct?
11     A.  When he first went out, that is
12  absolutely correct.
13     Q.  Okay.  And during his leave, his
14  physician was treating him for something other
15  than the rib injury, correct?
16     A.  During the period he was on federal
17  leave, you're correct, I'm only aware of one
18  ailment where he sought FMLA.
19     During the period when he was on just
20  D.C. FMLA, when the federal period had expired,
21  it was my understanding that he sought FMLA for
22  more than one condition.  So I think it was a

Page 482

1  continuation of the original condition.  I also
2  believe that there were other reasons why he
3  sought leave.
4     But I was not -- other than him saying
5  he had this rib injury, and us directing him
6  to go to Sedgwick, and then him getting
7  retroactively approved for it, I don't have
8  knowledge of what those medical conditions might
9  have been.
10     MR. MIOSSI:  Let me just make
11  something clear.  You said Sedgwick.  Did you
12  mean --
13     THE WITNESS:  I meant The Reed Group.
14     MR. MIOSSI:  The Reed Group.
15     THE WITNESS:  Could I --
16     JUDGE SWEENEY:  Yeah.  Do you want a
17  recess?
18     THE WITNESS:  Yeah.  I don't want to
19  stop in the middle of anything, but --
20     JUDGE SWEENEY:  Is this a decent time?
21     MS. KUNTZ:  Sure.
22     JUDGE SWEENEY:  That's fine.  We'll

Page 483

1  take a five-minute recess and come back in five
2  minutes.
3     All right?
4     (Recess taken.)
5     JUDGE SWEENEY:  We're back on the
6  record now.
7     Go ahead, counsel.
8  BY MS. SALB:
9     Q.  So we were just talking about --
10  before we went on break several minutes ago,
11  we were talking about the end period of Mr.
12  Skrynnikov's leave.  And I think that we agreed
13  that Mr. Skrynnikov went out on leave for a
14  reason that was unrelated to his ribs, right?
15     A.  We can agree that he went out on
16  some medical reason that was not related to
17  his broken ribs.  I don't know what he
18  originally went out for.  At the time, I did not
19  have any idea.
20     Q.  Okay.  The issue related to his rib
21  injury was brought to Fannie Mae's attention
22  only after Mr. Skrynnikov had been cleared to

13  (Pages 480 to 483)

Page 484

1   return to work, right?
2        A.  After he had the date to return
3   to work, I think he contacted -- I think he
4   contacted Carrie before the date he was supposed
5   to return to work, yes.  But he had been cleared
6   to return to work on a certain date.
7        That's my recollection.
8        Q.  He had been cleared to return to work
9   when he contacted Carrie Lee, and what was his
10  purpose in contacting Carrie Lee?
11       A.  My understanding is he wanted an
12  additional week to recover from the rib injury.
13       Q.  Okay.  Did Mr. Skrynnikov indicate,
14  when he communicated with Ms. Lee, anything
15  regarding his readiness to return to work?
16       A.  My recollection was that he
17  requested another week to recover from his rib
18  injury.
19       Q.  That's not my question, ma'am.  My
20  question is, did he communicate to Ms. Lee
21  anything regarding his readiness to return to
22  work?

Page 485

1        A.  That he wanted another week before
2   he could return to work for the rib injury.
3        Q.  Is it your testimony that you believe
4   that Mr. Skrynnikov indicated nothing regarding
5   his readiness to return to work, other than that
6   he wanted a week to recover?
7        A.  Okay.  I'm not sure about what you're
8   asking, but I think that -- I want to be clear.
9   My understanding is he had called or written or
10  something, asking for another week to recover
11  from the rib injury, and he wanted vacation.
12  And I don't know how he phrased it, so I can't
13  tell you whether it addressed readiness.  But my
14  recollection is, he said something about, well,
15  if you're not going to give it to me, I'll come
16  back on the date.  Something like that.
17       But that's what I remember.  So when
18  you keep saying readiness, I'm not sure if that
19  was the phraseology.  But if that's what you're
20  getting to, I do remember there being a, if you
21  won't give it to me, I'll come back on the date
22  I'm supposed to be back.

Page 486

1        Q.  Okay.  Now, did you learn about his
2   return to work from Carrie Lee?
3        A.  Probably.  Yeah.
4        Q.  Did she share with you the contents of
5   the e-mail that Mr. Skrynnikov had sent to her
6   regarding returning to work?
7        A.  About the rib injury?
8        Q.  Yeah.
9        A.  I believe so.
10       Q.  Now, did Mr. Skrynnikov indicate in
11  his e-mail, or at any time, for that matter,
12  that his rib injury affected his ability to
13  think?
14       A.  I don't remember exactly what he put
15  in the e-mail, but I know he included, like, a
16  one-page thing from the hospital.  And that one
17  page wasn't very specific, but it did indicate
18  that he was -- I believe it indicated he was on
19  medication, and that it sounded like he was
20  -- there was pain involved and it sounded like
21  it was a three- or four-week recovery.  That's
22  what I remember.

Page 487

1        And I don't know that he talked a lot
2   about what the effect on him was in his e-mail,
3   but he included that in a one-pager that
4   described all sorts of things that could be a
5   result of a -- it was a very generic description
6   of broken ribs, fractured ribs.
7        That's my recollection.
8        Q.  And is there -- was -- did Ms. Lee
9   communicate to you, or did you read in that
10  e-mail, anything regarding whether Mr.
11  Skrynnikov -- whether this injury, this rib
12  injury, affected his ability to do his work?
13       A.  Well, that was the concern.  It said
14  lots of things about fractured ribs.  It said he
15  was on medication, and it wasn't clear what the
16  medication was.  I don't remember it.  It said
17  that it could be significant pain.  That's
18  obviously what the issue was; we didn't know
19  what the issue was.
20       Q.  Did Mr. Skrynnikov communicate that he
21  had a medical need for leave?
22       A.  Yes.

Page 488

1    Q.  Need?
2    A.  Yes.  That's my recollection.
3        He asked for the additional week in
4  order to recover from the rib injury.  And the
5  attachment said that it would take three to four
6  weeks to recover from the kind of injury he had,
7  which, I thought, said he needed the leave.
8    Q.  What medication was it that you
9  believed that Mr. Skrynnikov might have had to
10 have taken?
11   A.  I don't know.  I remember there being
12 a reference to medication on what he attached.
13   Q.  Do you think that Tylenol would cause
14 him to be unable to concentrate or otherwise
15 perform his job duties?
16   A.  I don't know if Tylenol was
17 referenced.  If you show me that, I'll see that
18 there was a medication on there.  But, right
19 now, what stands out in my mind, and what I
20 remember focusing on, is this generic sheet that
21 indicated that it would take three to four weeks
22 to recover, and that there were various

Page 489

1  symptoms, and that medication -- I remember
2  medication being referenced.  If they had a
3  specific kind of medication, I don't remember as
4  I sit here, but I'm sure if it's on there it's
5  on there.
6    Q.  Okay.  And you would have reviewed
7  the paperwork that Ms. Lee shared with you
8  carefully before making determinations about
9  whether Mr. Skrynnikov could return to work or
10 not, right?
11   A.  No.  That's not up to me.  It was not
12 up to me to make a determination whether what he
13 had submitted was sufficient to allow him to
14 return to work.
15   Q.  Whose decision was it to place
16 Mr. Skrynnikov on leave for the rib injury?
17   A.  He was on leave.
18   Q.  He was on leave for depression.
19   A.  Okay.  Whatever he was on leave for,
20 he was on leave.
21   Q.  He was on leave for something other
22 than the rib injury, correct?

Page 490

1    Correct?
2    A.  That's my understanding, yes.
3    Q.  Okay.  And you know the law is very
4  clear that you may not seek a certification of a
5  return to work for any ailment, other than that
6  for which the FMLA leave was approved, right?
7    A.  At the time -- I think the rule that
8  you're referring to refers to federal FMLA.  He
9  was out of federal FMLA at that time.
10   Q.  Is it your contention -- is it your
11 belief -- excuse me.
12       Is it your belief that the regulations
13 which govern the federal FMLA do not also govern
14 the District of Columbia FMLA?
15   A.  Are you asking me whether the federal
16 rules, regulations, are also -- they were
17 adopted by D.C., is that what you're asking me?
18   Q.  I'm asking whether you have any
19 knowledge as to whether the federal regulations,
20 published in the Code of Federal Regulations,
21 have any relevance to the understanding or
22 interpretation of the D.C. FMLA?

Page 491

1    A.  Okay.  So that's a different question
2  than what you asked.
3        They -- they -- so the regulations
4  that you are talking about apply to federal
5  FMLA.  He was out of federal FMLA.
6        The reason we asked for a return
7  to work is -- and told him, he doesn't get
8  vacation.  He said he needed time to recover.
9  We have sick leave, for which we could ask for a
10 return to work, based on what he said.  We have
11 STD, which I thought he still had STD available
12 to him that he could have gotten.  And I didn't
13 know whether it was covered by the FMLA, but
14 it's our duty, if we know of an FMLA event, and
15 they don't have to say, I want FMLA, you know
16 that, if a person wants FMLA, all they have to
17 say is they have some event.  We referred him to
18 The Reed Group.  So the reason for the return to
19 work was related to what we believed to be
20 either a request for sick leave, a request for
21 STD, or a pending application for FMLA.
22       And I disagree with you that

Page 492

1  the law is clear on whether you can ask for a
2  return-to-work certification for another
3  condition for which a person is requesting FMLA.
4  But I'm not going to argue the law with you, but
5  you said it was clear.  It's not clear.
6        But with respect to D.C. FMLA, there
7  are no regulations that speak to the same issue
8  that are spoken to by the federal regulations.
9  But in any case, I don't believe that that would
10  have prohibited us from asking for a
11  return-to-work certification.
12     Q.  Well, let's see if I -- I want
13  to make sure I understand your testimony.  The
14  return-to-work certification that you asked for
15  was a second certification, right?
16     A.  Not for the condition he went out for.
17     Q.  I didn't limit it that way.
18        It was a second certification.
19     A.  No.  It was a certification for his
20  ribs.
21     Q.  Okay.  He had already --
22     A.  There might have been another one.

Page 493

1  But when you say a second one, it implies there
2  was a first related to that condition.
3        No.  What I'm saying is, there was
4  only one for the condition he went out on.  He
5  brought to our attention his ribs.  There were
6  multiple leaves that he could have benefitted
7  from.  Vacation was not one of them.  But we
8  needed to know that he was able to return to
9  work.  Because, based on what he gave us, it did
10  not appear that he had yet recovered.  Three to
11  four weeks that the note said was the recovery
12  time hadn't expired, I don't believe.
13     Q.  Okay.
14     A.  So we asked, for STD purposes --
15  for whatever leave purposes we had, we asked for
16  that.  And if he did get FMLA, he would have to
17  get a return to work for that condition.
18        That's what I'm saying.
19     Q.  Does Fannie take the position that it
20  can force somebody to take FMLA leave -- let me
21  rephrase this.
22        You indicated that Fannie Mae has a

Page 494

1  duty to grant FMLA leave when it has reason to
2  believe that FMLA leave --
3     A.  That's not what I said.
4     Q.  Please, let me finish my question
5  before you respond.
6        You indicated that Fannie Mae has a
7  duty to extend FMLA rights to an employee when
8  Fannie Mae has reason to believe that there is a
9  need for FMLA leave, correct?
10     A.  What I said was we believed he was
11  asking for further FMLA leave.
12     Q.  What is the basis of your contention
13  that he was asking for further FMLA leave?
14     A.  Because he said he needed another week
15  to recover from a rib injury, and he provided us
16  with information that indicated it was a pretty
17  serious thing.
18     Q.  Okay.
19     A.  And the focus wasn't just FMLA.  At
20  the time, the focus was STD.  He wanted another
21  week off.  He certainly was entitled to STD for
22  that, or sick leave.

Page 495

1     Q.  We're not talking about short-term
2  disability insurance.
3     A.  No.  We are.
4     Q.  No.  We're talking about the FMLA.
5        JUDGE SWEENEY:  All right.  Don't
6  -- okay.  Go ahead.  Next question.
7        MR. SALB:  Thank you, Your Honor.
8  BY MR. SALB:
9     Q.  There are two books in front of you,
10  one of which has a lots of exhibits, the other
11  has few.
12     A.  They look about the same to me.
13     Q.  All right.  Well, I'm interested in
14  Exhibit 68.
15        MR. MIOSSI:  It's on your left,
16  Madonna.
17        THE WITNESS:  This one?
18  BY MR. SALB:
19     Q.  Please turn to Exhibit 68.  It's a
20  two-page exhibit.
21        Turn to the second page, please.
22        Do you recognize that?

16 (Pages 492 to 495)

Page 496

1      A.  Let me look at the document.
2      Q.  Well, the second page is a different
3   document, so please look at the second page.
4      A.  So you're saying --
5      Q.  I'm asking you to look at the second
6   page.
7      A.  The second page?
8      Q.  Do you recognize that?
9      A.  I do.
10     Q.  Okay.  What is that?
11     A.  That's the e-mail that I recalled
12  seeing from Carrie Lee.
13     Q.  Okay.  And in this e-mail,
14  Mr. Skrynnikov advises that he broke three ribs,
15  correct?
16     A.  Right.  But to be clear, it doesn't
17  have the attachment --
18     Q.  Okay.
19     A.  -- that came.  But -- hold on.
20         Yes.  He says, I was in a
21  slip-and-fall accident and broke three ribs.
22     Q.  And from that, you made a

Page 497

1   determination that Mr. Skrynnikov needed to be
2   on leave?
3      A.  It said, I should be fully recovered
4   from it in about a week.  I'm attaching a note
5   from GW Hospital concerning the diagnosis.
6         So that's what the request was; he
7   needed more time.
8      Q.  I find it interesting that you used
9   the word needed.
10         Did he indicate in this e-mail that he
11  needed more time?
12     A.  That's how I interpreted it.
13     Q.  Did he indicate in this e-mail that he
14  needed more time?
15     A.  He didn't use the word needed.  He
16  stated a fact, apparently, that he broke his
17  ribs.  He attached a note, which I read into,
18  obviously, what the substance of the e-mail was.
19  And that's what we interpreted, particularly
20  since he was asking for vacation, he was asking
21  for leave.
22         So, no, he did not use the word

Page 498

1   needed.
2      Q.  And, in fact, I noticed that you read
3   out loud a portion of his e-mail, but you did
4   not read that last sentence, which says, if
5   additional time is not possible, I can start on
6   the scheduled date of my return.
7         Is there anything about that sentence
8   that indicates that he's unable to do his job?
9      A.  Okay.  So the analysis that I went
10  through --
11     Q.  Respectfully, ma'am, I'm not asking
12  about the analysis.  I'm asking a yes or no
13  question.
14         MR. MIOSSI:  The document speaks for
15  itself.  I think she should be allowed to answer
16  these really badgering questions.  I do.
17         JUDGE SWEENEY:  All right.  Is your
18  question is this what the sentence says?  Is
19  that what your question is?  I mean, because it
20  does say what it says.
21         MR. SALB:  It says what it says.
22         JUDGE SWEENEY:  Okay.  So why don't

Page 499

1   you ask another question, then.
2   BY MR. SALB:
3      Q.  All right.  Is there anything in
4   this document which says that Mr. Skrynnikov is
5   unable to do his job?
6      A.  That was the question.  That was the
7   question.  He included the diagnosis from the
8   hospital.  So you can't read this alone.  You
9   have to read it with the diagnosis.
10         So from Fannie Mae's perspective, it
11  is really irrelevant what the employee says his
12  fitness is.  He has now brought to our attention
13  that he may be unable to work.  In fact, he's
14  asking for another week to recover.
15         It was our job to ensure that he
16  didn't return before he was able and have to
17  cause more injury to himself or not be able to
18  perform his job.
19         So you can't read this e-mail, that's
20  dated the 21st of October, without reading it
21  with the diagnosis that came with it, that
22  one-page diagnosis.

