RODEN DEPOSITION

Charles Wayne Roden                                       May 29, 2014
                        Washington, D.C.

Page 1

```
 1                      JAMS ARBITRATION

 2   TIMOTHY SKRYNNIKOV,         )

 3              Claimant,        )

 4        v.                     ) No. 1410006294

 5   FEDERAL NATIONAL MORTGAGE   )

 6   ASSOCIATION (FANNIE MAE),   )

 7              Respondent.      )

 8

 9                        Washington, D.C.

10                        Thursday, May 29, 2014

11   Videotape Deposition of CHARLES WAYNE RODEN, called

12   for examination by counsel for Respondent in the

13   above-entitled matter, the witness being duly sworn

14   by CHERYL A. LORD, a Notary Public in and for the

15   District of Columbia, taken at the offices of WINSTON

16   & STRAWN LLP, 1700 K Street N.W., Washington, D.C.,

17   at 2:09 p.m., and the proceedings being taken down by

18   Stenotype by CHERYL A. LORD, RPR, CRR.

19

20

21

22
```

Page 2

1  APPEARANCES:
2
3  On behalf of Claimant:
4    S. MICAH SALB, ESQ.
5    MARY E. KUNTZ, ESQ.
6    LIPPMAN, SEMSKER & SALB LLC
7    7979 Old Georgetown Road, Suite 1100
8    Bethesda, MD  20814
9    (301) 656-6905
10
11 On behalf of Respondent:
12   WILLIAM G. MIOSSI, ESQ.
13   MARY M. LENAHAN, ESQ.
14   WINSTON & STRAWN LLP
15   1700 K Street N.W.
16   Washington, D.C.  20006-3817
17   (202) 371-5700
18
19
20
21
22

Page 3

1  APPEARANCES CONTINUED:
2
3    and
4    DAMIEN STEWART, ESQ.
5    FANNIE MAE
6    3900 Wisconsin Avenue N.W.
7    Washington, D.C.  20016-2892
8    (202) 752-8485
9
10 ALSO PRESENT:
11   Joseph Townsend, videographer
12
13
14
15
16
17
18
19
20
21
22

Page 4

1              C O N T E N T S
2  WITNESS                    EXAMINATION
3                             PAGE NO.
4  CHARLES WAYNE RODEN
5    Direct by Mr. Miossi           6
6    Cross by Mr. Salb             18
7    Redirect by Mr. Miossi        39
8    Recross by Mr. Salb           43
9
10             E X H I B I T S
11       (Exhibit attached.)
12 EXHIBIT NO.                    PAGE NO.
13  18  Fannie Mae Executive Comp
14      Allocation, SKRYNNIKOV00194-203    39
15      (Offered into evidence)            43
16
17
18
19
20
21
22

Page 5

1              P R O C E E D I N G S
2
3        THE VIDEOGRAPHER:  We are now on record in
4  the matter of Timothy Skrynnikov v. Federal National
5  Mortgage Association, Fannie Mae.  Today's date is
6  May 29, 2014.  The time is 14:09.  This is the
7  video-recorded deposition of Charles Wayne Roden
8  being taken at 1700 K Street N.W., Washington, D.C.
9        I'm the camera operator.  My name is
10 Joseph Townsend, in association with Alderson
11 Reporting located at 1155 Connecticut Avenue N.W.,
12 Washington, D.C.  The court reporter is Cheryl Lord,
13 also in association with Alderson Reporting.
14       Will all attorneys please identify
15 themselves and the parties they represent beginning
16 with the party noticing this proceeding.
17       MR. MIOSSI:  Bill Miossi, representing
18 Fannie Mae.
19       MS. LENAHAN:  Mary Lenahan, representing
20 Fannie Mae.
21       MR. STEWART:  Damien Stewart, for Fannie
22 Mae.

Page 6

1    MR. SALB:  Micah Salb, for the plaintiff.
2    MS. KUNTZ:  Mary Kuntz, for the plaintiff.
3    THE VIDEOGRAPHER:  Will the court reporter
4  please administer the oath.
5
6  Whereupon,
7            CHARLES WAYNE RODEN
8  was called as a witness by counsel for Respondent,
9  and, having been duly sworn by the Notary Public, was
10 examined and testified as follows:
11
12          DIRECT EXAMINATION
13          BY MR. MIOSSI:
14    Q.  Will you please state your name.
15    A.  Charles Roden.
16    Q.  Can I call you Chuck?
17    A.  "Chuck" is good.
18    Q.  Okay.  Chuck, the testimony that you're
19 going to give today is in the matter of Timothy
20 Skrynnikov against Fannie Mae.  He's brought certain
21 claims concerning the termination of his employment.
22 And we're taking this testimony of you today which we

Page 7

1  will use at the trial.
2      Is there a reason why you cannot be in
3  attendance at the trial which begins June 9th?
4    A.  I have a vacation planned that week.
5    Q.  All right.  And so you're scheduled -- is
6  it true, you're scheduled to be out of town that
7  weeks?
8    A.  Be out of town that week.
9    Q.  Okay.  How long have you worked for Fannie
10 Mae?
11   A.  Coming up on 12 years.
12   Q.  And currently, what is your job title?
13   A.  I'm the director of corporate accounting.
14   Q.  Very generally, what are the
15 responsibilities as director of corporate accounting?
16   A.  I run a small accounting team whose
17 primary responsibility is accruals for administrative
18 expenses, including employee compensation and
19 benefits.
20   Q.  I want to direct your attention to the
21 2008, 2009 timeframe, and that's where all my
22 questions are going to -- it's going to pertain to