Page 500

1     Q.   Okay.  Turn, if you would, to Exhibit
2  70.
3     A.   Okay.
4     Q.   And I'll bring your attention to the
5  third page of that exhibit.
6          Do you recognize that?
7     A.   The third page is a very clear copy of
8  what he had sent over.
9     Q.   Okay.
10    A.   I think the page before it with the
11 highlighting and the fuzziness is more like what
12 we got, although it didn't have the fax numbers,
13 obviously.  But what we got with that e-mail is
14 the document that is Bates Stamped 290, and with
15 the letters before it.  And that's just one
16 page, but it was very fuzzy.
17    Q.   So go back, then, to the second page,
18 which is Bates Stamped Fannie Mae 424.  Is that
19 the page that you received?
20    A.   Well, we didn't get this, because
21 it's got some reference that it was received on
22 10/29.  But we didn't get those markings on it,

Page 501

1  but it looks -- it was fuzzy like this and it
2  had highlighting.
3     Q.   Okay.
4     A.   And I think -- it's hard to know
5  whether you could look through the -- I think
6  you could actually, if you look carefully, see
7  through the highlighting what was the electronic
8  copy, but it didn't have the markings on it
9  about going from fax.
10    Q.   Okay.  But other than the fax, this is
11 the document that Mr. Skrynnikov attached to his
12 e-mail, correct?
13    A.   Yeah, 290.  And the one before it
14 seems to be the same.  I think they were the
15 same document.
16    Q.   Now, look at Item Number 2.
17    A.   Item 2.  Where's Item 2?
18    Q.   In the middle of the page.
19         Is that the reference to medication to
20 which you referenced?
21    A.   No.  Well, there's a couple of
22 references.  In the special instructions, and

Page 502

1  this is where it was difficult to understand
2  what this was, because it doesn't seem specific
3  to Mr. Skrynnikov.  While it has his name on it,
4  it has a lot of vagaries.
5          So the special instructions say, you
6  know, return to ED for worsening or worrisome
7  symptoms.  Follow up with primary care if not
8  improving.  Take medication as prescribed.  Do
9  not drive or operate heavy machinery while
10 taking this medication, as it may make you
11 drowsy.  So that's one reference to medication.
12         Then in two it says, you may take
13 Tylenol or Ibuprofen for pain, unless another
14 medicine is prescribed.  So the ones that were
15 special seem to indicate he was taking something
16 besides the Tylenol.  That's what I'm saying.
17 This didn't look like it was specific to him,
18 because there were things, like, if you were
19 given -- like, three says, if you were given a
20 rib belt to wear.
21         So it seemed to indicate this was
22 pretty serious.  It seemed to indicate he was

Page 503

1  on medication -- that he actually was on
2  medication that made him drowsy and he shouldn't
3  be driving or operating heavy machinery.  But it
4  wasn't clear.  And that's the reason -- we
5  weren't -- we couldn't make anything out of
6  this, other than, it seemed to be serious, go
7  to The Reed Group, see if you can get the STD,
8  and -- but you need a return to work to say
9  you're able to work when you -- because of
10 this -- because of this new issue that you're
11 saying you are suffering from.
12    Q.   Were you aware that by not permitting
13 Mr. Skrynnikov to return to work, you were
14 causing him to be out of work at a time that
15 would no longer be FMLA protected?
16    A.   Not here, no.
17    Q.   You were not aware of that?
18    A.   I don't think his FMLA -- I'm trying
19 to remember.  I don't think his FMLA expired at
20 this time.
21         When he was making the inquiry, I
22 don't think his FMLA had expired.

18  (Pages 500 to 503)

Page 504

1       Q.  Okay.  Now, are you aware of any
2   further communications from Mr. Skrynnikov after
3   that first e-mail regarding his rib injury?
4       A.  I believe that he -- I think -- I
5   believe he submitted something that got him
6   retroactively covered by the FMLA, and that
7   he got continued STD.  So he must have had
8   communications with someone.
9       Q.  Did he have communications with Fannie
10  Mae subsequent to that first e-mail?
11      A.  I think so.  I'm not remembering it.
12      Q.  All right.  Why don't you turn, then,
13  to Exhibit 68.
14      A.  Okay.
15      Q.  All right.  Now, as is always true
16  with e-mail, you start at the bottom.  And, of
17  course, the second page is Mr. Skrynnikov's
18  e-mail, the one that we just talked about,
19  right?
20      A.  It seems to be the same one.
21      Q.  Right.  Yep.
22          And then at the bottom of the page is

Page 505

1   an e-mail from Carrie Lee.
2       A.  Okay.
3       Q.  And we're now looking at e-mails
4   on October 22nd.  That's the day after Mr.
5   Skrynnikov's e-mail notifying Fannie Mae of the
6   rib injury, correct?
7       A.  Yes.
8       Q.  All right.
9           Look, please, at Mr. Skrynnikov's
10  e-mail, the one in the middle of the page at 1
11  p.m.
12          What is Mr. Skrynnikov advising Fannie
13  Mae?
14      A.  He is conveying to her his
15  understanding of the conversation he had with
16  The Reed Group.
17      Q.  Okay.  And what was his understanding,
18  as he conveyed it in this e-mail?
19      A.  What it says at 1:01 is that he did
20  not have a medical need to be out due to the rib
21  fracture, and that it does not need to be filed
22  as a continuation of STD, and that he could

Page 506

1   return to work on October 26th.
2       Q.  The e-mail that Mr. Skrynnikov sent
3   indicated that he was able to return to work,
4   right?  You understood it to mean that he
5   believed that he was able to return to work?
6       A.  As I read it now, --
7           JUDGE SWEENEY:  Counsel, are you
8   talking about the 1 p.m.?
9           MR. SALB:  Yes.
10          THE WITNESS:  All right.  That wasn't
11  sent to me.  So if you're asking me what I read
12  it to be, that seems to be his understanding of
13  the conversation.
14  BY MR. SALB:
15      Q.  Are you saying that you did not see
16  this e-mail in October of 2009?
17      A.  Oh, I'm sure I did, but it would have
18  been, obviously -- I don't know whether I saw it
19  at the time or later that day when it turned out
20  The Reed Group had a different understanding of
21  his status.
22          JUDGE SWEENEY:  Are you saying The

Page 507

1   Reed Group had a different understanding of
2   what's articulated in the e-mail?  Is that what
3   you're saying?
4           THE WITNESS:  That's how I read it.
5   The one above it says -- this is from Carrie
6   Lee back to him the same day.
7           JUDGE SWEENEY:  Right.
8           THE WITNESS:  It says, it's my
9   understanding that The Reed Group received
10  additional information from you.  And they've
11  instructed you to either provide them a release
12  to return to work for your second condition, or
13  present them certification to extend your
14  disability case with the advent of this new
15  condition.
16          So that's very different than what he
17  sent a couple hours ago.
18          That's the communication.
19  BY MR. SALB:
20      Q.  Mr. Skrynnikov was ultimately cleared
21  to return to work, right, from his rib injury?
22      A.  Ultimately, he had a return to work.

19  (Pages 504 to 507)

Page 508

1    Q.  And, ultimately, did anybody determine
2  that he was unable to work during -- strike
3  that.
4        It was Fannie Mae's decision not to
5  permit Mr. Skrynnikov to return to work when he
6  was scheduled to return following his FMLA leave
7  for depression, correct?
8    A.  As of October 22nd, what I understand
9  the decision about him is is what's stated in
10 the e-mail, where Carrie Lee states what The
11 Reed Group decided.
12       That's what I understand.
13       JUDGE SWEENEY:  That's the 4:54 p.m.
14 e-mail?
15       THE WITNESS:  That's right.  That's
16 what the decision was.
17       JUDGE SWEENEY:  And is this a decision
18 that Carrie Lee made?
19       THE WITNESS:  No.  It looks like The
20 Reed Group made this.
21       So the decision the day before was
22 where Carrie Lee had said, and that's Carrie

Page 509

1  Lee's decision based on what he had said the
2  day before, which was Wednesday, October 21st.
3  What Fannie Mae had done and what they directed
4  was down at the bottom.  That e-mail says, you
5  need to work through The Reed Group to get all
6  of your medical approvals for return to work.
7  They'll work with Fannie Mae to make sure all
8  the proper notifications occur.  And then she
9  says, you know, you've indicated the request is
10 based on a new different medical condition, and
11 you need to inform The Reed Group of your
12 condition and inability to return to work on
13 October 26th, given this injury.  At this point,
14 you cannot return to work unless you are cleared
15 to return to work for both conditions.  This
16 must come from The Reed Group.
17       So that's what we told him.  He
18 apparently contacted The Reed Group.  He told
19 Carrie his impression of what they said.  And
20 then the final one, that's where the Reed -- so
21 it's all been communicated, The Reed Group has
22 now made a decision about -- whatever

Page 510

1  information he provided to The Reed Group on
2  the 22nd has then caused them to ask for certain
3  things.
4        If he had gone to The Reed Group -- he
5  had some additional information.  If he had gone
6  to The Reed Group and whatever he gave
7  them was a return to work, as far as we were
8  concerned, based on the 21st, if he had a
9  specific doctor note that said he could return
10 on the 21st, or earlier or later, he could have
11 returned to work.
12       We left it -- we -- we put it over
13 to the Reed Group.  We asked him to communicate
14 with them.  That's what they came back with.
15       JUDGE SWEENEY:  All right.  Go ahead,
16 Counsel.
17       MR. SALB:  Thank you.
18 BY MR. SALB:
19    Q.  Are you aware that The Reed Group
20 determined that the medical records from the
21 emergency department, those records that you
22 were referencing, did not require that he had to

Page 511

1  be out of work?
2    A.  I don't know what they determined.
3    Q.  So you're not aware of that?
4    A.  Well, what point in time are you
5  talking about?
6    Q.  This period of time.  I'm asking you
7  whether you are aware that The Reed Group
8  determined that those emergency department
9  records did not conclude that Mr. Skrynnikov
10 needed to be out of work?
11    A.  What I know is what they wrote, what
12 Carrie Lee conveyed to him on October 22nd.
13 That's what I know.
14       You said, at that period of time, what
15 did I know about what they determined?  That's
16 what I know about what they determined.
17    Q.  The Reed Group ultimately came to
18 review those medical records from the emergency
19 department, the same one which you read as
20 requiring that he not be at work?
21    A.  No.  The same one that I read where I
22 said that it put into question whether he should

20  (Pages 508 to 511)

Page 512

1    be at work.

2        Q.  And it was Fannie Mae's decision that

3    he not be allowed to return to work until after

4    getting clearance from The Reed Group to do so,

5    right?  That was Fannie Mae's decision.

6        A.  No.  Fannie Mae's decision was that he

7    needed to present a -- he had to go to the Reed

8    Group, for whatever, and that he had to -- that

9    he wasn't to return unless he was cleared to

10   return to work, and that it would go through The

11   Reed Group.

12       Q.  I'm sorry.  If there's a difference

13   between what you're saying and I'm saying, I'm

14   not understanding.

15       MR. MIOSSI:  I don't think -- it

16   doesn't need to be rude.

17       JUDGE SWEENEY:  All right.  Just hold

18   it.

19       Why don't you just ask the question.

20   Don't comment on it.

21   BY MR. SALB:

22       Q.  Sure.

Page 513

1        Can you explain how your answer is not

2    simply agreeing with my question, agreeing with

3    the proposition that I laid out for you?

4        What's the difference between what you

5    said and what I had said?

6        A.  If he had come to us and said, hey, I

7    had this rib injury, and I -- oh, I didn't show

8    you that I have a release to come back to work,

9    he would have been back at work.

10       Q.  It was Fannie Mae's decision that

11   Mr. Skrynnikov would not be permitted to come

12   back to work until he got a return-to-work

13   certification approved by The Reed Group,

14   correct?

15       A.  Well, we wanted it to go through The

16   Reed Group.  That's what we said, yes.

17       Q.  That's Fannie Mae's decision?

18   Yes?

19       A.  Yes.  On the 21st.

20       Q.  Okay.  Very Good.

21       JUDGE SWEENEY:  You said the 21st.

22       THE WITNESS:  I'm sorry.  Well, yeah,

Page 514

1    it was conveyed to him on the 22nd.

2        JUDGE SWEENEY:  Right.

3        THE WITNESS:  I'm sorry.

4        JUDGE SWEENEY:  That's all right.

5        If he had shown up -- just shown up on

6    October 26th, physically came to work on October

7    26th, he would not have been allowed to work, is

8    that right, because he was not complying with

9    this memo?

10       THE WITNESS:  Okay.  So as of October

11   22nd, he had some things he was supposed to do,

12   according to The Reed Group.  That's the 4:00

13   memo.  And if he had not done them, he would not

14   have been allowed to come back on the 26th.

15       JUDGE SWEENEY:  So if he had shown up

16   on the 26th --

17       THE WITNESS:  If he just walked in and

18   said, you know what, I'm here, I didn't comply

19   with anything, I'm ready to go, he would have

20   been told, we need to know that -- we have a

21   certification for the one condition.  We need to

22   know you're able to work for the rib injury.

Page 515

1        But that ended up not happening,

2    because he did get more information.

3        JUDGE SWEENEY:  Right.

4        All right, Counsel.  Go ahead.

5        MR. SALB:  Thank you.

6    BY MR. SALB:

7        Q.  Is it your contention that the Reed

8    Group applies different levels of inquiry into

9    whether an employee -- whether an employee's

10   request for leave should be approved?

11       A.  Well, it would depend on what they're

12   asking for.

13       Q.  Explain to me.

14       A.  So if they're asking for STD, you have

15   to be totally incapacitated for STD.

16       If you're asking for -- they don't

17   administer our sick leave, because that's five

18   days before STD kicks in.  But if it's STD, it's

19   a total incapacity.  If it's FMLA, it's a

20   serious health condition.  So I mean, they are

21   different standards for it.