Page 8

1  that period of time.
2      What was your job in 2008, 2009?
3    A.  I was a manager in benefits accounting.
4    Q.  And what was that job?  What did it
5  entail?
6    A.  Primarily the accounting for incentive
7  compensation, employee incentive compensation and
8  executive benefits.
9    Q.  All right.  Can you describe or elaborate
10 generally what your work involved with respect to
11 that subject?
12   A.  As part of the controller's division,
13 accounting for the company's expenses as reported in
14 our financial statements was our role.  The expenses
15 were recorded at the time the cost was incurred.
16     And for accrual accounting, the cost is
17 incurred during the time that employees are earning
18 those benefits or compensation regardless of whether
19 they're paid in that period or in a future period.
20   Q.  During this period, 2008, 2009, did the
21 group that you supervised have occasion to interact
22 with the group where Timothy Skrynnikov worked?

Page 9

1    A.  We did.  We worked together on it probably
2  on a monthly basis.  We shared information.  The
3  financial planning and analysis group that
4  Mr. Skrynnikov worked in was kind of downstream from
5  our group in benefits accounting, so the accounting
6  entries that we made to the financials of the company
7  were available to the financial planning and analysis
8  team.
9    Q.  So what sort of information did you -- did
10 your group provide to the group in which
11 Mr. Skrynnikov was assigned -- which I think was
12 called financial planning and analysis; is that
13 right?
14   A.  That's right.
15   Q.  Okay.
16   A.  There was a monthly reconciliation report
17 that's -- in accounting we call it a subledger, but
18 it's a spreadsheet that contains the details of
19 expense that we recorded to the general ledger, to
20 the financials, and those -- those incentive
21 compensation plans were separated out so that we had
22 specific amounts by month for each of the incentive

3 (Pages 6 to 9)

Page 10

1  compensation plans that we were accruing for.
2      Q.  Okay.  And what was the purpose for which
3  you provided that data to the financial planning and
4  analysis group?
5      A.  Financial planning and analysis -- or we
6  call tell them FP&A -- they use that information to
7  compare to budgets and forecasts.  They would use
8  that information to do new forecasts and their own
9  kind of variance analysis that they would provide to
10 their management.  FP&A was responsible for managing
11 the company's administrative expenses.
12     Q.  Did Mr. Skrynnikov have access to
13 information that showed bonus payments that were
14 actually paid to Fannie Mae employees?
15         MR. SALB:  Objection, lack of foundation.
16         BY MR. MIOSSI:
17     Q.  You can go ahead and answer.
18     A.  The only bonus payments that he would have
19 access to is those that were reported publicly in our
20 10-K.
21     Q.  Okay.
22     A.  But he would not have had access to

Page 11

1  payroll information or any other human resources
2  information that would have an individual bonus by
3  person.
4      Q.  Let me back up a step since there was a
5  question -- or an objection as to the foundation.
6          Did you have access in your role as
7  manager in 2008, 2009 to payroll information?
8      A.  I did have access to payroll information.
9      Q.  And was access to that information
10 restricted in any way?
11     A.  It was highly restricted.  The benefits
12 accounting team that I worked in shared a secure
13 space with payroll, and all of us in that space, you
14 know, kept the information within the group.
15     Q.  All right.  Do you know whether anyone in
16 your group ever provided Mr. Skrynnikov access to
17 that payroll data?
18     A.  No, they would not have provided that
19 information.
20     Q.  If Mr. Skrynnikov or anyone not authorized
21 to work in your group wanted access to your work
22 area, were they free to come and go, or was there

Page 12

1  some restriction?
2      A.  We were behind a locked door that you had
3  to have a badge access to get in, so FP&A --
4  Mr. Skrynnikov did not have access.
5      Q.  Okay.  Now, in -- I want to direct your
6  attention to the period around September 2008.  And
7  that was the month in which the conservatorship of or
8  Fannie Mae in addition to the other GSEs was imposed;
9  is that right?
10     A.  That's right.
11     Q.  Did the imposition -- again in September
12 2008 of the conservatorship have any effect on the
13 bonus programs that Fannie Mae provided at that time?
14     A.  It did, so there were 2 bonus programs
15 during 2008 that were annual plans based on annual
16 performance, so for 2008, the performance decision
17 was made in September before the year was ended, and
18 the bonuses were determined they were going to be
19 zero, so the accounting entry was to reverse out all
20 of the accrued costs from January through August so
21 that we had zero expense accrued as of September
22 2008.