22       Q.  Well, all right.  And I'll come back

21  (Pages 512 to 515)

Page 516

1    to the line that I was just asking you about,
2    but the standard for FMLA is not simply a
3    serious health condition, right?  Your
4    eligibility for FMLA is not dependent on simply
5    having a serious health condition, is it?
6        A.  Well, there's all sorts of things
7    you have to go through, and they have to make
8    the determination on those things.
9        Q.  I'm talking about the basic
10   requirements for eligibility for FMLA leave.
11   That basic requirement is that you have to have
12   a serious health condition that affects your
13   ability to do your job, right?
14       A.  If you're unable to do that particular
15   job.  Not any job.
16       Q.  Right.  Of course.  To do the
17   employee's own job?
18       A.  Right.
19       Q.  Okay.  And it's your contention, just
20   so we're clear, that Mr. Skrynnikov's e-mail of
21   October 21st led you to believe that there was
22   reason to believe that Mr. Skrynnikov could not

Page 517

1    do his job because of his health condition,
2    right?
3        A.  No.  My testimony is, that raised a
4    question about whether he was able to do his
5    job.  And we wanted him to use the resources
6    that we had to either take the leave he needed
7    or to be able to come back to work.
8        Q.  And, now, going back to what I asked a
9    moment ago, understanding that the -- that the
10   standards for approval of one leave request may
11   be different from the applicable standards for
12   a different type of leave request, is it your
13   understanding that The Reed Group applies
14   different levels of inquiry, that they can do a
15   light-weight inquiry, an in-depth inquiry, they
16   can look very closely or they can look just on
17   the surface?
18       A.  I don't know.
19       Q.  Do you have any reason to believe they
20   would do different levels of inquiry?
21       A.  I would assume they would do what was
22   appropriate in the particular situation.

Page 518

1        Q.  And they know what level of inquiry is
2    appropriate, right?  That's their job, isn't it?
3        A.  What I know is that's what their job
4    is.
5        Q.  Okay.  Is there any reason why you
6    would tell The Reed Group to provide a high
7    level of scrutiny to a particular employee's
8    application for leave?
9        A.  If we felt that the situation was
10   confusing.
11       Q.  Scrutinizing a request for leave,
12   you're saying that that provides clarity in a
13   confusing situation?
14       A.  Yes.  Yes.
15       Q.  Okay.  So it's -- in -- when Fannie
16   Mae says to the Reed Group, we want you to give
17   this the highest level of scrutiny, --
18       A.  Right.
19       Q.  -- you're saying that that is not code
20   for, we want you to find a reason to deny this
21   request?
22       A.  Oh, God, no.  Absolutely not.  You're

Page 519

1    asking about this situation.  The situation was
2    relatively unique because we had an employee,
3    and we had -- you know, we had this situation
4    where we thought there was job abandonment.
5    Then it wasn't.  Then he retroactively handled
6    it.  Then we thought we had him coming back to
7    work and he had a rib injury.  And what we were
8    trying to do, is, look, we knew that -- I wanted
9    to make sure it was done right.
10           He had entitlements to leave, and we
11   don't -- we give employees what they're entitled
12   to, but we wanted to be sure that it had been
13   counted correctly, because you have D.C. and you
14   have federal and you have, potentially, ADA, and
15   you have -- a lot of balls were in the air.  And
16   we wanted to make sure that The Reed Group
17   wasn't focusing on one thing and overlooking
18   another.  So there have -- you know, it's a
19   difficult area of inquiry.  We wanted to make
20   sure we got it right.  There was no code being
21   sent.  No, absolutely not.
22       Q.  So, ultimately, what we learned was

Page 520

1  that his rib injury did not require absence from
2  work, and Fannie Mae's sua sponte requirement
3  that Mr. Skrynnikov provide certification that
4  he didn't have to be out of work caused him to
5  be out of work until after the expiration of his
6  FMLA protected leave.
7          Do I have that right?
8      A.  No.  Because I thought he got
9  certified for his rib injury.  That's what I
10 thought.  We asked him to come back, and he got
11 certified for a longer period of time.
12     Q.  Are you aware of any rules or
13 regulations that prohibit an employer from
14 delaying an employee's return to work while
15 seeking return to work certification?
16     A.  For that condition?  If -- if we need
17 that condition -- we would not delay a person's
18 return to work without reason.
19         So he had a return-to-work date that
20 had not yet been passed.  We asked him to get
21 his paperwork in order for the new condition.
22 He had been certified for the one.  We asked

Page 521

1  him to get his paperwork together for that new
2  condition.  I didn't -- I don't know what else I
3  can say.
4      MS. KUNTZ:  I don't think you need to
5  say anything else.
6          Thank you.
7      JUDGE SWEENEY:  Is that it?
8      MR. SALB:  Just a moment, Judge.
9          Thank you.  We are finished.  Thank
10 you.
11     JUDGE SWEENEY:  All right.  Good.
12         I'll tell you what, if we could --
13 just a point of the Chair here, can we just take
14 a two or three-minute recess here, and we'll
15 come back?
16     MR. MIOSSI:  Sure.
17     JUDGE SWEENEY:  Okay.
18     (Recess taken.)
19     JUDGE SWEENEY:  All right.  Let's see.
20 Back on the record now.  Cross examination.
21     MR. MIOSSI:  Thank you.  This will be
22 substantially shortened because of the testimony

Page 522

1  already given.
2          CROSS EXAMINATION
3  BY MR. MIOSSI:
4      Q.  So, Madonna, let me first ask, you
5  testified that Mr. Skrynnikov's Federal FMLA
6  leave expired when?
7      A.  It was sometime after the first letter
8  I was involved in was sent, and I believe by the
9  -- I believe by the time he had the issue with
10 his ribs.
11     Q.  Okay.
12     A.  Sometime in there.  I want to say late
13 September, early October.  Sometime like that.
14     Q.  So your memory is, the FMLA 12-week
15 period had expired before this issue about the
16 ribs came up; is that correct?
17     A.  That is my understanding, yes.
18     Q.  So just so that the record is clear,
19 at least as far as the terminology goes, because
20 it's -- you answered a series -- some of the
21 questions particularly in the period of time
22 around and after the rib injury occurred, you

Page 523

1  were talking about FMLA leave, FMLA leave,
2  FMLA leave.  But at that period, he was in a
3  different leave entitlement, and that was under
4  D.C. FMLA; is that correct?
5      A.  He had D.C. FMLA, and he had STD.
6      Q.  Around the rib injury, I'm just asking
7  you so it's clear, when you were using -- when
8  you were speaking, I guess, in shorthand, saying
9  FMLA, are you referring to the D.C. FMLA rules
10 and law, or FMLA federal rules and law?
11     A.  All right.  I want to be really clear.
12         My understanding was, by that time,
13 the federal law had expired.
14         When I was making inquiries about
15 his protected leave, I assumed it was D.C.  But,
16 obviously, you know, things -- I -- actually, at
17 that time, I thought he was out for a long
18 period of time.  I didn't know if he was going
19 to roll back into anything.
20         My concern was that I be made aware
21 of what leave he was entitled to, what his
22 entitlement was, and to be sure that we had it

Alderson Reporting Company
1-800-FOR-DEPO

Page 524

1  correct. But my understanding at the time and
2  after was it was the only protected leave he had
3  was the D.C. FMLA.
4      Q. Okay. Now, maybe it would help if you
5  look -- since you looked, maybe you even have it
6  open, I think it's Exhibit 68, --
7      A. Yes.
8      Q. -- and then the first page, and we
9  went over it extensively, but this is the e-mail
10  exchange where Mr. Skrynnikov is stating in his
11  e-mail to Carrie Lee that he is okay to return
12  to work. I'm just paraphrasing.
13      Do you remember that?
14      A. Right.
15      Q. What is -- does -- excuse me.
16      Does Fannie Mae permit employees to
17  self-determine or self-diagnose their medical
18  status?
19      A. No.
20      Q. And who do you -- in 2009, who did
21  Fannie Mae entrust with that decision, that
22  assessment?

Page 525

1      A. Where it involves STD and FMLA, it was
2  The Reed Group. Obviously, there are a couple
3  of other situations that Fannie Mae might be in
4  the position, but here it would be the FMLA and
5  the STD.
6      Q. Okay. And do -- I'll just refer all
7  my questions to this period in 2009.
8      In 2009, did Fannie Mae -- while The
9  Reed Group was your contractor, did any Fannie
10  Mae personnel participate in the assessment of
11  medical condition of an employee on any kind
12  of a leave, a Family Medical Leave or short-term
13  disability?
14      A. On FMLA, D.C., or any state or
15  federal, and STD, it would have been the
16  responsibility of The Reed Group.
17      JUDGE SWEENEY: If it was sick
18  leave --
19      THE WITNESS: With sick leave -- see,
20  that's where -- the two circumstances that I can
21  think of, because I want to be right, would be
22  sick leave that didn't go into STD, or an ADA

Page 526

1  determination.
2      But even at that point it's a very
3  -- sick leave, a person takes, unless there's
4  some reason to say, okay, you can take the sick
5  leave, but we need a return to work. And in
6  those situations, the return to work would be,
7  get a note from your doc, but you don't have to
8  tell us what it is that you're returning to work
9  from. You just need to know you're out.
10      There are lots of reasons why you
11  might ask somebody for a note for that five-day
12  period and they would get the note back in and
13  HR would help assess, you know, does this note
14  say the person can return to work. Does it look
15  like it's a legit note. Very high level.
16      JUDGE SWEENEY: But if it's sick
17  leave, you give the note to your supervisor?
18      THE WITNESS: The supervisor or HR.
19      JUDGE SWEENEY: Or HR?
20      THE WITNESS: Or HR.
21      JUDGE SWEENEY: I'm sorry, Counsel.
22  Go ahead.

Page 527

1  BY MR. MIOSSI:
2      Q. Thank you.
3      In the e-mail that Mr. Skrynnikov sent
4  to Carrie Lee on October 21st, and you testified
5  about this, he attached a document from the
6  George Washington emergency room, and you
7  testified about that.
8      A. Right.
9      Q. So can you please turn to Exhibit 70,
10  which contains several pages?
11      A. Right.
12      Q. I'm going to ask you to look at the
13  final page in that exhibit, the last page.
14      A. Right.
15      Q. And this is a form from the emergency
16  room, signed by a representative or a physician,
17  I assume it's a physician, for Mr. Skrynnikov
18  related to the visit for his rib injury.
19      Did you -- did you ever -- was this
20  document that -- did he attach it? Did he
21  attach it to the e-mail that you saw?
22      A. No. Absolutely not.

Page 528

1    Q.   When was the first time you were aware
2  of this document?
3    A.   When I saw this exhibit.  And I think
4  the inquiry was, well, you know, like, what is
5  this?  And it's, like, this doesn't belong here.
6        This -- the document that I had
7  testified about that we had gotten, I did
8  notice at the time that it said, one of two, and
9  we didn't get a second page, but, you know, it
10  was what it was.  We got, apparently, what he
11  thought was important.
12        It says 1 of 2.  And so when I first
13  saw it in connection with this exhibit book,
14  this is one of one, so this is a completely
15  separate document, it appears.  And I had never
16  seen this before, and it very much surprised me.
17  I will tell you that.
18    Q.   Well, if you had received this
19  document in October 2009, around the 21st, when
20  he sent in the one page, would it have made any
21  difference in the circumstances that
22  Mr. Skrynnikov found himself in?

Page 529

1    A.   Absolutely.
2    Q.   Can you elaborate how and why?
3    A.   If we had known that he had been
4  released on 10/16 to return to work -- he was
5  asking on the 21st for another week so he could
6  heal from his injury, and he gave us a page that
7  indicated all sorts of things could happen or
8  might happen.  It just put into question whether
9  he was able to return.
10        If he had told us what he apparently
11  knew at that time, and he seems to have gotten
12  it, like, 15 minutes after he got the one he
13  sent to us, because it says, prepared, Monday
14  October 12, 2009.  The one we saw was at 5
15  -- 15:15, and this is prepared at 15:31 -- I
16  don't know if it's the same person, the one's KK
17  and the other's Kathy Keller -- it says he could
18  return on 10/16.  Well, we would have made him
19  return.  This would have been his ability to
20  return to work.  This is a return to work
21  certification.
22        And so it really boggles my mind,

Page 530

1  because what he was saying is, I want a week to
2  recover, but if I -- you know, if you don't give
3  it to me, I'll return anyways.  And we said, oh,
4  you've told us about the rib injury.  Get a
5  return to work.
6        If he had come the next hour and
7  said, oh, you know, my bad.  I didn't give you
8  my return to work.  I could have returned on
9  10/16, but for the thing I was out for, he would
10  have come back on the day he was certified to
11  return.  There would have been no question.
12        So it's very puzzling that he didn't
13  just turn around and give us this.
14    Q.   Okay.  If you could turn back to
15  Exhibit 68, please.  And I'm going to ask you
16  to look at the top e-mail, from Carrie Lee to
17  Mr. Skrynnikov, October 22nd, 4:54 p.m.  And I'm
18  going direct your attention, in particular, to
19  Item B that Carrie enumerates.  And so maybe
20  just read that paragraph, and then I'll ask you
21  the question.
22    A.   Okay.

Page 531

1    Q.   Can you please -- what is the
2  significance of her statement to Mr. Skrynnikov
3  that presentation of a certification to extend
4  your disability case with the advent of this new
5  condition, does that have any significance to
6  the way the short-term disability benefits would
7  work for him?
8    A.   Yes.  The way our short-term
9  disability works, it's just a pay continuation
10  practice.  It's not insurance, so it's just a
11  benefit.  And it is -- it is -- it's a pay
12  continuation practice that covers the waiting
13  period for long-term disability.
14        So that's what it's supposed to be
15  tied to.  So our long-term disability policy
16  has a 26-week waiting period.  So if something
17  happens when you're an employee, and you go into
18  LTD, you don't get benefits for 26 weeks.
19        We have a short-term disability policy
20  that says, we cover you.  But at Fannie Mae,
21  because it is tied to long-term disability,
22  if you're out for Condition A, say you have an

Page 532

1    appendix out or something like that and you're
2    on short-term disability and you take 20 weeks
3    of the total 26 weeks, one week of sick leave
4    and then 25 weeks, you take 20 weeks for your
5    recovery from this appendicitis, and while
6    you're out, before you're able to return, you
7    have, I don't know, God forbid you get into a
8    car accident, completely different, and you're
9    disabled because of the car accident, some of
10   that may overlap, but you have to get your
11   information in to The Reed Group, because that
12   would start a new period of 26 weeks.
13         So for that second condition, you
14   could be covered beyond your 26 weeks for the
15   first one.  You would have 20 weeks, maybe a
16   little overlap, and then you would run another
17   26 weeks of pay continuation, as long as you
18   qualified.  So it would cover you if you, God
19   forbid, had to go into long-term disability.
20         Q.   Would an employee who does not have
21   a position still be eligible for short-term
22   disability benefits at Fannie Mae?