Page 13

1      Q.  Okay.  And is that something that your
2  group administered, the reversal or zeroing out of
3  these bonus payment accruals?
4      A.  That's right.  It was the journal entry to
5  the financials that my analyst would prepare and I
6  would approve.
7      Q.  And then was that data transmitted to the
8  group where Mr. Skrynnikov worked after that?
9      A.  The reversal for those 2 specific bonus
10 plans was sent to FP&A.  That's right.
11     Q.  And do you know what FP&A did with that
12 data reflecting the reversals after that?
13     A.  I don't know what they did with the data
14 specifically.
15     Q.  Okay.  Now, I want to ask you a similar
16 set of questions with respect to 2009.
17         For 2009, at the beginning of the year,
18 what if any accounting treatment did you apply to
19 bonus or incentive programs?
20     A.  So starting in June -- or January of 2009,
21 we resumed accruals for 2 bonus programs that we had
22 canceled for 2008.  And those accruals were based on

Charles Wayne Roden                                                                              May 29, 2014
Washington, D.C.

Page 14

1  a reduced target, and those accruals were based on
2  estimates provided by human resources for incentive
3  plans or compensation plans that would replace the
4  prior year annual plans that were zeroed out.
5      Q.  As of January 2009, were those bonus
6  programs or plans finalized?
7      A.  They were not finalized.
8      Q.  And so can you again explain: What were
9  you basing the 2009 bonus accruals on?
10         You mentioned data that -- and information
11 that human resources provided you.
12         Is there anything else?
13     A.  So to -- in order to do accounting
14 accruals, we look at whether or not it's probable
15 that we would be paying those bonuses or
16 compensation, and with messages from our CEO about a
17 compensation plan under construction, we felt it was
18 prudent to record those expenses starting in January
19 when employees were working towards the receipt of
20 these incentive payments or bonuses.
21     Q.  But is it -- am I -- is it correct that
22 those bonus programs as of the beginning of 2009 were

Page 15

1  not yet finalized or implemented; is that correct?
2         MR. SALB:  Objection, asked and answered
3  and leading.
4         BY MR. MIOSSI:
5      Q.  You can go ahead.
6      A.  Correct.  The bonus plans were not
7  approved as of January, and our accruals are based on
8  estimates for the plan that was anticipated to be
9  approved.
10     Q.  And later in 2009, were the bonus plans
11 approved?
12     A.  The plan which was called long-term
13 incentive plan was approved in June of 2009.
14     Q.  Okay.  Go ahead.
15     A.  And for the month of June 2009, we started
16 an accrual for the new plan, the long-term incentive
17 plan, and we reversed out the accruals for the plans
18 that we had estimated compensation for that we had
19 accrued from January through May.
20     Q.  Okay.  And what was the process -- and
21 this occurred again in what month?
22     A.  June of 2009 is the month that we recorded

Page 16

1  the entries.  The recording of those entries happened
2  after the month-end, which would have been in July.
3      Q.  Okay.  And after that -- those entries
4  were recorded reflecting these changes and reversals
5  that you've testified about, was that data
6  transmitted to the financial planning and analysis
7  group where Mr. Skrynnikov worked?
8      A.  It was.  It was trans- -- it was -- that
9  report was sent over to FP&A.
10     Q.  Okay.  In what month?
11     A.  In July.
12     Q.  Of 2009?
13     A.  That's right.
14     Q.  Okay.  Now, why couldn't these reversals
15 or changes to these accruals for the bonus programs
16 have been done any earlier in the year?
17     A.  It wasn't until June of 2009 that we had
18 approval for the new plan, so that the plan was under
19 construction during -- at the beginning of 2009 and
20 even earlier, but it wasn't until June of 2009 that
21 we got approval to communicate, you know, the
22 specifics of that plan and to go forward with that

Page 17

1  plan.
2      Q.  Okay.  Final question, at any point in
3  time, did Mr. Skrynnikov raise any concern whatsoever
4  to you that Fannie Mae had not adequately responded
5  to an information request from Senator Grassley's
6  office?
7      A.  No, he did not.
8      Q.  Another question for you.
9         What was the name of the old incentive
10 plan that was in force in 2008?
11        Did it have a name?
12     A.  Right.  So there were 2 incentive plans in
13 2008 that were zeroed out as a result of
14 conservatorship.  One for director-level employees
15 and above was titled, the annual incentive plan.  The
16 other plan for below director-level employees was
17 titled, discretionary bonus plan.
18     Q.  And do you recall the names of the bonus
19 plans that were substituted in June 2009?
20        Did they have names?
21     A.  The new plan was titled, long-term
22 incentive plan.

5 (Pages 14 to 17)

Charles Wayne Roden  
Washington, D.C.  
May 29, 2014

Page 18

1  Q.  Okay.
2      MR. MIOSSI:  Thank you, Mr. Roden.  I have
3  no questions for you, subject to redirect.
4
5           CROSS-EXAMINATION
6      BY MR. SALB:
7  Q.  Good afternoon, sir.  My name is Micah.
8      So let's make sure that I understand what
9  was going on.
10      First, Fannie Mae uses accrual accounting.
11      Correct?
12 A.  Correct.
13 Q.  And that means that we record obligations
14 and revenues when they are incurred not necessarily
15 when they're actually realized; is that right?
16 A.  When they're incurred is correct.
17 Q.  So when the legal obligation arises to pay
18 a bill or to -- or to receive income, with accrual
19 accounting, you report it then.
20     Right?
21 A.  Can you maybe clarify exactly what you're
22 asking, what we're talking about?