Page 533

1         A.   If we know about it -- because the
2    business has to continue, if a person runs out
3    of their protected leave, the business typically
4    would let their position go.  But if they had a
5    continuing need for an illness for short-term
6    disability, for pay continuation, and something
7    happened while they were at work, you know,
8    during the period that they were employed,
9    whether it's a car accident or whatever, our
10   practice has been to keep people on in a pay
11   status so that they could get that.
12         You have to be employed by Fannie Mae
13   to be eligible for this pay continuation.  And
14   they would get that pay continuation, but they
15   wouldn't have a job to return to.
16         Q.   And just so we're clear, is there
17   any legal obligation that Fannie Mae -- any
18   -- any law that requires Fannie Mae to extend
19   short-term disability benefits to its employees?
20         A.   No.  That's a voluntary pay
21   continuation practice with us.
22         Q.   And during the period of time that

Page 534

1    Mr. Skrynnikov was out on leave from July 9th or
2    10th to the expiration of his D.C. FMLA, which
3    was October 29, 2009, was he in a short-term
4    disability benefits status?
5         A.   I believe so, either pre-approved or
6    retroactively approved, you know?
7              I think there was pay continuation the
8    whole time.
9         Q.   And what does that mean exactly?  Is
10   that a percentage of pay, or is that a hundred
11   percent of pay?
12         A.   That's a hundred percent of pay.
13         Q.   And do your other benefits continue in
14   place?
15         A.   Yes.
16         Q.   To your knowledge, was Mr. Skrynnikov,
17   in fact, approved retroactively by The Reed
18   Group for the maximum 16-week D.C. FMLA
19   entitlement?
20         A.   I believe so.
21         Q.   And do you recall the date on which
22   his short-term disability benefits expired?

Page 535

1         A.   No.  But it would have been -- I
2    believe it was after that.
3         Q.   Okay.  Now, after Mr. Skrynnikov's
4    D.C. FMLA period expired, and after his
5    short-term disability period expired, were you
6    consulted by anyone with respect to the decision
7    to terminate Mr. Skrynnikov's employment?
8         A.   I believe so.
9         Q.   Okay.  And do you recall who sought
10   your advice on that question?
11         A.   I think it was always Carrie Lee.
12         Q.   Okay.  And did you provide her advice?
13         A.   Yes.
14         Q.   And what did you provide -- what did
15   you tell her?
16         A.   At the very end?
17         Q.   Yes.
18         A.   That he -- my recollection was he had
19   had -- he had -- his FMLA had expired, all the
20   FMLA entitlements, whether they were D.C. or
21   otherwise.  He had not asked for -- despite
22   being reminded of our policy, he had not asked

26 (Pages 532 to 535)

Page 536

1    about any ADA job-protected leave continuation,
2    which is standard for us to ask an employee if
3    you want that.  And he had not asked for that.
4    We were continuing, as would normal practice be,
5    to allow him to get the benefit of short-term
6    disability, but there was no reason why he
7    couldn't be terminated at that point.
8        Q.  And one final question:  Did you have
9    any knowledge, whatsoever, that Mr. Skrynnikov
10   allegedly expressed concerns about information
11   that Fannie Mae provided in response to a
12   request from Senator Grassley's office in the
13   first or second quarter of 2009?
14       Is there anything you knew anything
15   about?
16       A.  No.
17       MR. MIOSSI:  I don't have any
18   additional questions.
19       MR. SALB:  No cross.
20       JUDGE SWEENEY:  Okay.
21       MR. MIOSSI:  Thank you.
22       JUDGE SWEENEY:  All right.

Page 537

1        Thank you.
2        You're free to go, I think.
3        All right.  What are we doing next?
4        MS. KUNTZ:  I guess we're taking a
5    break.
6        JUDGE SWEENEY:  Do you have any
7    additional witnesses?
8        MR. SALB:  Just a moment.  You know
9    what, let's take a two-minute break.
10       JUDGE SWEENEY:  All right.  We'll take
11   a recess then.
12       (Recess taken.)
13       JUDGE SWEENEY:  All right.  So I
14   guess the first question here is, do plaintiffs
15   have any additional testimony?
16       MS. KUNTZ:  No.  Not for our case.
17       JUDGE SWEENEY:  All right.  So this is
18   plaintiff's case; is that correct?
19       MS. KUNTZ:  Yes, Your Honor.
20       JUDGE SWEENEY:  All right.  So I guess
21   we'll start with your side.
22       MS. LENAHAN:  We will call

Page 538

1    Ms. Harrison.
2        JUDGE SWEENEY:  Ms. Harrison, if
3    you'll go back to the stand here.
4        All right.  Ms. Harrison, we'll need
5    to swear you again.
6    Whereupon --
7            KRISTIN HARRISON,
8    called to testify, having been first duly sworn
9    or affirmed, was examined and testified as
10   follows:
11           DIRECT EXAMINATION
12   BY MS. LENAHAN:
13       Q.  Good morning, Ms. Harrison.
14       What is your educational background?
15       A.  I have an undergraduate degree from
16   University of Maryland in communications and a
17   masters in business administration from the
18   University of Maryland.
19       JUDGE SWEENEY:  All right.  You're
20   just right on the edge of being able to hear
21   you.
22   BY MS. LENAHAN:

Page 539

1        Q.  Are you currently employed?
2        A.  I am.
3        Q.  Where are you currently employed?
4        A.  At Fannie Mae.
5        Q.  And what is your current position?
6        A.  I'm the chief of staff for the
7    Financial Planning and Analysis Group.
8        Q.  And when did you move into that
9    position?
10       A.  April of this year.
11       Q.  And when did you start at Fannie Mae?
12       A.  I started as a contractor in September
13   of 2005 -- August or September of 2005, and
14   converted in November of 2005 to a full-time
15   employee.
16       Q.  And in November of 2005, what was your
17   position?
18       A.  In November of 2005?
19       Q.  Correct.  When you moved into a
20   full-time position.
21       A.  A senior financial analyst.
22       Q.  In what group?

27 (Pages 536 to 539)

Page 540

1      A.  In Financial Planning and Analysis.
2      Q.  And then did you ever get promoted in
3  that group?
4      A.  I did.
5      Q.  And what were the promotions?
6      A.  Eventually, I became a manager in
7  Financial Planning and Analysis.
8      Q.  And around what time period was that?
9      A.  I don't remember.  I don't know if it
10  was 2007 or 2008.  Maybe 2007.  I don't
11  remember.
12      Q.  And do you remember until what time
13  period you were the manager in the FP&A Group?
14      A.  I ended management -- the manager
15  position in September of 2009.
16      Q.  And can you just kind of briefly
17  describe what the Financial Planning & Analysis
18  Group does?
19      A.  We refer to it as a -- as the budget
20  and expense team for the company.  We are not
21  part of the controller's group.  We are a
22  separate division.  We do the financial

Page 541

1  forecasts for the company.  But a lot of -- a
2  lot of FP&A is made up of the general and
3  administrative expense management, which is
4  your typical compensation consultant dollars,
5  hardware and software.  It's your budget to run
6  the company.
7      Q.  And do you know who preceded you as
8  manager in FP&A?
9      A.  Multiple managers.  There's different
10  teams to support different business units within
11  the company.
12      Q.  Do you recall whose position you took
13  over as manager of FP&A?
14      A.  The group that I -- when I was
15  promoted -- sorry.
16          The group in the September or
17  October/November/December time frame of 2008, I
18  think, was a relatively new group that I took
19  over.  So I don't know if there was a
20  predecessor.
21      Q.  And what were some of your duties as
22  manager of Financial Planning and Analysis?

Page 542

1      A.  In the -- so this -- the team that I
2  was in, at that time frame, was called Corporate
3  Consolidations.  And one of the main
4  responsibilities was the business segment
5  allocation report.
6          That report is, basically, a -- it's
7  a report that takes all of the general
8  administrative expenses for the company and
9  attributes them to the specific lines of
10  business for the company, which we reviewed the
11  other day, which are the capital markets,
12  single-family and multifamily business lines.
13      Q.  And when you say corporate
14  consolidation, kind of explain to me what that
15  group does.
16      A.  We ran the monthly close for all of
17  the divisions.  So as your monthly expenses came
18  in, we ensured that each analyst or each team
19  was responsible for making sure their numbers
20  were accurate for their divisions.  So we would
21  hold calls that would ensure that they were
22  doing their due diligence to go over the

Page 543

1  numbers.
2          But other than that, the main
3  responsibility or output was the business
4  segment analysis and other metrics that impacted
5  everyone, meaning, for contractor head count, we
6  had a lot of contractors and consultants
7  onboard, because we were going through the
8  restatement or we were at the tail end of the
9  restatement, so a lot of people use the same
10  types of metrics.  And we were responsible for
11  coming up with those types of statistics or
12  metrics.
13      Q.  And during this October 2008 or
14  November 2008 to September 2009 time frame, who
15  was your manager?
16      A.  Mary Martin.
17      Q.  And did you have any direct reports?
18      A.  I had Lourdes Alcalday [phonetic], Tim
19  Skrynnikov.  And we also hired a contractor.
20  Her name was Vera Manda Van Cotta [phonetic].
21      Q.  And do you recall what Lourdes's job
22  duties were at that time?

28  (Pages 540 to 543)

Page 544

1    A.   Between Tim and Lourdes, there was
2  some overlap, but I tried to separate the
3  duties.  Tim was mainly responsible for business
4  segment allocations.  Lourdes still had some of
5  the checks and balances of Tim's work.  I think
6  she helped with the SOX, which is Sarbanes
7  Oxley.
8       I don't know, specifically, what she
9  did on a day-to-day basis.  I barely recall that
10 type of work.
11    Q.   And you mentioned a contractor named
12 Vera?
13    A.   Vera was hired in the winter of 2008
14 to come in and help with the automation of the
15 business segment allocation reporting.  So the
16 business segment allocation process was mostly
17 automated, but the reporting piece was very
18 manual still.
19    Q.   And so when you speak that it was very
20 manual, what does that mean in, kind of,
21 laymen's terms?
22    A.   So in Financial Planning and Analysis,

Page 545

1  the tool we used is called Hyperion.  It's
2  marked as a financial reporting tool.  And
3  within the company, anything that's financial
4  reporting with that designation requires it to
5  go through full software development lifecycle
6  phases, which is very long and expensive to have
7  changes made to a system.
8       So with a business segment allocation
9  report, it was not part of the system yet.
10 Nothing was automated.  Every time you wanted
11 to produce a report, it was basically a data
12 dump manipulated into a report.  Manipulated may
13 not be the right word, but massaged to fit into
14 a report, and then reported on.
15    Q.   So the end goal of Vera's job duties
16 was what?
17    A.   To incorporate the reporting piece
18 into the Hyperion system.
19    Q.   And would that, potentially, eliminate
20 the need for some personnel?
21    A.   The majority of that job, at the time,
22 which was Tim's, would be eliminated because of

Page 546

1  the work being automated for that purpose.
2    Q.   And, you know, you described a
3  little bit about what information goes into the
4  business segment allocation report.  Where would
5  your group obtain that information?
6    A.   Directly from the general ledger.
7  So all of the analysis on the numbers came from
8  each individual group or analysts.  We would
9  take the final numbers that came out of the
10 general ledger, put them back into a different
11 type of allocation reporting system in
12 PeopleSoft, which would run more calculations
13 to separate them into the lines of business.
14    Q.   And so the ultimate goal was to make
15 it less dependent on human interactions and
16 inputting it into, say, an Excel-based software
17 and have it more manually run?  Was that the
18 goal of the automation?
19    A.   No.
20       So that automation was done with Tim.
21 So Tim helped with getting -- we were in a lot
22 of test mode with the PeopleSoft team to do the

Page 547

1  calculations within PeopleSoft.
2       After those calculations were done,
3  there's still massaging to get it into a report
4  format so you could read what the cost of each
5  division was to a certain line of business for
6  their P&L statements.
7    Q.   Without, necessarily, a Fannie Mae
8  employee doing it?  It would just be done in the
9  background by a computer?
10    A.   By a system, yeah.
11    Q.   And that system was called what?
12    A.   Hyperion.
13    Q.   And so you spoke a little bit about
14 what Tim's job duties -- Mr. Skrynnikov's job
15 duties were when you first took over.  Can you
16 go into a little more detail about that?  What
17 would you say the percentage of his job duties,
18 when you first took over the group in October
19 2008, was the business segment allocation report
20 and running it?
21    A.   So our processes were cyclical, but 80
22 to 90 percent of his job was around the business

Page 548

1    segment allocation reporting.
2        Q.   And what would you say the other 10 to
3    20 percent -- 10 to 15 percent of his role was?
4        A.   It varied, but because we were -- we
5    were newly formed, we had started doing
6    contractor metrics and head count metrics for
7    the company.  We were responsible for signing
8    off on the SOX requirements, which were balance
9    consolidations for general ledger accounts.
10       But his role was evolving as we were
11   getting to a more sufficient process.
12       Q.   So as Vera continued to automate the
13   project or -- I'm not sure what you're --
14       A.   As Vera and as I got up to speed,
15   we eliminated a lot of manual processes that
16   weren't adding value and/or needed to be
17   streamlined.
18       Q.   In the production of the business
19   segment allocation report?
20       A.   Correct.
21       Q.   And you kind of speak about running
22   this business segment allocation report.  Just

Page 549

1    take us through, step by step, what would that
2    entail before it was automated?
3        A.   We had to coordinate with the
4    PeopleSoft general ledger team to, I don't know
5    if it's import, export numbers into the system.
6    We needed to tell them when to, basically, hit
7    the button, per se, to get the numbers loaded,
8    to validate what was coming out, ticked and tied
9    from our expectations, until it came to a data
10   file that we could export out of the system.
11       So it was still coordination.  It
12   wasn't just, you hit the go button and it was
13   done, but there were also additional steps to be
14   coordinated with a separate team?
15       Q.   It took less manpower each kind of
16   phase of the process.
17       A.   Yeah.  So when the piece that Vera
18   was working on was around documentation.  That's
19   where, when I came into their group,
20   documentation was key because I didn't
21   understand the process.  I was sitting with Tim,
22   in addition to Vera, to go over the manual steps

Page 550

1    that he was taking to run the process, as well
2    as ensuring those were the correct processes,
3    even though that's the way he did it.
4        Sometimes he did not have, like, a
5    step-by-step manual of how he did his job.
6    So we were uncovering some nuances, we were
7    uncovering sometimes things didn't work and he
8    would be troubleshooting and we were trying to
9    understand fully why things were done a certain
10   way, and then, at the same time, improving those
11   processes.
12       Q.   And what kind of financial numbers
13   went into the business segment allocation
14   report?  Are they actual?  Are they forecast?
15       A.   So we went over three reports the
16   other day, and I don't remember the exhibit
17   numbers.  But the purpose of the business
18   segment allocation report is to report profit
19   and loss on a business line.  We had three at
20   the company at the time.  So these were the
21   general and administrative expenses of the
22   divisions within the company allocated to those

Page 551

1    business lines.
2        Q.   So just to go over a few terms that
3    we'll probably use throughout your testimony,
4    when a Fannie Mae employee speaks about the
5    budget, what does that mean?
6        A.   The budget is an annual estimate
7    of expenses that would happen in the following
8    year.  So in September, usually September of,
9    what is this, 2014, we will run a process that
10   will give a bottoms-up view of our budget that
11   we'd have to adhere to for 2015.
12       Q.   And does that budget number ever
13   change?
14       A.   The budget number never changes,
15   but then comes a forecast.  And a forecast is
16   supposed to be a more accurate view of what your
17   spending will be, but that's not always the
18   case.
19       Q.   And if you refer to an actual, what is
20   an actual?
21       A.   Actuals represent your best estimate
22   of the monthly close.  So, for instance, it's a

Page 552

1    combination of accruals, which are estimates
2    provided to you, either by vendors and/or by --
3    if you have a fixed price contract and it was
4    straight-lined through the year, you know, that
5    could be an accrual, is one-twelfth of the
6    contract, in addition to payments received.
7         So I could receive a payment that was
8    for an invoice related to the previous year, but
9    because no one accrued for it properly, that
10   expense would hit me in the current year and
11   become part of my actuals, which is going to be
12   reflected on your monthly close cycle.
13        Q.   And so when you guys are pulling
14   together the business segment allocation report,
15   you said you received the actual numbers from
16   the business lines.
17             Would you ever ask them to change it?
18        A.   No.  The divisions is where we would
19   receive the actuals.
20        Q.   Okay.
21        A.   So each -- each division would have an
22   assigned analyst.  Some analysts would have more

Page 553

1    than one division.  They are responsible for
2    ensuring that those numbers were accurate.
3         Q.   Your group would have nothing to do
4    with it?
5         A.   No.
6         Q.   And what about the allocations that
7    are provided?  Who provides your group with the
8    specific allocations of how to move them across
9    the business segment allocation report?
10        A.   So we would reach out to each analyst,
11   who was responsible for ensuring that they reach
12   out to their cost center owners, which cost
13   centers made up a division, and get that
14   information, which would say, for cost center
15   XYZ, I have 50 people here, 10 percent spend
16   their time on single-family work; 15 percent on
17   multifamily; and the rest goes to capital
18   markets.  They are responsible for telling us
19   how their costs are attributable to those
20   business lines.
21        Q.   So, again, you would never request
22   them to change those allocations or percentages.