Page 19

1  Because accounting is different depending
2  on whether it's revenues or expenses.  Maybe if you
3  could specify.
4  Q.  The mere fact that we expect, that we
5  believe there might be reason to write a check at
6  some point in the future does not result in recording
7  that expense with accrual accounting.
8      Right?
9  A.  It does if services are being provided to
10 the company that result in an obligation to pay.
11 Q.  That's not my question, sir.
12     My question is, the mere fact that we
13 believe we might have to write a check in the future
14 does not trigger recording with accrual accounting.
15     Right?
16 A.  I -- I don't understand your question.
17 Q.  There's a difference between accrual
18 accounting and budgeting.
19     Right?
20 A.  That's true.
21 Q.  Budgeting is a list of all sorts of
22 expenses that we expect to have over the course of

Page 20

1  the fiscal period.
2      Right?
3  A.  That's right.
4  Q.  Okay.  And there are going to be lots of
5  things on a budget that will not yet appear on your
6  books when you have accrual accounting.
7      Right?
8  A.  I don't -- not necessarily.  In the case
9  of budgeting for administrative expenses, the budgets
10 or forecasts are often used for the accruals, because
11 the accruals are based on a projection of payments to
12 employees in the future that they're earning in the
13 current period.
14 Q.  Is it your contention that because a
15 payment is budgeted, it belongs on an accrual report,
16 that the expense has been accrued?
17     Is that your testimony, sir?
18 A.  That's not what I'm saying.
19     I'm saying if the accrual matches up with
20 the projected payout, budgets are projections,
21 forecasts are projections, so the accruals will be
22 adjusted if the forecast is different than the

Page 21

1  budget.
2  Q.  Thank you.  And so, you agree that merely
3  budgeting something does not require that it be
4  placed on your -- that it be recorded when you have
5  accrual accounting.
6      Right?
7  A.  I agree with that.
8  Q.  Okay.  So there's a standard -- there's a
9  point at which the expense is to be recorded.
10     Right?
11 A.  That's right.
12 Q.  Does Fannie Mae use generally accepted
13 accounting principles?
14 A.  We do.
15 Q.  Okay.  So what is the rule according to
16 GAAP for when an expense associated with payroll or
17 benefits is to be recorded with an accrual accounting
18 system?
19 A.  The accrual must be made when the company
20 benefits from the services provided by the employee.
21 Q.  And -- that's not it?
22 A.  And it's probable that the company will

Alderson Reporting Company  
1-800-FOR-DEPO

Page 22

1  make the payment.
2  Q. So the company has to be under some duty
3  to make the payment; isn't that right?
4  A. If it's probable.
5  Q. Is that the word that's used in GAAP?
6  A. Correct.
7  Q. Okay. And so, how do we determine whether
8  an expenditure is probable?
9  A. There -- I mean, there -- it's -- can you
10 give me a more specific of -- in this situation, how
11 do we --
12 Q. No. The general standard that you've just
13 defined for me according to GAAP is that when an
14 expense is -- when it's probable that there will be a
15 legal duty to pay an expense, then it is to be
16 recorded.
17    My question is, what does probable mean?
18 A. In this specific situation, the
19 probability threshold was met because it was
20 communicated to employees that there was a new bonus
21 plan under construction, and the human resources
22 department communicated to my team that it was

Page 23

1  probable that the plan would be approved, and so at
2  that point, the accounting accruals met the
3  threshold.
4  Q. So does that mean that you're not able to
5  define the word probable as that word is used in
6  GAAP?
7     I asked you for a definition, not for an
8  explanation.
9     Are you able to give me a definition?
10 A. "Probable" means more than likely
11 according to GAAP. It's a subjective term. There's
12 not a percentage you can apply to it.
13 Q. So even though you knew that the report
14 had been -- strike that.
15    You did know that Fannie Mae had said
16 publicly that there would not be bonuses.
17    Right?
18 MR. MIOSSI: When?
19 MR. SALB: In the 2008, 2009 timeframe.
20 MR. MIOSSI: That's a broad question.
21 Which year?
22 A. Yeah. I don't -- I know that for 2008,

Page 24

1  Fannie Mae said there would be no bonuses paid for
2  that plan year.
3      BY MR. SALB:
4  Q. And yet, accruals were maintained during
5  the course of 2008.
6     Correct?
7  A. They were reversed.
8  Q. When were they reversed?
9  A. IN September of 2008.
10 Q. In September. When was the public
11 pronouncement that there would be no accruals in 2008
12 made?
13    Do you know?
14 A. I don't remember a public pronouncement
15 about accruals. There was a public announcement that
16 we went under conservatorship in September of 2008.
17 In that same month, we reversed accruals.
18 Q. Are you saying that the decision not to
19 pay bonuses in 2008 was not made until June -- until
20 September of 2008?
21 A. Correct.
22 Q. Okay. And so until September of 2008, you

Page 25

1  had been told that it was highly likely -- excuse
2  me -- probable that bonuses would be paid for 2008;
3  is that right?
4  A. That's right.
5  Q. Now, are you familiar with any
6  correspondence that went to Senator Grassley?
7  A. I am -- I was not familiar at the time.
8  Q. You are now?
9  A. I am now.
10 Q. Okay. Do you remember the date of that
11 correspondence?
12 A. I do not.
13 Q. Okay. Do you remember the content of that
14 correspondence?
15 A. I vaguely do.
16 Q. What is your recollection?
17 A. It was from FHFA to Senator Grassley
18 describing the incentive plans at Fannie Mae and how
19 the retention of Fannie Mae's employees was a
20 concern, and there needed to be some kind of
21 retention bonus plan or retention plan, compensation
22 plan.