Page 554

1    You would just receive that information; is that
2    right?
3         A.   We might question the allocation, if
4    they didn't change, because they didn't actually
5    update anything, just to validate that they have
6    received the up-to-date information.
7         Q.   If you could turn to Exhibit 29,
8    I think it would give us a, kind of, clearer
9    understanding of what we've been talking about.
10            Exhibit 29 is entitled, the BSA Report
11   Full Year Forecast Q1 '09.  And is this an
12   example of a report that both Mr. Skrynnikov and
13   your group would produce?
14        A.   Yeah.  This is one of the reports.
15        Q.   And would Mr. Skrynnikov, or anyone in
16   your group, have any responsibility for the
17   numbers contained within this report?
18        A.   For the accuracy of reporting, yes.
19   Because, ultimately, there are an original set
20   of numbers, which comes out of a general ledger,
21   feeds into an allocation process, which would
22   then break it into these three columns and three

Page 555

1    tiers on the report.
2         Q.   And can you kind of just briefly
3    describe the different -- both columns and rows
4    in this report --
5         A.   Yep.
6         Q.   -- so we get a better understanding?
7         A.   So the columns are business lines that
8    we have at Fannie Mae are capital markets.  HCD
9    is for Housing and Community Development or
10   multifamily, and then SF is for single family.
11        Q.   So those are, in Fannie Mae, what's
12   known as the three divisions?
13        A.   Three lines of business.
14        Q.   Three lines of business?
15        A.   Yep.  At that point in time.
16            Then if you look at the -- I guess,
17   each --
18        Q.   Yeah.  Let's start with direct.
19        A.   Yeah.  Direct a hundred percent via
20   specific, means that, for costs centers within
21   the divisions, which are the labels on the
22   left-hand side, they have allocated that there's

31 (Pages 552 to 555)

Page 556

1    no allocation, they are a hundred percent
2    specific to the business lines.
3         So for capital markets, you wouldn't
4    see it repeated under any other section, because
5    a hundred percent of their costs are
6    attributable to supporting their line of
7    business. Same thing with HCD and single
8    family.
9         Now, underneath the business units,
10   you see business support, which are divisions
11   that don't bring in revenue.
12   Q.   Okay. Can you give a couple examples
13   of that?
14   A.   All of the ones under business
15   support. So you have business and development
16   technology, which is our technology
17   infrastructure team; business analysis and
18   decisions; communications and marketing. You'll
19   see finance under there. HAMP, which was our
20   newly stood-up Home Affordable Modification
21   Program under the President's initiative with
22   Treasury.

Page 557

1         Those were all non-revenue producing
2    divisions of the company.
3    Q.   So you would make no calculations for
4    these numbers? They would just go directly
5    into --
6    A.   Other than the allocation, we don't
7    come up with numbers.
8    Q.   Okay. So then for direct specific
9    allocation, what does that mean?
10   A.   So direct specific is still
11   attributable to -- okay, so for the first
12   line, I guess, the example for business and
13   development technology, you would have the three
14   lines of business. But then you might have,
15   let's just say 20 percent capital markets,
16   20 percent HCD, 20 percent single family, but
17   then the remaining 40 percent was attributable
18   to corporate.
19   Q.   Okay.
20   A.   So then corporate would become
21   the next spread and different allocation
22   methodology in that next section, which is

Page 558

1    called indirect. So that's why you see business
2    and development technology repeated again. And
3    it spreads what doesn't necessarily get
4    attributed to the business, but goes to the
5    corporate bucket, which then is redistributed
6    down to the business lines.
7    Q.   So the corporate bucket is then also
8    kind of the indirect. Is that how you --
9    A.   It's indirect, yes.
10   Q.   And so we can see that incentive
11   compensation falls under both direct specific
12   allocation, and indirect, meaning it has
13   corporate overhead, but then is spread again
14   over the three lines of business?
15   A.   Right. So where you can't identify
16   costs that are specifically allocated to a
17   business line, you would then re-spread the
18   remaining balance of that area back to the
19   businesses for a second allocation.
20   Q.   And your decision that the corporate
21   or indirect is a certain number and the direct
22   specific across the three business lines is a

Page 559

1    specific number, who do you receive that
2    information from?
3    A.   So for corporate allocation, it
4    depends on the division, as well.
5         For instance, the business and
6    development technology, I believe -- I don't
7    know if there was a generic way of saying
8    corporate should be spread based on the way that
9    direct was, as a percentage of total. I don't
10   remember the specifics of that. But we wouldn't
11   come up -- I mean, my group, necessarily, would
12   not come up with it. It might have been a
13   higher-level decision or directly from the
14   customers.
15   Q.   So it might come directly from
16   business and development technology, or it might
17   come from your higher-ups?
18   A.   Yep.
19   Q.   But it doesn't have anything to do
20   with your group in FP&A?
21   A.   No.
22   Q.   If you can turn to Exhibit 31 now?

32 (Pages 556 to 559)

Page 560

1     This is a BSA report full year
2 forecast quarter of 2009.
3          Now, why would some of the numbers
4 from Exhibit 29 and Exhibit 31 change?
5     A.   So 29 was the Q1 forecast.  So a point
6 in time what the -- what numbers were in the
7 general ledger that said, this was our forecast
8 for the division that would make up this report.
9          When they revised their forecast in
10 Q2, they could have had -- I mean, there's
11 multiple things they could have changed.  You
12 could have different actuals come in or you
13 could have a different forecast for the whole
14 year.
15     Q.   So it's not dependent -- it's not
16 always the actuals came in, the forecast must
17 have changed.  Sometimes the forecast changed
18 and the actuals stayed the same or -- you don't
19 know --
20     A.   Well, your actuals would always
21 change, because you would have more recent
22 actuals.  But your forecast could also change,

Page 561

1 which would change the numbers in total, as
2 well.
3     Q.   And, now, if you turn to Exhibit 30,
4 which is a BSA report forecast variance between
5 Q1 and Q2, '09, can you kind of explain the
6 significance of how the Exhibit 29 and Exhibit
7 31 interact to create Exhibit 30, or is it --
8     A.   I think -- I believe all that this
9 is doing is taking -- it says forecast, so I'm
10 assuming it's taking the Exhibit 29, which was
11 the full year forecast view of the numbers at
12 that point in time, which total 2.4 billion, in
13 contrast to your Q2 forecast, which was 2.384
14 billion, and showing how it changed within the
15 different segments and different business lines.
16          It's just a comparison of how the
17 numbers ran and came out and were produced in
18 one quarter versus the second quarter when you
19 had a different forecast and different values
20 and taking the sum of the two or the difference
21 between the two and putting it on paper.
22     Q.   And so the reference to variance is

Page 562

1 just the variance in this point of time between
2 the forecast of Q1 and forecast of Q2?
3     A.   Yeah.  Most likely taking Q2 minus Q1,
4 and that's the difference.
5          If you take 22.384 minus 2.408, is the
6 difference -- is that $23 million number under
7 total operating costs.
8     Q.   And did variances in this kind of
9 forecast variance ever worry you?
10     A.   They didn't worry us.  But it was our
11 responsibility to make sure that, Number 1, we
12 ran the allocation process properly and
13 correctly.  And if there were big swings, upper
14 management, which would mean my director, or the
15 vice president who was reviewing this, would
16 feel comfortable we didn't need to call
17 anything specific out.
18     Q.   Was it your job to say if, you know,
19 the Incentive Compensation Department decided
20 to change or zero out a bonus plan and,
21 therefore, significant variances occurred,
22 would that be your job to zero it out?

Page 563

1     A.   No.  It would be the responsibility of
2 the analysts and managers responsible for that
3 group.
4     Q.   Would you have even had access to that
5 kind of information, or would you have just told
6 that there was an explanation for why there was
7 a great variance?
8     A.   It depends on the circumstance.
9 And I think we've seen that -- we would have
10 asked questions before, because I think in
11 this -- in this specific example, where there is
12 a large variance, we would want to make sure
13 that we had some background on it, but we would
14 have reached out to the analysts.  And if they
15 didn't have knowledge, we would get permission
16 to go to the specific group.
17     Q.   And so for groups such as incentive
18 compensation, what kind of data or information
19 would your group receive to create the business
20 segment report?
21     A.   The same level of information we
22 would receive from any other group, which is

33 (Pages 560 to 563)

Page 564

1    accessible through the general ledger.  But it
2    was, basically, journal entries and/or payments
3    that come through at a cost center level to show
4    what was booked for the month, or for the time
5    period that you were looking at.
6        Q.  Can you turn to Exhibit 18?
7            Now, this is what's entitled as the
8    Executive Comp file.  And it has, kind of, two
9    dates on it.  One is May 20th, 2007, and another
10   is February, with too many zeroes, 2008.
11       A.  Yep.
12       Q.  But have you -- what is this report?
13       A.  I believe when we reviewed this, this
14   was an example of how incentive compensation, or
15   a portion of that division, was allocated by
16   cost center to the business lines, which are the
17   last three to four columns.
18       Q.  And you don't know if this was how
19   they allocated it in 2009?
20       A.  I don't recall.
21       Q.  And just to kind of explain this
22   spreadsheet to us, the term bonus, what does

Page 565

1    that mean?  When your group would see the word
2    bonus, what would that mean to you?
3        A.  It's hard to say what bonus meant
4    without it tying to something, even with a total
5    on here.  But -- so the allocation process was
6    given to us by each division.  So in the case of
7    incentive compensation, I know one of their
8    methodologies is that, depending on where an
9    executive or a higher-level manager sat within
10   the company, they would reference the
11   allocations given for that particular cost
12   center back to the lines of business to say,
13   this is your piece of our costs.
14           So in our company at Fannie Mae,
15   bonuses are not paid out by division.  They
16   are budgeted at a corporate level, which is the
17   Incentive Compensation Division, along with our
18   pension, along with other stocks, incentives, at
19   that time, whatever was in the budget.  I'm not
20   sure what bonus, what it meant, whether it be a
21   combination of things that could be attributable
22   to a specific person versus what couldn't be

Page 566

1    attributable to a certain person.  So I don't
2    know what bonus necessarily meant.
3        Q.  But this bonus could have included
4    pension, stock, the actual retentions bonus they
5    were paid, whatever bonus plans you had for
6    actual --
7        A.  Yeah.  They would make the
8    determination on what could be attributable to
9    a person that then would be allocated back to a
10   specific business line.
11       Q.  So looking at this number, you would
12   have never thought that this is a number a
13   director would have been paid out --
14       A.  No.
15       Q.  -- in cash on your bonus, --
16       A.  No.
17       Q.  -- you know, whenever you guys get
18   paid your bonuses?
19       A.  No.
20       Q.  Would you or anyone in your group have
21   access to what actual bonuses were paid?
22       A.  Absolutely not.

Page 567

1        Q.  And why not?
2        A.  It's confidential.  I mean, the way
3    that -- even if you have access to the general
4    ledger, that information is not booked at a
5    name-by-name level.
6            I don't even know if the accruals,
7    which have a generic title associated to the
8    description line item, have anything associated
9    to bonus when it's booked.
10           So we're not privy to it, I mean,
11   specifically, in our group, much less levels.
12   We have nothing to do with it.  We didn't need
13   to have access to that information.
14       Q.  So those, kind of, target bonuses that
15   are in Exhibit 18 are kind of an aggregate of
16   anything that could have been, kind of, known
17   in the world as incentive compensation for
18   Fannie Mae employees?
19       A.  So portion of incentive compensation,
20   but I don't know what makes up the number.
21       Q.  Do you remember, as of 2009, if
22   stock was part of incentive compensation, stock

34  (Pages 564 to 567)

Page 568

1    awards?
2        Did employees receive them?
3        A.  No.  Because once we got into
4    conservatorship, one of the major -- we had
5    multiple town halls, which were all hands for
6    employees across the company.  And they were
7    many, many hosted conversations where everyone's
8    stock options -- well, we were in a blackout
9    period, first of all.  So anyone who had stock
10   in the company, it all was on hold.  And then it
11   ultimately went to nothing.  So nothing was
12   awarded when it became a stock option.
13       Q.  So those target bonus numbers very
14   well could have included this stock option as
15   part of the aggregate number, but employees
16   never actually received them?
17       A.  Correct.  Because we went into
18   blackout, we weren't allowed to touch stock, and
19   we couldn't cash it.
20       Q.  Can you turn to Exhibit 23?
21       It's entitled the employee Incentive
22   Compensation Expense Reconciliation, --

Page 569

1        A.  Yes.
2        Q.  -- year-to-date expense for Account
3    6111-75, as of 6/30/2008.
4        A.  Yep.
5        Q.  Is this something that your group
6    would receive?
7        A.  We did receive it, upon request.  I
8    don't know if it was something that we received
9    normally or not.  But we didn't prepare this
10   document.  This document was prepared by the
11   incentive compensation team.
12       Q.  And do you recall who was the head of
13   that group?
14       A.  Chuck Roden was the manager of the
15   group at the time.
16       Q.  And is Chuck Roden who your
17   group would have interactions with at Fannie
18   questioned on variances within incentive
19   compensation?
20       A.  Yes.
21       Q.  And so you would go for any -- if you
22   had seen a forecast or a variance that didn't

Page 570

1    look right, you would refer any questions to
2    Chuck Roden's group?
3        A.  Most likely, it wasn't even Chuck.  It
4    was usually his director that we would interact
5    with, but, yes.
6        Q.  And if you take a look on the
7    left-hand side, there's a bunch of programs
8    listed.  Are these the types of different
9    incentive compensation benefits that Fannie Mae
10   offered that could have gone into that target
11   bonus number that we saw in Exhibit 18?
12       A.  Yes.  Any combination of this.  I
13   don't know what would make up the target,
14   because I don't know, specifically, which
15   programs were attributable to specific people
16   to come up with that bonus, per se, number.
17       Q.  And that was something -- that was a
18   target bonus number that Chuck Roden's group
19   would come up with and they would just provide
20   to you?
21       A.  Yes.
22       Q.  So in any of these documents that we

Page 571

1    have looked at, none of them give you an idea of
2    what a employee was actually paid in bonus?
3        A.  Nothing.
4        Q.  Did Mr. Skrynnikov ever have access to
5    the bonus amounts employees were actually paid?
6        A.  No.
7        Q.  And would anyone in your group?
8        A.  No.
9        Q.  During the time that you supervised
10   Mr. Skrynnikov, did he ever raise any concerns
11   with regard to incentive compensation or the
12   numbers provided to your group by Chuck Roden's
13   group?
14       A.  Other than understanding variances if
15   they met a certain threshold or we were asked to
16   dig a little deeper, that wasn't our
17   responsibility, and, no, he didn't ask.
18       Q.  And did Mr. Skrynnikov ever discuss
19   any concerns with you about how Fannie Mae was
20   reporting to Senator Grassley's request for
21   information?
22       A.  No.