Page 26

1    That's what I remember.
2    Q.  And what if anything did it say about the
3    2008 compensation incentive plan?
4    A.  I don't remember if it addressed that, and
5    I didn't read the whole thing.
6    Q.  Okay.  Now, if an employee sees an
7    accounting report that says, we have accrued these
8    expenses, it would be reasonable for that person to
9    conclude that there is a good probability that the
10   expenditures reflected by that accrual report will be
11   made; isn't that right?
12       MR. MIOSSI:  I object that you're asking
13   him to speculate.
14       MR. SALB:  I'm not.
15       BY MR. SALB:
16   Q.  Go ahead and answer, please.
17       MR. MIOSSI:  But you can answer.
18   A.  Can you restate the question.
19       BY MR. SALB:
20   Q.  Sure.  Let me make sure that I'm
21   understanding your testimony.
22       You put information on an accrual expense

Page 27

1    report -- forgive my sort of awkward phrasing of
2    that -- when you believe that there is -- that it is
3    probable that the expense will be paid because it has
4    been earned by the recipient.
5        Right?
6    A.  That's -- that's right, that -- we had the
7    probable assumption, but the labeling that we used on
8    the report was more of a placeholder for the new plan
9    that we knew was under construction.
10   Q.  You're talking about in 2009?
11   A.  2009.  Oh, you're still in 2008?
12   Q.  I'm not in either year.  I'm just
13   confirming that when you talk about a placeholder,
14   you're talking about the 2009 plan.
15       Right?
16   A.  Right.
17   Q.  Okay.  And in fact what we know is that
18   all the accruals during 2009 were reversed through a
19   journal entry.
20   A.  They were reversed and replaced with the
21   new plan -- right? -- so --
22   Q.  And did the new plan reflect employee

Page 28

1    performance, employee service, employee earnings from
2    prior to the date, the effective date of the new
3    plan?
4    A.  The accruals started in June of 2009, and
5    were amortized through the payment date in 2010, so
6    the period of expense recognition was -- we -- once
7    the books were closed, we couldn't go back into prior
8    periods.
9    Q.  But the period of time from January
10   through June during which you were recording the
11   accruals, those accruals were reversed out.
12       Right?
13   A.  Reversed and replaced, right, replaced
14   with an accrual for the new plan.
15   Q.  But the accrual for the new plan
16   accrued -- reported accrued expenses as they were
17   incurred from June moving forward, not
18   retrospectively.
19       Right?
20   A.  That's right.
21   Q.  So the employees were not paid in fact
22   bonuses that had been reflected on the accruals from

Page 29

1    January through June.
2        Right?
3    A.  That's -- that's not exactly right.
4    Q.  Well, let's go back and see what's wrong
5    here.
6    A.  Okay.
7    Q.  If I understand it, you reported the
8    accruals from January through June, and then in June,
9    you made a general ledger entry to reverse out those
10   accruals.  A new plan was created or formalized -- or
11   approved, rather, in June, and from June onward, you
12   began recording accruals; is that right?
13   A.  So let me -- I think I can answer the
14   question better with maybe some hypothetical numbers.
15   Okay?
16       If the planned payment in February 2010
17   is -- I'll say a hundred and 20 million because it
18   divides by 12 easily, and we start accrual in January
19   for 12 months, we're going to accrue 10 million a
20   month.
21       So when we -- and these are hypothetical
22   numbers.  They might get close.  When we get to June

Page 30

1  and we say, oh, we've got a new plan and we're going
2  to throw out the old plan, well, we're reversing the
3  old accruals. We're putting on new accruals. We're
4  still going to get to a hundred and 20 million by
5  December that reflect the accrual that we expect to
6  pay.
7       And the performance by employees reflected
8  January through December performance, not June
9  through December performance.
10      Q.  So essentially, this is a sleight of hand
11 so that you can still pay bonuses for the full fiscal
12 year even though you didn't have approval to do so
13 until June; is that right?
14      A.  I don't believe --
15      MR. MIOSSI: Object to the
16 characterization of anything as a "sleight of hand."
17      MR. SALB: Objection why?
18      MR. MIOSSI: Because I think it's
19 argumentative, and I don't think it's an appropriate
20 characterization of any testimony this witness has
21 given.
22      BY MR. SALB:

Page 31

1       Q.  Okay. And what was your answer, sir?
2       A.  The plan that was approved was approved by
3  the conservator.
4       Right?
5       And my understanding is, the plan was for
6  performance for the whole year. And performance
7  ratings at Fannie Mae are based on 12 months.
8       Q.  What about the employee who left Fannie
9  Mae in July?
10      Did he or she receive a bonus that would
11 have covered January through June?
12      A.  When employees leave, they forfeit their
13 bonuses, so they would not receive a bonus.
14      Q.  What if that employee transferred to a job
15 that wasn't subject to a bonus?
16      They haven't left. They haven't forfeited
17 their bonus.
18      Would they receive a bonus for that
19 period?
20      A.  Human resources would have to answer that
21 question.
22      Q.  Now, let's go back to what really matters,