35 (Pages 568 to 571)

Page 572

1    Q.   Did he ever raise any apparent
2  discrepancies between the totals for executive
3  compensation reported to Grassley and the totals
4  he saw on the monthly reports he updated, which
5  was part of his assignment?
6    A.   No.
7    Q.   Did Mr. Skrynnikov ever discuss with
8  you Fannie Mae going into conservatorship?
9    A.   No.
10    Q.   Did Mr. Skrynnikov ever discuss with
11  you how the incentive compensation file may
12  change as a result of Fannie Mae being put into
13  conservatorship?
14    A.   No.
15    Q.   And that's either for 2008 or 2009?
16    A.   No.
17    Q.   Did Mr. Skrynnikov ever speak to you
18  about Senator Grassley's request?
19    A.   No.
20    Q.   Did you have any role in FHA's
21  response to Senator Grassley's letter?
22    A.   No.

Page 573

1    Q.   Did anyone in your group have any role
2  in responding to Senator Grassley's letter?
3    A.   Not that I'm aware of.
4    Q.   Did you participate in any discussions
5  on how to respond?
6    A.   No.
7    Q.   Did you read FHA's response on behalf
8  of Fannie Mae?
9    A.   No.
10    Q.   When did you first learn that Senator
11  Grassley had requested information from Fannie
12  Mae about their incentive compensation?
13    A.   As part of this arbitration.
14    Q.   So well after?
15    A.   Well after, yes.
16    Q.   And when you were supervising
17  Mr. Skrynnikov, did you ever throw things at
18  him?
19    A.   No.
20    Q.   Did you ever ask him if he understood
21  English?
22    A.   No.

Page 574

1    Q.   Did you ever treat him poorly?
2    A.   No.
3    Q.   Did you think your relationship with
4  Mr. Skrynnikov was a professional one?
5    A.   Yes.
6    Q.   Did you ever yell at him for his job
7  performance?
8    A.   No.
9    Q.   Did you ever make any comments about
10  his salary or he wasn't living up to the
11  expectations of his salary?
12    A.   Yes.
13    Q.   What were those comments about?
14    A.   I think I questioned him on the type
15  of performance he was providing, and, basically,
16  the amount of time and handholding that I was
17  involved in, with a senior financial analyst at
18  the time.  And I was questioning if he thought
19  he was providing value for the amount of money
20  he was being paid, that should we be doing this
21  level of work and fixes for what he was getting
22  paid.

Page 575

1    Q.   And when you provided him his job
2  change form in July of 2009, did you throw it at
3  him?
4    A.   No.
5    Q.   Did you make any further comments
6  about his inability to live up to his job
7  performance?
8    A.   No.
9    Q.   Did you ever tell him, it looks like
10  you have hatred in your eyes?
11    A.   No.
12    Q.   Did you have any issues with
13  Mr. Skrynnikov's performance?
14    A.   Yes.
15    Q.   Starting when?
16    A.   So I believe I became his manager in
17  November -- October/November of 2008.  And we
18  write performance evals in the beginning of
19  January, so I had about two months of
20  supervision.
21        So during the time that I was getting
22  up to speed and the time of the evaluations, I

36 (Pages 572 to 575)

Page 576

1  was responsible for documenting his performance.
2       At that time, Lourdes Alcalday was a
3  previous manager, as well as Mary Martin.  They
4  were responsible for writing the majority of his
5  documented performance review for the previous
6  year.  And I had talked to Cheryl Sember,
7  because I didn't feel like I had enough detail
8  to write against each goal within his
9  performance eval, other than a high-level
10  summary, so within the performance eval, you'll
11  see that I quote and have -- I had, at that
12  time, specific documentation, that came
13  specifically from Lourdes and Mary, to provide
14  an evaluation against each specific goal.  And
15  then myself, after two months of evaluation,
16  also agreed with the majority of their comments,
17  which was a combination of attention to detail,
18  he was more process oriented than analytical in
19  the way he produced his work, things of that
20  nature, that, ultimately, were repetitive.  And
21  then -- and then that, ultimately, led to a
22  rating of an FM minus at the time in the

Page 577

1  company, which was -- I think there was an FM,
2  FM plus, FM minus.  I don't know if there were
3  more than that.  But, basically, you -- as an FM
4  minus, you are in a pretty rough position.
5  That, basically, told you that you needed to
6  improve quickly.
7       But it was the responsibility of the
8  manager to put them on a development plan.  The
9  development plan had very specific steps on what
10  needed to improve, and how, in relation to the
11  workload.  And that was what was documented and
12  reviewed, I believe weekly, with Tim.
13       Q.  And you mentioned Cheryl Sember?
14       A.  Cheryl Sember.
15       Q.  Who was she?
16       A.  She was Carrie Lee's boss.  I don't
17  know if Carrie was on vacation at the time, or I
18  don't remember the circumstances.  But I was
19  more specific around when I was copying and
20  pasting their, meaning Lourdes and Mary's,
21  comments into the evaluation that I was able to
22  do that since I ultimately delivered the

Page 578

1  evaluation to Tim with their comments in it.
2       Q.  Okay.  So Cheryl Sember is HR and
3  Lourdes Alcalday and Mary Martin were both his
4  previous supervisors that entered information in
5  his end-of-the-year 2008 --
6       A.  Mary was my director, so she was still
7  in Tim's chain of command as far as management.
8  But Lourdes was his previous manager, who then
9  became his peer.
10       Q.  And when does Fannie Mae start
11  conducting end-of-year reviews?
12       A.  January of the following year.
13       Q.  Can you turn to Exhibit 33, please?
14       Exhibit 33 is it entitled, 2008
15  year-end review for Timothy Skrynnikov?
16       A.  Yes.
17       Q.  And so this is for the review period
18  of January 1, 2008, until December 31, 2008?
19       A.  Correct.
20       Q.  And you are listed as his manager,
21  but, as you explained previously, and if you can
22  point out where certain instances where you cut

Page 579

1  and paste previous manager's reviews of him, --
2       A.  Yep.
3       Q.  -- just for clarity.
4       A.  So if you flip to the page ending with
5  673, which is the second page, you'll see it.
6  There's bolded words assessment by Timothy
7  Skrynnikov.  And then under that paragraph,
8  assessment by Kristin N. Harrison.  And then I
9  would copy, paste and say, assessment from
10  previous managers, L. Calhoon and M. Martin.
11  And that's what they would provide him, which is
12  underneath that.
13       Q.  So most of this review was provided by
14  his previous manager, who were in the position
15  from January 1, 2008, until you took over in
16  about October or November 2008?
17       A.  Correct.  And then if you go to the
18  page labeled 6.
19       Q.  I think it's Bates Stamped FM_ 675?
20       A.  Yeah.  Halfway through the page,
21  there's a break in it, and it has KH comments.
22       Q.  Okay.

37 (Pages 576 to 579)

Page 580

1    A.  That was my specific assessment,
2  following Lourdes and Mary's, which was above
3  mine.
4    Q.  Okay.  And if you could just kind of
5  read out that first two sentences, I think it
6  would be --
7    A.  After reviewing a few months of
8  reporting and work product from Tim, I agree
9  with comments provided by prior management.
10 Many areas continue to need development, such
11 as attention to detail, ownership and
12 accountability, communication and interpersonal
13 skills.  Organization, self-sufficiency and
14 independence initiation are the next steps.
15   Q.  And then your final paragraph
16 states what Mr. Skrynnikov has to do to kind of
17 increase his score or improve?
18   A.  Yeah.  That was more of a summary.
19 So, like I said, after this was written, then I
20 was responsible for a very detailed development
21 plan, which we tracked weekly.
22   Q.  And now how is a year-end review

Page 581

1  provided to an employee at Fannie Mae?
2    MR. SALB:  Objection, Your Honor.
3  We have sort of -- I've been listening to this
4  testimony.  First I thought this was just sort
5  of background, but it's gone on for quite
6  sometime.  I'm not sure -- in fact, I'm quite
7  sure that there's no relevance to all of this
8  discussion about Mr. Skrynnikov's job
9  performance.  This is not a job performance
10 case.  This is an FMLA case.
11   JUDGE SWEENEY:  All right.  Well,
12 what's your position on that?
13   MS. LENAHAN:  Your Honor, we would say
14 his performance is directly relevant.  After his
15 time on the D.C. FMLA expired, his business
16 managers made a decision to not hold his job
17 open, and it was based on his prior performance
18 reviews, dating back as early as 2008.
19   It also goes directly into the
20 relevance of his False Claims Act.  If he was
21 already receiving prior performance reviews, his
22 retaliation cannot be.

Page 582

1    JUDGE SWEENEY:  All right.  I'll
2  overrule the objection.  You can continue with
3  this line of questioning.
4    It is 12:30.
5    MS. LENAHAN:  I don't have that much
6  further, but I'm happy to break.
7    JUDGE SWEENEY:  If you're telling me
8  five or ten minutes, then that's fine.
9    MS. LENAHAN:  No.  No.  It's not five
10 or ten minutes.
11   JUDGE SWEENEY:  It's not five or ten
12 minutes.  Okay.  Well, it's a little after
13 12:30.  This is when we've usually broken for
14 lunch.  So maybe this would be a good time to do
15 that.  Okay?  Should we take our usual hour and
16 come back at 1:30?
17   MR. MIOSSI:  Yes.
18   All right.  We'll go off the record
19 then.
20   (Recess taken.)
21   JUDGE SWEENEY:  All right.  Back on
22 the record.

Page 583

1    And, Counsel, are you ready to
2  continue with your direct examination of the
3  witness?
4    MS. LENAHAN:  Yes, Your Honor.
5    JUDGE SWEENEY:  Okay.  Go ahead.
6  BY MS. LENAHAN:
7    Q.  Ms. Harrison, we were finishing up
8  with Exhibit 33, which is Mr. Skrynnikov's 2008
9  year-end review, which he got an FM minus.  What
10 was the result of receiving an FM minus?
11   A.  It required that -- I don't know
12 if there's a policy or procedure on it -- but
13 because he was an FM minus, it required more
14 specific management of an employee, to ensure
15 they knew what they had to do to improve their
16 status.  Otherwise, if they continued performing
17 poorly, they would -- ultimately could end up
18 being removed from the company, fired.
19   Q.  Can you turn to Exhibit 41?  Exhibit
20 41 is an e-mail from you to Carrie Lee, dated
21 Monday, May 18th, 2009, and it's entitled
22 quarterly review check-in.  And there's an

Page 584

1 attachment with a quarterly review for Tim
2 5/18/09.
3          Why did you do this quarterly review?
4     A.   This was part of the development
5 plan that I spoke of earlier, which was a more
6 specific plan, that the employee and myself
7 would follow, to ensure that we were doing what
8 we could do as far as management to ensure that
9 he knew what he had to do to improve his status
10 from FM minus.
11     Q.   So the attachment is something that
12 you would have provided to Mr. Skrynnikov so he
13 could know how he was progressing since his FM
14 minus?
15     A.   Yeah.  He would have had a copy, and
16 this is what we would have worked off of, as far
17 as his goals would be what would be highlighted
18 and then the comments are how he was
19 progressing.
20     Q.   And do you recall delivering this to
21 Mr. Skrynnikov?
22     A.   Yes.

Page 585

1     Q.   And what was his reaction?
2     A.   So he had a chance to respond, which
3 would be documented in the report itself.  So I
4 think if we -- if we read through it, you'll
5 see, in some cases, he may agree or some
6 -- agrees -- I'm sorry.  Some examples he may or
7 may not agree or have a difference of opinion of
8 what he thought.  But this was the documentation
9 that was used.
10     Q.   And can you just give a quick summary
11 of what -- you know, obviously, there were a
12 couple of performance issues, but is there
13 anything, you know, generally that you recall
14 about Mr. Skrynnikov's performance that needed
15 to be improved?
16     A.   Yep.  So complete and timeliness on
17 deliverables was a major theme, to make sure he
18 wasn't missing deadlines.  The second was one
19 around getting rid of the process mentality.  So
20 instead of following step-by-step procedures,
21 also thinking about what it meant, instead of
22 just following them step-by-step, or in addition

Page 586

1 to, I guess is better worded.
2          Communication, again, and timeliness
3 to both myself and to team members.  And
4 organization and prioritization of what he was
5 responsible for.
6     Q.   And why would you have sent this to
7 Carrie Lee?
8     A.   Because she was aware -- well, she was
9 our HR business partner.  He had the FM minus,
10 and this is what -- it showed my effort, as his
11 manager, to help him get on track.
12     Q.   And from the time you gave him the FM
13 minus until May, had his performance improved?
14     A.   I don't believe so.  I think it was
15 consistent that he was still struggling in many
16 areas.
17     Q.   And what would be your next -- what
18 was your next step after giving him the
19 quarterly review?
20     A.   It's ongoing documentation.  And if,
21 ultimately, it continued, what happened was it
22 resulted in a performance improvement plan or a

Page 587

1 written warning.
2     Q.   And prior to the written warning,
3 did you meet with him?  Were there discussions?
4 What was to occur?
5     A.   We were meeting weekly to follow up
6 on this plan or to ensure that he was getting
7 timely feedback from myself, so nothing was a
8 surprise.
9     Q.   And was your boss also involved in
10 this?
11     A.   I don't believe -- as far as
12 delivering the report, I think it would still
13 be just him and myself as his direct manager.
14     Q.   Can you turn to Exhibit 44, please?
15 And this is dated July 1, 2009, and it's to
16 Timothy Skrynnikov, from Kristin Harrison.  And
17 the subject is a written warning for
18 unsatisfactory job performance.
19          Who drafted this document?
20     A.   I drafted it.
21     Q.   So all of the contents within this
22 document of examples of his poor performance

Page 588

1    were noted by you?
2        A.  It is.
3        Q.  And do you recall presenting this to
4    Mr. Skrynnikov?
5        A.  Yes.
6        Q.  And when was that?
7        A.  On the date that's it's dated, July
8    1st, 2009, with Tim and Carrie Lee.
9        Q.  And what were the concerns that caused
10   you to draft a written warning?
11       A.  Ongoing, repetitive issues with
12   the performance that started back with the
13   development plan, which would specifically track
14   the steps that he needed to take to improve his
15   performance before written warning was issued.
16       Q.  Okay.  So in here you say the number
17   of times you meet and the direction and the
18   one-on-one session, and all your notations are
19   accurate, to your best of your memory?
20       A.  Yes.  Because this was actually
21   supported -- this letter was supported with
22   a lot of printed e-mails and documentation to

Page 589

1    specifically support what was provided in here
2    as examples.
3        Q.  And the general quality of his work,
4    since the quarterly check-in was -- had
5    deteriorated further or was the same?
6        A.  Yes.  And there are multiple instances
7    of ongoing issues with his deliverables and the
8    type of work he was producing where it required
9    heavy follow-up and interaction.  And that's why
10   it was documented, with specific examples, and
11   followed up with paperwork that followed that,
12   as well.
13       Q.  And after this meeting, did
14   you provide Mr. Skrynnikov with a job
15   reclassification?
16       A.  Yes.  So the company, in general, had
17   a few focus groups.  I don't know what outside
18   company we had.  But we had gone through
19   restructuring of how we qualified employees
20   in different levels and positions, so we were
21   Levels 1 through 5.  Five being the highest
22   level before you got to a director status, which

Page 590

1    we saw in the previous exhibits were six, and
2    officers were seven.
3            And they wanted to provide more
4    granularity on the types of positions and
5    roles and responsibilities that we held.  So
6    it was -- I think it was initialized by the HR
7    Department, but every one in the company was
8    re-leveled, including myself, into levels, as
9    opposed to numbers, which could or couldn't
10   impact the salary, because then they had ranges
11   of salary that was tied to the levels that they
12   reset everyone at.
13           So Tim was a recipient of a
14   re-leveling, just the same as I was, as
15   a manager.  He was level-set and got a
16   notification of that.
17       Q.  Okay.  And so his increased salary
18   after you provided him with his written warning
19   had nothing to do with his job performance?
20       A.  That's correct.
21       Q.  When's the next time you spoke to him,
22   Mr. Skrynnikov?