Page 32

1  which is the accrual, and my question to you
2  regarding the person who sees these numbers, sees
3  these accruals.
4       Isn't it fair to say that when we see an
5  accrual, that is a signifier that it is probable that
6  the expenditure will be made?
7       A.  I agree with that, sure.
8       Q.  And if somebody were to see something that
9  appears to say it is probable that we will make this
10 expenditure and the person who sees it thinks that
11 that's an improper expenditure, you would expect that
12 person to say, hey, what's the deal here.
13      Right?
14      A.  Yeah, I think they would ask the question,
15 sure.
16      Q.  Now, you've indicated that the accruals
17 were -- for the first half of 2009 were placeholders.
18      Right?
19      A.  (Nodding head.)
20      Q.  You have to answer audibly, please.
21      A.  Yes, they were placeholders.
22      Q.  And were they marked as placeholders on

Page 33

1  the accrual reports?
2       A.  They were labeled using the same plan
3  names as in 2008. Those plans had not been
4  terminated, and we didn't know, you know, exactly
5  what the new plan was going to be called until it was
6  approved.
7       Q.  Does that mean your answer is no, they
8  were not demarcated in any way as placeholders?
9       A.  That's true.
10      Q.  The reports that were sent to
11 Mr. Skrynnikov's office, they included these
12 accruals.
13      Right?
14      A.  That's right.
15      Q.  Okay. And the -- in 2008 and the first
16 half of 2009, there were no incentive plans that had
17 been approved.
18      Right?
19      Let me try that question again because
20 it's a little bit -- so in 2008, the first half of
21 2008, the incentive plan -- there was no -- there was
22 no incentive plan.

Charles Wayne Roden					May 29, 2014
Washington, D.C.

Page 34

    1        Right?
    2        MR. MIOSSI:  In 2008?
    3        MR. SALB:  I'm sorry.  I meant to say in
    4    2009.  Thank you, counsellor.
    5        MR. MIOSSI:  M-hm.
    6    A.   In 2009, there was a -- so a plan being
    7    like a plan document that our board of directors had
    8    to approve.  We had the old plan still in effect.  We
    9    didn't have approval to pay out anything under the
   10    old plan, but the plan itself had not been
   11    terminated.
   12        BY MR. SALB:
   13    Q.   Fair enough.  But you had no authority to
   14    make any payments under that plan.
   15        Right?
   16    A.   Yeah.  I don't recall if it was just 2008
   17    where we were prohibited from paying bonuses under
   18    the plan or if that applied to multiple years.  I
   19    don't recall.
   20    Q.   Okay.  2008, you did not have authority to
   21    make bonus payments pursuant to the incentive plan.
   22        Right?

Page 35

    1    A.   That's true.
    2    Q.   And -- okay.
    3        MR. SALB:  Can we go off the record for a
    4    minute?
    5        MR. MIOSSI:  Sure.
    6        THE VIDEOGRAPHER:  Going off the record.
    7    The time is 14:46.
    8        (Recess.)
    9        THE VIDEOGRAPHER:  Back on the record.
   10    The time is 14:56.
   11        BY MR. SALB:
   12    Q.   Mr. Roden, are you aware that the FHFA
   13    reported in March of 2009 to Senator Grassley that
   14    Fannie Mae was scheduled to pay 71.9 million dollars
   15    in incentive compensation in 2009?
   16    A.   I am aware of that.
   17    Q.   Okay.  Did you play any role in providing
   18    the information which led to this letter?
   19    A.   No, I did not.
   20    Q.   Do you know where FHFA got the information
   21    that it used for this letter?
   22    A.   I don't know.

Page 36

    1    Q.   Okay.  The number 71.9 million as the
    2    amount that Fannie Mae was scheduled to pay in 2009
    3    is incorrect.
    4        Right?
    5    A.   I believe it -- that number relates to
    6    just the retention awards, because incentive
    7    compensation encompasses a lot of different programs.
    8    Q.   In fact, the accruals as of March of 2009
    9    for 2009 were in the order of 300 million.
   10        Right?
   11    A.   Not the accruals.  The budget was in the
   12    350 million range.
   13    Q.   Okay.  The budget?
   14    A.   The accruals as of March would have been
   15    much smaller than that.
   16    Q.   The accruals were on target for budget.
   17        Right?
   18    A.   I believe they were even below budget.
   19    Things had changed between the timing of the budget,
   20    which is August, and the accruals that were done
   21    January through March.  So there was -- there was
   22    probably a variance between the 2.