Page 591

1        A.  I don't remember speaking to him after
2    the delivery of this report, --
3        Q.  Do you remember why?
4        A.  -- that's July 1st.
5            I didn't -- I didn't -- July 1st,
6    I don't know what day it was, maybe a Tuesday or
7    Wednesday, it was a holiday weekend.  And then I
8    don't remember him returning to work the
9    following week.
10       Q.  And do you know why he didn't return
11   to work the following week?
12       A.  I do not.
13       Q.  Did you or anyone at Fannie Mae try to
14   communicate with Mr. Skrynnikov while he was on
15   leave or not coming into work?
16       A.  No.  Other than the e-mail he sent
17   saying he wasn't going to be in work, that was
18   the last time, through e-mail or through any
19   conversation or communication from him that I
20   received.
21       Q.  So he notified you in early July
22   that he was going on leave, and after that, you

40  (Pages 588 to 591)

Page 592

1    didn't hear from him again?
2        A.  He notified us that he was not coming
3    to work that day.
4        Q.  Okay.  Did you ever tell Mr.
5    Skrynnikov that you were no longer his manager?
6        A.  No.
7        Q.  Did you ever have any discussions with
8    The Reed Group about his return to work?
9        A.  No.
10       Q.  Did you ever speak to The Reed Group
11   about Mr. Skrynnikov?
12       A.  No.
13       Q.  Did you have any discussions with
14   anyone at Fannie Mae about Mr. Skrynnikov's
15   return to work?
16       A.  Other than checking to see if Tim
17   contacted myself or Lori Mallon.  If he had
18   contacted us, those were the only requests that
19   I received around Tim and his whereabouts.
20       Q.  Did you have any role in
21   Mr. Skrynnikov's termination?
22       A.  No.

Page 593

1            MS. LENAHAN:  That's it.
2            JUDGE SWEENEY:  Okay.  Let me just
3    interpose a question here.
4            THE WITNESS:  Sure.
5            JUDGE SWEENEY:  Since we're at Exhibit
6    44, --
7            THE WITNESS:  You said 44?
8            JUDGE SWEENEY:  Yeah.  Forty-four.
9    Yeah.
10           On Page 3, where you -- where it says
11   -- that paragraph at the bottom saying, I expect
12   to see significant, sustained improvement within
13   a reasonable period.
14           Do you see where I'm referring to?
15           THE WITNESS:  Yes.
16           JUDGE SWEENEY:  Yeah.
17           Was there any standard for what
18   reasonable period would be?
19           THE WITNESS:  No.
20           JUDGE SWEENEY:  Did you have any --
21           THE WITNESS:  I didn't.  That's why
22   I went to HR for the formal written warning.

Page 594

1    There was no documentation as far as timing is
2    concerned.  But because this was an ongoing
3    behavior pattern, from FM minus at the year-end
4    to this point, it was to make it more formal,
5    other than the development plan, to let him know
6    that, you already received the FM minus, which
7    is a pretty big hit on an employee at
8    year-end.
9            JUDGE SWEENEY:  Right.
10           THE WITNESS:  But then there is no
11   standard on timing of -- I can't even tell you,
12   because that was my first written warning at the
13   time.
14           JUDGE SWEENEY:  This was the first
15   time you had ever done one of them?
16           THE WITNESS:  That's correct.
17           JUDGE SWEENEY:  So, at the time, you
18   didn't have any --
19           THE WITNESS:  Time frame.
20           JUDGE SWEENEY:  -- time frame of when
21   the reasonable period would end?
22           THE WITNESS:  I did not.

Page 595

1            JUDGE SWEENEY:  Who's going to do the
2    cross?
3            MS. KUNTZ:  I am.
4            CROSS EXAMINATION
5    BY MS. KUNTZ:
6        Q.  Ms. Harrison, you testified that
7    you gave Mr. Skrynnikov his 2008 performance
8    evaluation in January of 2009?
9        A.  In the beginning of the year.  I don't
10   know if it was January.  I think it was dated
11   February, so I'm not sure what date it was
12   delivered on.
13       Q.  You don't recall?
14       A.  No.
15       Q.  Could we look at Exhibit 33?
16       A.  Yep.
17       Q.  Could we look at the last page of
18   Exhibit 33?
19       A.  The last page?
20       Q.  Yes.
21       A.  Yes.
22       Q.  Do you want to -- could I direct your

Page 596

1   attention to the -- I think we had called them
2   signature lines.  Are those electronic
3   signatures at the bottom of the last page of
4   the exhibit?
5       A.  No.
6           JUDGE SWEENEY:  Are you talking about
7   33?
8           MS. KUNTZ:  I'm talking about -- yes.
9           THE WITNESS:  675?  That's not the
10  last page.
11          MS. KUNTZ:  Thirty-three.  I have
12  -- it's a four-page exhibit.
13          JUDGE SWEENEY:  Right.
14          MS. KUNTZ:  And I'm looking at the
15  last page.
16          JUDGE SWEENEY:  It's the
17  second-to-the-last page.
18          MS. LENAHAN:  Second-to-the-last.  You
19  must not have the last page.
20  BY MS. KUNTZ:
21      Q.  Okay.  I guess I must not.  I'm
22  talking about the page that has a place for the

Page 597

1   employee and for the manager to sign.
2       A.  It ends with 675 on the bottom right
3   corner?
4       Q.  Yes.
5           So my question has to do with the
6   date.  Would this indicate the date on which --
7   so 3/30/2009 is when you finalized this with
8   Mr. Skrynnikov?
9       A.  In the system.
10      Q.  In the system?
11      A.  Yeah.
12      Q.  And would you have given it to him if
13  he signed it on 3/17?
14      A.  No.
15      Q.  I'm sorry.  That was a when would you
16  have given it?
17      A.  I don't know.  You could -- you had
18  -- it depends on the time period that they would
19  open the system up.  But employees had a period
20  or window of time that they could sign it.  And
21  then it would come back to your queue, and you
22  would have a period of time to sign it.  So it

Page 598

1   wasn't when you delivered it that the signature
2   would be on there.
3       Q.  So it wasn't finalized, however, until
4   the 30th of March; is that correct?
5       A.  It wasn't recorded in the system as
6   he acknowledged it in the system with that time
7   stamp.  I don't know what finalized means.
8       Q.  You wouldn't characterize that as
9   -- okay.
10          Thank you.
11      A.  Yeah.
12      Q.  And when did you create the
13  development plan?
14      A.  I don't remember.  It was sometime
15  between when this document was -- when the
16  written year-end performance was created and
17  the time I delivered it in March, April.  I
18  don't recall exactly when.
19      Q.  I'm sorry.  So would you have created
20  the development plan before the performance
21  evaluation was finalized?
22      A.  No.

Page 599

1       Q.  No?
2           So the development plan was created
3   sometime after 3/30/2009?
4       A.  It could have been concurrently.  I
5   don't remember the time frame.
6       Q.  And there was something you called a
7   quarterly review?
8       A.  Quarterly check-in.
9       Q.  The quarterly check-in took place in
10  May?
11      A.  Correct.
12      Q.  What does the term quarterly mean in
13  this context?
14      A.  Three-month span.
15      Q.  And May 18th is three months from --
16      A.  March or April.
17      Q.  If the performance review is finalized
18  at the end of March, and you're testifying that
19  either at the same time or subsequently to
20  3/30/2009 the development plan was created, in
21  what sense can May 18th been a quarterly review?
22      A.  It could have been February, March and

Page 600

1   April.
2       Q.   But if the development plan was not
3   created until the end of March --
4       A.   I didn't state that the development
5   plan was created at the end of March.  I said I
6   didn't know when it was created.  I said it
7   could have been done concurrently.  Because I've
8   already said that the date on here is when he
9   signed it.  It's not when it was finalized,
10  whenever you're implying by finalized, but I
11  don't have an exact date.
12      Q.   So could I ask you to look at Exhibit
13  44?
14      A.   Yep.
15      Q.   In the second paragraph of the first
16  page of that exhibit, you reference an initial
17  goal setting, March 31st, 2009?
18      A.   Okay.
19      Q.   Is initial goal setting a requisite to
20  creating a development plan?
21      A.   No.  Initial goal-setting is a process
22  that the system -- I'm sorry.  A process that

Page 601

1   Fannie Mae has for putting goals in for the
2   current year.
3       Q.   So it has nothing to do with the
4   development plan?
5       A.   I'm sure it coincides with the
6   development plan.
7       Q.   So why is it referenced here in this
8   written warning?
9       A.   It says, even though I have provided
10  ongoing guidance and direction to help you
11  improve your performance, to include our initial
12  goal-setting, weekly one-on-one sessions and
13  quarterly review check-in, I have not seen the
14  required improvement, particularly in the
15  significant areas of timely, error-free and
16  streamlined work products.
17          So it was just an example of what I
18  had done to address certain goals so he was
19  aware that these weren't -- you just need to
20  improve.  We had specific measurements, and I
21  was referencing different situations in which we
22  spoke of those.

Page 602

1       Q.   Okay.  But you make no mention of a
2   development plan here.
3       A.   Okay.
4       Q.   Why would you omit the development
5   plan as an example of something you have done in
6   the written warning?
7       A.   It's not -- the quarterly check-in
8   references the document that was used.
9       Q.   But the initial goal-setting does not.
10      A.   I don't understand the question.
11      Q.   So as you spoke of this, you spoke
12  of getting an F minus triggers creating a
13  development plan, and the quarterly -- the
14  development plan requires the quarterly
15  check-in, and an outcome of the quarterly
16  check-in was the written warning.
17          Did I understand that progression?
18      A.   In this circumstance, that was the
19  progression.
20      Q.   So how did you know that that was an
21  appropriate progression?  Is there a document at
22  Fannie Mae that documents that progression, or

Page 603

1   how did you get this?
2       A.   I was working with HR to make sure
3   I, as a manager, was doing what I needed to do,
4   because he was -- because I inherited Tim as an
5   FM minus.  So I was doing what I needed to do,
6   what I thought I needed to do to show that I was
7   on Tim's side to help him change the perception
8   and/or behaviors he had, to ensure he could
9   grow, instead of, you know, keep going down the
10  path of not performing.
11      Q.   That wasn't my question.
12          My question was, how did you know that
13  procedure?
14          Is the answer that you went to Fannie
15  Mae Human Resources?
16      A.   There's no procedure.  I think that's
17  what I said.  There's no procedure.  I was
18  working with my manager, I was working with
19  HR, --
20      Q.   And is that the source --
21      A.   -- to understand what I needed to do.
22      Q.   -- of this notion that there was a

43 (Pages 600 to 603)

Page 604

1  progression and FM minus meant that you needed
2  to create a development plan?
3       A.  Yes.
4       Q.  And who told you you needed to create
5  a development plan?
6       A.  I don't know if it was my director.
7  I don't know if it was HR.  I don't know if it
8  was a combination.  But it was to make sure that
9  we were investing our time and resources to show
10 that --
11      Q.  I understand that.  I'm asking
12 about --
13      MR. MIOSSI:  I think the witness
14 should be allowed to complete her answer.
15      JUDGE SWEENEY:  Yeah.  Let her finish
16 her answer.
17      All right.  Were you finished?
18      THE WITNESS:  I don't know who
19 exactly told me, but I know I seek advice on
20 what I needed to do to make sure that he could
21 improve his performance.
22 BY MS. KUNTZ:

Page 605

1       Q.  Now, have you handed out written
2  warnings subsequently in your experience as a
3  manager?
4       A.  No.
5       Q.  So this was the only time that you've
6  done this?
7       A.  Yes.
8       Q.  Have you discussed with other managers
9  or had management training that discusses an
10 appropriate progression?
11      A.  There's nothing in Fannie Mae, that
12 I'm aware of, that has a progression plan.  I
13 think it's case-by-case on the situation.
14      MS. KUNTZ:  No further questions.
15      JUDGE SWEENEY:  Nothing else?  Okay.
16      Anything else?
17      MS. LENAHAN:  Nothing.
18      JUDGE SWEENEY:  Okay.  Thank you, Ms.
19 Harrison.
20      You can go back where you were sitting
21 before.
22      MR. MIOSSI:  Judge, we're -- Damien's

Page 606

1  checking to make sure Court Call works even a
2  little better than yesterday, but that's at
3  3:00.
4       Okay.  So -- when she's available.
5  She's in Dallas right now.
6       JUDGE SWEENEY:  Okay.  Is she not
7  available before 3?
8       MS. LENAHAN:  Court Call is not
9  available.  It has to be a set time.
10      MR. MIOSSI:  Yeah.  So she arranged
11 her schedule, and then we had to lock Court Call
12 in.
13      JUDGE SWEENEY:  Technology, it's a
14 plus, and then there's always a minus on it.
15 You know, sometimes the old fashion way is
16 -- you get nostalgic for it.
17      MR. MIOSSI:  So we start at 3.  My
18 questions for Lori Mallon, 15 minutes, --
19      JUDGE SWEENEY:  Okay.
20      MR. MIOSSI:  -- perhaps, but not much.
21 I don't have any documents for her.
22      JUDGE SWEENEY:  Okay.  Good.