Page 37

    1    Q.   Was it a significant variance?
    2    A.   I don't -- I don't recall if it was
    3    significant.
    4    Q.   Do you recall the amount of the variance?
    5    A.   I don't recall the amount.
    6    Q.   Okay.  Now, in 2009, Fannie Mae was
    7    scheduled to pay long-term incentive bonuses of a
    8    hundred thousand dollars or more to all of its
    9    director-level employees.
   10        Right?
   11    A.   No, that doesn't sound right.
   12    Q.   Isn't the minimum bonus --
   13    A.   Director-level employees don't make -- I
   14    mean, a hundred thousand is way too high for bonuses
   15    for director-level employees.
   16    Q.   How many director-level employees are
   17    there?
   18    A.   In 2009?
   19    Q.   Yes.
   20    A.   Probably around 600 to 700.
   21    Q.   604 sound about right?
   22    A.   That sounds close, yeah.

10 (Pages 34 to 37)

Page 38

1  Q.  And it's your testimony that those 604
2  director-level employees did not have a minimum
3  scheduled long-term incentive payment of a hundred
4  and 25,000 dollars?
5  A.  It was not a hundred thousand.  And the
6  long-term incentive did not start until June of 2009,
7  so if you're talking about the March letter, it's not
8  correct.  What you're saying is not correct.
9      Long-term incentive plan started in June
10 of '09.  I think you're referring to a March letter.
11 Q.  I am, yes.
12 A.  Okay.  So are you asking about March or
13 June?
14 Q.  I'm talking -- I'm asking about the March
15 timeframe, what was understood and reported in March
16 of 2009.
17 A.  In March of 2009 where we were accruing
18 for 10-plus incentive comp programs, the aggregate of
19 all of those programs, including pension benefits and
20 stock awards from prior years, 2 and 3 years prior
21 that were vesting over a 4-year period and thus being
22 recognized as expense during 2009, when you aggregate

Page 39

1  all of those benefits, including pension and stock
2  and deferred cash that had a 4-year vesting period,
3  you could get to a number in excess of a hundred
4  thousand for director level on average, but not --
5  you could not get there with just an annual bonus
6  plan.
7      MR. SALB:  Thank you.  Nothing further.
8
9          REDIRECT EXAMINATION
10     BY MR. MIOSSI:
11 Q.  A few more questions, Chuck.
12     When was the first time you were aware of
13 the FHFA response to Senator Grassley that's dated I
14 think March 27, 2009?
15 A.  The first time I read it was last night.
16 Q.  I'm going to show you an exhibit we're
17 marking -- well, is already marked as exhibit 18.
18          (Exhibit No. 18
19          was marked for
20          identification.)
21     MR. MIOSSI:  Joint submission.  Here is an
22 extra copy for you.

Page 40

1      MS. KUNTZ:  Thank you.
2      BY MR. MIOSSI:
3  Q.  And I just have a few limited questions
4  for you.
5      First, do you recognize exhibit 18?
6  A.  I recognize it now.  I don't recognize it
7  from 2009.
8  Q.  Okay.  Is this a type of report that you
9  work with and see in your -- in your current job as
10 director of corporate accounting?
11 A.  I do see this occasionally.  I don't
12 create it.  My team doesn't create it, but I'm
13 vaguely -- I'm familiar with it.
14 Q.  Okay.  What is the date that this data
15 corresponds to?
16 A.  It says -- it looks like February 2008
17 printed in May of 2007.
18 Q.  Okay.  So does this -- can you make -- can
19 you reconcile those 2 different dates that you've
20 just identified?
21 A.  If -- if the print date is correct, it
22 would appear this report was prepared in May of '07

Page 41

1  looking forward to 2008.  That kind of doesn't make
2  sense because it says, February 2008, so it appears
3  to be an error.
4  Q.  What is the -- if I can direct your
5  attention to the column on the far right.
6      What -- and it contains -- it's captioned,
7  total.
8      What is -- does that total number with
9  respect to each named individual reflect?
10     What does it consist of?
11 A.  So that total -- so the hundred and 25,000
12 total, which is the same as the bonus column, that
13 reflects the aggregate of all of the incentive comp
14 plans that were being allocated to the business
15 segments at Fannie Mae.  So it's kind of a misnomer
16 to call it bonus.
17     It's really all of the plans including
18 pension and stock and everything that we were
19 recognizing as expense -- I actually recognize the
20 number, a hundred and 25,000 as an average
21 director-level incentive comp cost, including all of
22 those various plans.

Page 42

1  Q. And so for instance, you mentioned
2  long-term incentive. I'm just trying to understand
3  the categories that would comprise that total. You
4  mentioned pension.
5       And can you identify or list the other
6  categories that would get you to that hundred and
7  25,000-dollar total with respect to the first person
8  named on this exhibit?
9  A. So at a director level, which would be the
10 first person named, there actually would not be any
11 -- well, probably not any pension benefits for that
12 level. It would be the higher-level officer.
13      But we would have for that level
14 restricted stock awards that had been granted in the
15 preceding 3 years, annual grants that are amortized
16 over a 4-year period. Even though our stock price
17 plummeted after conservatorship, we still had to
18 recognize the cost of those stock grants based on the
19 market value at the time that the awards were given
20 in prior years.
21      So the stock grants made up a pretty large
22 piece of the hundred and 25,000. There was also

Page 43

1  something called deferred cash, which was a grant of
2  cash that vested over a 4-year period that would be
3  included in that number. And this number also -- it
4  reflects the 2008 average bonus targets that would
5  have been established around the end of '07 to early
6  2008.
7       MR. MIOSSI: Okay. I will for the record
8  move the admission of the document, but I don't think
9  we have to since it's joint.
10      (Exhibit No. 18 was offered into
11      evidence.)
12      MR. MIOSSI: And with that, I have no more
13 questions. Thank you.
14
15           RECROSS-EXAMINATION
16      BY MR. SALB:
17 Q. Just a couple of followup if I can.
18      At the top it says, CO.
19      Do you see that?
20 A. I do.
21 Q. What does that mean?
22 A. "CO" is for corporate.