Page 607

1       And then that will --
2       MR. MIOSSI:  Then we're going to rest.
3       JUDGE SWEENEY:  You're going rest.
4  And you expect that you'll rest today, too; is
5  that right?
6       MR. SALB:  Probably.
7       JUDGE SWEENEY:  I'm not trying to lock
8  you down.  Just trying to get a sense here.
9       MR. SALB:  No.  That's fair.
10      JUDGE SWEENEY:  All right.  We can go
11 off the record now.
12      (Recess taken.)
13      JUDGE SWEENEY:  All right.  We'll go
14 on the record here.
15      Good afternoon, ma'am.
16      Can you hear me?
17      MS. MALLON:  Good afternoon.
18      JUDGE SWEENEY:  You can hear me?
19      MS. MALLON:  I can hear you.
20      Can you hear me?
21      JUDGE SWEENEY:  Yes.
22      I'm Judge Sweeney, and you're here as

44  (Pages 604 to 607)

Page 608

1  a witness in this arbitration.  And could you
2  raise your right hand and be sworn to testify
3  here in this proceeding?
4        Whereupon --
5              LORI MALLON,
6  called to testify, having been first duly sworn
7  or affirmed, was examined and testified as
8  follows:
9        JUDGE SWEENEY:  And would you state
10  your name and your business address, please?
11        THE WITNESS:  Yeah.  Lori Mallon.  And
12  my business address is 3900 Wisconsin Avenue,
13  Washington, D.C.
14        MR. MIOSSI:  You can put your hand
15  down, Lori.
16        JUDGE SWEENEY:  Yes.
17        MR. MIOSSI:  You are really sworn now.
18        THE WITNESS:  You don't want me to
19  hold it like this the whole time?
20        JUDGE SWEENEY:  No.  I don't think so.
21        MR. MIOSSI:  We want you to be
22  comfortable.

Page 609

1        JUDGE SWEENEY:  Right.
2        THE WITNESS:  Okay.
3        JUDGE SWEENEY:  And we are making a
4  record here, Ms. Mallon.  So please don't talk
5  unless somebody's asking you a question, okay?
6        I'll take that as a yes.
7        Counsel, are you going to examine her?
8        MR. MIOSSI:  I am.
9        Thank you.
10        JUDGE SWEENEY:  Okay.  Go ahead.
11        DIRECT EXAMINATION
12  BY MR. MIOSSI:
13    Q.  Lori, what is your current job at
14  Fannie Mae, please?
15    A.  My current job is vice president of
16  operations for the Making Home Affordable
17  Program and for foreclosure prevention and
18  outreach.
19    Q.  How long have you been a Fannie Mae
20  employee?
21    A.  It will be 11 years this upcoming
22  December.

Page 610

1    Q.  What was your job in 2009?
2    A.  My job in 2009, I was the director
3  in the Financial Planning and Analysis team,
4  under the Corporate Finance Division.
5    Q.  And in that role, did the Financial
6  Planning and Analysis group report to you?
7    A.  Yes, it did.
8    Q.  And was Mr. Tim Skrynnikov part of
9  that group reporting up to you in 2009?
10    A.  Yes.  For a portion of 2009, that's
11  correct.
12    Q.  Okay.  And was Kristin Harrison one of
13  your direct reports for at least part of 2009?
14    A.  Yes, she was.
15    Q.  And I think we've got it established
16  in the record she transferred to a different
17  part of the company at the end of September
18  2009.
19        Do you recall that?
20    A.  I do.
21    Q.  Okay.  And at that point, did
22  Mr. Skrynnikov report directly to you?

Page 611

1    A.  That's right.  Yes.
2    Q.  I'd like to direct your attention to
3  the latter part of 2008, the early part of 2009,
4  and ask if you had any knowledge of
5  Mr. Skrynnikov's job performance?
6        MR. SALB:  Your Honor, I'm going to
7  raise the same objection.
8        THE WITNESS:  Can you repeat the time
9  frames that you just asked?
10  BY MR. MIOSSI:
11    Q.  Yeah.  I'm asking you, the late part
12  of 2008, early part of 2009, and ask whether you
13  had knowledge of the job performance of Mr.
14  Skrynnikov?
15        JUDGE SWEENEY:  All right.  Before you
16  respond, yes, go ahead.
17        MR. SALB:  I'm going to reiterate my
18  objection.
19        The defendants are trying to do
20  through the back door that which they cannot do
21  through the front door.
22        The issue in this case is not whether

Page 612

1  the defendants were satisfied or dissatisfied
2  with Mr. Skrynnikov's performance, or whether
3  they might have terminated him, in any event.
4  The issue in this case is whether they had leave
5  to terminate him because of the expiration of
6  the FMLA protection.
7          The issue here is the applicability
8  of the FMLA and whether they interfered with
9  his return to work, not with whether they
10 voluntarily decided to let him continue working
11 or not.
12         So his job performance is just not
13 relevant, in any event.
14         JUDGE SWEENEY:  All right.  I think
15 the 2008/2009 job performance has some relevance
16 in connection with the totality of all of the
17 issues that are presented in this case, and I'll
18 overrule the objection.
19         You can go ahead.
20         MR. MIOSSI:  Thank you, Judge.
21 BY MR. MIOSSI:
22    Q.  I'll restate the question for you.

Page 613

1          I'm directing your attention to late
2  2008, early 2009, and ask you what knowledge you
3  had about Tim Skrynnikov's job performance?
4     A.  I mean, I knew through our corporate
5  annual HR process, you know, that Tim was not
6  considered a strong performer.
7     Q.  Okay.  And at that time, Ms. Harrison
8  was his direct supervisor; is that correct?
9     A.  That's correct.  Although Kristin
10 reported to some other -- a different reporting
11 chain at that time.
12    Q.  Okay.  Did you have any knowledge that
13 in -- in the -- I'm just trying to pick a date,
14 in the June/July time frame, that Mr. Skrynnikov
15 was issued a written performance warning?
16    A.  Yes.  I was aware of that.
17    Q.  And prior to that time, did you have
18 knowledge that he was on a work development
19 program that Ms. Harrison was working with him
20 on?
21    A.  Yes.  I knew he was on a development
22 plan of some sort, performance development plan.

Page 614

1     Q.  Okay.  Now, I'd like to move on to a
2  different topic and ask you about some things
3  that were going on in the Financial Planning and
4  Analysis group in 2009.
5          Were there any changes, or could
6  you describe if there were any changes that the
7  Financial Planning and Analysis group was going
8  through or implementing at that time?
9          MR. SALB:  Objection.
10         THE WITNESS:  I would say that was a
11 time period where we were doing --
12         JUDGE SWEENEY:  Just a second, ma'am.
13         THE WITNESS:  -- a lot of automation
14 of --
15         JUDGE SWEENEY:  Just hold up one
16 second, please.
17         It was a very general question.  You
18 said anything going on in 2008/2009?  Is that
19 what I heard?
20         MR. MIOSSI:  Changes to the Financial
21 Planning and Analysis group that were
22 implemented in 2009.

Page 615

1          JUDGE SWEENEY:  Are you talking about
2  personnel or are you talking about --
3          MR. MIOSSI:  I'm talking about changes
4  to the processes, the automation, that affected
5  Mr. Skrynnikov's job duties.
6          JUDGE SWEENEY:  Okay.
7          MR. SALB:  Again, the issue in this
8  case is whether Fannie Mae was permitted to fire
9  or get rid of Mr. Skrynnikov during the period
10 of his FMLA leave, whether Fannie Mae interfered
11 with his return to work.  Whether -- even if
12 they made dramatic changes and completely didn't
13 need his job anymore, they would not be able to
14 terminate his employment without meeting some
15 pretty stiff burdens, which are not present in
16 this case.  And so the reorganization to which
17 they've referred throughout this case is just
18 not relevant because it doesn't get them
19 anywhere.
20         It may be relevant, of course, to
21 whether they decided, voluntarily, to keep a
22 position open or not keep a position open after

Page 616

1  the termination of the FMLA-protected leave.
2  But this case is not about that. It is not
3  about their voluntary decisions. It's about the
4  FMLA leave itself.
5      The job reorganization is just not
6  relevant.
7      JUDGE SWEENEY: All right. Well,
8  I think it could have some relevance. I'll
9  overrule the objection.
10      All right. You can go ahead.
11  BY MR. MIOSSI:
12      Q. You were answering, Lori. Do you want
13  to pick up where you were? Do you know where
14  you left off, or do you want another question?
15      A. No. I can pick up where I left off.
16  I think I was getting ready to talk about, there
17  was a number of initiatives underway to automate
18  what was a number of heavily manual processes
19  that were in the FP&A Group at that time.
20      Q. And how did that process, if at
21  all, effect the work and the duties that
22  Mr. Skrynnikov was assigned to perform during

Page 617

1  this period?
2      A. Well, during -- there's a period,
3  actually, before the team -- before June,
4  there was a lot of focus on -- Tim's primary
5  responsibility was working on, I believe it was
6  called the Business Segment Allocation Process,
7  which was a manual process of consolidating and
8  allocating expenses across business units. And
9  there was an effort at that time to automate
10  that process and the reporting around that
11  function.
12      Q. And did that have any effect on
13  the job duties that Mr. Skrynnikov had been
14  performing up until that time?
15      A. I don't recall at what point the
16  automation was final, Bill. I know that the
17  work was going on through 2009, and I believe by
18  the third quarter or so of 2009 that work was
19  primarily fully automated.
20      Q. Okay. Thank you.
21      I'd like to direct your attention to
22  the termination of Mr. Skrynnikov's employment.

Page 618

1  It's a fact in this case that his D.C. FMLA
2  leave expired at the end of October 2009,
3  October 29, to be specific. And he had a
4  short-term disability period that expired on
5  November 2nd, 2009.
6      So my first question is, did he
7  request from you at any point in October 2009
8  for the permission to take vacation?
9      A. No.
10      Q. Did you have a role in determining to
11  terminate Mr. Skrynnikov's employment?
12      A. I did, yes.
13      Q. And would you tell what role you
14  played and why you made the decision that you
15  did?
16      A. Yeah. The role I played was, as
17  the director, it was primarily my decision to
18  terminate the employment, receiving, you know,
19  counsel from, you know, from other folks, as
20  well.
21      Really, the primary driver was that
22  the work that he had been performing over time

Page 619

1  was fully automated, and the skill set that Tim
2  had wasn't a skill set, you know, that there was
3  a role for on the team, kind of, you know, on a
4  go-forward basis.
5      Q. Now, were you adding people to this
6  group at this period in late October, early
7  November 2009?
8      A. No.
9      Q. Were you --
10      A. If anything, we were under budget
11  pressure at that time.
12      Q. Were you filling positions that had
13  gone vacant during this period within the FP&A
14  group?
15      A. I don't recall us filling any open
16  positions at that time within the FP&A group.
17      Q. Okay. Do you have, or did you have,
18  at the time in 2009, any knowledge whatsoever
19  that Mr. Skrynnikov had raised concerns about
20  the accuracy of information disclosed in
21  response to Senator Grassley's request about
22  compensation and incentive bonus information?

47 (Pages 616 to 619)

Arbitration Day 3                                    July 24, 2014

Washington, D.C.

Page 620

1    A.  I did not.

2    Q.  Okay.  Did you have any role in

3  responding to Senator Grassley's request for

4  that information?

5    A.  I did not.

6    Q.  Did you have any knowledge that

7  Mr. Skrynnikov had complained to anyone about

8  being the victim of retaliation?

9    A.  No.

10   Q.  At the time, did you have any

11  knowledge that Mr. Skrynnikov had raised

12  complaints with ethics and compliance concerning

13  harassment?

14   A.  No.

15   Q.  And did you have any involvement in

16  the decisions to grant or deny Mr. Skrynnikov

17  any leave requests that he sought during 2009?

18   A.  No.  I believe the requests were all

19  following our regular corporate leave request

20  process.

21     MR. MIOSSI:  Okay.  Thank you, Lori.

22  I have no more questions.

Page 621

1     JUDGE SWEENEY:  Okay.  Counsel?

2     MR. SALB:  Briefly.

3        CROSS EXAMINATION

4  BY MR. SALB:

5    Q.  Good afternoon, Ms. Mallon.

6      Who were the people who contributed

7  input into the decision not to retain Mr.

8  Skrynnikov?

9    A.  There was input from his manager at

10  the time, which was Kristin Harrison.  And we

11  always involve our HR and legal employment

12  teams whenever we make any decisions around

13  employment.  And so that would have been the

14  two other teams.

15   Q.  That would have been Carrie Lee and

16  Madonna McGwin?

17   A.  That's correct.

18   Q.  After Mr. Skrynnikov -- excuse me.

19  Yeah.  After Mr. Skrynnikov's employment was

20  ended, you did publish a vacancy announcement

21  for his position, didn't you?

22   A.  I'm sorry.  I didn't hear that piece.

Page 622

1  There was some background noise.

2    Q.  I'm sorry.

3      After Mr. Skrynnikov's employment was

4  terminated, Fannie Mae did publish a vacancy

5  announcement to fill his position, didn't it?

6    A.  I don't recall us posting a position

7  to backfill a position on -- that Tim -- doing

8  the work that Tim was doing, no.  I don't recall

9  that.

10   Q.  Was a financial analyst employed

11  in the FP&A section after Mr. Skrynnikov's

12  employment ended?

13   A.  Is your question, did we post a

14  financial analyst position after his employment?

15  Is that the question?

16   Q.  Yes.

17   A.  I don't recall.  We may have.

18   Q.  Okay.

19   A.  But it was not a backfill for Tim's

20  particular position.

21     MR. SALB:  Okay.  Thank you.  No

22  further questions.

Page 623

1     JUDGE SWEENEY:  All right.  Anything

2  else, Counsel?

3     MR. MIOSSI:  No.  Thank you.

4     JUDGE SWEENEY:  All right.  Thank you.

5  Ms. Mallon.  That will conclude your

6  participation.

7     THE WITNESS:  Great.  Thank you.

8     MR. MIOSSI:  Thank you, Lori.

9     JUDGE SWEENEY:  All right.  That is

10  over with now.  Okay.  I think we have our plan

11  to go forward here; is that correct?

12     MS. KUNTZ:  Yes, Judge.

13     JUDGE SWEENEY:  Okay.  I was able to

14  do up the --

15     MS. KUNTZ:  We have our order.

16     JUDGE SWEENEY:  Yeah.  The order's

17  here.  So I'll give everybody a copy of this,

18  September 5th and September 12th being the

19  operative dates.

20      And we will conclude the proceedings

21  here for today.  And I want to thank everybody

22  for their very diligent contributions and

48  (Pages 620 to 623)

Page 624

```
 1    participation here, and we'll close the
 2    recording.
 3          THE REPORTER:  Do you have a
 4    preference as to full size or mini?
 5          MR. SALB:  Ptx.
 6          THE REPORTER:  Okay.
 7          MS. LENAHAN:  We'll take a ptx also.
 8          THE REPORTER:  Okay.
 9    Thank you.
10    (Hearing concluded -- 3:17 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
```