Page 44

1  Q. And what does it mean?
2  A. The FP&A team uses -- the 4 columns
3  starting with CO through HCD -- they're using those
4  columns to come up with how to allocate the cost of
5  incentive compensation. And corporate -- that column
6  is essentially for people that don't support one of
7  the other 3 business lines or business segments.
8  Q. And what do -- what are those other 3?
9  A. "CM" is capital markets. "SF," single
10 family. "HCD," which we've since renamed, is housing
11 and community development.
12 Q. Is there anything on this report that
13 would indicate that the total of the -- what's
14 denominated as bonus toward the middle of the page,
15 that that total is an aggregate of multiple sources
16 of bonus money?
17 A. This report that FP&A owns does not have
18 anything else on here to indicate, but with the
19 report that my team sent to FP&A, combination of
20 those 2 reports would make it clear.
21 Q. Is there anything on this report that
22 indicates that the number, a hundred and 25,000, is

Page 45

1  not the accrual for this particular calendar --
2  fiscal year, but instead is a reiteration of dollars
3  that were earned and therefore accrued in prior
4  years?
5  A. I mean, it just -- it says, February 2008,
6  so I don't know exactly how the FP&A group used this,
7  but people in FP&A probably understood how to read
8  and what that date meant. To me, it doesn't make
9  sense.
10 Q. One more question.
11      What would the amount of the journal entry
12 be when the bonuses were reversed later on?
13      Would it be a hundred 25,562 dollars?
14 A. I mean, the question doesn't really make
15 sense, but the bonus reversal was a component of the
16 hundred and 25. The hundred and 25,000 average was
17 made up of all of the incentive comp programs, of
18 which annual bonuses are only 2.
19      Right?
20      So the reversal of the annual bonuses is
21 only a piece of the total.
22 Q. So in 2008, when the accruals were

Page 46

1  reversed, is it your testimony that when we look at
2  the accrual numbers on this report, which have a
3  grand total I believe on the last page of 250 million
4  dollars -- that the amount of the reversal was not
5  this 250 million dollars.
6        Correct?
7     A.  It was much less.  The reversal was much
8  less than 250,000 dollars -- or 250 million.  Sorry.
9     Q.  What was the reversal?
10    A.  I don't recall the exact amount, but I do
11 know the restricted stock and the deferred cash and
12 the other incentive comp plans that fed into this 250
13 made up a substantial portion of it, a large portion
14 of that number, but I don't remember the exact
15 amount.
16    Q.  Approximately how much of this 250 million
17 dollars was reversed through that GL entry?
18    A.  In September of 2008 -- right? -- this is
19 2008 we're talking about?
20    Q.  Yes.
21    A.  I would say in really round numbers a
22 hundred million.

Page 47

1     MR. SALB:  Thank you.  No more.
2     MR. MIOSSI:  Thank you very much.
3     THE VIDEOGRAPHER:  We're now going off the
4  record.  The time is 15:13.
5     (Whereupon, at 3:15 p.m., the taking of
6  the instant deposition ceased.)

Page 48

1          CERTIFICATE OF DEPONENT
2  I hereby certify that I have read and examined the
3  foregoing transcript, and the same is a true and
4  accurate record of the testimony given by me.
5  Any additions or corrections that I feel are
6  necessary, I will attach on a separate sheet of
7  paper to the original transcript.

              _____
9             Signature of Deponent

11 I hereby certify that the individual representing
12 himself/herself to be the above-named individual,
13 appeared before me this _____ day of _____,
14 2014, and executed the above certificate in my
15 presence.

              _____
17           NOTARY PUBLIC IN AND FOR

              _____
20                 County Name

22 MY COMMISSION EXPIRES:

Page 49

1        CERTIFICATE OF COURT REPORTER
2  UNITED STATES OF AMERICA   )
3  DISTRICT OF COLUMBIA       )
4     I, CHERYL A. LORD, the reporter before
5  whom the foregoing deposition was taken, do hereby
6  certify that the witness whose testimony appears in
7  the foregoing deposition was sworn by me; that the
8  testimony of said witness was taken by me in machine
9  shorthand and thereafter transcribed by
10 computer-aided transcription; that said deposition is
11 a true record of the testimony given by said witness;
12 that I am neither counsel for, related to, nor
13 employed by any of the parties to the action in which
14 this deposition was taken; and, further, that I am
15 not a relative or employee of any attorney or counsel
16 employed by the parties hereto, or financially or
17 otherwise interested in the outcome of this action.

19        CHERYL A. LORD
20        Notary Public in and for
21        the District of Columbia
22 My Commission expires July 14, 2016